JAMES A. LASSART (SBN 40913)
NICHOLAS C. LARSON (SBN 275870)
MURPHY, PEARSON, BRADLEY & FEENEY
88 Kearny Street, 10th Floor
San Francisco, CA  94108
Telephone:     (415) 788-1900
Facsimile:     (415) 393-8087
Email:          JLassart@mpbf.com
                    ADriscoll@m; bf.com

Attorneys for Defendant
LELAND YEE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>v.<br><br>LELAND YEE,<br><br>      Defendant. | Case No.  CR 14-00196-CRB-2 (JCS)<br><br>**DEFENDANT LELAND YEE'S NOTICE OF MOTION AND MOTION TO SUPPRESS EVIDENCE DERIVED FROM WIRETAP INTERCEPTIONS, OR IN THE ALTERNATIVE FOR A *FRANKS* HEARING; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**HEARING DEMANDED**<br><br>Date:     April 30, 2015<br>Time:    9:30 a.m.<br>Court:   Hon. Charles R. Breyer<br>Location:  Courtroom 6, 17th Floor |

1    PLEASE TAKE NOTICE that on April 30, 2015, or as soon thereafter as the matter may be

2  heard, in Courtroom 6 of the above-referenced Court, before the Honorable Charles R. Breyer,

3  Defendant Leland Yee ("Yee"), through counsel, will, and hereby does, move to (1) suppress evidence

4  obtained from government wire interceptions on the grounds that said wire interceptions were issued

5  without probable cause as required by Title 18 of United States Code Section 2518(1)(c), and in

6  violation of Title 18 of United States Code Section 2510 *et seq.,* or in the alternative, (2) schedule a

7  hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674 (1978).

8    This motion is made pursuant to the Fourth Amendment of the United States Constitution,

9  Title 18 of United States Code Section 2518(1)(c), and Rule 12(b)(3) of the Federal Rules of Criminal

10  Procedure.

11    This motion is based upon the attached Memorandum of Points and Authorities, the files and

12  records of this case, the concurrently filed Declaration of James A. Lassart, and on such argument or

13  evidence that the Court may permit.

14    Defendant Yee hereby joins in any and all other motions to suppress the intercepted wire

15  communications that have or will be filed in connection with the above-captioned case.

16    Defendant Yee hereby reserves the right to amend this motion in the event that the defense is

17  provided with additional discovery or uncovers new evidence that provides grounds to pursue

18  suppression of the evidence addressed in this motion.

19

20  Dated: March 26, 2015                    Respectfully submitted,

21                                MURPHY, PEARSON, BRADLEY & FEENEY

22

23                                By: /s/ JAMES A. LASSART
                                        James A. Lassart
24                                      Nicholas C. Larson
                                        Attorneys for Defendant
25                                      LELAND YEE

26

27

28

- 1 -

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES .................................................................. 1

I.   INTRODUCTION .......................................................................................................... 1

II.  STATEMENT OF FACTS ............................................................................................ 1

    A.   Second Superseding Indictment: .......................................................................... 1

    B.   The Wiretap Applications And Orders .................................................................. 1

III. CONSTITUTIONAL AND STATUTORY FRAMEWORK .......................................... 2

    A.   Wiretaps Are Subject to Stringent Conditions ...................................................... 2

        1.   Probable Cause ......................................................................................... 2

        2.   Necessity .................................................................................................. 3

        3.   Minimization ............................................................................................ 4

    B.   Title III Requires Suppression of Communications that Are "Unlawfully Intercepted" or Not Made in Conformity with the Order of Authorization ............................... 4

IV.  ARGUMENT .................................................................................................................. 5

    A.   Suppression is Warranted Because the Government Failed to Establish Probable Cause .................................................................................................................... 5

        1.   The November 13, 2012 Application Fails to enumerate the charged offenses as Target Offenses for which the wire interceptions of the Target Telephones will discover evidence, and fails to offer probable cause for Yee's involvement ........................................................................................ 5

        2.   The November 13, 2012 Application Fails to elaborate as to the reasons why wire interception is necessary for Target Telephone #2, instead stating only that other methods of investigation have failed. ......................................... 8

    B.   The Applications From the Period Between November 2012 and July 2013 Fail to Establish the Requisite Necessity to Justify Wiretap Interception ........................... 8

        1.   Failure to Show Necessity As to Each Conspirator and Each Telephone ................. 9

            a.   Extensive Reliance on Boilerplate, Generic Language ................................ 9

            b.   Failure to Make Specific Efforts to Recruit or Use Informants Against the Targets At Any Time Between November 2012 and July 2013 ............ 11

                (1)   Failure to Recruit Viable CHSs ..................................................... 11

                (2)   Failure to Indicate Whether Additional CHSs Could be Located, Even Those With Only Partial Knowledge ..................... 13

- i -

# TABLE OF CONTENTS
(continued)

Page

(3)   Failure to Describe Peculiarities of the Target(s) of November 2012 Application and Subsequent Applications That Would Prohibit Infiltration by CHSs ........................................................... 13

c.   Failure to Make Specific Efforts to Use Undercover Agents Against the Targets of the 2012 and 2013 Applications ......................................... 14

2.   Even if Necessity Exists on the Face of the Wiretap Affidavit, Suppression is Warranted if the Affidavit Contains False or Misleading Statements that are Material to the Finding of Necessity .................................................................. 16

3.   Even if the Wiretap Application Demonstrates Necessity on its Face, A Sufficient Preliminary Showing Has Been Made of Misleading Representations in the Wiretap Affidavit to Justify the Conduct of a *Franks* Hearing .................................................................................................................... 17

C.   The Wiretaps Should Further Be Suppressed Because They Were Not Minimized in Accordance with Title III ................................................................................................. 20

1.   The Government Admits That Its Agents Intercepted Thousands of Non-Pertinent Calls, Even Months Into the Investigation ................................................ 21

2.   The Majority of the Calls Designated By the Government as "Pertinent" Had Nothing Whatsoever To Do With the Offenses Described in the Wiretap Order ........................................................................................................................ 24

D.   All Wiretaps Derived from the Subsequent Applications Must Also Be Suppressed ........... 25

V.   CONCLUSION ..................................................................................................................... 25

- ii -

# TABLE OF AUTHORITIES

**Page**

## CASES

*Berger v. New York*
  388 U.S. 41 (1967) ........................................................................................................ 2

*Dalia v. United States*
  441 U.S. 238 (1979) ...................................................................................................... 3

*Franks v. Delaware,*
  438 U.S. 154, 98 S. Ct. 2674 (1978) ...................................................... 1, 2, 9, 16, 17, 25

*Gelbard v. United States*
  408 U.S. 41 (1972) .................................................................................................... 2, 4

*Giordenello v. United States*
  357 U.S. 480 (1958) ...................................................................................................... 3

*Go-Bart Importing Co. v. United States*
  282 U.S. 344 (1931) .................................................................................................... 24

*Katz v. United States*
  389 U.S. 347 (1967) ...................................................................................................... 2

*Olmstead v. United States*
  277 U.S. 438 (1928) .................................................................................................... 25

*United States v. Abascal*
  564 F.2d 821, 1977 U.S. App. LEXIS 5784,
  1 Fed. R. Evid. Serv. (Callaghan) 694 (9th Cir. 1977) ................................................. 9

*United States v. Ailemen*
  986 F. Supp. 1228 (N.D. Cal. 1997) ..................................................................... 10, 11

*United States v. Arreguin*
  277 F. Supp. 2d 1057 (E.D. Cal. 2003) ..................................................................... 25

*United States v. Brone*
  792 F.2d 1504 (9th Cir. 1986) ................................................................................. 4, 9

*United States v. Carneiro*
  861 F.2d 1171 (9th Cir. 1988) ....................................................................... 4, 9, 16, 17

*United States v. Cervantes*
  703 F.3d 1135 (9th Cir. 2012) .................................................................................... 3

*United States v. DePalma*
  461 F. Supp. 800 (S.D.N.Y. 1978) ........................................................................... 21

- iii -

## TABLE OF AUTHORITIES
(continued)

Page

*United States v. Giordano*
  416 U.S. 505 (1974)..................................................................................3, 5, 25

*United States v. Hyde*
  574 F.2d 856 (5th Cir. 1978) ................................................................21

*United States v. Ippolito*
  774 F.2d 1482 (9th Cir. 1985) ................................................3, 4, 13, 16, 17

*United States v. Kalustian*
  529 F.2d 585 (9th Cir. 1976) ................................................................2, 3

*United States v. Principie*
  531 F.2d 1132 (2d Cir. 1976) ..............................................................21

*United States v. Renzi,*
  722 F. Supp. 2d 1100 (D. Ariz. 2010) ....................................................21

*United States v. Rivera*
  527 F.3d 891 (9th Cir. 2007) ..............................................................21

