1   JAMES A. LASSART (SBN 40913)
    NICHOLAS C. LARSON (SBN 275870)
2   MURPHY, PEARSON, BRADLEY & FEENEY
    88 Kearny Street, 10th Floor
3   San Francisco, CA  94108
    Telephone:    (415) 788-1900
4   Facsimile:    (415) 393-8087
    Email:        JLassart@mpbf.com
5                 NLarson@mpbf.com

6   Attorneys for Defendant
    LELAND YEE
7

8                  UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10                  SAN FRANCISCO DIVISION

11

12  UNITED STATES OF AMERICA,          Case No.  CR 14-00196-CRB-2 (JCS)

13          Plaintiff,                 **DEFENDANT LELAND YEE'S REPLY IN
                                       SUPPORT OF MOTION TO SUPPRESS
14  v.                                 EVIDENCE DERIVED FROM WIRETAP
                                       INTERCEPTIONS, OR IN THE
15  LELAND YEE,                        ALTERNATIVE FOR A *FRANKS*
                                       HEARING**
16          Defendant.

17                                     **HEARING DEMANDED**

18                                     Date:      July 7, 2015
                                       Time:      9:30 a.m.
19                                     Court:     Hon. Charles R. Breyer
                                       Location:  Courtroom 6, 17th Floor
20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| I. | INTRODUCTION ................................................................ | 1 |
| II. | ARGUMENT ...................................................................... | 1 |
|  | A.  Suppression Is Warranted Because the Government Failed to Establish Probable Cause ...................................................................... | 1 |
|  | B.  The Applications From the Period Between November 2012 and July 2013 Fail to Establish the Requisite Necessity to Justify Wiretap Interception ........................... | 5 |
|  | 1.  Failure to Show Necessity as to Each Conspirator and Each Telephone ........... | 5 |
|  | a.  The Government Maintained Such Contact with Defendant Jackson that Yee's Wiretap Was Not Necessary .......................... | 6 |
|  | b.  The Government Maintained Direct Contact with Defendant Yee through Use of UCE 4773 ....................................... | 7 |
|  | c.  The Government Failed to Establish Yee's Contact with Other Individuals Sufficient to Justify Wire Interception of Target Telephone 2 When They Had Wire Interception of Target Telephone 1 ....................................... | 8 |
|  | d.  Extensive Reliance on Boilerplate, Generic Language .......................... | 11 |
|  | C.  The Wiretaps Should Further Be Suppressed Because They Were Not Minimized in Accordance with Title III ............................. | 12 |
|  | 1.  The Government's Entire Minimization Argument Hinges on the Information About the Voicebox System that Was Not Disclosed to Defendants Until April 2015 ....................................... | 13 |
|  | a.  The Government Deliberately Excluded Relevant Information from the Fifteen Day Reports .......................... | 14 |
|  | b.  Defendants' Analysis of the Overview Sections Correctly Interpreted the Data Provided by the Government, and Exhibit 28 Does Not Adequately Analyze the Pertinent Data .......................... | 15 |
|  | D.  All Wiretaps Derived from the Subsequent Applications Must Also Be Suppressed ........... | 18 |
| III. | CONCLUSION ...................................................................... | 19 |

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Illinois v. Gates,*
462 U.S. 213 (1983).................................................................................... 1

*U.S. v. Arreguin,*
277 F. Supp. 2d 1057 (E.D. Cal. 2003) ..................................................... 18

*United States v. Blackmon,*
273 F.3d 1204 (9th Cir. 2001) ............................................................. 5, 11

*United States v. Elliott,*
893 F.2d 220 (9th Cir. 1990) ...................................................................... 1

*United States v. Giordano,*
416 U.S. 505 (1974)................................................................................... 18

*United States v. Ippolito,*
774 F.2d 1482 (9th Cir.1985) ...................................................................... 6

*United States v. Lynch,*
367 F.3d 1148 (9th Cir. 2004) .................................................................... 5

*United States v. McGuire,*
307 F.3d 1192 (9th Cir. 2002) .................................................................. 13

*United States v. Meling,*
47 F.3d 1546 (9th Cir. 1995) ................................................................... 1, 4

*United States v. Principie,*
531 F.2d 1132 (2d Cir. 1976) .................................................................... 13

*United States v. Rivera,*
527 F.3d 891 (9th Cir. 2007) ............................................................... 13, 18

*United States v. Torres,*
908 F.2d 1417 (9th Cir. 1990) ................................................................... 11

**Statutes**

18 U.S.C.
§ 2518 ...................................................................................................... 2, 4
§ 2518(3) ...................................................................................................... 1
§ 2518(3)(a) .................................................................................................. 1
§ 2518(3)(b) .................................................................................................. 1
§ 2518(3)(d) .................................................................................................. 1

# I.    **INTRODUCTION**

The government's interception of Defendant Leland Yee's ("Yee") phone calls was unconstitutional and without support in fact or law. Specifically, the government's failure to proffer particular facts establishing any criminal course of conduct, establish requisite necessity for the wiretaps, and implement any meaningful minimization procedure, collectively require suppression of the unlawfully intercepted communications. In response to Yee's motion to suppress, and that of Defendant Keith Jackson ("Jackson"), the government filed a lengthy opposition brief ("Opposition") that at its core is dismissive of both motions – "both of the defendants' motions are entirely without merit, and should be denied" (Opposition at 1). However, the dismissive Opposition overlooks and fails to address several key points addressed by Defendant Jackson and Yee in their motions about critical prerequisites required by the Ninth Circuit to permit wiretapping, and the government – not Defendants – bears the burden of meeting these prerequisites.   In short, the Opposition fails to address all of the deficiencies in the government's wiretap applications and as a result suppression of the unlawfully intercepted communications is required by law.

