1   JAMES J. BROSNAHAN (CA SBN 34555)
    JBrosnahan@mofo.com
2   SOMNATH RAJ CHATTERJEE (CA SBN 177019)
    SChatterjee@mofo.com
3   CHRISTOPHER W. MAGAÑA (CA SBN 287256)
    CMagana@mofo.com
4   MORRISON & FOERSTER LLP
    425 Market Street
5   San Francisco, California 94105-2482
    Telephone: 415.268.7000
6   Facsimile: 415.268.7522

7   Attorneys for Defendant
    KEITH JACKSON
8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11

12   UNITED STATES OF AMERICA,              Case No.   3:14-CR-00196 (CRB)

13                   Plaintiff,             **KEITH JACKSON'S NOTICE OF**
                                            **MOTION AND MOTION TO**
14          v.                              **SUPPRESS FRUIT OF ILLEGAL**
                                            **WIRETAPS, OR IN THE**
15   KEITH JACKSON,                         **ALTERNATIVE, FOR A** *FRANKS*
                                            **HEARING**
16                   Defendant.
                                            **HEARING DEMANDED**
17
                                            Date:     April 30, 2015
18                                          Time:     9:30 a.m.
                                            Court:    Hon. Charles R. Breyer
19                                          Location: Courtroom 6, 17th Floor

20

21                    <u>**PREVIOUSLY FILED UNDER SEAL**</u>

22

23

24

25

26

27

28

1

## NOTICE OF MOTION

2   PLEASE TAKE NOTICE that on April 30, 2015, at 9:30 a.m., or as soon thereafter as the

3   matter may be heard before the Honorable Charles Breyer, Defendant Keith Jackson, through

4   counsel, will and hereby does move this Court for an order suppressing all communications

5   obtained by means of wire interceptions on the grounds that the wire interceptions were made

6   without probable cause and without the requisite showing of necessity in violation of Title 18 of

7   the United States Code Section 2518, in violation of Title 18 of the United States Code Section

8   2510 *et seq*, and in violation of the Fourth Amendment of the United States Constitution.

9   Defendants further move to suppress on the ground that the interceptions were not made in

10  conformity with the order of authorization as they were not properly minimized as required by

11  law.  Alternatively, this motion seeks a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154

12  (1978).

13  This motion is made pursuant to the Fourth Amendment of the United States Constitution,

14  Title 18 of the United States Code Section 2518(1)(c), and Rule 12(b)(3) of the Federal Rules of

15  Criminal Procedure.  This motion is based upon the attached Memorandum of Points and

16  Authorities, attachments, exhibits, the files and records in this case, and any argument or evidence

17  which may be presented during the pendency of this motion and at the hearing on this and related

18  motions.

19  Mr. Jackson hereby joins in any and all other motions to suppress the intercepted wire

20  communications that have or will be filed in connection with the above-captioned case.

21

22  Dated: March 26, 2015                          Respectfully submitted,

23                                                 MORRISON & FOERSTER LLP

24

25  By:   /s/ James J. Brosnahan
          JAMES J. BROSNAHAN

26                                                 Attorneys for Defendant
                                                   KEITH JACKSON

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTIONS.................................................................................................. i

I.    INTRODUCTION ................................................................................................. 1

II.   THE AFFIDAVIT IN SUPPORT THE NOVEMBER 13, 2012 WIRETAP
APPLICATION ON MR. JACKSON'S AND SENATOR YEE'S CELL PHONES
IS RIFE WITH MATERIAL MISSTATEMENTS AND OMISSIONS ........................... 2

    A.   The Government Made Material False Statements and Misrepresentations
in the November 13, 2012 Affidavit ........................................................... 2

    B.   The Government Omitted Substantial Exculpatory Evidence that
Undermine the Government's Probable Cause and Necessity Claims ................. 8

    C.   The Government Failed to Disclose the Nature of UCE-4773's Misconduct ........ 9

    D.   Stripped of Material Misrepresentations and Omissions, the Application
Fails to Establish Probable Cause ........................................................... 10

III.  INTERCEPTIONS FROM THE WIRETAP EXTENSIONS SHOULD BE
SUPPRESSED ................................................................................................ 11

IV.  GIVEN THE MISREPRESENTATIONS AND OMISSIONS, AND LACK OF
PROBABLE CAUSE, THE COURT SHOULD SUPPRESS THE
INTERCEPTIONS OR ORDER AN EVIDENTIARY HEARING TO TEST THE
VALIDITY OF THE AFFIDAVITS ....................................................................... 14

V.   THE AFFIDAVITS SUBMITTED IN SUPPORT OF WIRETAPS FAIL TO
ESTABLISH NECESSITY FOR A WIRETAP ......................................................... 16

    A.   The Government Failed to Show that Normal Investigative Techniques
Were Insufficient................................................................................. 17

        1.   Unimpeded Access to Mr. Jackson ............................................. 18

        2.   Access to Other Defendants and Witnesses.................................... 18

        3.   Telephone Records Analysis...................................................... 19

        4.   Trash Records....................................................................... 20

        5.   Mail Covers and Internet Records .............................................. 20

        6.   Physical Surveillance .............................................................. 21

    B.   The Government Misled the Court as to the Reasons for Requesting a
Wiretap............................................................................................. 21

VI.  THE GOVERNMENT FAILED TO MINIMIZE THE INTERCEPTION OF
IRRELEVANT CONVERSATION......................................................................... 22

VII. CONCLUSION ................................................................................................ 24

1

# TABLE OF AUTHORITIES

2

Page(s)

3

CASES

4

*Aguilar v. Texas,*
378 U.S. 108 (1964) ............................................................................................ 17

5

*Franks v. Delaware,*
438 U.S. 154 (1978) ..................................................................................... 2, 15

6

7

*Mills v. Graves,*
930 F.2d 729 (9th Cir. 1991) .......................................................................... 16

8

9

*United States v. Aileman,*
986 F.Supp. 1228 (N.D. Cal. 1997) ........................................................ 14, 15

10

*United States v. Blackmon,*
273 F.3d 1204 (9th Cir. 2001) ................................................................. *passim*

11

12

*United States v. Brone,*
792 F.2d 1504 (9th Cir. 1986) ........................................................................ 14

13

*United States v. Canales Gomez,*
358 F.3d 1221 (9th Cir. 2004) ........................................................................ 14

14

15

*United States v. Carneiro,*
861 F.2d 1171 (9th Cir. 1988) .......................................................... 12, 15, 17

16

17

*United States v. Chesher,*
678 F.2d 1353 (9th Cir. 1982) ........................................................................ 15

18

19

*United States v. Echavarria-Olarte,*
904 F.2d 1391 (9th Cir. 1990) ........................................................................ 14

20

*United States v. Elliott,*
893 F.2d 220 (9th Cir. 1990) .......................................................................... 14

21

22

*United States v. Garcia-Villalba,*
585 F.3d 1223 (9th Cir. 2009) ........................................................................ 14

23

*United States v. Giordano,*
416 U.S. 505 (1974) ........................................................................................ 16

24

25

*United States v. Gonzalez, Inc.,*
412 F.3d 1102 (9th Cir. 2005) ........................................................................ 14

26

27

*United States v. Ippolito,*
774 F.2d 1482 (9th Cir. 1985) ........................................................................ 17

28

Page

*United States v. Kahn*,
415 U.S. 143 (1974) ........................................................................... 18

*United States v. Kalustian*,
529 F.2d 585 (9th Cir. 1975) ............................................................ 17

*United States v. Kiser*,
716 F.2d 1268 (9th Cir. 1983) .......................................................... 15

*United States v. McGuire*,
307 F.3d 1192 (9th Cir. 2002) .......................................................... 22

*United States v. Meling*,
47 F.3d 1546 (9th Cir. 1995) ............................................................ 14

*United States v. Renzi*,
722 F. Supp. 2d 1100 (D. Ariz. 2010) .............................................. 22

*United States v. Rivera*,
527 F.3d 891 (9th Cir. 2007) ............................................................ 22

*United States v. Smith*,
31 F.3d 1294 (4th Cir. 1994) ............................................................ 16

*United States v. Spagnuolo*,
549 F.2d 705 (9th Cir. 1977) ............................................................ 17

*United States v. Staffeldt*,
451 F.3d 578 (9th Cir. 2006) ............................................................ 14

*United States v. Stanert*,
762 F.2d 775 (9th Cir.), *as amended*, 769 F.2d 1410 (9th Cir. 1985) .................................. 9, 15

*United States v. Tham*,
960 F.2d 1391 (9th Cir. 1992) .......................................................... 14

*United States v. Turner*,
528 F.2d 143 (9th Cir. 1974) ............................................................ 22

**STATUTES**

18 U.S.C.
§§ 1341, 1343 & 1346 ........................................................................ 1
§ 1956 ................................................................................................. 1
§ 2518(1)(c) .......................................................................... 14, 15, 16
§ 2518(3)(a) ...................................................................................... 14
§§ 2518(3)(a),(b) & (d) .................................................................... 14
§ 2518(10) ........................................................................................... 2
§ 2518(10)(a) .................................................................................... 16

21 U.S.C. 841 ...................................................................................................... 1

**Page**

21 U.S.C.
   § 843(b) ........................................................................................................ 1
   § 846 ............................................................................................................. 1

v

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

On November 13, 2012, the United States sought and obtained authority to intercept telephone conversations conducted over defendant Keith Jackson's mobile telephone, as well as Mr. Jackson's conversations on Senator Yee's telephones.  The government sought and obtained an order extending the wiretaps on Mr. Jackson's and Senator Yee's telephones on February 8, 2013, April 3, 2013, and May 9, 2013.  Mr. Jackson continued to be a target of a wiretap obtained on Senator Yee's telephones on July 1, 2013.  As a result of these wiretaps, the government obtained over 16,879 audio files representing interceptions of communications over Mr. Jackson's cell phone during that time period.  This figure represents no minor intrusion, especially one predicated on deliberate false statements and omissions.  By this motion, Mr. Jackson moves to suppress all communications obtained pursuant to those wiretaps and any evidence obtained as a result of those wiretaps, *i.e.*, fruit of the poisonous tree.