*United States v. Robinson*
  698 F.2d 448 (D.C. Cir.1983) ..............................................................13

*United States v. Santora*
  600 F.2d 1317 (9th Cir. 1979) .........................................................9, 17, 20

*United States v. Scott*
  436 U.S. 128 (1978)..........................................................................4, 22

*United States v. Scully*
  546 F.2d 255 (9th Cir. 1976) ..............................................................20

*United States v. Simels*
  2009 U.S. Dist. LEXIS 56732 (E.D.N.Y., July 2, 2009) ..............................21

*United States v. Simpson*
  813 F.2d 1462 (9th Cir. 1987) ..........................................................11, 13

*United States v. Spagnuolo*
  549 F.2d 705 (9th Cir. 1977) ........................................................4, 13, 14, 16

*United States v. Torres*
  908 F.2d 1417 (9th Cir. 1990) ..........................................................24, 25

*United States v. Tortorello*
  480 F.2d 764 (2d Cir. 1973) ................................................................4

*United States v. Underwood*
  725 F.3d 1076, 2013 U.S. App. LEXIS 16227,
  2013 WL 3988675 (9th Cir. Cal. 2013)..................................................3

- iv -

# TABLE OF AUTHORITIES
(continued)

Page

### STATUTES

18 United States Code
    § 1346 ................................................................................................................. 5
    § 1349 ................................................................................................................. 5
    § 1951(d) ............................................................................................................. 5
    § 1956(h) ............................................................................................................. 5
    § 1962(d) ............................................................................................................. 5
    § 2510 *et seq.* ....................................................................................................... 1
    § 2515 .............................................................................................................. 3, 4
    § 2516 ................................................................................................................. 2
    § 2518 ........................................................................................................... 11, 14
    § 2518(1) ............................................................................................................. 2
    § 2518(1)(c) ................................................................................... 1, 3, 16, 17, 20
    § 2518(10)(a) ...................................................................................................... 4
    § 2518(4) ............................................................................................................. 2
    § 2518(5) ............................................................................................................. 4
    § 2518(3) .......................................................................................................... 2, 3
    Chapter 119 ...................................................................................................... 22

### RULES

Federal Rules of Criminal Procedure
    Rule 12(b)(3) ...................................................................................................... 1

- v -

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

The government's interception of Defendant Leland Yee's ("Yee") phone calls was unconstitutional and without support in fact or law. Specifically, the government's failure to proffer particular facts establishing any criminal course of conduct, establish requisite necessity for the wiretaps, and implement any meaningful minimization procedure, collectively require suppression of the unlawfully intercepted communications. The Ninth Circuit has repeatedly held that the government is not permitted to resort to wiretapping unless a number of critical prerequisites are met. Those prerequisites were not met in this matter and the unlawfully obtained evidence must be suppressed.

## II.    STATEMENT OF FACTS

**A.    Second Superseding Indictment**

The Second Superseding Indictment was filed on January 29, 2015 (Dkt. #671). In it, the government charges Defendant Leland Yee on twelve Counts: Count Two alleges Conspiracy to Conduct the Affairs of An Enterprise Through Racketeering; Count 213 and Count 214 allege Conspiracy to Obtain Property Under Color of Official Right; Count 215 alleges Honest Services Conspiracy; Counts 216-221 allege Honest Services Fraud; and Count 229 and Count 230 allege Conspiracy to Commit Money Laundering.

**B.    The Wiretap Applications And Orders**

The wiretap Applications and Orders[1] which are the subject of this motion were issued by The United States District Court of the Northern District of California, San Francisco Division, pursuant to a series of governmental affidavits. These Applications were made over a seven month period, starting on November 13, 2012, and ending in July of 2013. During this time period, Yee was the subject of one wiretap in November of 2012, *three separate wiretaps* in April of 2013, one wiretap in May of 2013, and two wiretaps in July of 2013, resulting in thousands of audio files representing interceptions of communications from Yee's phones. To obtain this "evidence," the government resorted to wiretaps as its principal investigative technique, recycling the same generic, boilerplate language in its wiretap applications to rush from one wiretap order to the next. Typically, the wiretap applications are spaced apart by short time intervals, leaving little or no

---

[1] The Applications and Orders are all attached as exhibits to the Declaration of James A. Lassart submitted in support of this motion.

- 1 -

1  opportunity for any meaningful attempt to undertake normal good-faith investigative techniques, as required

2  by law. These Applications raise serious issues regarding the adequacy of the showing on "necessity."

3  Furthermore, if the Court does not suppress the wiretap evidence based on lack of necessity, a *Franks* hearing

4  must be conducted to challenge the authenticity of the government's claim of necessity as to the target of each

5  of the Applications.

6  ## III.   CONSTITUTIONAL AND STATUTORY FRAMEWORK

7  **A.   Wiretaps Are Subject to Stringent Conditions**

8        Fourth Amendment privacy concerns underlying electronic interceptions are critically important.

9  *Berger v. New York*, 388 U.S. 41, 56 (1967) ("The need for particularity and evidence of reliability in the

10  showing required when judicial authorization of a search is sought is especially great in the case of

11  eavesdropping."); *see also Katz* v. *United States*, 389 U.S. 347, 353 (1967); *United States v. Kalustian*, 529

12  F.2d 585, 589 (9th Cir. 1976) ("The Act has been declared constitutional only because of its precise

13  requirements and its provisions for close judicial scrutiny."). This rigor is necessary because wiretaps are a

14  highly invasive investigative technique, and are conducted without notice to the innocent individuals affected.

15  *See Berger*, 388 U.S. at 63 ("Few threats to liberty exist which are greater than that posed by the use of

16  eavesdropping devices.").

17      **1.   Probable Cause**

18        Congress enacted Title III to establish a "comprehensive scheme for the regulation of wiretapping and

19  electronic surveillance." *Gelbard v. United States*, 408 U.S. 41, 46-48 (1972) ("the protection of privacy was

20  an overriding congressional concern [in enacting Title III]"). Title III imposes a number of preconditions,

21  including a warrant authorizing the wiretap and prescribing precisely which conversations of individuals on

22  telephones may be sought and for what period of time.   18 U.S.C. §§ 2518(1), (4).   In particular, the

23  application must establish probable cause in relation to three facts:  (1) that the individual has committed or is

24  about to commit one of the offenses specified by Congress in Section 2516; (2) that communications

25  concerning the enumerated offense will be intercepted; and (3) that the particular telephone or device being

26  tapped is itself being used in connection with the commission of the specified offense.   18 U.S.C.

27  §§ 2518(3)(a), (b) & (d).

28        Conclusions of the affiant unsupported by underlying facts cannot be used to establish probable

- 2 -

1   cause. *United States v. Underwood*, 725 F.3d 1076 (9th Cir. Cal. 2013), at *10-12 (citing *United States v.*

2   *Cervantes*, 703 F.3d 1135, 1139-40 (9th Cir. 2012)).  Rather, "an affidavit must recite underlying facts so that

3   the issuing judge can draw his or her own reasonable inferences and conclusions; it is these facts that form the

4   central basis of the probable cause determination." *Id.* at *11 (internal citations omitted); *see also*

5   *Giordenello v. United States*, 357 U.S. 480, 486 (1958) ("The Commissioner must judge for himself the

6   persuasiveness of the facts relied on by a complaining officer to show probable cause.").

7       **2.      Necessity**

8       The Ninth Circuit has long recognized the critical balance between effective law enforcement and the

9   restraint necessary to protect the public in the context of wiretap interception. *See, United States v. Kalustian*,

10  529 F.2d 585, 588 (9th Cir. 1976).  Central to this restraint is the government's burden to meet the

11  "exhaustion" or "necessity" requirement of 18 U.S.C. § 2518(1)(c), which requires that each application for

12  electronic surveillance include "a full and complete statement as to whether or not other investigative

13  procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be

14  too dangerous."

15      The standard is reflected in 18 U.S.C. Section 2518(3)(c), which provides that the issuing judge shall

16  determine whether "normal investigative procedures have been tried and have failed or reasonably appear to

17  be unlikely to succeed if tried or to be too dangerous."   The statutory standard is to be strictly applied. A

18  district court must reject a wiretap application if law enforcement officers have not attempted, without

19  success, traditional methods that "easily suggest themselves and are potentially productive and not unduly

20  dangerous." *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir. 1985).

21      Because necessity is the keystone of Congressional regulation of electronic eavesdropping, courts

22  have given close scrutiny to applications challenged for non-compliance. *Kalustian*, 529 F.2d at 589-90. This

23  scrutiny has been recognized by the Supreme Court as an essential component of judicial review of

24  government conduct. *See, Dalia v. United States*, 441 U.S. 238 (1979).  Where the government fails to

25  comply with its duty to demonstrate necessity, suppression of wiretap evidence is the appropriate remedy, as

26  provided for under the statute.  18 U.S.C. § 2515. *United States v. Giordano*, 416 U.S. 505, 527 (1974).