# II.    **ARGUMENT**

**A.    Suppression Is Warranted Because the Government Failed to Establish Probable Cause**

In the Opposition the government argues that it met the standard for establishing probable cause as to Yee. The government cites 18 U.S.C. § 2518(3) as the relevant standard that allows for courts to authorize wiretaps if an applicant shows probable cause that:   (a) an individual is committing, has committed, or is about to commit specified offenses; (b) communications relevant to that offense will be intercepted through the wiretap; and ...(d) the individual who is the focus of the wiretap investigation will use the tapped phone. 18 U.S.C. § 2518(3)(a), (b), (d). Courts will uphold a wiretap if, looking only to the four corners of the wiretap application, there is a "substantial basis" for these findings of probable cause. *United States v. Meling,* 47 F.3d 1546, 1552 (9th Cir. 1995) (internal citations omitted); *see also Illinois v. Gates,* 462 U.S. 213, 236 (1983).[1]  (Opposition at 6.)

---

[1] The government, however, misstates the appropriate standard of review for probable cause, when they argue that the decision finding probable cause should only be reversed if the decision amounted to clear error. (Opposition at 5.)  In fact, the reviewing court should conduct *de novo* review of the original court's decision to authorize the wiretap interceptions. *See United States v. Elliott*, 893 F.2d 220, 222 (9th Cir. 1990).

DEFENDANT YEE'S REPLY IN SUPPORT OF MOTION TO SUPPRESS
EVIDENCE DERIVED FROM WIRETAP INTERCEPTIONS

Case No.
CR 14-00196-CRB-2 (JCS)

1      Upon closer examination, however, there was no "substantial basis" for a finding of probable

2   cause as to Yee in the November 13, 2012 Application. Specifically, the government has not shown the

3   factors set forth in 18 U.S.C. § 2518 sufficiently with regard to Yee. With regard to the first factor, the

4   government is required to establish that Yee was committing, or had committed, conspiracy with regard to

5   mail fraud and honest services fraud, as alleged in the November 2012 Affidavit. The November 2012

6   Affidavit does set forth actions and communications by Yee that are typical of a candidate soliciting

7   donations as they run for office. For instance, Yee had meetings with UCE 4773, as he would with any other

8   donor. He discussed monetary contributions and the retirement of debt, central concerns for a candidate

9   during a political campaign. Yee also communicated with Defendant Jackson, who assisted in fundraising for

10  Yee's campaign. The government then mischaracterized these interactions as sufficient to show that Yee was

11  committing, or had committed, conspiracy.[2] To make a blanket statement to that effect does not rise to the

12  "substantial basis" level required by the statute, nor does it establish all of the elements of a conspiracy.

13      In the government's opposition to Yee's Motion to Suppress, they cite to four instances that purport to

14  show evidence of Yee's commission of a conspiracy.  These conversations took place on October 14, 2011,

15  September 4, 2012, September 19, 2012, and September 24, 2012. (A true and correct copy of a transcript of

16  the October 14, 2011 conversation is attached to the Declaration of James Lassart in support of this Reply

17  ("Lassart Reply Dec.") as Exhibit A; a true and correct copy of an audio clip and the 302 of the September 4,

18  2012 conversation is attached as Exhibit B; a true and correct copy of the linesheet and 302 of the

19  September 19, 2012 conversation is attached as Exhibit C; and a true and correct copy of the linesheet of the

20  September 24, 2012 conversation is attached as Exhibit D.)

21      The government contends these instances contribute to the establishment of probable cause sufficient

22  to justify wire interception of Yee's phone. However, examination of these instances shows that while the

23  government has mischaracterized them as being in furtherance of a conspiracy, they are actually typical

24  conversations a political candidate running for office has with potential donors.[3]

25  _____

26  [2] For further discussion of all the misrepresentations and material omissions in the government's wiretap applications please see Defendant Keith Jackson's Motion to Suppress and Reply in support thereof, which Yee joined.

27  [3] Throughout the Opposition the government consistently and conveniently assumes that their
28  interpretation of the interactions that allegedly took place between Yee and others are not only correct but also the only possible interpretation. For example, they assume that legitimate political fundraising

1   The October 14, 2011 conversation takes place during a meeting between Yee and UCE 4773 and

2   concerns issues with straw donations, and alternatives to those donations, like UCE 4773 donating to one of

3   Yee's ballot measure initiatives.[4] (Opposition at 36-37.) The September 4, 2012 conversation also takes place

4   during a meeting between Yee and UCE 4773, and concerns Yee's arranging a meeting with software

5   consultants. Yee and UCE 4773 also discussed his outstanding campaign debt from the mayoral campaign

6   and his continued search for donations. (*Id.* at 37-38.)

7   The September 19, 2012 conversation takes place over two telephone calls on Target Telephone Two

8   between Yee and UCE 4773. The conversation involves Yee discussing drafting a letter on behalf of UCE

9   4773's company, as well as swapping donations with ███████████████████, a legal way of

10   obtaining funds. (*Id.* at 38.) During the interim between the two conversations, the government emphasizes

11   that a call took place between Target Telephone 1, attributed to Defendant Jackson, and Target Telephone 2,

12   attributed to Defendant Yee.  However, the Opposition fails to establish how this interim call rises to the level

13   of probable cause.

14   The final conversation, on September 24, 2012, is another phone conversation. However, this

15   conversation is between UCE 4773 and Defendant Jackson, who purports to speak on Yee's behalf and asks

16   UCE 4773 for money. Defendant Yee is not on that phone call.

17   Three of these four conversations took place between Defendant Yee and UCE 4773. The other

18   conversation took place between Defendant Jackson and UCE 4773. However, in its Opposition, the

19   government does not quote directly from the transcripts of the conversations, which would provide the exact

20   context of what was said by both parties. Instead, the government *quotes directly from the November 2012*

21   *Quinn Affidavit, which the government authored.* The government then emphasizes areas of the affidavit

22   narrative in order to persuade this Court that the only reasonable interpretation of these conversations is that

23

24   – through bundling of multiple donations – is an attempt at illegal activity with the intent to avoid the
     campaign finance limits, when exactly the opposite is true. (See, e.g., Opposition at 13.)

25

26   [4] Here, the government claims this conversation shows Yee agreed with UCE-4773 that "It's too much
     money not to get something back."  Not so. Upon closer examination, Yee is not talking at all in this
     portion of the conversation; it is only UCE-4773 that is talking. In fact, Yee says "right" numerous

27   times (as in "right, go on, I'm listening" *and not* "yes, I totally agree you need to get something for
     your money from me"). When Yee does finally speak it is to tell UCE-4773 the importance of

28   fundraising the right way given that he expects his campaign to be audited.