The government submitted only one affidavit in support the November 13, 2012 wiretap application on Mr. Jackson's and Senator Yee's cell phones.  That affidavit by FBI Special Agent Ethan Quinn[1] is rife with inaccuracies, misstatements, and material omissions—made deliberately or with reckless disregard for the truth—that fundamentally mischaracterized the facts and status of the investigation.  Stripped of these inaccuracies, the application fails to establish probable cause that Mr. Jackson was involved in the specific crimes identified by the government as "target offenses" in the application.[2]  As a result, any intercepts pursuant to the November 13 applications must be suppressed.  Further, the information obtained pursuant to that wiretap was tainted, and subsequent wiretap applications relied on the tainted November 13 wiretap

---

[1] Hereafter "First Quinn Affidavit."

[2] The First Quinn Affidavit identifies six "target offenses" for which Agent Quinn claims there is probable cause to justify the interception of  Mr. Jackson's and Senator Yee's cell phone conversations: (a) mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343 & 1346; (b) money laundering, in violation of 18 U.S.C. § 1956; (c) violations of the Travel Act, in violation of 18 U.S.C. § 1956; (d) conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846; (e) distribution of controlled substances, in violation of 21 U.S.C. 841; and (f) use of communication facility to commit or facilitate narcotics offense, in violation of 21 U.S.C. § 843(b).

application and tainted information obtained pursuant to that application.[3]  Accordingly, information obtained pursuant to subsequent wiretap applications are fruit of the poisonous tree and must also be suppressed.  The affidavit filed in support of the November 13, 2012, application, as well as subsequent affidavits, also lack the requisite showing that wiretaps were necessary to the government's investigation.  The failure to show necessity is an independent reason to suppress information obtained pursuant to those wiretaps.  Further, after the wiretaps were in place, the government then failed to properly minimize the intrusion into the defendants' conversations as promised in the supporting affidavits and as required by law.

Accordingly, under 18 U.S.C. § 2518(10), the Court should suppress the contents of any wire or oral communication intercepted by means of the wiretaps as well as any evidence that was obtained as a result of the tainted interceptions.  In the alternative, the Court should order an evidentiary hearing, including the testimony of affiants Quinn, Clark, Garlie, and Jones, and undercover agents UCE-4773 and UCE-4599 under *Franks v. Delaware*, 438 U.S. 154 (1978), in order to test the validity, accuracy, and completeness of the affidavits.

## II.   THE AFFIDAVIT IN SUPPORT THE NOVEMBER 13, 2012 WIRETAP APPLICATION ON MR. JACKSON'S AND SENATOR YEE'S CELL PHONES IS RIFE WITH MATERIAL MISSTATEMENTS AND OMISSIONS

### A.   The Government Made Material False Statements and Misrepresentations in the November 13, 2012 Affidavit

In order to attempt to manufacture probable cause for the target crimes and necessity, the government included numerous misstatements and made material omissions in the Quinn affidavit.  False and misleading statements are described in Attachment A.  For Example:

1.   Agent Quinn asserts that his November 13, 2011 affidavit was based in part on "Every conversation listed in this Affidavit to which 4773 was a party, except one conversation,

---

[3]Accompanying the February 8, 2013 application was an affidavit prepared by Agent Quinn (hereafter "Second Quinn Affidavit"); accompanying the April 3, 2013 application was an affidavit prepared by FBI Special Agent Maya Clark (hereafter "Clark Affidavit"); accompanying the May 9, 2013 application was an affidavit prepared by Special Agent Jennifer Garlie ("Garlie Affidavit"); and accompanying the July 1, 2013 application was an affidavit prepared by FBI Special Agent Jason Jones ("Jones Affidavit").

was recorded and I have reviewed all recorded conversations and/or reports of those conversations." (First Quinn Affidavit at 13, n.2.) There are hundreds of hours of recordings leading up to the November 13 application. Whether Agent Quinn listened to every conversation involving UCE-4773 is doubtful. His statement suggests that he did not and that, instead, he read certain reports of some of the conversations. If the reports mischaracterized the conversations between the target and the agent, then Agent Quinn's affidavit necessarily includes false statements and misrepresentations. Given the FBI's very real concerns about UCE-4773's conduct in this investigation, there are significant concerns about the reliability of the information he provided in any reports that Agent Quinn may have relied upon in his affidavit.

2.      Agent Quinn asserts that Mr. Jackson was introduced to UCE-4773 in September 2011 and that "[f]rom that point forward, UCE-4773 has been in contact with JACKSON and has been solicited by JACKSON and others to make unlawful payments to" certain campaigns. (First Quinn Affidavit at 13.) This is false. Mr. Jackson had not been soliciting unlawful payments to campaigns from UCE-4773 since September 2011. Indeed, UCE-4773 is the first person to suggest the idea of donations in excess of the contribution limits, which he did in a September 26, 2011 phone call to Jackson. (Chatterjee Decl. Ex. 1.) The government further mischaracterizes the conversation by omitting statements from Jackson suggests that any donations be made by credit card or check as required under local campaign law. The false idea that Mr. Jackson was the one initiating such activity permeates the affidavits and significantly shades the probable cause analysis, of which Agent Quinn was well aware when preparing this affidavit.

3.      Agent Quinn states that "official action included Senator Yee acting on behalf of *companies* that UCE 4773 represented he had an interest in contracts with the State of California and other governmental entities within the state of California" including "writing a letter and placing a telephone call on behalf of *companies* related to UCE 4773." (First Quinn Affidavit at 14. ) (emphasis added.) This statement is false. Senator Yee is alleged to have made a call and written a letter on behalf of only *one* company. This is no minor technical defect. The affidavit intentionally overstates the allegation of criminal conduct in order to obtain a wiretap.

4.      Agent Quinn asserts that Mr. Jackson and others agreed that UCE-4773 would receive favors for political contributions that would "include benefits in receiving contracts as local and/or minority businesses for companies in which UCE4773 represented he had an interest, regardless of their place of operation and the ownership of companies." (First Quinn Affidavit at 15.) This is false. The government cites no conversation where such a promise or agreement was made. We are aware of no such promise or agreement in the record.

5.      Agent Quinn asserts that UCE-4599 represented himself to Mr. Jackson "as a marijuana trafficker and money launderer from New Jersey who is affiliated with La Cosa Nostra, an Italian organized crime organization." This is false. We have located no recording where UCE-4599 stated to Mr. Jackson that he was affiliated with or a member of "La Cosa Nostra," or even the "mafia," or that he was a "trafficker" in marijuana.

6.      Agent Quinn asserts that on May 25, 2011, Mr. Jackson told UCE-4599 that "if UCE 4599 wanted to contribute $5,000 to Senator Yee's campaign, the money could be placed in different accounts under multiple names at a rate of $500 each." (First Quinn Affidavit at 18.) This conversation does not appear in discovery. What *does* appear in discovery about that evening entirely contradicts that narrative. It is UCE-4599 who attempts to make a contribution over local limits, which Mr. Jackson refused. On May 25, 2011, Mr. Jackson told UCE-4599 about an upcoming fundraiser on June 23, 2011, for Leland Yee, who Mr. Jackson believes will be the next mayor of San Francisco. (Chatterjee Decl. Ex. 3) UCE-4599 offered to make a donation, and Mr. Jackson made it clear that the donation was subject to local limits and had to be by check or credit card:

Jackson: "How much should I put you down for?

4599: What do you need?

Jackson: $500

4599: That's it?

Jackson: That's it. You only can do $500

4599: Oh really?

Jackson: Yeah, that's it.

1    4599: You want cash or you want…?

2    Jackson: No, you gotta do a check.

3    4599: Listen I don't do checks, I don't do anything check.

4    Jackson: Alright, you could do credit card.

5    4599: Alright, well, I'll figure it out.

6         7.     Agent Quinn asserts that on June 24, 2011, Mr. Jackson "asked UCE 4599 to

7    contribute $3,000." (First Quinn Affidavit at 18). This is false. Mr. Jackson told UCE-4599 that

8    he had committed to raising $20,000 for Senator Yee and was $3,000 short. He asked if UCE-

9    4599 "would be interested in *raising* a little money for us." (Chatterjee Decl. Ex 4.) This false

10   statement is emblematic of the government's misrepresentations. Raising $3,000, which means

11   that funds come from different sources, is fundamentally different than contributing $3,000.