27

28

DEFENDANT YEE'S MOTION TO SUPPRESS                                     Case No.
EVIDENCE DERIVED FROM WIRETAP INTERCEPTIONS                            CR 14-00196-CRB-2 (JCS)

1    Moreover, necessity must be established with factual specificity,[2] must be shown as to each telephone and

2    each conspirator,[3] and the affidavit must establish that the government undertook a good faith effort to apply

3    normal investigative techniques prior to seeking the wiretap.[4]

4         **3.    Minimization**

5         Title III broadly prohibits the wiretapping of conversations except in conformity with the statute's

6    "stringent conditions." *Gelbard*, 408 U.S. at 46.  In particular, Section 2518(5) of Title III provides that "the

7    authorization to intercept shall be conducted in such a way as to minimize the interception of communications

8    not otherwise subject to interception."  18 U.S.C. § 2518(5); *United States v. Scott*, 436 U.S. 128, 140 (1978).

9    This provision is designed "to prevent unnecessary intrusion into the privacy of the surveillance target."

10   *United States v. Tortorello*, 480 F.2d 764, 783 (2d Cir. 1973).  The minimization requirement strikes a

11   balance between the need to investigate possible criminal activity and the need to limit the invasion of privacy

12   that results from that wiretap.

13   **B.    Title III Requires Suppression of Communications that Are "Unlawfully Intercepted" or Not
         Made in Conformity with the Order of Authorization**

14

15        Section 2515 excludes from use "in any trial, hearing, or other proceeding in or before any court"

16   "any wire or oral communication [that] has been intercepted" and any "part of the contents of such

17   communication" if the "disclosure of that information would be in violation of this chapter."  18 U.S.C.

18   § 2515.  As a result, Title III authorizes an "aggrieved person" to seek suppression of any communication that

19   "was unlawfully intercepted" under Title III or the Fourth Amendment.  18 U.S.C. § 2518(10)(a). Title III's

20   statutory rule of exclusion "require[s] suppression where there is failure to satisfy any of [the] statutory

21

22   [2] The government's affidavit in support of the wiretap order "must give a factual basis sufficient to
     show that ordinary investigative procedures have failed or will fail in the particular case at hand."
     *United States v. Spagnuolo*, 549 F.2d 705, 710 (9th Cir. 1977). *Ippolito*, 774 F.2d at 1486.  To show

23   necessity, the government must overcome the statutory presumption against granting a wiretap
     application.  *Ippolito*, 774 F.2d at 1486.  The presumption cannot be overcome by conclusory,

24   boilerplate or generic statements in the wiretap affidavit.  *Spagnuolo*, 549 F.2d at 710.

25   [3] The Ninth Circuit has recognized a showing of necessity is required for each telephone and member
     of a conspiracy, and that the government cannot simply use its necessity argument for one conspirator

26   to justify a wiretap against another.  *United States v. Carneiro*, 861 F.2d 1171 (9th Cir. 1988).

27   [4] The Ninth Circuit has "expressly adopted a practical and common sense approach in determining the
     sufficiency of government wiretap affidavits."  *Ippolito*, 774 F.2d at 1486. Fundamental to this

28   approach is a showing that the agents endeavored in good faith to successfully utilize normal
     investigative techniques.  *United States v. Brone*, 792 F.2d 1504, 1506 (9th Cir. 1986).

- 4 -

1    requirements that directly and substantially implement the congressional intention to limit the use of intercept

2    procedures to those situations clearly calling for the  employment of this extraordinary investigative device."

3    *United States v. Giordano*, 416 U.S. 505, 527 (1974).

### IV.   ARGUMENT

**A.    Suppression is Warranted Because the Government Failed to Establish Probable Cause**

6    Here, the relevant predicate offenses against Defendant Leland Yee are 1) Honest Services Fraud

7    under 18 U.S.C. Sections 1346 and 1349; 2) Conspiracy to Conduct the Affairs of an Enterprise through

8    Racketeering Activity under 18 U.S.C. Section 1962(d); 3) Conspiracy to Deprive Property Under Color of

9    Official Right under 18 U.S.C. Section 1951(d); and 4) Conspiracy to Commit Money Laundering under 18

10   U.S.C. Section 1956(h).  As explained below, the government's application failed to establish probable cause

11   to believe that Yee was engaged in any of these predicate offenses, much less that wiretaps were needed to

12   obtain evidence of these offenses.

**1.    The November 13, 2012 Application Fails to enumerate the charged offenses as Target Offenses for which the wire interceptions of the Target Telephones will discover evidence, and fails to offer probable cause for Yee's involvement**

15   The November 13, 2012 Application[5], which initiated the seven month wire interceptions into Yee's

16   telephone and electronic communications, lists the Target Offenses as the following: mail fraud and wire

17   fraud, money laundering, violations of the Travel Act, conspiracy to distribute controlled substances,

18   distribution of controlled substances, and use of communication facility to commit or facilitate narcotics

19   offense. While the Application lists mail and wire fraud and money laundering as a possible Target Offenses,

20   the specific offense of Honest Services Fraud is not specifically addressed. Moreover, the other charged

21   offenses against Yee *are not mentioned at all*.

22   The description of Yee as a Target Subject in the November 13, 2012 Application refers to him as a

23   "California State Senator, and the Primary user of Target Telephone 2." With respect to his relationship to

24   other Target Subjects, Yee is stated to "have previously served on the San Francisco School Board with Mr.

25   Jackson." This brief description, which does not contain any suggestion of possible criminal activity, stands in

26   sharp contrast to the lengthy descriptions of other Target Subjects, aside from Yee's staff. Additionally, the

---

[5] The November 13, 2012 Application includes numerous material misstatements and material omissions in the supporting affidavits that warrant suppression of the resulting fruits. *See* Motion to Suppress filed by Defendant Keith Jackson.

DEFENDANT YEE'S MOTION TO SUPPRESS                                          Case No.
EVIDENCE DERIVED FROM WIRETAP INTERCEPTIONS                                 CR 14-00196-CRB-2 (JCS)

acts that the November 13, 2012 Application enumerates as evincing probable cause on the part of Yee for the wire interception do not provide probable cause for the issuance of a Title III wiretap. The Application contains the following alleged actions pertaining to "payments to Senator Yee":[6]

- Yee being a "friend and associate" of Mr. Jackson.

- Mr. Jackson acting to solicit campaign donations on Yee's behalf, beginning in 2011 when Yee was a candidate for San Francisco Mayor.

- Conversations that Mr. Jackson had with UCEs, allegedly on Yee's behalf, soliciting donations for Yee's campaign.

- A single voicemail from Yee, dated September 23, 2011, in which Yee told a UCE that "It was nice to see him yesterday" and "hopefully there are things that we can do of help to you."

- A conversation between Yee and one of the UCEs, dated September 30, 2011, discussing fundraising in Los Angeles and San Francisco, not on Target Telephone 2, during which Yee discussed the 500 dollar limit on contributions and the format of the fundraisers.

- A meeting between one of the UCEs and Yee, dated October 24, 2011, discussing alternate ways to contribute over 500 dollars to the mayoral campaign, and phone conversation regarding the same.

- Mr. Jackson's receiving checks from UCEs allegedly on behalf of Yee.

The Application contains the following alleged actions as "pertaining to campaign debt repayment contributions for ███████ and Senator Leland Yee":

- Members of Yee's staff — ███████ — contacting UCEs for donations to Yee's Secretary of State Campaign.

- Mr. Jackson contacting UCEs for donations to Yee's Secretary of State Campaign.

- Discussions about donations to ██████'s campaign between Jackson, ███████ and several of the UCEs, many of which took place on Target Telephone #1 (Jackson's telephone).

- Mr. Jackson making representations to UCEs on Yee's behalf.

- A meeting between Yee, Mr. Jackson, and several UCEs, dated June 26, 2012, during which Yee requested a donation from one of the UCE's and discussed potential opportunities for the UCEs supposed software consulting company.

- A phone conversation between Yee and one of the UCEs, dated August 16, 2012, during which Yee stated he would be happy to set up a meeting for the software consulting company with San Mateo County.

- A meeting between Yee, Mr. Jackson, and one of the UCEs, dated September 4, 2012, during which Yee discussed setting up a meeting for the software consulting company, a tournament

[6] Only two or three of these conversations took place on Target Telephone #2 (Yee's telephone).

- 6 -

DEFENDANT YEE'S MOTION TO SUPPRESS
EVIDENCE DERIVED FROM WIRETAP INTERCEPTIONS

Case No.
CR 14-00196-CRB-2 (JCS)

in October, and soliciting a donation from the UCE to retire his mayoral campaign debt.