- 3 -

1    Defendant Yee was engaged in a conspiracy. The government goes as far as including Agent Quinn's

2    statement "I believe that there is probable cause that the calls over the Target Telephones related, in part, to

3    the exchange of acts by Senator YEE for campaign contributions from UCE 4773." (Opposition at 39:7-8.)

4         While the government may believe that there is probable cause that Yee had committed, or was

5    committing, conspiracy, that belief is insufficient to meet the "substantial basis" standard set forth in *Meling*.

6    Thus, the government has failed with regard to the first factor in U.S.C. § 2518.

7         The government also failed to establish the second factor – that the government was required to show

8    that communications relevant to the offense of conspiracy would be intercepted through the wiretap. As

9    discussed more thoroughly in the section on necessity, the government was aware before November of 2012

10   that the overwhelming majority of calls on Yee's phone would be between him and Defendant Jackson. This,

11   combined with the consistent success of UCE 4773's contact with both Yee and Defendant Jackson, negated

12   any need for a wire interception of Yee's phone. It also demonstrates how the government's failure to

13   establish a conspiracy, including the players, the agreed upon goals, and the overt acts taken, makes it

14   impossible for the government to establish that communications relevant to the conspiracy would be

15   intercepted through the wiretap. What communications are relevant? Who are the communications between?

16   How can the government determine whether a communication that is intercepted is pertinent? These are but a

17   few of the many unanswered questions resulting from the vague and overly broad conspiracy charges against

18   Yee and without specificity in regard to these charges, the government cannot establish the second factor in

19   U.S.C. § 2518.

20        With regard to the third factor, the government must establish that the individual who is the focus of

21   the wiretap investigation will use the tapped phone. Due to the fact that Target Telephone 2 belonged to Yee,

22   this factor was met. However, in light of the fact that the government did not meet the other two factors, this

23   is unavailing. Ultimately, with regard to Yee, the government has failed to meet the test required by the Ninth

24   Circuit that there is a "substantial basis" for these findings of probable cause. *United States v. Meling*, 47 F.3d

25   1546, 1552 (9th Cir. 1995) (internal citations omitted).

26        In sum, it is clear from the context of the November 13, 2012 Application, the language of the

27   Affidavit, and the manner in which the wiretap was implemented that the government did not establish

28   probable cause in support of the instant wiretap. Its fruits must be suppressed.

DEFENDANT YEE'S REPLY IN SUPPORT OF MOTION TO SUPPRESS
EVIDENCE DERIVED FROM WIRETAP INTERCEPTIONS

Case No.
CR 14-00196-CRB-2 (JCS)

**B.** **The Applications From the Period Between November 2012 and July 2013 Fail to Establish the Requisite Necessity to Justify Wiretap Interception**

The government has failed to establish requisite necessity for a wiretap investigation of Yee. In the Opposition, the government argues that it has established necessity as to both Jackson and Yee. Furthermore, the government cites legal authority that states that they do not need to exhaust to the "bitter end" all other investigative techniques and that they should be permitted more leeway with regard to necessity when a conspiracy is at issue.[5] However, even if the legal authority in the Opposition on necessity is considered to be applicable by the Court, the government came nowhere near the "bitter end" of exhausting all techniques.[6] Moreover, the use of the "conspiracy" charge as a means to lower the necessity standard does not pass muster. The conspiracy must be established. It is not. The conspiracy also must involve those with intent to achieve a goal that is illegal – UCEs do not have such intent and cannot be part of a conspiracy. The government did not establish necessity for its wiretaps of Defendant Jackson or Yee. Even assuming, *arguendo*, that necessity was established for Defendant Jackson's phone, it was not for Yee. The government's sustained relationship with Defendant Jackson, whom they already had successfully intercepted, their frequency of communication with Defendant Jackson, and their monetary exchanges with Defendant Jackson were sufficient to derive all information needed with regard to Yee. Additionally, the success of UCEs in communicating with Yee, and the close relationship between Defendant Jackson and Yee, which the government had access to, negated the need for wiretap interception on Yee.

**1.** **Failure to Show Necessity as to Each Conspirator and Each Telephone**

In order to successfully demonstrate necessity for interception of wire communications, the government is required to demonstrate necessity for each individual conspirator, as well as each target

---

[5] See Opposition at 6-8, however, it must be noted that the government also continually cites legal authority about the potential danger to law enforcement in regard to the necessity for a wiretap and yet, the government has not once alleged or made any reference to any actual danger as a need for a wiretap in this matter.

[6] The government contends the appropriate standard of review with respect to necessity is "under an abuse of discretion standard." This is only partially correct. The authorizing court's finding of necessity may be overturned only for abuse of discretion, *but* whether other investigative procedures have been exhausted or why they reasonably appear not likely to succeed is reviewed *de novo*. *United States v. Lynch*, 367 F.3d 1148, 1159 (9th Cir. 2004). Further, whether the government's wiretap application complied with the "full and complete statement" requirement of Section 2518(1)(c)—a crucial component in establishing necessity—is reviewed *de novo*. *See United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001).

1  telephone. *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir.1985).  In the instant case, the government

2  failed to do so with regard to Yee.

3          **a.**     **The Government Maintained Such Contact with Defendant Jackson that**

4                    **Yee's Wiretap Was Not Necessary**

5       As the government states in their affidavits, their UCEs were introduced to Defendant Jackson in

6  August of 2010. (*See* November 2012 Affidavit of FBI Special Agent Ethan A. Quinn ("Quinn Affidavit"), a

7  true and correct copy of which was attached to Yee's Motion to Suppress ("Yee Motion") as part of Exhibit

8  B, at 13:8-9.)  Defendants Yee and Jackson were then introduced to UCE 4773 in September of 2011. *Id.* at

9  11-14.

10      From that point on, the government alleges "UCE 4773 has been in contact with Jackson and has

11  been solicited by Jackson and others to make unlawful payments to the campaigns of, or to retire the

12  campaign debts, California State Senator Leland Yee." *Id.* This is reflected in the Quinn Affidavit, which

13  details nearly daily conversations via telephone and multiple meetings between Defendant Jackson and

14  UCE 4773. *See generally* Quinn Affidavit at 21-62. During these conversations, Defendant Jackson often

15  represents to UCE 4773 that he is speaking on Defendant Yee's behalf. (*See e.g.* Quinn Affidavit at 27:22-

16  28:4, 42:21-28.)