12        8.     Agent Quinn asserts that "sometime" before September 20, 2011, "4599 told

13   Jackson that his friend [4773] was a businessman who assisted UCE 4599 in laundering money."

14   (First Quinn Affidavit at 19). This is false. We are aware of no recorded conversation in which

15   UCE-4599 ever discussed with Mr. Jackson that UCE-4773 assisted UCE-4599 with money

16   laundering prior to September 20, 2011. On the contrary, UCE-4773 was introduced as a

17   businessman with his own dealings apart from UCE-4599, and who was interested in growing his

18   business in the Bay Area. During a call between Mr. Jackson and UCE-4599 regarding meeting

19   UCE-4773, on September 14, 2011, UCE-4599 describes UCE-4773 as follows:

20           [A]ctually, one of the guys my family does business with, his name
             is Mikey, or I call him Mikey, but his real name is Michael ▮▮▮▮

21           He's a really, really good guy, he's a heavy hitter from the Atlanta
             area. I think he's definitely somebody you should know because

22           he's gonna start up – he's looking at starting up some business in
             and around this area and everything he does, I mean he's done a lot

23           of work with us and he's helped my family out a lot, but he's got
             his own thing going on and I think he's worth meeting. He's

24           definitely worth meeting.

25   (Chatterjee Decl. Ex. 5.) UCE-4599's does not suggest that UCE-4773 is involved in money

26   laundering or any type of criminal activity.

27        9.     Agent Quinn states that Mr. Jackson told UCE-4773 that "he broke up the money

28   among straw donors in order to make conduit contributions." (First Quinn Affidavit at 22.)

Agent Quinn does not state when this conversation took place. The discovery suggests that Agent Quinn might have been referring to an October 10, 2011 conversation. As of this date, however, it was impossible for Mr. Jackson to have "broken up" any contribution from UCE-4773. UCE-4773 had only contributed a total of $1,000, representing $500 from UCE-4773 and $500 from UCE-4773's wife, amounts well within local contribution limit.

10.     Agent Quinn asserts that by October 14, 2011, "UCE 4773 had contributed $11,000 to Senator Yee's campaign." (First Quinn Affidavit at 22.) This is false. The affidavit makes clear that by that date, UCE-4773 donated $500 from himself, arranged for his wife to donate $500, arranged for 10 undercover agents to donate $500, and written a check to Keith Jackson for consulting fees for $5,000. Agent Quinn contradicted his own representation by stating that the agent "raised" $11,000 by that date. (First Quinn Affidavit at 22).

11.     Agent Quinn misrepresents Senator Yee's October 14, 2011, conversation with UCE-4773. Agent Quinn quotes UCE-4773 as describing his donations as "too much money … not to get something" and then alleges that Senator Yee acknowledged that statement. US400293. This is false. Senator Yee did not acknowledge that a donation was too much money not to get something in return. The full passage shows that Senator Yee acknowledged that UCE-4773 believes that he cannot ask for a quid-pro-quo. (Chatterjee Decl. Ex. 8.)

12.     Agent Quinn states that "[t]hroughout the remainder of the 2011 Mayoral campaign JACKSON and ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ contacted UCE 4773 via telephone to ask for additional contributions beyond the campaign finance limit." (First Quinn Affidavit at 24.) Again, this is false. Agent Quinn fails to provide any specific instances, but relies on generic unsubstantiated claims. The government appears to be referring to the calls that it already summarized, which encourage UCE 4773 to donate additional money to a ballot measure.

13.     Agent Quinn mischaracterizes a January 18, 2012 conversation between Senator Yee, ▓▓▓▓▓▓ and UCE-4773 regarding request for additional donations to retire Senator Yee's campaign debt, and omits critical statements contradicting the false narrative presented. (First Quinn Affidavit at 25.) Senator Yee acknowledges that UCE-4773 has already contributed

1    $500 and states "He cannot give, you can't give." (Chatterjee Decl. Ex. 9.)  When UCE-4773

2    asks how he can raise money without donating personally, ███ Yee, and UCE-4773 discuss

3    bundling money, like UCE-4773 did before, when he raised $5,000 by gathering checks from

4    individual donors, and giving the checks to ███

5        14.    Agent Quinn states that "[o]n February 15, 2012, UCE 4773 mailed a $2,000

6    check to JACKSON.  UCE 4773 and JACKSON discussed that this payment, which was made to

7    JACKSON personally, was the first of what were going to be under-the-table, monthly payments

8    to JACKSON" for helping UCE-4773 build his business interests in San Francisco.  (First Quinn

9    Affidavit at 29.)  This is false.  During this call, Mr. Jackson and UCE-4773 discuss a contract for

10   consulting services and UCE-4773 informs Mr. Jackson he has already mailed a $2,000 check for

11   consulting services.  (Chatterjee Decl. Ex. 2).  There is no record in the discovery where UCE-

12   4773 describes his fees to Jackson as "under-the-table."  On the contrary, UCE-4773 paid

13   Mr. Jackson by check and by wire transfer for consulting services in connection with legitimate

14   business.

15        15.    Agent Quinn asserts that, in a discussion between Mr. Jackson and UCE-4773,

16   "[Mr. Jackson] stated that they are trying to get [an individual] on the '███ Commission' which

17   'will be good for us.'"  (First Quinn Affidavit at 42)  This statement is false and misleading

18   because it incorrectly implies that Mr. Jackson is exerting political pressure to get an individual

19   placed on the ███ Commission.  In this May 18, 2012 discussion, the "they"

20   Jackson was referring to was a third party who was considering placing someone on the ███

21   ███ Commission, but Mr. Jackson was not involved in that effort.  (Chatterjee Decl.

22   Ex. 11.)

23        16.    Agent Quinn asserts that on May 30, 2012, at a lunch with Mr. Jackson, UCE-

24   4773 and UCE-4599 discussed "their investments together, including UCE-4599's operations 'up

25   north' – a reference to his purported marijuana grows."  (First Quinn Affidavit at 42.)  He also

26   asserts that UCE-4599 advised that his "father wanted to make sure UCE-4773 [was] cleaning the

27   finances of Madison International," UCE-4773's company.  (Id.)  Agent Quinn, however, omits

28   that Jackson was not a part of the "up north" conversation.  (Chatterjee Decl. Ex. 12.)  Nor was

1    Jackson a part of the conversation regarding Madison International. (*id.*) Further, neither UCE-

2    4599 nor UCE-4773 uses the word "marijuana" in reference to their business "up north."

3         17.    Agent Quinn asserts that on September 19, 2012, during a call with UCE-4773,

4    "JACKSON explained that the $10,000 will be broken up into $500 donations to [candidate], who

5    ran for ███████ According to Jackson, [candidate] would then turn the money over to Senator

6    YEE." (First Quinn Affidavit at 50.) This is false and misleading. During this call, Mr. Jackson

7    asked UCE-4773 to donate to the candidate, stating that if money is raised for that candidate, "in

8    return she will raise money for [Senator Yee]." Mr. Jackson does not say that the same money

9    will be passed through to Senator Yee. (Chatterjee Decl. Ex. 13.) The context of this discussion

10   is one candidate raising money for another candidate, which is fundamentally different than the

11   government's representation.

12        **B.    The Government Omitted Substantial Exculpatory Evidence that Undermine
          the Government's Probable Cause and Necessity Claims**

13

14        Agent Quinn's selection of conversations to present to the Court was highly selective and

15   misleading. He selectively omitted substantial exculpatory evidence that contradicts the

16   government's claim of probable cause in an effort to "stack[] the deck" against Mr. Jackson and

17   Senator Yee. For example:

18        1.    On May 25, 2011, UCE-4599 asked Mr. Jackson how much he can contribute to

19   Senator Yee's mayoral campaign. Mr. Jackson replied that the limit is $500 and that the

20   contribution must be by check or credit card. (Chatterjee Decl. Ex. 3).

21        2.    On October 14, 2011, UCE-4773 asked Senator Yee how UCE-4773 can avoid

22   contribution limits to individual candidates. Senator Yee did not encourage UCE-4773 to

23   contribute in excess of the contribution limits. Instead, he told him that under the law the

24   contribution limits to not apply to ballot measures. (Chatterjee Decl. Ex. 8).

25        These and other exculpatory statements demonstrating that Mr. Jackson and Senator Yee

26   were making efforts to comply with campaign finance regulations were excluded from the

27   government's wiretap application, and had they been included, they would have weighed against

28   any finding of probable cause. By reporting less than the total story, the government's effort

reflects an attempt to materially influence the Court's decision. *See United States v. Stanert*, 762 F.2d 775, 780-81 (9th Cir.), *as amended*, 769 F.2d 1410 (9th Cir. 1985). ("By reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw. To allow a magistrate to be misled in such a manner could denude the probable cause requirement of all real meaning.")

**C.    The Government Failed to Disclose the Nature of UCE-4773's Misconduct**

The government failed to disclose the nature of UCE-4773's misconduct in the November 13 wiretap application and throughout the subsequent applications. This was done while at the same time acknowledging that UCE-4773 was "the primary undercover agent used in this branch of the investigation," see First Quinn Affidavit at 73, and had, for all intents and purposes been removed from the investigation. It was only when UCE-4773 became embroiled in a financial scandal, jeopardizing his continued availability in the investigation, did the government seek authorization for a wiretap.