- A phone conversation between Yee and one of the UCEs, dated September 19, 2012, during which the UCE requested that Yee write a letter for his alleged computer consulting company to the CA Department of Public Health so that the company could get contacts in San Mateo. Yee suggested that the UCE give him a draft. Yee then suggested the UCE donate $10,000 to ███████, a legal donation.

- A phone conversation between Yee and one of the UCEs discussing the draft of the letter.

- A draft of the letter from Yee received by the UCE on September 24, 2012.

- A phone conversation between Yee and one of the UCEs on Target Telephone #2 discussing his Secretary of State debt and potential donation from the UCE.

- Further conversations in 2012 between UCEs and Mr. Jackson making representations on Yee's behalf.

- Conversations between Yee and one of the UCEs regarding introduction to an alleged employee at the CA Department of Public Health on October 18, 2012.

Finally, during this time period, one of the UCEs made five different donations to Yee's campaign, or to retire his campaign debts.[7]

Particularly striking about the above alleged evidence that the November 13, 2012 Application proffers for the foundation laid in seeking the interception of wire communications are 1) the lack of use of Target Telephone #2, and 2) the lack of direct communications with Yee. During the initial period of the investigation, in the described events in 2011 pertaining to payments made to Senator Leland Yee, Target Telephone #2 is used only two or three times, in sharp contrast to Target Telephone #1, which is used almost constantly. This is also reflected in the minimal number of contacts that the UCEs describe as actually having with Yee, which stands in sharp contrast to the regular interactions the UCEs have with other Target Subjects. Moreover, the government has not put forth sufficient evidence in the initial section to verify that Mr. Jackson is allegedly acting or speaking upon Yee's behalf, or that Yee's actions and discussions are fully reflected in Mr. Jackson's actions.

The second period of the investigation, described as "pertaining to campaign debt repayment contributions for ███████ and Senator Leland Yee," mirrors the pattern set forth in the initial period, with UCEs meeting with Yee directly very few times, and meeting with those who purport to speak on his

---

[7] Those payments were for $500 on September 21 and October 2, 2011, and for $5000 on October 11 and 13th of 2011 and February 7, 2012.

1  behalf the majority of the time. The discussions that the UCEs describe as having with Yee are innocuous,

2  and conversations that all political candidates have with their potential donors when running for office. There

3  is nothing in his conduct that rises to the level of any of the Target Offenses described. Additionally, Target

4  Telephone #2 is again used a minimal amount, not indicating the necessity for wire interception.

5
6
   **2.      The November 13, 2012 Application Fails to elaborate as to the reasons why wire interception is necessary for Target Telephone #2, instead stating only that other methods of investigation have failed.**

7  The November 13, 2012 Application does not enumerate any specific reasons why other investigative

8  methods are unlikely to succeed. The government's assertions as to why other methods are likely to fail — in

9  support of its claim of necessity — actually serve to highlight the dearth of evidence as to Yee.   The

10 November 13, 2012 Affidavit notes that traditional investigative techniques failed to uncover evidence

11 against Yee. The government's necessity showing establishes that the only thing wrong with less invasive

12 methods of investigation is the government's disappointment with their results.  Poor results, however, are not

13 necessity.  They are a lack of probable cause.

14 The lack of probable cause is also made evident by the fact that, even after months of investigation,

15 the government was unable to define what it was that it hoped to find in Yee's conversations. For example,

16 the Target Offenses section of the Affidavit lists only one Target Offense even broadly related to the offenses

17 that Yee was eventually charged.[8] This boilerplate language does not rise to the level to adequately assert

18 probable cause for as invasive a technique as a wiretap.

19 In sum, it is clear from the context of the November 13, 2012 Application, the language of the

20 Affidavit, and the manner in which the wiretap was implemented that the government did not establish

21 probable cause in support of the instant wiretap.  Its fruits must be suppressed.

22
23
   **B.      The Applications From the Period Between November 2012 and July 2013 Fail to  Establish the Requisite Necessity to Justify Wiretap Interception**

24 The government purports to establish necessity for wiretaps starting with the November 2012

25 Application, and continuing in the subsequent Applications (February 2013, April 2013, May 2013,

26
27
28
   [8] In this section the government only states "there is probable cause to believe the following: The Target Subjects and Interceptees are using the Target Telephones in connection with the commission of the Target Offenses, and particular wire communications of the Target Subjects and Interceptees and others as yet unknown, concerning the Target Offenses will be obtained through the interception of wire communications on the Target Telephones."

- 8 -

1    and July 2013) in the affidavit section entitled "Necessity." In this section, the government purports to

2    show that normal, investigative techniques are inadequate in the following areas: use of confidential

3    human sources ("CHSs"); use of undercover employees ("UCEs"); cooperating witnesses; pole

4    cameras; physical surveillance; telephone records analysis; trash searches; mail covers; search

5    warrants; and grand jury subpoenas. In large part, the government's claims are boilerplate, generic

6    representations found in all wiretap affidavits and lack the required specificity to demonstrate why

7    normal investigative techniques would fail as to the particular target of this wiretap application.

8       **1.       Failure to Show Necessity As to Each Conspirator and Each Telephone**

9            As discussed earlier, the Ninth Circuit has repeatedly held that the government must demonstrate

10   necessity for *each* conspirator and telephone, and may not simply carry over necessity arguments from earlier

11   wiretap applications filed against other conspirators with regard to other telephones. The law is clear that it is

12   not enough for the government to show that the target of the present wiretap application is alleged to be a

13   member of the same conspiracy as to which prior wiretaps had been issued previously against other

14   conspirators. *Carneiro*, 861 F.2d at 1181; *Brone*, 792 F.2d at 1507; *U.S. v. Santora*, 600 F.2d 1317, 1321 (9th

15   Cir. 1979); *United States v. Abascal*, 564 F.2d 821 (9th Cir. 1977).

16          In the case at bar, the government has violated this cardinal rule. As discussed more fully below, the

17   November 2012 Application and subsequent Applications, filed in February, April, May, and July of 2013

18   each borrow heavily from one another, regardless of the fact that several of the wiretap applications were filed

19   against all members of the conspiracy. These Applications clearly fail to show necessity as to the specific

20   telephone targeted (Target Telephone #2) or the particular conspirator who is alleged to be using that phone.[9]

21          The government's conduct causes the Applications to be defective on both necessity and *Franks*-

22   related grounds because the government does not propound new necessity-related arguments in the 2013

23   Applications, but repeatedly carries over necessity arguments from earlier wiretaps.  Thus, this district court

24   should examine the government's conduct from both perspectives.

25       **a.       Extensive Reliance on Boilerplate, Generic Language**

26          The November 2012, February 2013, April 2013, May 2013, and July 2013 Applications are replete

27
28   [9] None of the Applications suggest that wiretap authorization is being sought in lieu of normal investigative methods to avoid the risk of danger to the safety of an agent or informant.

- 9 -

1    with boilerplate, generic language.[10]   Obvious examples can be found in the following excerpts, which are

2    found *verbatim* in *every* Application submitted, starting with November 2012:

3        1.    "The interception of wire communications over the Target Telephones is necessary

4              in order for the government to fully achieve the goals and objectives of this

5              investigation. Specifically, interception of wire communications over the Target

6              Telephones is necessary in this matter because normal investigative techniques have

7              been tried and have failed to fully achieve the goals and objectives of this

8              investigation, or appear reasonably unlikely to succeed if attempted, or are too

9              dangerous to be attempted."

10       2.    "The following is a list of the investigative techniques that either have been used or

11             have failed, reasonably appear unlikely to succeed if they are tried, or are too

12             dangerous to employ in this investigation."

13       3.     "I do not believe that the CHSs can achieve all of the objectives of the investigation

14             without interception of wire and electronic communications."

15       4.    " . . . the use of CHSs will not fully reveal the scope of all of the crimes being

16             committed by the Target Subjects and Interceptees, thereby preventing agents from

17             fully achieving all of the goals of this investigation."

18       5.    " . . . UCE operations have failed to fully achieve the goals of the investigation. In

19             particular, the use of UCEs has failed to reveal the full breadth of alleged criminal

20             activity JACKSON, Senator Yee and the other targets and Interceptees."

21       6.    "Based on my training and experience, I know that physical surveillance has

22             significant limitations."

23       7.    "Phone records also do not allow law enforcement agents to learn any specific

24             information about the Target Subjects' and Interceptees' criminal activities."

25       8.    "Phone records cannot conclusively establish a person's involvement in the criminal

26             activities, or assist in determining the exact nature of the relationships between

27

28   _____

[10] This Court in *U.S. v. Ailemen*, 986 F. Supp. 1228 (N.D. Cal. 1997) granted a motion to suppress
wiretap evidence finding that the wiretap affidavit relied far too much on boilerplate, generic language.