17      In addition to their frequent conversations, the government alleges that "From the time of this initial

18  meeting between Jackson and UCE 4773…and continuing to the present time, *Jackson and UCE 4773 have*

19  *developed a relationship that included payment of $2,000 per month by UCE 4773 to Jackson for his work in*

20  *furthering UCE 4773's business interests.*" Quinn Affidavit at 19:26-28.  (Emphasis added.)

21      Moreover, at the time of the first governmental application for wire interception on Yee, the

22  government already had successfully been intercepting Defendant Jackson's communications for several

23  months prior, as part of the installation of a microphone and video camera inside Defendant Nieh's car in

24  April of 2012, as well as a wiretap of Nieh's phone. (Opposition at 2:21-22.) The government also alleges that

25  Defendant Jackson had also solicited donations from several UCEs for Yee, starting in May of 2011. (*Id.* at

26  10.) Thus, the government was aware of the possibility of gaining information from communications with

27  Defendant Jackson with regard to causes of action involving Yee's campaign.

28      The alleged relationship between UCE 4773 and Defendant Jackson, as well as the frequency of

1  communication between the two, negated any need for the government to intercept wire communications on

2  Defendant Yee's phone, Target Telephone 2.

3          **b.**     **The Government Maintained Direct Contact with Defendant Yee through Use of UCE 4773**

4

5        After Defendant Jackson introduced UCE 4773 to Yee, UCE 4773 was successful in maintaining

6  regular contact both over the phone and in person with Yee. Between September 2011 and November 2012,

7  the government enumerates many conversations between Yee and UCE 4773. (Quinn Affidavit at 21-60.)

8  These conversations are summarized below for this Court's convenience.

9  **Conversations between UCE 4773 and Yee relating to Defendant Yee's campaign for Mayor:**

| Date | Conversation Type, Citation |
|------|------------------------------|
| September 30, 2011 | Phone call (Quinn Affidavit at 21:8-26) |
| October 14, 2011 | Phone call (*Id.* at 22:22-23) |
| October 14, 2011 | In Person Meeting (*Id.* at 22:24-23:22) |
| October 20, 2011 | Phone Call (*Id.* at 23:23-24:14) |
| November 5, 2011 | Phone Call (*Id.* at 24:15-16) |

**Conversations between UCE 4773 and Yee relating to Yee's campaign for Secretary of State:**

| Date | Conversation Type, Citation |
|------|------------------------------|
| January 18, 2012 | In Person Meeting (Quinn Affidavit, 25:1-7) |
| June 26, 2012 | In Person Meeting (*Id.* at 44:4-11) |
| August 6, 2012 | Phone Call (*Id.* at 45:23-28) |
| September 4, 2012 | In Person (*Id.* at 46:25-48:4) |
| September 10, 2012 | Voicemail (*Id.* at 48:28-49:1) |
| September 10, 2012 | Phone Call (*Id.* at 49:2-8) |
| September 19, 2012 | Phone Call (*Id.* at 49:12-50:5) |
| September 20, 2012 | Phone Call (*Id.* at 51:3-14) |
| September 27, 2012 | Text Message (*Id.* at 56:14-15) |
| September 27, 2012 | Phone Call (*Id.* at 56:16-57:2) |

DEFENDANT YEE'S REPLY IN SUPPORT OF MOTION TO SUPPRESS
EVIDENCE DERIVED FROM WIRETAP INTERCEPTIONS

Case No.
CR 14-00196-CRB-2 (JCS)

| September 29, 2012 | Text Message (*Id.* at 57:3-5) |
| October 18, 2012 | Phone Call (*Id.* at 58:6-59:2) |
| October 18, 2012 | Phone Call (*Id.* at 59:4-60:5) |
| October 18, 2012 | Phone Call (*Id.* at 60:6-17) |

As is demonstrated by the table, UCE 4773 had a consistent level of success in communications with Yee directly. There was no requisite necessity that the government get a wire interception for Target Telephone 2 – all the government had to do was have UCE 4773 pick up the phone.

The success of UCE 4773 in directly communicating with Yee was combined with his almost daily communications with Defendant Jackson regarding Yee, his actions, and contributions to both his Secretary of State and Mayoral campaigns. During one of these conversations, Defendant Jackson indicated that Yee felt "very comfortable with UCE 4773" (Quinn Affidavit at 50:8-9). On another occasion, Defendant Jackson stated that UCE 4773 should not worry, because Yee "had his back." (*Id.* at 61:1-2.) These statements suggest that the government was aware that Yee had a level of confidence in UCE 4773, and would be willing to share information with him willingly, as was also evidenced by Yee's conversations with him. With every indication that Yee would continue to willingly communicate with UCE 4773, and the fact that Defendant Jackson was *being paid by* UCE 4773 to represent his business interests with regard to Yee, the government could not show the requisite necessity to establish a wiretap on Defendant Yee's telephone.

### c. The Government Failed to Establish Yee's Contact with Other Individuals Sufficient to Justify Wire Interception of Target Telephone 2 When They Had Wire Interception of Target Telephone 1

There is no requisite necessity established by the government as to the wire interception of Defendant Jackson.[7] However, assuming *arguendo* the government is able to establish said necessity, there is still no necessity as to wire interception of Yee.

All charges that the government brings against Yee refer to conspiracy between Yee and Defendant Jackson in some capacity. (*See generally* Second Superseding Indictment.) These charges contain many discussions and actions involving the two Defendants, and hardly any discussions or actions engaged in by

---

[7] See Defendant Jackson's response to the Opposition for further discussion of this argument.

1   Yee outside of Defendant Jackson's presence. Examining the lack of independent actions and discussions by

2   Yee illustrates the fact that the government could have received the majority of the information sought by the

3   use of UCEs and the wire interception of Defendant Jackson's phone. The wire interception of Yee's phone

4   was not necessary.