In a footnote to the affidavit in support of the November 13, 2012 wiretap application, the FBI revealed that it had concerns about UCE-4773's management of the undercover operation. The FBI Special Agent admits that he was "was aware that there has been an internal FBI program review related to the financing and financial record-keeping of the undercover program under which UCE 4773 was operating. To date, that review has not resulted in any formal findings or determinations regarding the credibility of UCE 4773." (First Quinn Affidavit at 13 n.2.) Had the government provided the Court with a true accounting of UCE-4773's conduct, that information would have been material..

In the February 8, 2013, the FBI Special Agent disclosed in a subsequent wiretap application that there was a "pending internal investigation by [the] FBI regarding UCE-4773." (Second Quinn Affidavit at 10 n.1.) The government reported that, while "UCE 4773 may be permitted to work on this case again," the internal investigation caused the government to "withdraw UCE 4773 by utilizing a cover that UCE 4773 was working on business interest for UCE 4599 in Panama and that UCE 4773's father had passed away." (Second Quinn Affidavit at

1  10 n1, 107.)  A review of the evidence reflects that UCE-4773 did not have any contact with

2  Jackson following his "withdrawal" from the investigation.

3      **D.**    **Stripped of Material Misrepresentations and Omissions, the Application Fails to Establish Probable Cause**

4

5      At the time of filing the November 13, 2012 wiretap application, the government lacked

6  probable cause to seek a wiretap targeting Mr. Jackson.  Despite the government's extensive use

7  of undercover agents and other traditional investigative techniques, there were insufficient indicia

8  that Mr. Jackson was engaged in any activity related to the target offenses.  Absent the requisite

9  probable cause, the wiretap authorization was invalid.[4]

10      Mr. Jackson was first introduced to UCE-4599 by Raymond Chow over the telephone on

11  June 28, 2010.  Mr. Chow subsequently introduced UCE-4599 to Mr. Jackson in person on

12  August 5, 2010, describing Mr. Jackson as a consultant working with ▮▮▮▮▮▮▮▮ and

13  other companies in the San Francisco Bay area.  UCE-4599 introduced himself to Mr. Jackson as

14  a businessman looking for investment opportunities in San Francisco, even suggesting that

15  Mr. Jackson could help him obtain permits to do business in San Francisco.  At no time prior to

16  the November 13, 2013 wiretap application did UCE-4599 describe himself to Keith Jackson as a

17  person with ties to "La Cosa Nostra."  Mr. Jackson met with UCE-4599 numerous times during

18  the more than two-year period between their introduction and the filing of the wiretap application.

19  During this time period, UCE-4599 spent hundreds, if not thousands, of dollars on food and

20  drinks for Mr. Jackson.[5]  Their conversations ranged from social banter, to the discussion of

21  legitimate business opportunities.  At most, UCE-4599 bragged about his own involvement in

22  conduct that could at best be described as of questionable activity, but never once did UCE-4599

23

24  [4]The appearance of Mr. Jackson's name in status reports filed by the government in connection with previously

25  authorized interceptions targeting defendants Raymond Chow and George Nieh is insufficient to provide probable cause in support of the November 13, 2012 application.  No evidence from the prior wiretaps provide any basis for

26  probable cause for the target offenses against Mr. Jackson.

27  [5]In a September 4, 2013 letter to defense counsel, AUSA Waqar Hasib indicated that the government was in the process of collecting receipts and similar items reflecting expenditures made by UCE's and CHS's on behalf of Mr. Jackson.  To date, the defense has yet to receive a complete accounting of these materials.

28

1    expressly describe his activities as criminal or illegal.  UCE-4599's description of his purported

2    conduct is insufficient to cast the shadow of probable cause on Mr. Jackson.

3          Similarly, at no time did Mr. Jackson engage in criminal conduct with UCE-4773.  On the

4    contrary, UCE-4773 was introduced to Mr. Jackson as a person with whom UCE-4599's family

5    does business and who is looking to invest heavily in the San Francisco Bay Area.  (Chatterjee

6    Decl. Ex. 5)  As the First Quinn Affidavit correctly notes, "UCE 4773 presented himself as a

7    businessman based in Georgia who represents clients who are interested in business and

8    investment opportunities in California generally, and the San Francisco Bay area in particular."

9    (First Quinn Affidavit at 19.).  Throughout his relationship with UCE-4773, Mr. Jackson sought

10   out legitimate business opportunities for UCE-4773 to invest in pursuant to a $2,000 monthly

11   consultancy agreement.  Among the efforts Mr. Jackson expended on UCE-4773's behalf were a

12   meeting with an █████████████████████ to discuss statewide opportunities for

13   development of assisted living facilities, redevelopment opportunities in Oakland, California,

14   business opportunities in California for UCE-4773's client Well Tech, meetings with █████

15   █████ officials about business and housing development in San Francisco, a meeting with a

16   █████████████ regarding a hotel and shopping development opportunity in █████

17   and numerous other business opportunities.  Notably, UCE-4773 promised Mr. Jackson he would

18   have a share in completed investments.  Second Quinn Affidavit at 104-105.  In short,

19   Mr. Jackson's relationship to UCE-4733 was as a paid consultant to a legitimate businessman.

20   **III.   INTERCEPTIONS FROM THE WIRETAP EXTENSIONS SHOULD BE
         SUPPRESSED**

21

22         The affidavits in support of the extensions to the wiretap, including those filed on

23   February 8, 2013, April 3, 2013, May 9, 2013, and July 1, 2013 relied heavily on allegations from

24   earlier wiretaps.  Most additional paragraphs report the details of telephone conversations

25   intercepted under authority of preceding wiretap authorizations.  As a result, misstatements and

26   omissions contained in the November 13, 2011, affidavit were carried forward into subsequent

27   wiretap affidavits.  Thus, the subsequent affidavits are subject to the same defects.  In addition,

28   the wiretaps they support are tainted fruit of the initial, illegal wiretap application and order.  *See*

1  *United States v. Carneiro*, 861 F.2d 1171, 1182 (9th Cir. 1988) ("The extension request was

2  based on evidence derived from the original wiretap order which we have concluded was

3  improperly issued. Therefore, the . . . wiretap extension is also invalid. The evidence derived

4  from it must be suppressed."). Furthermore, these affidavits also include additional material

5  misrepresentations and omissions.

6        False or misleading statements in subsequent affidavits include the following:

7      1.    As in the First Quinn Affidavit, each subsequent affiant asserts that UCE-4599

8  represented himself to Mr. Jackson a member of an "East Coast La Cosa Nostra Family" with

9  "marijuana trafficking interests" in Northern California.[6] Again, we have located no recording

10  where UCE-4599 stated to Mr. Jackson that he was affiliated with or a member of "La Cosa

11  Nostra," or even the "mafia," or that he was a "marijuana trafficker."

12      2.    Agent Quinn asserts that in a November 16, 2012, UCE-4773 stated that "It is too

13  much money not to get something out of." Mr. Jackson had requested UCE-4773's assistance in

14  raising $15,000 for Senator Yee. Despite the government's representations to the contrary, UCE-

15  4773's actual statements reflect that he is aware he isn't getting anything out of his donations to

16  Senator Yee. (Chatterjee Decl. Ex. 8) UCE-4773's frustration that he's not getting "pay to play"

17  favors from Yee has no bearing on whether Mr. Jackson is engaged in criminal activity. His

18  frustration actually speaks to the opposite conclusion: that there is no "pay to play" with Mr.

19  Jackson and Senator Yee.

20      3.    Agent Quinn asserts that on December 12, 2012, CHS#11 "stated 'it' might be

21  lucrative if they could pull it off and asked JACKSON if he knew anyone on the Oakland City

22  Council." Second Quinn Affidavit at 72. The agent concludes that this conversation must relate

23  to "engaging in manufacture and/or sales of marijuana and possible bribery." *Id.* This conclusion

24  fundamentally misrepresents the nature of the call. Mr. Jackson and CHS#11 discussed obtaining

25  permits concerning marijuana under state and local laws, and there was no discussion of

26  "bribery." (Chatterjee Decl. Ex. 15.)

27

28  [6] Second Quinn Affidavit at 8; Clark Affidavit at 12; Garlie Affidavit at 9; Jones Affidavit at 8.

4.      On January 22, 2013, "UCE 4599 told JACKSON that if Senator YEE wrote the letter [proclamation for the CKT], he would write the check. Jackson said that he would make it happen." Second Quinn Affidavit at 91. This misrepresents and omits what actually occurred during this conversation. Senator Yee had already agreed to provide the proclamation before UCE-4599 offered to "write the check.".

5.      In April 2013, FBI Agent Maya Clark stated regarding UCE-4773, "As of the filing of this Affidavit, I am informed that UCE 4773 may be permitted to resume limited undercover work in this investigation. I am also informed that there is a pending internal investigation by the FBI regarding UCE 4773. To date, that investigation has reached no conclusions that would impact the credibility of UCE 4773." Clark Affidavit at 16 n.16. This is misleading. As noted above, UCE-4773 was effectively withdrawn from the investigation the previous year.