- 10 -

1       individuals speaking over the telephones."

2          Beyond the obvious use of boilerplate, generic language, the Applications are written so as to convey

3 the impression that they are specific as to each Target Telephone, but in fact, upon closer scrutiny, they are

4 nothing more than a repetitive narrative of predictable, frequently used law enforcement expressions that

5 mask the reality that the government simply did not undertake conventional investigative methods for the

6 each of the *particular targets at issue* in the Applications between November 2012 and July 2013. *See*,

7 *Ailemen*, 986 F. Supp. at 1239.

8          In fact, the generic problem before this Court is not confined to the use of language *per se*, but applies

9 to the overall design of the Affidavits in each of the successive Applications, which summarize the general

10 history of the investigation but do not specifically explain any steps that have been taken to enable the

11 Government to investigate the targets at issue by more conventional techniques.

12       **b.**    **Failure to Make Specific Efforts to Recruit or Use Informants Against the**

13               **Targets At Any Time Between November 2012 and July 2013**

14          The November 2012 Application refers to two Confidential Human Sources, identified as CHS 11

15 and CHS 12, who were introduced to the Target Subjects of the investigation through the use of UCEs. As

16 discussed more fully later in this motion, these two Confidential Human Sources carry-over from the

17 November 2012 Application through each of the subsequent 2013 Applications, and thus do not reflect any

18 good faith efforts by the government to recruit Confidential Human Sources or expand the pool of potential

19 Confidential Human Sources for any of the subsequent Applications.

20          Starting with the November 2012 Application, all Applications set forth are deficient on their faces,

21 relying on boilerplate, generic comments regarding the inadequacy of the CHSs. Reducing all the verbiage to

22 its bare essence, what the government is saying is that they have two CHSs who have been unable to gather

23 sufficient information relating to the Target Subjects. What the government has presented by this affidavit is

24 nothing more than an illusion of necessity. *United States v. Simpson*, 813 F.2d 1462, 1472 (9th Cir. 1987).

25 When matched against the standards previously discussed, artfully drafted representations in the affidavit

26 regarding the two CHSs fall far short of the showing required under Section 2518.

27       **(1)**    **Failure to Recruit Viable CHSs**

28          The government knew during the course of its investigation that the use of CHS 11 and CHS 12

- 11 -

1    would not yield sufficient results to achieve the goals of its investigation. This is clear from their statement in

2    the November 2012 Application that "The use of these CHSs, introduced through the UCEs, while very

3    useful to the undercover investigation, has not and is not reasonably expected to provide any additional

4    information or insight as to activities otherwise hidden from the UCEs."

5         This sentiment is also reflected in the 2013 Applications. In the February 2013 Affidavit, the April

6    and May 2013 Affidavits, and the July 2013 Affidavit, the government states "CHS 12 did not provide any

7    substantial additional contact since the November 13, 2012 Affidavit." This statement evidences that the

8    government was aware for *seven* months, from November of 2012 until July of 2013, of the inefficacy of

9    CHS 12. The government explicitly states that one of two CHSs being utilized in the investigation had *no*

10   *substantial additional contact with the Target Subjects since November of 2012*. Despite this, during the

11   seven months following the November 2012 Application, the government made no effort to locate new CHSs

12   that may have had more success with gaining the information necessary to further the investigation. Instead,

13   they simply repeated the fact that both CHS 11 and CHS 12 were ineffective, stating verbatim in every

14   Application that the use of CHSs would not "achieve all of the objectives of the investigation without

15   interceptions of communications."

16        These repeated statements evidence that the government simply wanted wiretaps on the Target

17   Telephones, and did not want to spend the time or effort to recruit new CHSs. They were aware of the

18   continued inefficacy of both CHSs' abilities to gather relevant information. They even repeatedly

19   acknowledge the fact that CHS 12 had made no real contact with the Target Subjects during the majority of

20   the course of the investigation. However, during seven months of Applications, no new CHSs are mentioned.

21   The 2013 Affidavits state time and time again "In this investigation, agents have constantly attempted to

22   identify confidential human sources," while indicating agents have been doing no such thing. CHS 11 and

23   CHS 12 remain the *only two* CHSs discussed throughout the investigation.

24        In order to persuade the issuing judge that informants were not a viable resource, the government

25   merely sets forth generic remarks about these two CHSs it already had in its ranks. This is insufficient.  The

26   government has failed to meet its burden of showing that it endeavored in good faith to recruit viable

27   informants who had the ability to help the government infiltrate the organization and obtain information

28   relevant to the Target Subjects.

- 12 -

It is important to note that nowhere in the affidavit does the government discuss efforts undertaken to *recruit* viable CHSs, instead stating "agents have constantly attempted to identify CHSs who may have information." These identifications have only been successful as to CHSs 11 and 12, who do not have sufficient information by which to achieve the goal of the investigation. There is no explanation, as required, in the Application as to why in this particular investigation, ordinary means of investigation such as the recruitment and use of CHSs will fail or be too dangerous. *U.S. v. Robinson*, 698 F.2d 448, 453 (D.C. Cir.1983); *Ippolito*, 774 F.2d at 1486; *Simpson,* 813 F.2d at 1471; *Spagnuolo,* 549 F.2d at 711.

Under these circumstances, the November 2012 Application and 2013 Applications, all of which use the same language, provide nothing more than a conclusory assertion that informants cannot be used. Such assertions clearly fail the statutory test. *Spagnuolo*, 549 F.2d at 710.

### (2)   Failure to Indicate Whether Additional CHSs Could be Located, Even Those With Only Partial Knowledge

Importantly, the November 2012 Application and subsequent 2013 Applications' Affidavits fail to show CHSs 11 and 12 were the only individuals who could have been considered as possible informants. The November 2012 Application mentions a third CHS, CHS 13, who was deemed to be non-credible by the government for matters unrelated to the Target Subjects. Aside from this, none of the Applications discuss additional recruitment efforts with specificity, stating only that "agents have constantly attempted to identify confidential human sources." Despite this statement, the entire pool of CHS candidates the government has included in their investigation are CHS 11 and CHS 12.

Thus, it still remains to be shown whether other individuals, aside from these two CHSs, could have been recruited by the government to help infiltrate the target organization.

Moreover, the obligation to explore the use of new CHSs does not turn on whether they were able to "fully reveal the scope of all the crimes being committed by the Target Subjects." The government was required to attempt to recruit CHSs who had only partial knowledge about the target organization, and in using only CHS 11 and CHS 12, it failed to do so.

### (3)   Failure to Describe Peculiarities of the Target(s) of November 2012 Application and Subsequent Applications That Would Prohibit Infiltration by CHSs

In filing the November 2012 Application and 2013 Applications, the government consistently

- 13 -

1   maintained that the use of CHS 11 and CHS 12 could not "fully achieve the goals of the investigation." The

2   Applications fail, however, to mention that the Affidavits should have described the peculiarities of the Target

3   Subjects that prohibited penetration of their relationship by informants.  *Spagnuolo,* 549 F.2d at 710. The

4   2013 Applications discuss the extensive nature of CHS 11's interaction with "certain Target Subjects and

5   Interceptees" that resulted from CHS 11 ███████████████████████████ The Affidavits

6   then go on to state that despite the fact that ██████████████████ the "extensive

7   communications" he has with them remain insufficient. They make no effort to address why. This is in

8   addition to the broad statement discussed above that CHS 12 has simply made no substantial contact with any

9   of the Target Subjects since November of 2012.

10         By simply repeating boilerplate, generic remarks about the inadequacy of CHS 11 and CHS 12, the

11   Applications fail to explain or even suggest why the particular people who are being targeted by the

12   Applications cannot be successfully investigated through use of CHSs or other investigative means. The case

13   law cited above makes it clear that *peculiarity* is a critical aspect of the wiretap analysis:  that is, what is

14   peculiar about the target of the pending wiretap application that makes normal, investigative techniques

15   unsuccessful or futile? The Applications completely fail to address the critical element of peculiarity by

16   repeatedly using generic, boilerplate commentary, sometimes verbatim from one Application to the next. For

17   the foregoing reasons, the affidavit does not comply with the necessity requirements under 18 U.S.C. Section

18   2518.  On this basis alone, the motion to suppress should be granted.

19              c.      **Failure to Make Specific Efforts to Use Undercover Agents Against the Targets**
20                      **of the 2012 and 2013 Applications**

21         The 2012 and 2013 Applications discuss the relative success of the UCEs involved in regard to

22   penetrating the target organization. They repeatedly assert that the use of UCEs "has been the most successful

23   investigative tool to date." However, the government then asserts that this level of success has been

24   insufficient, and that the UCEs "have failed to fully achieve the goals of the investigation," particularly

25   because the "use of UCEs failed to reveal the full breadth of alleged criminal activity of the Target Subjects."