5       Count Two charges Yee and Defendant Jackson with conspiracy to conduct the affairs of an

6   enterprise through a pattern of racketeering activity. In examining the 64 "overt acts" that the government lists

7   as being in furtherance of the conspiracy, there is only one that involves Yee conversing with someone other

8   than Defendant Jackson or one of the government's UCEs. (*Id.* at 11:18-20:11.) This single act involves Yee

9   having a conversation with a member of senate staff. (*Id.* at 13:22-23.) This single conversation is the only

10   evidence the government obtained solely through the wire interception of Yee's phone.[8]

11       Count 213 charges Yee and Defendant Jackson with conspiracy to obtain property under color of

12   official right. Of the seven items listed in the "manner and means of the conspiracy" section, the only one that

13   involves Yee acting outside the presence of Defendant Jackson or one of the government's UCEs is his vote

14   on SB-309. (*Id.* at 67:11-69:2.) Evidence of this vote was not captured through the use of a wire interception.

15       Count 214 also charges Yee and Defendant Jackson with conspiracy to obtain property under color of

16   official right. Also like Count 214, the only action of the six listed that Yee engages in outside the presence of

17   Defendant Jackson or one of the government UCEs is his vote, this time on AB 1309. (*Id.* at Page 72:5-6.)

18   Evidence of this vote was not captured through the use of a wire interception.

19       Count 215 charges Yee and Defendant Jackson with honest services conspiracy. Of the 35 actions

20   listed, Yee engages in one conversation outside the presence of Defendant Jackson or one of the government

21   UCEs, asking a member of his staff about a donation. (*Id.* at 76:20-21.) A member of his staff also attended

---

[8] Upon closer examination, the November 2012, April 2013, May 2013, and July 2013 affidavits mention 218 calls and text messages involving Defendant Yee. Of these 218, 145 are with either Defendant Jackson or a UCE or CHS: this means that *66 percent* of the mentioned calls were intercepted on both sides of the call. In the November 2012 affidavit, Yee is involved in 18 of the mentioned calls. All 18 of these calls are to a UCE or Defendant Jackson. The same is true of the 27 calls that Yee is involved or mentioned in in the April 2013 affidavit. In the May affidavit, Yee is involved in 67 of the calls mentioned, and 36 of these 67 involve either Defendant Jackson or a UCE or CHS. In the July affidavit, Yee is involved in 106 of the calls mentioned, and of these 106, 64 mention Defendant Jackson or a UCE. Additionally, Yee attended six meetings in July, four in May and two in April that are mentioned in the affidavits. All of these meetings were attended by Jackson and one or more UCEs as well. In short, these statistics demonstrate the lack of necessity as to Target Telephone 2 as well as the lack of probable cause as to Yee.

- 9 -

1   the ceremonial dinner of the Chee Kung Tong, an event discussed in the presence of Defendant Jackson. (*Id.*

2   at 77:15-18.) Evidence of this attendance was not captured through use of a wire interception.

3       Counts 216-221 charge Yee and Defendant Jackson with honest services fraud. The charges site to

4   six conversations from the wire intercepted telephones. Each of these conversations includes either Defendant

5   Jackson or a government UCE. (*Id.* at 80:15-24.)

6       Count 222 charges Yee and Defendant Jackson with Conspiracy with regard to firearms. Of the 20

7   actions listed, none involve Yee outside the presence of Defendant Jackson or one of the government UCEs.

8       Counts 229 and 230 charge Yee and Defendant Jackson with conspiracy to commit money

9   laundering. Count 229 sets forth 8 actions, and incorporates actions from counts 215, 219 and 221. (*Id.* at

10  86:23-87:25.)  None of these actions involve Yee outside the presence of Defendant Jackson or one of the

11  government UCEs. Count 230 sets forth 8 actions as well, and, like Count 229, none involve Yee outside the

12  presence of Defendant Jackson or one of the government UCEs.

13      The in-depth examination of the charges against Yee and Defendant Jackson further emphasizes the

14  lack of requisite necessity for a wire interception on Target Telephone 2, given that the government had a

15  wire interception on Target Telephone 1. Many of the charges lacked a single action that involved Yee acting

16  or having conversations outside of the presence of Defendant Jackson or one of the government's UCEs. Of

17  the charges that contained such actions, only a single conversation between Yee and a member of his staff

18  was evidenced by the wire interception. This single conversation does not rise to the level required by the

19  Ninth Circuit to establish necessity as to each target of a wire interception. The government failed to meet this

20  burden to establish necessity as to Yee.

21      The government may claim that there was no way to know which of the Target Subjects would yield

22  information sufficient to achieve all the goals of the investigation. However, looking at the Quinn Affidavit

23  from November 2012, this is not the case. The "Pen Register and Toll Analysis" portion of the Affidavit

24  details activity between the two Target Telephones, one belonging to Yee, and the other belonging to

25  Defendant Jackson, between July and October of 2012. (Quinn Affidavit at 65:19-67:5.) Defendant Jackson's

26  Target Telephone shows a variety of calls between Defendant Jackson and other Target Subjects enumerated

27  in the affidavit. There are 403 calls to ███████ 426 calls to ███████ 3727 to ███████, and 456

28  to ███████. (*Id.* at 66.)

- 10 -

1    In stark contrast, Yee's phone activity shows no calls to ███████, or ████. Aside from

2    84 calls to ████████████████████████████████, and 187 calls to his office in

3    Sacramento, the only person that the phone records indicate Yee is speaking to is Defendant Jackson. There

4    are 437 phone calls between Target Telephone 2 and Defendant Jackson's phone. (*Id.*) Thus, *almost every*

5    *call* that was pertinent to the government's investigation conducted on Target Telephone 2 would have been

6    available to the government by wire interception of Target Telephone 1 by itself.

7    The Pen Register and Toll analysis shows that the government knew ahead of time that they could not

8    show requisite necessity for wire interception of Yee's phone, and that all the evidence that could be derived

9    therefrom would be available from other sources - namely, their own agents and the wire interception of

10   Defendant Jackson's phone. Thus, the wire interceptions of Yee's phone should be suppressed.

11                          **d.      Extensive Reliance on Boilerplate, Generic Language**

12   In the Opposition the government contends that the Ninth Circuit finds boilerplate, generic language

13   acceptable. (*See* Opposition at 8; "…boilerplate conclusions regarding traditional investigative techniques are

14   permitted in wire affidavits.)  This position is patently false. The Ninth Circuit has specifically stated that

15   "[t]he presence of conclusory language in [an] affidavit will not negate a finding of necessity *if the affidavit,*

16   *as a whole, alleges sufficient facts demonstrating necessity.*"  *United States v. Torres*, 908 F.2d 1417, 1423

17   (9th Cir. 1990) (emphasis added.)