6.      Agent Clark describes a February 14, 2013 call, between CHS#11 and Mr. Jackson discussing Mr. Jackson's consulting business. She concludes that this conversation "illustrated JACKSON attempting to secure CHS #11 projects and favorable treatment from politicians in exchange for monetary payments." (Clark Affidavit at 24.) This conclusion misrepresents the nature of the call. The quoted language in the affidavit is in direct reference to Mr. Jackson's efforts to secure a consulting contract with a prominent Bay Area company. This work is entirely unrelated to Mr. Jackson's work for CHS#11 and there was no discussion of favorable treatment in exchange for donations. Again, an affiant attempts to use the words and conduct of a government agent to establish probable cause against Mr. Jackson where none exists. (Chatterjee Decl. Ex. 17.)

IV. **GIVEN THE MISREPRESENTATIONS AND OMISSIONS, AND LACK OF PROBABLE CAUSE, THE COURT SHOULD SUPPRESS THE INTERCEPTIONS OR ORDER AN EVIDENTIARY HEARING TO TEST THE VALIDITY OF THE AFFIDAVITS**[7]

Given the material misstatements and omissions noted above and in Exhibit A and the government's failure to show probable cause, the Court should suppress the results of the wiretaps on Mr. Jackson or order an evidentiary hearing to test the validity of the affidavits.

"Because Congress recognized the grave threat to privacy that wiretaps pose, it spelled out in elaborate and generally restrictive detail the process by which wiretaps may be applied for and authorized." *United States v. Staffeldt*, 451 F.3d 578, 580 (9th Cir. 2006). This was to ensure that "wiretaps are limited to those 'situations clearly calling for the employment of this extraordinary investigative device.'" *Id.*

Before resorting to a wiretap, the government must demonstrated probable cause[8] and prove necessity. *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1110 (9th Cir. 2005); *United States v. Garcia-Villalba*, 585 F.3d 1223, 1227 (9th Cir. 2009). The government must establish probable cause to find that (1) that the individual has committed or is about to commit one of the offenses specified by Congress in § 2516; (2) that communications concerning the enumerated offense will be intercepted; and (3) that the particular telephone or device being tapped is itself being used in connection with the commission of the specified offense. 18 U.S.C. §§

---

[7]A wiretap challenge in the district court is, essentially, appellate review of the original authorizing court's decision to permit a wiretap. *See United States v. Aileman*, 986 F.Supp. 1228 (N.D. Cal. 1997) (affirming magistrate decision to suppress wiretap evidence where there was no necessity). The standard of review varies depending on the legal issue. A district court's decision to authorize a wiretap on the face of the application and affidavit is reviewed for an abuse of discretion. *See United States v. Canales Gomez*, 358 F.3d 1221, 1225 (9th Cir. 2004); *United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001); *United States v. Echavarria-Olarte*, 904 F.2d 1391, 1395 (9th Cir. 1990). The authorizing court's determination that the government's wiretap application complied with the "full and complete statement" requirement of Section 2518(1)(c) is reviewed de novo. *See Blackmon*, 273 F.3d at 1207; *United States v. Brone*, 792 F.2d 1504, 1506 (9th Cir. 1986). Similarly, de novo review is utilized when evaluating whether false statements or omissions affected the original decision to authorize the interception. *See United States v. Elliott*, 893 F.2d 220, 222 (9th Cir. 1990). The ultimate question whether a false statement or omission is essential to a finding of probable cause or necessity is a mixed question of law and fact reviewed de novo. *United States v. Tham*, 960 F.2d 1391, 1395 (9th Cir. 1992). When defending the wiretap applications and orders, the government must be limited to the facts and information contained within the application and affidavits when presented to the authorizing court. *See, e.g., United States v. Meling*, 47 F.3d 1546, 1551-52 (9th Cir. 1995) ("Looking only to the four corners of the wiretap application, we will uphold the wiretap if there is a 'substantial basis' for these findings of probable cause.").

[8]*See* 18 U.S.C. § 2518(3)(a).

1   2518(3)(a),(b) & (d).  The government must set forth a "full and complete statement of the facts

2   and circumstances" justifying the applicant's belief that a wiretap order should issue.  18 U.S.C. §

3   2518(1)(c).  This statement must include the details of the offense that has been or "is about to

4   be" committed.  *Id.*

5       The affidavit in support of a wiretap application may not contain material misstatements

6   or omissions.  *United States v. Carneiro*, 861 F.2d 1171, 1176 (9th Cir. 1988).  If the application

7   for the order does not satisfy the probable cause or necessity requirement when any misstatements

8   are removed and any omissions are inserted, the court must order suppression of the wiretap

9   recordings.  *United States v. Ailemen*, 986 F. Supp. 1228, 1231 (N.D. Cal. 1997) (*quoting United*

10  *States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir. 1985)).

11      Under *Franks*, the court must hold an evidentiary hearing when the defendant challenges

12  the validity of an affidavit and makes a "substantial preliminary showing" that (1) the allegations

13  in the supporting affidavit were the result "of deliberate falsehood or reckless regard for the truth"

14  and (2) the remaining portion of the affidavit is not sufficient to support a finding of probable

15  cause.  *Frank v. United States*, 438 U.S. 154, 171 (1978).  When considering the effect of

16  misrepresentations and omissions on the existence of probable cause, a court considers the effect

17  "cumulatively."  *United States v. Kiser*, 716 F.2d 1268, 1274 (9th Cir. 1983).  "Specific

18  allegations" of misrepresentation or omissions in an affidavit entitle a defendant to a *Franks*

19  hearing.  *See id. at* 1271.  "Clear proof" of deliberate or reckless omission or misrepresentation is

20  not required.  *U.S. v. Stanert*, 762 F.2d at 781.  The Ninth Circuit requires (1) a "substantial

21  showing" that the affidavit contained reckless or intentional misrepresentations or omissions and

22  (2) without the misrepresentations or omissions the affidavit would not support a finding of

23  probable cause.  *Id.* at 782; *see also United States v. Chesher*, 678 F.2d 1353, 1360 (9th Cir.

24  1982).  Once these two prongs are met, the defendant may test the validity of the affidavits

25  through live testimony and cross-examination of witnesses.  *Chesher*, 678 F.2d at 1362.

26  Moreover, "[t]here is no 'good faith' exception to the *Franks* doctrine: a warrant based upon

27

28

1  knowing or recklessly made falsehoods in the affidavit will be invalid." *Mills v. Graves*, 930

2  F.2d 729, 733 (9th Cir. 1991).[9]

3       Here, Mr. Jackson has made a substantial showing that the affidavits contain material

4  misrepresentations and omissions, and that these falsehoods were deliberate or, at the very least,

5  made with reckless disregard for the truth. These specific allegations are sufficient to entitle

6  Mr. Jackson to an evidentiary hearing to test the validity of the affidavits at issue.

7  **V.    THE AFFIDAVITS SUBMITTED IN SUPPORT OF WIRETAPS FAIL TO
          ESTABLISH NECESSITY FOR A WIRETAP**

8

9       The evidence obtained pursuant to the wiretaps should also be suppressed because the

10  government failed to establish necessity. Congress intended that wiretap surveillance not be

11  "routinely employed as the initial step in a criminal investigation." *United States v. Giordano*,

12  416 U.S. 505, 515 (1974). To obtain a wiretap, therefore, the government must overcome this

13  statutory presumption against such an intrusive investigative method by proving necessity.

14  *Giordano*, 416 U.S. at 515; *United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001). The

15  purpose of the necessity requirement is to ensure that wiretapping is not resorted to in situations

16  where traditional investigative techniques would suffice to expose the crime. *United States v.*

17  *Kahn*, 415 U.S. 143, 153, n. 12 (1974). Normal, traditional investigative techniques include

18  "standard visual or aural surveillance techniques by law enforcement officers, general questioning

19  or interrogation under an immunity grant, use of regular search warrants, and the infiltration of

20  conspiratorial groups by undercover agents or informants." See generally S. REP. 90-1097, 1968

21  U.S.C.C.A.N. 2112, 2190. Under 18 U.S.C. § 2518(1)(c), the government may establish

22  necessity for a wiretap by showing that traditional investigative procedures (1) have been tried

23  and failed; (2) reasonably appear unlikely to succeed if tried; or (3) are too dangerous to try. *See*

24  *also United States v. Smith*, 31 F.3d 1294, 1298 n.2 (4th Cir. 1994). A district court must reject a

25

26  [9] Any "aggrieved person" may seek suppression of any communication that "was unlawfully intercepted" under Title
    III or the Fourth Amendment. 18 U.S.C. § 2518(10)(a). Title III "require[s] suppression where there is failure to
    satisfy any of [the] statutory requirements that directly and substantially implement the congressional intention to
27  limit the use of intercept procedures to those situations clearly calling for the  employment of this extraordinary
    investigative device." *United States v. Giordano*, 416 U.S. 505, 527 (1974).

28

1   wiretap application if law enforcement officers have not first attempted, without success,

2   traditional investigative methods that "easily suggest themselves and are potentially productive

3   and not unduly dangerous." *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir. 1985).