26   This assertion is repeated in each Application from November 2012 until July 2013. The Applications do not

27   go into detail as to the reasons the UCEs have not revealed the full breadth of this criminal activity, stating

28   only that the Target Subjects "remain guarded and secretive regarding their full knowledge and the full

- 14 -

1  participation in criminal activity."

2      The Applications then indicate that one of the UCEs has "gained a limited amount of trust with the

3  Target Subjects," however the Target Subjects do not "directly discuss all of their criminal activities with the

4  UCE." The Application then indicates that this lack of trust has continued even though specific UCEs have

5  worked with the Target Subjects for "approximately one year."

6      The Applications do not go into the "full breadth of the criminal activities" that the Target Subjects

7  are supposedly conversing about while not in the presence of the UCE. The November 2012 and February

8  2013 Applications state that the Target Subjects had conversations in the presence of the UCEs having to do

9  with the "consideration in exchange for payments to Senator Yee's campaign." The July 2013 Application

10  states that with respect to "making payments to public officials in exchange for official acts," one of the UCEs

11  has "made significant inroads with Senator Yee, including bribing Senator Yee for a proclamation." Despite

12  these inroads, the Application continues to state the same UCE "will not be able to achieve all of the goals of

13  the investigation," because he is not "in a position to follow through directly with those issues and maintain

14  his current persona." The above described interactions, and interactions like them, form the *gravamen* of the

15  charges which the government is alleging against Senator Yee. As the Applications mention that they took

16  place in the presence of a UCE, there is no concrete justification as to why wiretapping the Target Telephones

17  is necessary.

18      The Applications do not specify what further efforts the UCEs can take to gain the trust of the Target

19  Subjects, an endeavor with which they have had some measure of success. Nor do the Applications specify

20  precisely why the UCEs are unable to continue in their respective roles and gather more evidence against the

21  Target Subjects. The fact that there has been some measure of success in gaining the Target Subjects' trust, as

22  is evidenced by the conversations involving the charges that have taken place in front of the UCEs, suggests

23  that with further effort the UCEs could be successfully used to accomplish the government's objectives

24  without the use of the interception of wire communications. However, without giving an explanation as to

25  why this success is insufficient, the government merely asserts that in order for the investigation to be

26  successful, the UCEs must be used "in conjunction with interception of wire communications over the Target

27  Telephones."

28      This conclusory language suggests that the government wants its wiretap order quickly and does not

- 15 -

1  want to be bothered with the effort and time required to employ normal, investigative techniques, such as the

2  use of undercover agents.  The repetitive language in the Applications begins in the November 2012

3  Application and continues in the Subsequent Applications. This demonstrates that the government became

4  comfortable with the practice of rolling over one wiretap after another and gave short shrift to alternative

5  investigative methods.

6        The November 2012 Application states that the investigating Agent "does not believe that the UCEs

7  can be used to achieve all of the goals of the investigation." However, the Ninth Circuit in *Spagnuolo* held

8  that the necessity showing must be sufficiently specific so that the issuing judge can make his/her own

9  *independent* determination; opinions based on the agent's experience will not satisfy the government's

10  obligation under Section 2518(1)(c). *Spagnuolo*, 549 F.2d at 710-711.

11        In the case at bar, the government has sought to circumvent the standards clearly enunciated by the

12  Ninth Circuit. The agents in this case failed to employ productive investigative methods to discover the

13  information desired as to the targets of each of the Applications. For this reason, the government has not

14  satisfied the necessity requirement.  *Carneiro*, 861 F.2d at 1180.  On this basis, suppression should be

15  granted. However, if the Court finds that necessity has been shown, then in the alternative, this Court should

16  conduct a *Franks* hearing to explore the misleading nature of the statements made in the November 2012

17  Application in regard to the government's claim of necessity.

18        **2.    Even if Necessity Exists on the Face of the Wiretap Affidavit, Suppression is Warranted**
          **if the Affidavit Contains False or Misleading Statements that are Material to the**
19        **Finding of Necessity**

20        When law enforcement officers circumvent the procedural requirements of Section 2518(1)(c), courts

21  must suppress the evidence obtained from the illegal wiretap. Thus, even where a wiretap application may

22  appear to show necessity on its face, courts will suppress evidence derived from a wiretap order issued on the

23  basis of an affidavit that contains material omissions or misstatements.  *See, Carneiro*, 861 F.2d at 1179. The

24  general proposition is that if these omissions and misstatements had been revealed in the application, "a

25  reasonable district court judge could have denied the application because necessity for the wiretap order had

26  not been shown." *Ippolito*, 774 F.2d at 1487.

27        Applying the guidelines set forth in *Franks v. Delaware*, 438 U.S. 154 (1978), suppression is

28  warranted where: (1) the affidavit contains misstatements or omissions made with the intent to deceive the

- 16 -

1   issuing judge, or with a reckless disregard for the truth, that were material to the necessity determination; and

2   (2) the affidavit, after the misstatements are deleted and the omissions are inserted, does not disclose the

3   requisite necessity for a wiretap. *Ippolito,* 774 F.2d at 1485-1487.

4         The Ninth Circuit has suppressed wiretap evidence in circumstances where the issuing judge was

5   misled by the government's failure to disclose that the necessity argument in the wiretap application derived

6   from a previous wiretap application. *See U.S. v. Carneiro,* 861 F.2d 1171 (9th Cir. 1988). In *Carneiro,* the

7   fact that the government carried over arguments on necessity from a previous application into the present

8   application served as significant evidence of government misconduct because it established that the issuing

9   court was led to believe that traditional methods of investigation had been undertaken in regard to the target of

10  the present wiretap application.

11        The carry-over problem is not resolved in the government's favor simply by disclosing the existence

12  of the previous wiretap application in the body of the present application.  In *U.S. v. Santora,* 600 F.2d 1317

13  (9th Cir. 1979), the Circuit suppressed all wiretap evidence, and fruits thereof, based on the government's

14  noncompliance with Section 2518(1)(c), through the government's reiteration of necessity arguments from

15  the prior affidavit in the present affidavit. *Id.* at 1322.

16        Judged by these standards, the 2013 Applications contain misleading statements, even assuming all of

17  the statements made by the agents are true and accurate (a major assumption that should be tested in a *Franks*

18  hearing, at minimum) insofar as they reiterate statements and "incorporate by reference" statements from

19  earlier Applications. Each of the 2013 Applications carry over necessity-related arguments from the

20  November 2012 Application and those that were submitted earlier in 2013. The 2013 Applications rely

21  heavily on references to prior affidavits, citing to them while discussing both the CHSs and UCEs.  However,

22  these Applications also suggest that specific efforts had been made by federal agents to investigate the

23  target(s) of the Application, when in fact the purported efforts were just the same generic contentions asserted

24  earlier. Further, Yee respectfully contends the discussion below makes a preliminary showing sufficient to

25  warrant a *Franks* hearing.

26      **3.**     **Even if the Wiretap Application Demonstrates Necessity on its Face, A Sufficient**
             **Preliminary Showing Has Been Made of Misleading Representations in the Wiretap**

27               **Affidavit to Justify the Conduct of a *Franks* Hearing**

28        In a nutshell, the 2013 Applications are highly misleading because they appear to substantially rely

- 17 -

1  upon the same necessity arguments presented in earlier Applications while purporting to show that specific,

2  conventional efforts had been made to investigate the activities of the Target Subjects.

3      The targets of the 2013 Applications are referred to in the affidavit as some combination of Telephone

4  Targets #1 through #5. Each Application seeks a different combination thereof. Despite this, in seeking to

5  establish necessity for the wiretap, the government repeatedly refers directly to the earlier wiretap applications

6  in this investigation. The April 2013 Application states that both the November 2012 Application and the

7  February 2013 Applications are incorporated by reference for the Target Subjects. This pattern continues in

8  the May 2013 Application, where the government incorporates by reference the November 2012 Application,

9  the February 2013 Application, and multiple Affidavits from April of 2013. This point was reiterated towards

10  the end of the necessity section of the 2013 Applications, with the emphasis that continued interception is

11  needed. The July 2013 Application states, for example:

12        "With respect to the interceptions stemming from prior Affidavits, these interceptions
         of wire and electronic communications obviously were extremely productive in
13        assisting the investigation into the Target Offenses and identifying Target Subjects
         and Interceptees. Nonetheless, those interceptions alone were not sufficient to fully
14        achieve the goals of the investigation."

15      As the chronology outlined below demonstrates, over a seven month time period, the government

16  moved repeatedly from one wiretap to another, strongly suggesting that the justification for the wiretap in the

17  July 2013 Applications is nothing more than a re-hash of the same generic commentary set forth in each of

18  the antecedent applications.