18   As discussed above, the government has failed to allege facts sufficient to demonstrate requisite

19   necessity as to Yee. Where this cornerstone of the necessity is not met, the presence of conclusory language is

20   insufficient to establish necessity on its own. The government has not included conclusory language in their

21   Affidavits in addition to alleging requisite necessity - they have relied repeatedly on conclusory language to

22   serve *as a basis* for this necessity. This is exactly what the panel in *Blackmon* criticized, in an affidavit that

23   contained boilerplate language as a whole. *Blackmon*, 273 F.3d at 1210-11.

24   As is set forth in Yee's Motion to Suppress, the government provides reasoning as to why other

25   investigative techniques are insufficient to achieve the goals of their investigation in the November 2012

26   Affidavit. This reasoning is insufficient to establish requisite necessity as to Yee, in light of the fact that the

27   government had a notable degree of success in the use of other investigative techniques, especially the use of

28   UCEs. The government additionally fails in the November 2012 Affidavit to explain why any other

- 11 -

1   investigative techniques would be unreasonable to attempt or too dangerous. The government then repeats

2   this reasoning in the April, May and July 2013 Affidavits, using vague language as to why other investigative

3   techniques cannot be undertaken.

4        The government alleges that Wires 4-7 do not use boilerplate or generic language, and that each of

5   these Affidavits supply a "wealth of case specific details."  This is not the case. The April, May and July

6   Affidavits simply restate the reasoning in the November 2012 Affidavit with regard to the use of other

7   investigative techniques - namely, that they will not work. The discussion of CHSs did not elaborate on any

8   efforts made by the government to recruit new informants, but continued to set forth the statement that both

9   CHSs were "unable to gather sufficient information relating to the Target Subjects." The same was true of

10   subsequent discussions of the use of UCEs and other investigative techniques. The conclusory language used

11   by the government as to necessity set forth in the November 2012 Affidavit is taken by each of the

12   subsequent Affidavits to be sufficient. These Affidavits then do nothing more than give updates on the same

13   investigative techniques that have been utilized previously, without enumerating any further investigative

14   techniques the government has undertaken as an alternative to wire interception.[9]

15        The Opposition also argues that the government is not required by the Ninth Circuit to pursue these

16   investigative techniques to the "bitter end of every non-electronic device as to every telephone and principal

17   in question to a point where the investigation becomes redundant or impractical…." *Baker,* 589 F.2d at 1013.

18   However, *they are* required by the Ninth Circuit to establish necessity as to each individual application. In this

19   case, by their blatant failure to employ *any* new investigative techniques, they instead rely on the same

20   conclusory language as to why alternate investigative techniques would fail. In short, the government failed to

21   meet its burden.

22   **C.    The Wiretaps Should Further Be Suppressed Because They Were Not Minimized in
23   Accordance with Title III**

24        The government has violated its duty under Title III to "minimize" the interception of non-pertinent

25   _____

[9] It is critical to re-emphasize that even if necessity exists on the face of the wiretap affidavit,
26   suppression is warranted if the affidavit contains false or misleading statements that are material to the
finding of necessity.  Moreover, even if the wiretap application demonstrates necessity on its face, a
27   sufficient preliminary showing has been made in the motions to suppress filed by Yee and Defendant
Jackson to justify the conduct of a *Franks* hearing. *See* Defendant Jackson's response to the
28   Opposition.

- 12 -

1  communications. In the Opposition the government argues that this is not the case. In support, the

2  government emphasizes that "[t]he minimization techniques used do not need to be optimal, only

3  reasonable ...." *United States v. Rivera*, 527 F.3d 891, 904 (9th Cir. 2007), and that compliance with

4  minimization requirements "requires examination of the monitoring officers' conduct in light of the particular

5  circumstances." *United States v. McGuire*, 307 F.3d 1192, 1199-1200 (9th Cir. 2002). However, first and

6  foremost, the government bears the burden of proving its compliance with the minimization requirement,

7  *United States v. Rivera*, 527 F.3d 891, 904 (9th Cir. 2007), and failure to minimize can require suppression.

8  *United States v. Principie*, 531 F.2d 1132, 1139-40 (2d Cir. 1976).  In the instant action the government has

9  violated its duty under Title III to "minimize" the interception of non-pertinent communications.  Specifically,

10  the government has not acted reasonably under the circumstances with regard to the timely and proper

11  disclosure of minimization data, and without this data it is *impossible* to determine if the standards set forth in

12  *Rivera, McGuire,* and *Principie* have been met.  Given that the government bears the burden of establishing

13  that the standards for minimization were met, the government has failed and the illegally-intercepted

14  communications must be suppressed.

      **1.**     **The Government's Entire Minimization Argument Hinges on the Information About the Voicebox System that Was Not Disclosed to Defendants Until April 2015**

17      The Opposition contains an elaborate analysis of data presented in the government's fifteen day

18  reports based on information not previously disclosed to Defendants or this Court. By so doing, the

19  government has impeached the data presented in its fifteen day reports to Defendants and this Court. The

20  government has induced both this Court and Defendants to rely on information known to be inaccurate, by

21  failing to provide a complete picture of how this information is to be interpreted. Additionally, the

22  government provided both this Court and Defendants with an inconsistent representation of the data on a

23  month by month basis, arbitrarily excluding categories which were included in this Court's order authorizing

24  the interception of wire communications, and which should have been included in the fifteen day report data.

25      Starting in November of 2012, this Court authorized five separate 30 day periods of monitoring

26  electronic communications on Target Telephones used by Defendant Jackson and Yee. Of these, four

27  monitoring periods included Target Telephones used by Yee.