4   Moreover, a wiretap application should be rejected if the agency cannot demonstrate that normal

5   investigative techniques would necessarily fail after "a reasonable period of time." *United*

6   *States v. Spagnuolo*, 549 F.2d 705, 710 (9th Cir. 1977); *accord United States v. Blackmon*, 273

7   F.3d 1204, 1207 (9th Cir. 2001).

8        In the Ninth Circuit, the necessity provisions require the government to set forth a "full

9   and complete statement of specific allegations," establishing the necessity for the wiretap.

10  *Blackmon*, 273 F.3d at 1207 (citing *Ippolito*, 774 F.2d at 1486). Mere conclusions by the affiant

11  are insufficient to justify a wiretap order. *Cf.*, *Aguilar v. Texas*, 378 U.S. 108 (1964) (reviewing

12  search warrant affidavits). They do not provide facts from which a detached judge or magistrate

13  can determine whether other alternative investigative procedures exist as a viable alternative.

14  *United States v. Kalustian*, 529 F.2d 585, 590 (9th Cir. 1975). Nor is it sufficient for the

15  government to argue that conspiracies are tough to crack, so we need a wiretap. *Id.* at 589.

16  Similarly, "boilerplate conclusions that merely describe inherent limitations of normal

17  investigative procedures," *Blackmon*, 273 F.3d at 1210, or that are based solely upon an agent's

18  knowledge and experience rather than the facts of a specific case are insufficient to establish

19  necessity. *Spagnuolo*, 549 F.2d at 710. Instead, the affidavit must contain an "adequate factual

20  history of the investigation and a description of the criminal enterprise sufficient to enable" the

21  issuing court to determine on its own whether there is the requisite necessity for the use of a

22  wiretap. *Id.* Further, each wiretap application or extension, standing alone, must satisfy the

23  necessity requirement. *See Carneiro*, 861 F.2d at 1176.

24      **A.**    **The Government Failed to Show that Normal Investigative Techniques Were**
        **Insufficient**

25

26      Here, the government did not fully exhaust normal investigative techniques before seeking

27  the wiretaps and relied on boilerplate conclusions that are insufficient to establish necessity.

28

1.   **Unimpeded Access to Mr. Jackson**

Through the use of undercover employees (UCEs) and confidential human sources (CHSs), the government infiltrated nearly every aspect of Mr. Jackson's life. The government used at least twenty-two UCEs and CHSs in this case, most of whom had direct contact with Mr. Jackson. Four of these individuals, UCE-4599, UCE-4773, UCE-4180, and CHS11, so ingratiated themselves into Mr. Jackson's life that they became the dominant characters in both his personal and professional lives. For example, from September 2011 through January 2013, there were over 400 telephone calls between these individuals and Mr. Jackson, many of them lasting an hour or more. There were many more hours of in-person contacts over the course of more than a hundred meetings. And, Mr. Jackson spent untold hours searching for legitimate business opportunities on their behalf. These individuals had complete unimpeded access to Mr. Jackson's life. Mr. Jackson never refused to meet with these individuals and never refused to answer a question from them. The affidavits fail to mention the successful and repeated efforts that the agents made to keep Mr. Jackson involved in their activities. The hundreds of body wire recordings produced in discovery reflect this near total immersion into Mr. Jackson's life. The government should have been required to show why it would be unable to obtain any and all of the information relayed on the telephone intercepts by simply asking Mr. Jackson questions.

2.   **Access to Other Defendants and Witnesses**

The First Quinn Affidavit lists two potential cooperating witnesses. One of whom, ████████████, the affiant acknowledges has no role in the target offenses or "any particular insights or information into the communications between Target Subjects and Interceptees regarding the Target Offenses in this affidavit." (First Quinn Affidavit at 78.) The other, a "Target Subject," previously served as a source for the FBI from ████████████ *Id.* Why the government did not attempt to utilize this source in this investigation is unclear. The agent simply concludes that because the source did not provide information that advanced the goals of the previous investigation she would not be able to do so here. No reference to the nature of the previous investigation is made. This is not a full and complete statement as to why utilizing this source would be insufficient in this investigation.

1   At least one individual ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ previously cooperated
2   with the FBI by wearing a recording device to meet with one of the identified Target Subjects and
3   Interceptees in an unrelated matter. The government, however, chose not to share this
4   information while seeking a wiretap, and did not explain whether it attempted to employ this
5   source for further assistance.

6   Aside from listing only two identified potential cooperating witnesses, Agent Quinn fails
7   to provide a full and complete statement of the steps the government undertook to identify other
8   potential cooperating witnesses. The other affiants fare no better. Each subsequent affiant lists
9   the same two potential cooperating witnesses and relies upon Agent Quinn's statement for why
10  they are of limited value to the investigation. Despite the massive amount of information gleaned
11  from the wiretaps, the government failed to identify or pursue a single additional potential
12  cooperating witness, which shows that the government failed to make use of the investigative
13  techniques available.

14  Simple physical surveillance and a review of phone records and mail covers would have
15  revealed other potential witnesses to approach early in the investigation. Numerous individuals
16  associated with Mr. Jackson and other Target Subjects met with government officials to discuss
17  their knowledge of the case well after the first wiretap authorization. A good faith effort would
18  have involved approaching these individuals sooner, or at least providing specific reasons as to
19  why doing so would not have advanced the investigation's goals.

20      **3.    Telephone Records Analysis**

21  Traditional law enforcement techniques include review of three types of phone records
22  that do not involve intrusive wiretaps: Pen registers; toll registers; and trap and trace records. The
23  government utilized these methods throughout this investigation. (First Quinn Affidavit at 81.)
24  Agent Quinn, however, fails to state what information was gleaned from these techniques, which
25  a full and complete statement requires. Instead, he recites the inherent limitations of these
26  methods as grounds for necessity, which is exactly what *Blackmon* held to be insufficient. There,
27  the affidavit claimed that pen registers "only provide evidence that the telephone was used,
28  without showing the identity of the callers or the nature or purpose of those communications."

1  *Blackmon*, 273 F.3d at 1210.[10]  As the Ninth Circuit noted, "this is nothing more than a

2  description of the inherent limitations of these devices.  A full and complete statement of

3  necessity must specify why, in the particular case at hand, these inherent limitations will be

4  insufficient."  *Id.*  The same is true here.  The affidavits here, however, fail to specify why these

5  inherent limitations would have been insufficient.

6          **4.**  **Trash Records**

7       The affidavits assert that agents have "considered using trash searches in this

8  investigation,"[11] but they also reflect that agents never once attempted a trash cover as to Mr.

9  Jackson, and apparently only once attempted a trash cover as to Senator Yee. [12]  Agent Quinn

10  acknowledges that trash covers can reveal information such as "unknown aliases, contact

11  information for associates or documents related to financial transactions," yet he asserts that even

12  though he was investigating money laundering, such information would "have limited

13  usefulness."  (First Quinn Affidavit at 82.)  He then relies on boilerplate assertions, stating that

14  "based on my training and experience" trash covers would be unhelpful in this case, without

15  specifying why they would be insufficient in this case.  *Blackmon* prohibits such conclusory

16  statements.

17          **5.**  **Mail Covers and Internet Records**

18       Agent Quinn states that the government requested mail covers on Mr. Jackson's residence,

19  but he fails to discuss what the government gleaned from them.  Mail covers are useful

20  investigative tools that record mail coming into a home and leaving a residence.  They are

21  particularly useful when used in conjunction with financial records whenever the government

22  

---

23  [10] Here, agents use similar language: "While the records show . . . communication between [targets] they do not
    demonstrate the content of any such communication," they do not "assist in determining the exact nature of the
24  relationships," and they do not "necessarily identify the actual parties to the conversations."  (First Quinn Affidavit
    at 81.)

25  [11] First Quinn Affidavit at 82.

26  [12] Agent Quinn claims a trash cover as to Mr. Jackson was not feasible because Mr. Jackson lives in an apartment
    building and his trash "cannot be distinguished from the trash of other residents in the building."  (First Quinn
27  Affidavit at 82.)  Yet, in the same paragraph, he states a trash cover cannot be conducted on another suspect's single-
    family residence because doing so would alert her to their presence.  *Id.*  Agent Quinn cannot have it both ways.

28

attempts to show a flow of money. Agent Quinn's affidavit fails to show that a good faith effort was made to utilize this technique. Instead, once again, Agent Quinn relies on boilerplate, "based on my training and experience" language to conclude that such efforts would not have proven fruitful. Furthermore, UCEs and CHSs had been communicating with Mr. Jackson by email well before November 13, 2012. The government could have sought a search warrant seeking access to Mr. Jackson's email before applying for the wiretap—if they had probable cause. Instead, it wasn't until April 24, 2014—nearly a month after he was arrested in this matter—that agents served Mr. Jackson's email provider with a search warrant. (Chatterjee Decl. Ex. 28.)

### 6.    Physical Surveillance

Agent Quinn asserts that physical surveillance has been used throughout the investigation and there has been "some limited success." (First Quinn Affidavit at 80.) The agent intentionally omits any further explanation. Instead, the agent reverts to boilerplate statements about why physically surveillance was unlikely to advance the goals of the investigation. *Id.* at 79-80. Although the agent states that physical surveillance does not reveal the content of conversations, normal investigative techniques are not limited to a single technique, and Agent Quinn fails to consider information that surveillance combined with other investigative techniques could reveal. The affidavits reflect no effort to utilize information gleaned from physical surveillance to advance the goals of the investigation.