19      Questions must be raised in assessing whether the government has merely recycled, or carried over,

20  necessity arguments from the earlier 2012 and 2013 Applications in the later ones, as the reasons set forth for

21  necessity are substantially the same throughout.  As discussed earlier in this memorandum, the law is clear that

22  a showing of necessity must be made as to each specific target of a wiretap application; the government may

23  not simply carry over prior necessity arguments made in earlier applications regarding other telephone targets.

24      Thus, it is essential to examine the integrity of the 2013 Applications by their reliance upon, and

25  cross-references to, the earlier wiretap applications. Indeed, the 2013 Applications openly acknowledge their

26  dependency upon the necessity claims made in earlier applications. For example, early in the November 2012

27  Application, the affiant states that the request for wiretap authorization is based in part on information

28  obtained through an investigation of the Chee Kung Tong that started in 2010, and that during the course of

- 18 -

1    that investigation one of the current UCEs was introduced to Keith Jackson via telephone. The February 2013

2    Application acknowledges that in April of 2012, Jackson was intercepted through a prior order for

3    interception of oral and electronic communications, an acknowledgement that is repeated in each of the

4    subsequent 2013 Affidavits.

5        Moreover, several of the 2013 Applications expressly state, in their sections on Probable Cause, that

6    findings contained therein are dependent upon prior wiretaps. For example, the April 2013 Application states:

7    "Pursuant to a court order, from November 13, 2012 through December 12, 2012, interceptions of wire

8    communications over Target Telephone 1 (Jackson) and Target Telephone 2 (Yee) were captured. Also

9    pursuant to a court order, on February 11, 2013, interception resumed of wire and electronic communications

10   of Target Telephone 1. Through those interceptions and continued meetings with UCEs and CHSs, the

11   investigation has continued to reveal the existence of the Target Offenses listed above." This statement is

12   repeated in both the May 2013 and July 2013 Applications.

13       The frequent repetitions in the 2013 Applications indicate these Applications are doing little more

14   than rehashing their prior arguments. This is a clear violation of the government's good faith duty to

15   undertake normal, investigative techniques in regard to each subsequent Application. The 2013 Applications

16   raise serious questions as to whether the claims of necessity they present are merely carry-overs from

17   antecedent Applications in violation of law. Of particular importance is the misleading nature of the

18   government's practice:   to the extent the government has re-stated (or carried over) necessity-related

19   arguments from earlier wiretap applications, the government has misled the issuing court in the 2013

20   Applications by making the same, or substantially the same, arguments made in earlier wiretap applications

21   regarding other telephone targets.

22       A comparison between the necessity sections of the November 2012 Application and the February,

23   April, May and July 2013 Applications strongly supports the view that the government has been engaged in

24   a pattern and practice of carrying over old arguments into each successive wiretap application, thus

25   demonstrating that the 2013 Applications (1) were misleading to the court, and (2) fail to meet the necessity

26   standard when the misleading statements are redacted, as they should be.[11]

---

27   [11] See chart attached as exhibit to the Declaration of James A. Lassart for an overview of the
     substantial similarity and repetition of rationale contained in the Applications on the claims of

28   necessity.

DEFENDANT YEE'S MOTION TO SUPPRESS                                    Case No.
EVIDENCE DERIVED FROM WIRETAP INTERCEPTIONS                           CR 14-00196-CRB-2 (JCS)

1    As illustrated in the attached chart, the substantial similarity between all of the Applications between

2    November 2012 and July 2013 strongly suggests that the government has misled the issuing court by failing

3    to disclose that the necessity arguments were largely carried over from prior wiretap applications and thus

4    failed to satisfy the legal requirements that normal, investigative efforts be undertaken *specifically for the*

5    *target of the wiretap application at issue.*

6    The government cannot escape the sanction of suppression by arguing that the Applications openly

7    disclosed the existence of the prior applications and thus was not in any way trying to conceal the

8    Application's dependency on the prior applications. Under substantially similar facts involving a wiretap

9    affidavit that cross-referenced to earlier wiretap affidavits in the same investigation, the Ninth Circuit in

10   *Santora* expressly held that "[r]eference to the previous affidavit was insufficient to meet the requirements of

11   Section 2518(1)(c)."   600 F.2d at 1322.   In the case at bar, there is reasonable cause to believe that the

12   government misled the issuing judge by failing to disclose the extent to which the Applications are repetitions

13   of prior necessity arguments — a mere carry-over from earlier applications.

14   **C.      The Wiretaps Should Further Be Suppressed Because They Were Not Minimized in**
             **Accordance with Title III**

15

16   Recognizing the extraordinary invasion of privacy engendered by a wiretap order, Congress

17   conditioned the use of electronic surveillance on efforts by law enforcement to "minimize" the

18   interception of non-pertinent communications.   The Ninth Circuit has noted that "[t]he minimization

19   provision reflects and substantially implements Congress' intent to limit interceptions.   There must be

20   suppression if the government has failed to comply substantially with the minimization requirement."

21   *U.S. v. Scully*, 546 F.2d 255, 262 (9th Cir. 1976).

22   When the Government listens to, and records, conversations that are not evidence of the crimes that it

23   is supposedly investigating, the government thereby tramples the Constitutional privacy interests that Title III

24   was designed to protect. As one district court has noted:  "Nothing places the extraordinary intrusiveness of

25   electronic surveillance in clearer relief than the recording of communications that bear no relationship to the

26   criminal activity giving rise to the surveillance itself. . . . [A]ll one has to do to appreciate the wisdom of

27   Title III's stringent approval requirements is listen to a recording of a wholly innocent conversation that

28   should never have been recorded."   *United States v. Simels*, 2009 U.S. Dist. LEXIS 56732, *32 (E.D.N.Y.,

- 20 -

July 2, 2009).  Accordingly, "[b]efore evidence seized under this section may be admitted, the court must be 'left with the conviction that on the whole the agents have shown a high regard for the right of privacy and have done all they reasonably could to avoid unnecessary intrusion.'"  *United States v. DePalma*, 461 F. Supp. 800, 817 (S.D.N.Y. 1978).

The government bears the burden of proving its compliance with the minimization requirement, *United States v. Rivera*, 527 F.3d 891, 904 (9th Cir. 2007), and failure to minimize can require suppression. *United States v. Principie*, 531 F.2d 1132, 1139-40 (2d Cir. 1976).  A systematic violation of the duty to minimize is an appropriate basis for suppression of all intercepted communications (not just the ones that are plainly innocent).  *See, e.g., Simels*, 2009 U.S. Dist. LEXIS 56732, at *32 (violation of minimization requirement "render[s] the entire execution, rather than the interception of particular conversations, improper"); *United States v. Hyde*, 574 F.2d 856, 869 (5th Cir. 1978) ("If the minimization requirement is blatantly disregarded, the information obtained through the wiretap may be suppressed."); *United States v. Renzi*, 722 F. Supp. 2d 1100 (D. Ariz. 2010) (suppressing all evidence obtained by wiretap in light of failure to minimize). As illustrated below, here, the Government has violated its duty under Title III to "minimize" the interception of non-pertinent communications.  Thus, these communications must be suppressed.

> **1.    The Government Admits That Its Agents Intercepted Thousands of Non-Pertinent Calls, Even Months Into the Investigation**

In the course of its extensive wiretap investigation, the government intercepted over *twelve thousand* telephone calls from Yee's cellular and home telephones between November 2012 and July 2013. Over eleven thousand of these calls were intercepted from his cell phone between November 14, 2012 and July 21, 2013, and over 1200 were intercepted form his home phone between April and July of 2013.  Of these calls, 6608 are included in the government's overview of intercepted calls in its fifteen day interim reports. An examination of these reports shows a disturbing trend on the part of the government of failing to minimize a staggeringly large number of intercepted calls.

With respect to Yee's telephone, the government's interim reports indicated that, of the 6929 telephone calls intercepted, only 573 (slightly over 8 percent) were "pertinent." The government reports additionally indicated that of the total number of intercepted telephone calls, only 665 were minimized. Notwithstanding that **more than 91% of the calls were wholly irrelevant, the government minimized**

- 21 -

only 10% of the calls.

Each court order authorizing the interception of wire communications from November 2012 until July 2013 contain the following language: "It is further ordered that the monitoring of wire communications must terminate immediately when it is determined that the communications are unrelated to communications subject to interception under 18 U.S.C. Chapter 119." The fact that the government identified less than ten percent of calls as pertinent to the investigation evidences that they have not complied with this provision of the order. While failing to minimize non-pertinent calls in the initial stages of the investigation may be defensible, the continued failure to minimize over the course of a lengthy investigation is not. *See Scott,* 436 U.S. at 141 (noting that interception of non-pertinent calls in late stages of surveillance is unreasonable). Here, the government's failure to minimize remained a consistent issue from the onset of the interception of electronic and wire communications throughout the investigation--a full seven months after the initial wiretap.