28      In its fifteen day reports to this Court, the government included a section entitled "Overview of

- 13 -

1   Interceptions" ("Overview Sections"). Each of these Overview Sections purported to provide for this Court

2   "an overview of interceptions of wire communications over the Target Telephones" for the first fifteen days

3   of each period covered by the monitoring authorizations. (*See* The fifteen day report section of the affidavits

4   submitted by the government to this Court from November 13, 2012 through July 12, 2013, attached to

5   Defendant Yee's Motion to Suppress Evidence Derived From Wiretap Interceptions ("Yee Motion") as

6   Exhibits B-F.) The government did not include with its fifteen day reports, applications, or affidavits any

7   information regarding how to properly interpret the data provided in these sections, aside from taking the

8   numbers represented therein as true.

9           a.      **The Government Deliberately Excluded Relevant Information from the**
                    **Fifteen Day Reports**

10

11          The Overview Sections appear to be straightforward in the information they provide; the total number

12  of intercepted calls, those that were found to be pertinent, and those which were minimized. However, the

13  information presented therein misrepresents the efficacy of the fifteen day reports in several manners. First,

14  the Overview Sections for November, April and May were structured similarly. However, the government

15  chose to include data regarding the interception of SMS messages in both the April and May, and excluded

16  this data from the November report. (*Id.* at Exhibits B, D & E [Fifteen day report section].) The government

17  does this despite the fact that their Opposition acknowledges that there were 274 SMS messages intercepted

18  during the period covered by the November 2012 fifteen day report. (See Opposition, Exhibit 28.) The

19  government does the same in the July report, declining to note there were no SMS messages received during

20  that interception. (*See* Yee Motion, Exhibit F [Fifteen day report section].)

21          The Opposition goes out of its way to emphasize that the only calls "that matter" for the purposes of

22  analyzing whether proper minimization occurred are those over two minutes. ("More important is the analysis

23  in the bottom two thirds of each chart, which addresses all calls (conversations and text messages) that were

24  longer than two minutes in length. This is critical because it is not necessary or practical to minimize short

25  calls…" (Opposition at 57:14-16.) The government did not share data regarding these "critical" calls in the

26  November, April, or May reports, breaking the Overview Sections into the categories of "total number of

27  wire intercepts," "number of intercepts flagged as pertinent," and "number of minimized intercepts." (*See* Yee

28  Motion, Exhibits B-F [Fifteen day report section].) Similarly, the Opposition discusses the fact that the "total

- 14 -

1   number of wire intercepts" includes not only completed phone calls, but also "missed calls," categorized as

2   "calls where the phone rang, but there was no answer and no connection was made to an answering machine,

3   calls where voice mails were left, alerts signaling that the voice mailbox was full, text messages, and calls

4   where there was a technical problem with the phone line and there was no audio and no content." (See

5   Opposition at 55:6-9.) However, information regarding phone calls that were actually completed is again

6   excluded from the November, April, and May reports, and is provided only in the July Overview Section.

7   (*See* Yee Motion, Exhibits B-F [Fifteen day report section].)

8          Despite the fact that the government purports to have given this Court a thorough picture of the data

9   relevant to the interceptions of wire communications, the above enumerated sections reflect its failure to do

10  so. By its own admission, critical information analyzed in the Opposition in the form of numbers of calls over

11  two minutes and completed calls versus wire intercepts were missing from the Overview Sections presented

12  to this Court.

13          b.      **Defendants' Analysis of the Overview Sections Correctly Interpreted the
            Data Provided by the Government, and Exhibit 28 Does Not Adequately**
14          **Analyze the Pertinent Data**

15          Relying on the data provided by the government as accurately representing an overview of the

16  interception of wire communications, Defendants conducted an analysis of the percentage of pertinent and

17  minimized conversations. Defendants did so by simply adding the total number of calls and calculating

18  percentages for those characterized as pertinent, as well as those minimized. This analysis was presented to

19  this Court in Defendant's Motion to Suppress.[10]

20          In that analysis, Defendants found that with regard to Yee, between November of 2012 and July of

21  2013, only 573 total calls were characterized as "pertinent" in the Overview Sections. Additionally, only 665

22  total calls were minimized, according to the Overview Sections. This was out of a total of 6,929 "total wire

23

24  [10] The government has mathematical inconsistencies in its Exhibit 28, contending the total intercepted
    calls should be 6,608. However, the total number of intercepted calls in Exhibit 28 is 7,052.

25  Additionally, the government contends that the total number of intercepted calls, 6929, in Defendant's
    chart is incorrect based upon the data derived from the Overview Sections. However, this ignores that

26  the July "number of wire intercepts" category numbers were 1494 and 371, as opposed to the
    "completed calls" category numbers which were 1324 and 220.  For the sake of consistency,

27  Defendant relied upon the data presented in "number of wire intercepts" category, since the
    "completed calls" category was only included in the July Report. Thus, the total number of "wire

28  intercepts" is correct.

DEFENDANT YEE'S REPLY IN SUPPORT OF MOTION TO SUPPRESS                                    Case No.
EVIDENCE DERIVED FROM WIRETAP INTERCEPTIONS                                               CR 14-00196-CRB-2 (JCS)

1    intercepts" as set forth by the Overview Sections. (*See* Yee Motion, Exhibits B-F [Fifteen day report

2    section].) Based upon these totals, slightly more than eight percent of the total wire intercepts were

3    characterized as pertinent by the government during the course of their eight month wiretap, and slightly more

4    than ten percent were minimized. *Id.*

5          The government now takes issue with Defendants' analysis, and puts forth new information about the

6    Voicebox System. This information includes a lengthy discussion of monitoring instructions provided to

7    agents, complete with two declarations from supervising agents. (See Declaration of Special Agent Clark and

8    Declaration of Special Agent Folger, attached to the Government's Opposition as Exhibits 21 and 26.) Also

9    included is a discussion of the Voicebox System's "nomenclature data," (See Opposition at 54:7-9), and a

10   purported explanation of whether calls characterized as pertinent or non-pertinent were actually monitored by

11   agents. *Id.*

12         Based on this newly disclosed information, the government then generates a new chart, which is

13   included in the Opposition as Exhibit 28 for this Court's reference. This chart purports to put forward the

14   actual percentages of calls that were pertinent or minimized during each period of interception of the wire

15   communications. However, this chart deliberately puts forward different information than that produced in the

16   prior fifteen day reports, and in so doing, attempts to misdirect this Court's interpretation of the percentages of

17   wire intercepts considered to be pertinent or minimized.