### B.    The Government Misled the Court as to the Reasons for Requesting a Wiretap

The government misled the Court as to the reasons for requesting the wiretap. Necessity was never the issue. Rather, it was the unavailability of the government's primary investigator, UCE-4773, due to his involvement in what the government characterized as financial misconduct. The government alleges that UCE-4773 began his investigation in September 2011 and gathered evidence of criminal conduct involving Mr. Jackson and others for fourteen months. In November 2012, relying primarily on UCE-4773, the government suddenly asserted its need for a wiretap, claiming that UCE-4773 was unable to "fully penetrate the inner circles of trust" of the targets. US400343. As noted above, UCE-4773, perhaps more than any other agent, inserted

1  himself in to Mr. Jackson's personal and professional life.  One month after the wiretap

2  application was granted, the government removed UCE-4773 from the operation for misconduct.

3       Agent Quinn claims that UCE-4773's work was insufficient because Mr. Jackson and

4  others were "guarded and secretive."  By the time the government sought a wiretap, however, the

5  government was well aware that that UCE-4773 was under investigation and unavailable to

6  further his undercover role in the investigation.  In short, the government wanted a wiretap to

7  replace its lead investigator, who engaged in misconduct.  The government, however, cannot

8  create the requisite necessity through its own actions.  *Cf. Blackmon*, 273 F.3d at 1211 (holding

9  that the "government may not cast its investigative net so far and so wide as to manufacture

10  necessity.").  UCE-4773's misconduct and removal from the case might have resulted in a delay

11  to the government's investigation, but it cannot be used as a shortcut to circumvent traditional

12  investigative techniques and serve as the basis for necessity.

13  **VI.  THE GOVERNMENT FAILED TO MINIMIZE THE INTERCEPTION OF**

14  **IRRELEVANT CONVERSATION**

15       "Minimization requires that the government adopt reasonable measures to reduce to a

16  practical minimum the interception of conversations unrelated to the criminal activity under

17  investigation while permitting the government to pursue legitimate investigation."  *United States*

18  *v. McGuire*, 307 F.3d 1192, 1199 (9th Cir. 2002).  The government bears the burden of proving

19  its compliance with the minimization requirement.  *United States v. Rivera*, 527 F.3d 891, 904

20  (9th Cir. 2007).  Where the minimization provision of the order was disregarded throughout the

21  period covered by the order, a total suppression of all evidence derived from the wiretap is

22  appropriate, not just the calls that should have been minimized.  *See United States v. Turner*, 528

23  F.2d 143 (9th Cir. 1974); *United States v. Renzi*, 722 F. Supp. 2d 1100 (D. Ariz. 2010).

24       Here, the government intercepted more than 16,000 communications over Mr. Jackson's

25  cell phone from November 2012 through June 2013.  Roughly half these calls were classified as

26  pertinent or non-pertinent in the status reports filed by the government.[13]  These reports reflect

27

28  [13] Chatterjee Decl. Exs. 23-28.

that, despite the massive interception of Mr. Jackson's communications over this period, the

government failed to implement and observe proper minimization procedures. Of the over 8,000

intercepted communications identified in the status reports, only a fraction of these, roughly 16%,

were deemed pertinent.  And, the government minimized only 6% of the intercepted

communications.  As these figures suggest, 84% of the intercepted communications were

unrelated to the investigation.  These figures hold through the investigation.  The data from each

of the government's status reports is summarized below:

| Status Report Date | Total Number of wire intercepts | Number of wire intercepts flagged as pertinent | Number of Minimized intercepts |
|---|---|---|---|
| December 3, 2012 | 1897 | 323 | 139 |
| February 28, 2013 | 1619 | 280 | 135 |
| April 25, 2013 | 3074 | 425 | 147 |
| May 24, 2013 | 1921 | 337 | 110 |
| July 18, 2013 | | | |
| TOTAL | 8511 | 1365 | 531 |

The extensiveness of the intercepts, and the figures reported by the government in the status

reports indicate that the government failed to comply with its minimization requirements.  The

appropriate remedy in this case is the full suppression of all intercepts obtained from the wiretap

orders.

///

///

///

## VII.   CONCLUSION

For all of the reasons stated above, Defendant's Motion to Suppress all communications intercepted pursuant to wiretap and all evidence obtained as a result of the tainted interceptions.

Dated: March 26, 2015

Respectfully submitted,

MORRISON & FOERSTER LLP


By:   /s/ James J. Brosnahan
        JAMES J. BROSNAHAN

        Attorneys for Defendant
        KEITH JACKSON

# Exhibit A

Exhibit A

Material Misstatements in and Omissions From Affidavits in

Support of for Authorization to Intercept Wire Communications of Keith Jackson

| Agent's Affidavit | Fact |
|---|---|
| From September 2011 forward, UCE 4773 "has been in contact with Jackson and has been solicited by Jackson and other to make unlawful payments to the campaigns of, or to retire the campaign debts of, both California State Senator Leland YEE and ▮▮▮▮▮▮▮▮▮▮" (First Quinn Affidavit at 13.) | False.  Keith Jackson had not been soliciting unlawful campaign payments since September 2011.  UCE-4773 was the first to suggest contributing in excess of local campaign limit. (Chatterjee Decl. Ex. 1.) |
| Describes UCE-4599 as to Keith Jackson as "posing as a member of an East Coast La Cosa Nostra family with marijuana trafficking interests in Northern California and ties to the Chee Kung Tong . . . ." (First Quinn Affidavit at 8.) | False.  A review of the evidence reflects that UCE-4599 did not identify himself as a member of "La Cosa Nostra" or as a "trafficker" November 13, 2012. |
| During a February 15, 2012 phone call UCE-4773 and Jackson discussed a $2,000 payment that was "the first of what were going to be under-the-table monthly payments to Jackson." (First Quinn Affidavit at 29.) | The call does not say that the payments were "under the table"; the discussion does not imply that the payments to Mr. Jackson were inappropriate or illegal in any way. (Chatterjee Decl. Ex. 2.) |
| On May 25, 2011, Mr. Jackson told UCE-4599 that "if UCE 4599 wanted to contribute $5,000 to Senator Yee's campaign, the money could be placed in different accounts under multiple names at a rate of $500 each." (First Quinn Affidavit at 18.) | UCE-4599 is the one who attempted to make a contribution over the local limits: Jackson: "How much should I put you down for? 4599: What do you need? Jackson: $500 4599: That's it? Jackson: That's it.  You only can do $500 4599:  Oh really? Jackson: Yeah, that's it. 4599: You want cash or you want…? Jackson: No, you gotta do a check. 4599: Listen I don't do checks, I don't do anything check. Jackson: Alright, you could do credit card. 4599: Alright, well, I'll figure it out. |

Exhibit A
Material Misstatements in and Omissions From Affidavits in
Support of for Authorization to Intercept Wire Communications of Keith Jackson

| Agent's Affidavit | Fact |
|---|---|
| | (Chatterjee Decl. Ex. 3.) |
| On June 24, 2011, Jackson "asked UCE 4599 to contribute $3,000". (First Quinn Affidavit at 18). | This is false. Mr. Jackson told UCE-4599 that he had committed to raising $20,000 for Senator Yee and was $3,000 short. He asked if UCE-4599 "would be interested in *raising* a little money for us." (Chatterjee Decl. Ex. 4.) |
| On September 20, 2011, UCE-4599 "arranged a telephone meeting between JACKSON . . . and UCE 4773, who was posing as UCE 4599's businessman friend from the East Coast. Sometime before this call, UCE 4599 told JACKSON that his friend was a businessman who assisted UCE 4599 in laundering money." (First Quinn Affidavit at 19.) | False. First, the date of the call is incorrect. UCE-4599 arranged the introductory call between Jackson and UCE-4773 on September 13, 2011. Second, at no time prior to September 20, 2011 did UCE-4599 describe UCE-4773 as assisting UCE-4599 in laundering money. (Chatterjee Decl. Ex. 5.) |
| Omission | On September 23, 2011, Senator Yee called UCE-4773 to discuss issues related to affordable housing. Senator Yee followed protocol under California campaign finance laws and terminated the policy call on affordable housing before calling back UCE-4773 to begin a new conversation on fundraising. In the fundraising call, Senator Yee requested UCE-4773's assistance in *raising* $5,000 to $10,000 and explains to him the $500 limit on individual donations.<br><br>(Chatterjee Decl. Ex. 6.) |
| Omission | On September 23, 2011, Mr. Jackson again explained the $500 contribution limit to UCE-4773, and correctly noted that anyone can *raise* as much money as for a candidate as desired.<br><br>(Chatterjee Decl. Ex. 6.) |
| Describing a September 26, 2011 phone call between Jackson and UCE 4773, the affiant asserts "JACKSON said 'Leland mentioned to me today…if you had a number of people that you wanted to work for him to meet and greet whatever; he is willing to come to Atlanta or wherever.' . . . UCE4773 agreed and said that the people UCE4773 is associating with would need to see senator YEE, shake his hand and know that they are getting | The correct quote from UCE-4773 is "Now, I can, what I can do, because, now the people I'm dealing with they definitely need to see him, shake his hand, know that they're getting something out of it." (Chatterjee Decl. Ex. 8.) |