The data from each of the government's interim reports is summarized below:[12]

| Date | Total | Pertinent | Minimized |
|------|-------|-----------|-----------|
| November 2012 | 1546 | 195 | 124 |
| April 2013, Phone 2 | 1845 | 128 | 148 |
| April 2013, Phone 3 | 71 | 1 | 0 |
| April 2013, Phone 4 | 185 | 15 | 47 |
| May 2013 | 1417 | 108 | 103 |
| July 2013, Phone 2 | 1324 (completed) | 104 | 150 |
| July 2013, Phone 4 | 220 (completed) | 22 | 93 |

As shown above, the government's pattern of delinquency was consistent throughout the investigation. During the November 2012 wiretap, the government stated in its interim report that 1546 calls were intercepted. Of these, 195 were deemed pertinent, and only 124 were minimized. Thus in November 2012, 12 percent of total calls were considered to have some bearing on the investigation. However, only eight percent of the total calls were minimized. In other words, a staggering 80 percent of the calls that the government itself characterized as non-pertinent were not minimized.

---

[12] The interim reports are attached as exhibits to the Declaration of James A. Lassart.

- 22 -

This pattern continues in the next wiretap, which monitored three of Yee's telephones in April 2013. On these phones, the government monitored 1845 on the first, "Target Telephone #2," 71 on the second, "Target Telephone #3," and 185 on the third, "Target Telephone #4." Of these, 128 were considered pertinent on Target Telephone #2, one was considered pertinent on Target Telephone #3, and 15 were considered pertinent on Target Telephone #4. The government minimized 148 on Target Telephone #2, none on Target Telephone #3, and 47 on Target Telephone #4. Thus, for the total of 2101 calls monitored on these three phones, only 144 of those calls (less than seven percent) were considered pertinent. Of that same total, only 195 of those calls (slightly over nine percent) were minimized. Thus, the government failed to minimize 84 percent of calls characterized as non-pertinent.

The government's failure to comply with the court's order that non-pertinent calls be minimized continued until the end of the investigation. Even after renewing the wiretap a total of three separate times for Yee's Telephones, the government continued to intercept and record hundreds of non-pertinent conversations. In the July 2013 interim report, the government describes the call activity on two of Yee's phones, Target Telephones #2 and #4. The total number of completed calls monitored on these phones was 1544. Of these, the government characterized 126 as being pertinent to the investigation, and 243 as being minimized. Thus, only eight percent of the calls monitored were considered pertinent. Despite this, the government continued to be delinquent in their duty to minimize — as slightly less than 16 percent of the calls were minimized according to their fifteen day report.

Additionally, the failure to minimize or spot check calls which may be considered to develop into a discussion of pertinent subject matter, such as calls which take place between alleged co-conspirators, may be defensible. However, the lengthy surveillance and spot checking of calls which are very clearly non-pertinent cannot be defended. The government has systematically failed to minimize calls which are obviously non-pertinent. Examples of these calls include: 1) Multiple spot checks into a fourteen minute conversation on December 4, 2012 between Yee and a friend about her difficulty searching for a job — of this conversation, over ten minutes was monitored; *Line sheet 808379-803381;* and 2) Failure to minimize a seven minute conversation on April 7, 2013 between Yee and an unidentified female about a liquor license for a bar while she is at the airport in Los Angeles; *Line sheet 808785-808788.*[13]

---

[13] These line sheets are attached to the Declaration of James A. Lassart as exhibits.

DEFENDANT YEE'S MOTION TO SUPPRESS
EVIDENCE DERIVED FROM WIRETAP INTERCEPTIONS

Case No.
CR 14-00196-CRB-2 (JCS)

1   The pattern of failing to minimize an overwhelming majority of calls, many of which are non-

2   pertinent, shows a blatant disregard for the regulations of Title III and Yee's Fourth Amendment Rights.

3   Accordingly, suppression of all conversations recorded from the Target Telephones is appropriate and

4   necessary. *See United States v. Torres*, 908 F.2d 1417, 1423-24 (9th Cir. 1990).

5   **2.    The Majority of the Calls Designated By the Government as "Pertinent" Had Nothing**
        **Whatsoever To Do With the Offenses Described in the Wiretap Order**

6

7   As stated above, the original Application from November 2012 identifies mail and wire fraud, money

8   laundering, conspiracy to distribute controlled substances, distribution of controlled substances, and use of a

9   communication facility to commit or facilitate narcotics offense as Target Offenses.

10   The telephone calls from the original wiretap on Yee's phone, designated as Target Telephone #2,

11   had nothing to do with these Target Offenses. Thus, the majority of phone calls designated as "pertinent" by

12   the government, of the mere twelve percent that were so designated in the November 2012 interim report,

13   dealt with non-pertinent subjects, such as Yee's fundraising efforts, campaign donations, and initiation of his

14   campaign for Secretary of State. There were no conversations evidencing Yee's engagement in money

15   laundering, conspiracy to distribute controlled substances, distribution of controlled substances, or use of a

16   communication facility to commit or facilitate narcotics offense, and only very attenuated phone calls that the

17   government may have characterized as having to do with alleged mail fraud. This is evidenced by the fact that

18   Defendant Yee is not included in the majority of these Target Offenses in the government's Second

19   Superseding Indictment — none of the charges against him have anything to do with distribution of narcotics

20   or controlled substances, or the use of a facility to commit or facilitate narcotics offense. Nevertheless, the

21   subsequent Applications for the wiretap communications were based upon the same arguments made by the

22   government as those set forth in the November 2012 Application — namely, that more conventional

23   investigative techniques would be unavailing in achievement of the full goal of the investigation. In light of

24   the fact that even the calls designated as pertinent by the government in the initial Application have little to do

25   with the Target Offenses enumerated in that Application, these subsequent Applications must be suppressed.

26   The Supreme Court has long recognized that the fundamental purpose of the Fourth Amendment's

27   warrant clause is "to protect against general searches." *Go-Bart Importing Co. v. United States*, 282 U.S. 344,

28   357 (1931). This conduct is antithetical to the Fourth Amendment. In fact, the harm to privacy inflicted by a

- 24 -

general warrant is even more acute in the case of a general warrant to eavesdrop. *Olmstead v. United States*, 277 U.S. 438, 475-76 (1928). The government's use of eavesdropping to search for a crime, any crime, rather than specific evidence of a particular crime, violated both Title III and the core principles of the Fourth Amendment. Accordingly, suppression of all conversations recorded from Target Telephones related to Yee is appropriate and necessary. *See United States v. Torres*, 908 F.2d 1417, 1423-24 (9th Cir. 1990).

**D.     All Wiretaps Derived from the Subsequent Applications Must Also Be Suppressed**

The suppression remedy provided in Title III extends to unlawfully obtained wiretap interceptions, and "evidence derived therefrom." In *Giordano*, the Supreme Court ruled that "evidence derived" from an initial unlawful interception includes subsequent applications that rely upon the initial submission and intervening wiretaps to establish probable cause. 416 U.S. at 529-31; *U.S. v. Arreguin*, 277 F. Supp. 2d 1057, 1059 (E.D. Cal. 2003). Accordingly, all evidence obtained using communications intercepted on the basis of evidence obtained from Yee's phones must be suppressed.

**V.     CONCLUSION**

For the foregoing reasons, the Court should suppress all of the wiretap recordings intercepted from Yee's phones obtained pursuant to the November 2012 Application, and each of the subsequent applications, as well as all evidence derived therefrom. Alternatively, the Court should conduct a *Franks* hearing to make a determination to what extent the wiretap evidence should be suppressed.

Dated:  March 26, 2015                            Respectfully submitted,

                                                 MURPHY, PEARSON, BRADLEY & FEENEY


                                                 By: /s/ JAMES A. LASSART
                                                     James A. Lassart
                                                     Attorneys for Defendant
                                                     LELAND YEE

JAL.20886117.docx

DEFENDANT YEE'S MOTION TO SUPPRESS
EVIDENCE DERIVED FROM WIRETAP INTERCEPTIONS

Case No.
CR 14-00196-CRB-2 (JCS)

JAMES A. LASSART (SBN 40913)
NICHOLAS C. LARSON (SBN 275870)
MURPHY, PEARSON, BRADLEY & FEENEY
88 Kearny Street, 10th Floor
San Francisco, CA  94108
Telephone:      (415) 788-1900
Facsimile:       (415) 393-8087
Email:            JLassart@mpbf.com
                       NLarson@mpbf.com

RECEIVED

2015 MAR 26  P 3 15

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Attorneys for Defendant
LELAND YEE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.  CR 14-00196-CRB-2 (JCS) |
| Plaintiff, | |
| v. | |
| LELAND YEE, | |
| Defendant. | |

**DOCUMENTS SUBMITTED UNDER SEAL**

**(Crim. L.R. 56-1)**