18         First, in order to distance the data from the Overview Sections from that presented in Exhibit 28, the

19   government changes the identifier of each of the Target Telephones. Instead of being called Target

20   Telephone 1 or 2, as they were referred to in each of the fifteen day reports, the government now refers to

21   Target Telephones by the phone numbers associated with them. (*See* Opposition, Exhibit 28.)

22         Second, despite the government's statement that the data provided under the "total wire intercepts"

23   category of the Overview Sections is correct, there are several discrepancies in the numbers when compared

24   with Exhibit 28. (*See* Opposition, Page 54, fn. 7.) The total number of intercepted calls for Target Telephone

25   2 for the April 2013 Overview Section is stated as 1845, where Exhibit 28 lists it as 1852. The same is true for

26   the totals for Target Telephone 2 for the May 2013 analysis, with the total being listed as 1417 in the

27   Overview Section and 1419 in Exhibit 28. The trend continues in the totals for Target Telephones 2 and 4 in

28   the July 2013 Overview Section, where the totals are listed as 1324 and 220 in the fifteen day report,

- 16 -

1   respectively, and as 1594 and 385 in Exhibit 28. The overall effect of these discrepancies is that the total calls,

2   which the government represented as being 6,608 in its Opposition, actually numbers 7,052.

3         In an effort to create the impression that it was sufficiently diligent in monitoring and minimizing the

4   wire interceptions, the government analyzes only those calls intercepted that were longer than two minutes in

5   duration. However, examining the number of these calls in contrast to the total number of calls provides a

6   stark contrast between what the government is attempting to put forward as its effort at minimization and

7   what its effort actually was. The maximum number of calls over two minutes that were intercepted is 325, on

8   Target Telephone 2 in April of 2013. *Id.* Of these, the Government claims that it minimized 99, and that it

9   minimized 81 that were characterized as non-pertinent. *Id.*

10        This is contrasted with the number under "total number of intercepted calls" in the same category –

11  1852. Of this total, the government contends it minimized 148, and 128 were characterized as pertinent.

12  Together, these categories create less than 15 percent of the total intercepted calls. Exhibit 28 gives no

13  explanation as to whether the total minimized calls were or were not pertinent, or where the "total number" of

14  minimized calls fits into the number of minimized calls "longer than two minutes." Nor does it elucidate what

15  happened to the remaining 1576 calls that were intercepted on Target Telephone 2 during April of 2013.

16        Exhibit 28, which purports to clarify the data presented in the Overview Sections, does nothing more

17  than attempt to change this Court's perception of the data which exists. The Exhibit puts forth the data from

18  the Overview Sections, and then does not even attempt to analyze it, instead analyzing calls over two minutes,

19  a category which was not included in any of the Overview Sections before July of 2013.

20        The government had an obligation to disclose information as to how the Voicebox system worked

21  with each of the prior fifteen day reports relied on by both this Court and Defendants. Their failure to do so

22  impeaches the information contained therein by inducing both this Court and Defendants to rely upon

23  numerical data that the government knew to be inaccurately represented. The text of the Overview Sections

24  state simply "total number of intercepts," "number of intercepts flagged as pertinent," and "number of

25  minimized intercepts." Without further explanation as to the intricacies of the Voicebox System, the only

26  reasonable interpretation of this text is to read its plain meaning and rely on this meaning as accurate. Thus, in

27  their withholding of information that illustrated how the software works, the government has misrepresented

28  data to this Court.

DEFENDANT YEE'S REPLY IN SUPPORT OF MOTION TO SUPPRESS
EVIDENCE DERIVED FROM WIRETAP INTERCEPTIONS

Case No.
CR 14-00196-CRB-2 (JCS)

1    In the instant motions to suppress the illegally obtained information from multiple wiretaps, Yee and

2    Defendant Jackson both argued that the government failed to properly minimize the wires. Specifically, Yee

3    argued that the government intercepted thousands of non-pertinent calls and mischaracterized numerous other

4    calls as pertinent. In response, the government dismissed Yee and Jackson's arguments as without merit

5    because both completely misunderstand and misinterpret the minimization data. However, the government

6    bears the burden of proving its compliance with the minimization requirement, *United States v. Rivera,* 527

7    F.3d 891, 904 (9th Cir. 2007). Here, the Government has not only violated its duty under Title III to

8    "minimize" the interception of non-pertinent communications, it has also misled the Court and Defendants

9    about the nature and number of communications intercepted. In short, the government has not met its burden

10    to show compliance with the minimization requirement and therefore these communications must be

11    suppressed.

12    **D.    All Wiretaps Derived from the Subsequent Applications Must Also Be Suppressed**

13    The suppression remedy provided in Title III extends to unlawfully obtained wiretap interceptions,

14    and "evidence derived therefrom." In *Giordano*, the Supreme Court ruled that "evidence derived" from an

15    initial unlawful interception includes subsequent applications that rely upon the initial submission and

16    intervening wiretaps to establish probable cause. *United States v. Giordano*, 416 U.S. 505, 529-31 (1974);

17    *U.S. v. Arreguin*, 277 F. Supp. 2d 1057, 1059 (E.D. Cal. 2003). Accordingly, all evidence obtained using

18    communications intercepted on the basis of evidence obtained from Yee's phones must be suppressed.

19    ///

20    ///

21    ///

22    ///

23    ///

24    ///

25    ///

26    ///

27    ///

28    ///

### III.   CONCLUSION

For the foregoing reasons, the Court should suppress all of the wiretap recordings intercepted from Yee's phones obtained pursuant to the November 2012 Application, and each of the subsequent applications, as well as all evidence derived therefrom. Alternatively, the Court should conduct a *Franks* hearing to make a determination to what extent the wiretap evidence should be suppressed.


Dated:  April 28, 2015

MURPHY, PEARSON, BRADLEY & FEENEY


By _____
    James A. Lassart
    Nicholas C. Larson
    Attorneys for Defendant
    LELAND YEE


20899574.doc