Exhibit A

Material Misstatements in and Omissions From Affidavits in
Support of for Authorization to Intercept Wire Communications of Keith Jackson

| Agent's Affidavit | Fact |
|---|---|
| something in return." (First Quinn Affidavit at 20.) | |
| On September 30, 2011, UCE-4773 said raising $20,000 "is not the issue and expressed the complication about breaking the money, i.e., finding enough individual contributors to donate $500 each." (First Quinn Affidavit at 21.) | As Agent Quinn acknowledges, Senator Yee gave UCE-4773 advice on how to raise $20,000 in increments of $500 from willing donors by "market[ing] it or pitch[ing] it" not "breaking" up a large donation. (Chatterjee Decl. Ex. 7.) |
| Mr. Jackson told UCE-4773 that "he broke up the money among straw donors in order to make conduit contributions." (First Quinn Affidavit at 22.) | Agent Quinn does not state when this conversation took place. The discovery suggests that Agent Quinn might have been referring to an October 10, 2011 conversation. As of this date, however, it was impossible for Mr. Jackson to have "broken up" any contribution from UCE-4773. UCE-4773 had only contributed a total of $1,000, representing $500 from UCE-4773 and $500 from UCE-4773's wife, amounts well within local contribution limit. |
| Agent Quinn asserts that by October 14, 2011, "UCE 4773 had contributed $11,000 to Senator Yee's campaign." (First Quinn Affidavit at 22.) | This is false. The affidavit makes clear that by that date, UCE-4773 donated $500 from himself, arranged for his wife to donate $500, arranged for 10 undercover agents to donate $500, and written a check to Keith Jackson for consulting fees for $5,000. Again, Agent Quinn blurs the distinction between "raised" and "contributed." |
| Agent Quinn quotes UCE-4773 from an October 14, 2011, describing his donations as "too much money ... not to get something" and then alleges that Senator Yee acknowledged that statement. (First Quinn Affidavit at 22-23.) | This is false. Senator Yee did not acknowledge that a donation was too much money not to get something in return. The full passage shows that Senator Yee acknowledged that UCE-4773 knows that he cannot ask for a quid-pro-quo. (Chatterjee Decl. Ex. 8.) |
| "Senator Yee acknowledged that UCE 4773 had already contributed the legal maximum amount. In light of that fact, UCE 4773 asked how he could make a $10,000 contribution to which Senator Yee responded to the effect of: 'Just give the checks to ▮▮▮▮▮▮▮▮▮, just how we did it before.'" (First Quinn Affidavit at 25.) | When UCE-4773 asks how he can raise money without donating personally, ▮▮▮▮ Yee, and UCE-4773 discuss bundling money, like UCE-4773 did before, when he raised $5,000 by gathering checks from individual donors, and giving the checks to ▮▮▮▮▮▮▮▮ (Chatterjee Decl. Ex. 9.) |
| "On April 12, 2012, UCE 4773 called JACKSON on Target Telephone 1. JACKSON asked UCE 4773 if he received JACKSON's email regarding information on affordable housing projects. JACKSON told UCE 4773 that he has been doing some research on tax breaks and how to make profit from not-for-profit affordable housing. . . ." (First Quinn Affidavit at 38-39.) | False. Mr. Jackson does discuss doing research on tax-breaks for UCE-4773 on affordable housing. But, Jackson does not tell UCE-4773 he is researching "how to make profit from not-for-profit affordable housing". (Chatterjee Decl. Ex. 10.) |
| During the April 12, 2012 call "Jackson told UCE 4773 that if he can contribute at least $10,000 more | This is false. Jackson advised UCE-4773 to stick to his original commitment to *raise* $10,000 to $20,000 |

Exhibit A

Material Misstatements in and Omissions From Affidavits in
Support of for Authorization to Intercept Wire Communications of Keith Jackson

| Agent's Affidavit | Fact |
|---|---|
| that would carry a lot of weight and said 'We'll just figure out . . . down the road, how we can keep on moving forward . . . you got to get your feet wet here.'" (First Quinn Affidavit at 39. | for ▮▮▮▮▮ campaign. (Chatterjee Decl. Ex. 10.) |
| On May 18. 2012, "JACKSON stated they are trying to get ▮▮▮ on the ▮▮ Commission' which "will be good for us." (First Quinn Affidavit at 42.) | This is misleading. The affidavit implies that Jackson is trying to get ▮▮ on the ▮▮ Commission. The "they" in the affidavit is a third party. (Chatterjee Decl. Ex. 11.) |
| On May 30, 2012, at a lunch with Jackson, UCE-4773 and UCE-4599 discussed "their investments together, including UCE-4599's operations 'up north' – a reference to his purported marijuana grows." (First Quinn Affidavit at 42.) UCE-4599 advised that his "father wanted to make sure UCE-4773 [was] cleaning the finances of Madison International," UCE-4773's company. | The affidavit omits that Jackson was not involved in either of these discussions. (Chatterjee Decl. Ex. 12.) |
| On September 19, 2012, "JACKSON explained that the $10,000 will be broken up into $500 donations to ▮▮▮▮▮ who ran for ▮▮▮▮▮▮▮ According to JACKSON, ▮▮▮▮ would then turn the money over to Senator YEE." (First Quinn Affidavit at 50.) | This is false and misleading. Jackson explains to UCE-4773 that if UCE-4773 contributes $500 to ▮▮ then "in return she will raise money for Leland." Jackson does not say that the money UCE-4773 gives to ▮▮ will be passed through to Yee. Jackson repeats to UCE-4773 that "you can still only give $500" per person. (Chatterjee Decl. Ex. 13.) |
| Describing a September 27, 2012 call between Jackson and UCE-4773, Jackson states that "Senator Yee also mentioned to Jackson that there was an article related to the state helping senior citizens and the disabled with voting and they would need computer analysis. Senator Yee told JACKSON that he wanted to put UCE 4773 in a position *to get that contract*." (First Quinn Affidavit at 56.) | Jackson told UCE-4773 that Yee wanted to put UCE 4773 in a position to "bid" on the contract. (Chatterjee Decl. Ex. 14.) |
| On December 12, 2012, at approximately 2:01 p.m., JACKSON received a call on the Target Telephone from CHS #11. CHS #11 stated "it" might be lucrative if they could pull it off and asked if JACKSON knew anyone on the Oakland City Council. JACKSON said he did not, but might know somebody who knew somebody. CHS #11 discussed getting a license to manufacture the | This is misleading. The "it" that might be "lucrative if they can pull it off" is obtaining a permit regarding marijuana under the rules and regulations under state and local law. There is no discussion of bribery. (Chatterjee Decl. Ex. 15.) |

Exhibit A

Material Misstatements in and Omissions From Affidavits in
Support of for Authorization to Intercept Wire Communications of Keith Jackson

| Agent's Affidavit | Fact |
|---|---|
| marijuana in Oakland and then sell it in New Jersey. CHS #11 hoped JACKSON could introduce them to Oakland City Council so that they could work on getting a license to grow in Oakland.  JACKSON suggested a meeting with ▮▮▮▮▮ or someone like that, that JACKSON would find out.  I believe that this conversation related to engaging in manufacture and/or sales of marijuana and possible bribery related to obtaining a license to manufacture and/or sell marijuana. (Second Quinn Affidavit at 72.) | |
| During January 22, 2013 a conversation "UCE 4599 told JACKSON that if Senator YEE wrote the letter, he could write the check. Jackson said the he would make that happen." (Second Quinn Affidavit at 91). | This is misleading.  It omits that Yee had already agreed to provide a proclamation without any discussion of a campaign donation. |
| In a February 14, 2013 conversation, "JACKSON advised UCE-4599 that YEE "was gonna do the proclamation and bring it on the 29th." UCE-4599 had requested of JACKSON and YEE an official proclamation praising the Hop Sing Tong for the Tongs anniversary celebration in exchange for contributions. UCE-4599 asked whether JACKSON had told YEE that UCE-4599 would give him a check after he received the proclamation. JACKSON responded "yeah whatever well do something afterwards. I just want to try to do a fundraiser for him. (Clark Affidavit at 25.) | This is false.  Again, it omits that Yee had already agreed to provide a proclamation without discussion of a campaign donation.  Jackson's response supports this.<br><br>(Chatterjee Decl. Ex. 16.) |
| "When Jackson and CHS #11 discussed some of the other development projects, JACKSON stated "you can do it as long as it's legit and you got, ah, no other BS attached to it.' CHS #11 responded, "I don't know, I don't know you got [u/i] is legit. I think our toes is on the line. Have to be careful what you do.'" (Clark Affidavit at 24.)  Agent Clark concludes this February 14, 2013, exchange "illustrated JACKSON attempting to secure CHS #11 projects and favorable treatment from politicians in exchange for monetary payments." | The quoted language in the affidavit is in direct reference to Mr. Jackson's efforts to secure a consulting contract with a prominent Bay Area company. This work is entirely unrelated to Mr. Jackson's work for CHS#11 and there was no discussion of favorable treatment in exchange for donations. (Chatterjee Decl. Ex. 17.) |