1   JAMES J. BROSNAHAN (CA SBN 34555)
    JBrosnahan@mofo.com
2   SOMNATH RAJ CHATTERJEE (CA SBN 177019)
    SChatterjee@mofo.com
3   CHRISTOPHER W. MAGAÑA (CA SBN 287256)
    CMagana@mofo.com
4   MORRISON & FOERSTER LLP
    425 Market Street
5   San Francisco, California 94105-2482
    Telephone: 415.268.7000
6   Facsimile: 415.268.7522

7   Attorneys for Defendant
    KEITH JACKSON

8

9                   UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11

12   UNITED STATES OF AMERICA,           Case No.   3:14-CR-00196 (CRB)

13                   Plaintiff,           **KEITH JACKSON'S REPLY IN
                                          SUPPORT OF MOTION TO SUPPRESS
14          v.                            FRUIT OF ILLEGAL WIRETAPS, OR
                                          IN THE ALTERNATIVE, FOR A
15   KEITH JACKSON,                       *FRANKS* HEARING**

16                   Defendant.           **HEARING DEMANDED**

17                                        Date:      July 7, 2015
                                          Time:      9:30 a.m.
18                                        Court:     Hon. Charles R. Breyer
                                          Location:  Courtroom 6, 17th Floor
19

20                   **PREVIOUSLY FILED UNDER SEAL**

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................................ii

I.      INTRODUCTION ......................................................................................................... 1

II.     THE GOVERNMENT'S NUMEROUS MISREPRESENTATIONS AND
        MATERIAL OMISSIONS WARRANT A HEARING ................................................. 2

        A.      Mr. Jackson and Senator Yee Are Entitled to a Hearing to Get to
                the Bottom of the Many False Statements the Government Made to
                the Court.................................................................................................................. 2

        B.      The Government Fails to Contradict Mr. Jackson's Showing that
                the November 13, 2012 Affidavit Was Infested with False
                Statements ............................................................................................................... 4

        C.      The Government Does Not Deny Making Material Omissions ......................... 13

        D.      UCE-4773's Misconduct Was Material and Omitted ...................................... 14

        E.      The Government Continued Making False Representations and
                Material Omissions to the Court in the Wiretap Extension
                Applications ......................................................................................................... 15

III.    THE GOVERNMENT FAILED TO ESTABLISH NECESSITY FOR A
        WIRETAP .................................................................................................................. 17

        A.      The Government Does Not Deny that It Could Have Obtained
                Information from Mr. Jackson by Simply Asking Him Direct
                Questions .............................................................................................................. 18

        B.      The Government Failed to Exhaust Other Traditional Investigative
                Techniques in Good Faith .................................................................................. 19

        C.      The Government Manufactured Necessity Because It Wanted a
                Wiretap to Replace UCE-4773, Who Was Terminated From the
                Investigation ........................................................................................................ 22

IV.     THE GOVERNMENT'S VIOLATION OF ITS DUTY TO MINIMIZE
        THE INTERCEPTION OF NON-PERTINENT CONVERSATIONS
        WARRANTS SUPPRESSION ................................................................................... 23

V.      CONCLUSION ........................................................................................................... 26

1

## <u>TABLE OF AUTHORITIES</u>

2
                                                                          **Page(s)**

3  CASES

4  *Liberty Lobby Inc. v. Pearson,*
5    390 F.2d 489 (D.C. Cir. 1967) ................................................................. 3

6  *McCutcheon v. Fed. Election Comm'n,*
     134 S. Ct. 1434 (2014) ............................................................................. 3
7

8  *United States v. Bennett,*
     219 F.3d 1117 (9th Cir. 2000) .................................................................. 24

9  *United States v. Blackmon,*
10   273 F.3d 1204 (9th Cir. 2001) ........................................................ 17, 20, 22

11  *United States v. Bonds,*
     No. 11-10669, 2015 WL 1842752 (9th Cir. Apr. 22, 2015) ...................... 4
12

13  *United States v. Elliott,*
     893 F.2d 220 (9th Cir. 1990) ................................................................... 4

14  *United States v. Garcia-Villalba,*
15   585 F.3d 1223 (9th Cir. 2009) .................................................................. 18

16  *United States v. Ippolito,*
     774 F.2d 1482 (9th Cir. 1985) .................................................................. 20
17

18  *United States v. Lynch,*
     367 F.3d 1148 (9th Cir. 2004) .................................................................. 17

19  *United States v. McGuire,*
20   307 F.3d 1192 (9th Cir. 2002) .................................................................. 18

21  *United States v. Meling,*
     47 F.3d 1546 (9th Cir. 1995) ................................................................... 9

22  *United States v. Rivera,*
23   527 F.3d 891 (9th Cir. 2007) ................................................................... 23

24  *United States v. Scully,*
     546 F.2d 255 (9th Cir. 1976), *vacated on other grounds sub nom.*
25   *United States v. Cabral*, 430 U.S. 902 (1977) ....................................... 23

26  *United States v. Spagnuolo,*
27   549 F.2d 705 (9th Cir. 1975).............................................................. 19, 20

28

*United States v. Tham*,
    960 F.2d 1391 (9th Cir. 1992)................................................................................. 4

*United States v. Turner*,
    528 F.2d 143 (9th Cir. 1975)................................................................................. 24

**STATUTES**

Cal. Gov't Code § 82015 ......................................................................................... 8

S.F. Campaign & Gov't Conduct Code § 1.104(g).................................................. 8

# I.   INTRODUCTION

Keith Jackson moved to suppress the wiretaps on his telephone.  Over the course of six months the government intercepted over 16,879 communications over this line.  After identifying numerous false statements and omissions in the affidavits filed in support of the wiretaps, the government opines that Mr. Jackson has failed to make a substantial preliminary showing that the affidavits intentionally or recklessly misrepresented or omitted material facts.  A great many defendants have passed through this Court and have made false statements not nearly as egregious as those made by the agents in this case.  It is a safe bet that other agents reviewed the draft affidavits, particularly UCE-4773, the lead investigator on the honest services investigation, and UCE-4599.  They would have seen the false statements and known they were false but nonetheless allowed the affidavit to be presented to this Court.  In no other context would a statement, such as the affidavits at issue here, be accepted with the multiple false statements material to the proceedings that totally undermine the credibility of the presenter as is the case here.  The nature, purpose, and extent of the misrepresentations and material omissions demonstrate deliberate or reckless conduct.

Further, the government failed to show the required necessity to obtain a wiretap.  Among other things, the government failed to show that its agents could not learn from Mr. Jackson what they wanted simply by asking him.  By the time the government sought the wiretaps, Mr. Jackson viewed the agents as his business clients and never refused to meet with them or answer their questions.  And, the government did not exhaust other traditional investigative techniques.  In essence, the government wanted the wiretap to replace UCE-4773, who was being terminated from this investigation, not because of statutory necessity.

Only a hearing can get to the bottom of what happened here.  The defense and the Court should know: What did Agent Quinn know when he drafted the affidavit?  Why did Agent Quinn prepare the November 13 affidavit?  Did UCE-4773 and UCE-4599 review the affidavits?  Why did the government include false statements and make material omissions in the affidavits?  Why was there no solid evidence of a quid-pro-quo?  Did the agents follow the Attorney General Guidelines on Federal Bureau of Investigation Undercover Operations, particularly those

regarding sensitive circumstances, such as those involving public officials? What representations

did UCE-4773 and UCE-4599 *actually* make to Mr. Jackson?  To what extent did the agents

infiltrate Mr. Jackson's life?  Why did the government really want the wiretaps?  What

information did the government need that the agents could not obtain by asking Mr. Jackson?

## II.     THE GOVERNMENT'S NUMEROUS MISREPRESENTATIONS AND MATERIAL OMISSIONS WARRANT A HEARING

### A.     Mr. Jackson and Senator Yee Are Entitled to a Hearing to Get to the Bottom of the Many False Statements the Government Made to the Court

Mr. Jackson has identified at least 19 material misrepresentations and omissions of

exculpatory evidence in the wiretap applications, yet the government ignores them.  Try as it

might, the government cannot shirk responsibility.  The Court should order a hearing to get to the

bottom of the misrepresentations and material omissions the government made to the Court.

These misrepresentations were made deliberately or at least recklessly.  Their multitude

alone demonstrates deliberate or reckless behavior and calls into question all of the

representations of Agent Quinn as well as the statements of UCE-4773 and UCE-4599 that Agent

Quinn relied upon.  UCE-4773 was the lead investigator for the honest services and related

charges at issue in the first trial.  He must have read the government affidavits and been aware of

the numerous false statements submitted to this Court.  To the extent he did not review drafts of

the Quinn affidavits, that failure alone demonstrates recklessness.  Further, the government

admits that all the conversations were recorded.  That the government had recordings available

and still made misrepresentations and material omissions further demonstrates that they were

deliberately or recklessly made.  The government's misrepresentations are material.  For

example:

- Conflating the significant distinction between "contributing," which raises a specter of excessive personal donations, and "raising" funds, which does not, in the context of a political campaign.

- Asserting that Mr. Jackson's business relationship with UCE-4773 was "under-the-table," when UCE-4773 paid Mr. Jackson by checks for unquestionably legitimate consulting to develop business in the Bay Area.

- Asserting that UCE-4599 represented himself to Mr. Jackson as a member of "La Cosa Nostra," when that never happened.

- Asserting that UCE-4773 was represented to Mr. Jackson as a person who assisted UCE-4599 in laundering money and trafficking marijuana, which did not happen.

- Failing to inform the Court that Mr. Jackson told UE-4773 that his contributions must be by check or credit card.

These and many other false statements and omissions pervade the November 13 wiretap application affidavit and infect all subsequent affidavits. The Court must examine the cumulative effect of these misrepresentations and omissions. The cumulative effect was to prejudice the Court with false and inflammatory allegations.

Absent these misrepresentations and material omissions, the government lacked probable cause for the target offenses. The government incorrectly asserts that the Opening Brief ignored whether the remaining allegations rose to probable cause. (*See* Mot. at 10-11.) And, the remaining allegations the government cites to establish probable cause (Opp. at 32-34), are so vague and incomplete that, by themselves, they do not rise to probable cause. They contain much discussion of campaign contributions, but contributing to political campaigns is Constitutionally protected. *See, e.g., McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434, 1448 (2014). They also contain discussions of the government agent's requests from Senator Yee, which is also Constitutionally protected. *See, e.g., Liberty Lobby Inc. v. Pearson*, 390 F.2d 489, 491 (D.C. Cir. 1967) ("[E]very person or group engaged in…trying to persuade Congressional action is exercising the First Amendment right of petition.") The allegations only show individuals engaged in discussion about Constitutionally protected activities. No facts in the affidavit show that Senator Yee or Mr. Jackson agreed to a quid-pro-quo or that Mr. Jackson agreed to any criminal conspiracy.

Accordingly, the government deliberately, or at least recklessly, amplified its affidavit with false representations and omissions to manufacture probable cause by overlaying a false patina of criminality. Hence, the government falsely claimed that Mr. Jackson was paid "under-the-table," fixed contracts, manipulated politicians, and was told that he was dealing with "La Cosa Nostra," a "trafficker," and a "money launderer," when, on the contrary, UCE-4773 pretended to be a legitimate businessman who approached Mr. Jackson to help him engage in legitimate business, putting Mr. Jackson on retainer for consulting services. Absent the

1  government's misrepresentations and material omissions to fabricate a patina of criminality, no

2  probable cause arises.

3      The honest services and related charges, which require an explicit quid-pro-quo, including

4  a specific exchange, allege a crime of words and intent.  Precision, meaning, and the exact words

5  used by the defendants that reflect their understanding and intent matter.  The government has

6  obstacles in establishing such a case.  The Ninth Circuit's recent opinion in *United States v.*

7  *Bonds*, No. 11-10669, 2015 WL 1842752, (9th Cir. Apr. 22, 2015) (*en banc*), illustrates the

8  difficulties in making a crime out of words.  The court explained that Mr. Bonds' "rambling, non-

9  responsive" answer to a grand jury question, which was subject to interpretation, did not amount

10  to obstruction of justice.  Given these obstacles, the government elected to shade the words used

11  by Mr. Jackson and the agents by throwing out inflammatory buzz-words and making

12  misrepresentations and material omissions to enhance its case, all in direct violation of the law.

13      Mr. Jackson has made more than a substantial showing of deliberate, or at least, reckless,

14  misrepresentation and material omissions the government made to the Court in connection with

15  its wiretap application and is entitled to a hearing with Agent Quinn, UCE-4773, UCE-4599, and

16  others to so establish.[1]

17  **B.    The Government Fails to Contradict Mr. Jackson's Showing that the**
18  **November 13, 2012 Affidavit Was Infested with False Statements**

19      In the Opening Brief, Mr. Jackson identified at least 17 false statements in the

20  November 13 affidavit, which the government has been unable to refute.  The following tracks by

21  number those 17 statements:

22

23

_____

24  [1] The government misstates the appropriate standard of review, incorrectly contending that a
    decision that probable cause exists should only be reversed if the decision amounted to clear
25  error.  (Opp. at 5.)  The reviewing court should conduct *de novo* review of the original court's
    decision to authorize the wiretap interceptions.  *See United States v. Elliott*, 893 F.2d 220, 222
26  (9th Cir. 1990).  *De novo* review is appropriate because the probable cause question "turns on the
    consequences of a fraud on the issuing magistrate which that magistrate was not in a position to
27  evaluate." *Id.*  Also reviewed *de novo* is the ultimate question of whether a false statement or
    omission is essential to a finding of probable cause or necessity.  *United States v. Tham*, 960 F.2d
28  1391, 1395 (9th Cir. 1992).

1.     Agent Quinn's assertion that he has read or reviewed "[e]very conversation listed in this Affidavit to which 4773 was a party, except one conversation" is a material misstatement. (First Quinn Affidavit at 13 n.2.)  The government writes that this "purported misstatement . . . is nothing more than a suspicion by Jackson that the FBI may not have conducted proper due diligence before" seeking the November 13, 2012 wiretap. (Opp. at 11).  It is more.  The Court noted that the information the government provided regarding the dismissal of UCE-4773 is potentially *Giglio* material, useful for impeachment.  And, as shown below, UCE-4773's 302s contradict recordings.  UCE-4773's credibility is called into question.  That Agent Quinn relied on an agent whose credibility is called into question further challenges Agent Quinn's credibility.

2.     Agent Quinn falsely stated that "UCE-4773 has been in contact with JACKSON *and has been solicited by JACKSON* and others to make unlawful payments to" certain campaigns since September 2011.  (First Quinn Affidavit at 13) (emphasis added).   The government admits that UCE-4773 "suggest[ed] that Jackson take a lump sum of $5,000 and break it up into smaller donations . . ." (Opp. at 12.)  Accordingly, it was UCE-4773 who solicited Jackson to make those campaign contributions, not the other way around.  Indeed, this pattern of government agents suggesting or initiating the conduct the government complains about permeates the affidavits.

    The government argues that Mr. Jackson "first suggested to undercover agents the idea of giving $5,000 as a lump sum and then putting it into different accounts" in a May 25, 2011 conversation.  (Opp. at 13.)  In support, the government attaches a "FBI-302" summarizing the purported conversation.  (Opp., Ex. 2.)  Unsurprisingly, the government attaches neither a transcript nor the actual audio recording.  These purported communications do not appear on any audible portion of the recordings.  (See Chatterjee Decl. ISO Reply, Ex. 29.)

3.     The government must concede that Agent Quinn misrepresented that "official action included Senator Yee acting on behalf of *companies*" in connection with UCE-4773.  (See First Quinn Affidavit at 14.)  The government claims this is an "issue of semantics." (Opp. at 13).  More than that, this false representation is another example of the government attempting to exaggerate and overstate the nature of the alleged criminal activity.  Without question, UCE-4773

only requested assistance from Senator Yee with a single company, Well Tech.  Despite its

rhetoric, the government has presented no evidence of any purported "official action" in

connection with any other company.

        4.      Agent Quinn falsely asserted that *Mr. Jackson and others* agreed that UCE-4773

would receive favors for political contributions that would "include benefits in receiving contracts

as local and/or minority businesses for companies in which UCE4773 represented he had an

interest, regardless of their place of operation and the ownership of the companies." (First Quinn

Affidavit at 15).  In response, the government cites purported statements made by third parties,

called "interceptees," but fails to identify any statement by *Mr. Jackson that he* agreed to any

such thing.  The government cites to purported conversations with two individuals, █████████

███████████████  but Mr. Jackson did not participate in those discussions.  Those

discussions have no bearing on probable cause against Mr. Jackson.  Even so, the government

misrepresents the nature of these calls with ██████████████[2]  Further, the

_____

[2] The government cites to a May 7, 2012, conversation between UCE-4773 and ██████████
██████████ purportedly confirmed she "received a $5,000 check for a political candidate that
UCE 4773 had mailed earlier." (Opp at 14.)  Later in the conversation, she purportedly told the
agent she was "checking on possible business for UCE-4773, and could do a certification for a
local office right away." (Opp. at 14.)  The government attempts to mislead the court with its
paraphrasing of the conversation.  First, there is no indication in the conversation that the check
discussed in the conversation was related to a political contribution. The extent of the discussion
about the check is as follows:

          UCE-4773:     Hey, I wanted to make sure you got the check.

         █████████     I did, thank you.

(Chatterjee Decl. ISO Reply, Ex. 30.)  Second, the statement that ██████████ was checking on
possible business for the agent and "could do certification for a local office right away" is
inaccurate:

        █████████     Okay so um, um I'll talk to Keith. I'm sure Keith is basically organizing
some meeting for you with Lennar and then hopefully we will have the information about
these two lands so you can actually get you know, take a look at these two lands and the
other companies as far as fitting an office in here, that's easy we can do that right away,
you know certification, so you should be fine with everything else, you know except the
PR and that's basically you know Keith's area not mine.

(*Id.*)  ██████████'s statement is far from a promise or agreement that companies UCE-4773
represented would receive contracts as a local and/or minority business.  Significantly, she never
promises UCE-4773 "certification for a local office right away" for a business "regardless of their
place of operation and the ownership of companies."

1  government fails to identify any favorable treatment that UCE-4773 would purportedly receive

2  for political contributions.

3        5.        Agent Quinn falsely asserts that UCE-4599 represented himself as a marijuana

4  trafficker and money launderer from New Jersey who is affiliated with La Cosa Nostra. (First

5  Quinn Affidavit at 16-17.) The government concedes that UCE-4599 never "overtly link[ed]

6  himself to organized crime . . . ." (Opp. at 15). The government then argues that "common sense

7  would suggest that real members of shadowy criminal groups ordinarily would not use" such

8  phrases. (*Id.*) Yet, when an affiant asserts to the Court that a government agent represented

9  himself to a defendant as a "marijuana trafficker" and "money launderer" affiliated with "La Cosa

10  Nostra," that should mean that the agent *actually made those representations*. The agents here

11  did not. And the government's representation to the Court that the agent made those

12  representations is false. Again, the government charged a crime of words, which requires

13  precision. Yet the government is playing fast and loose with words, misrepresenting to the Court

14  what was actually said between Mr. Jackson and the government agents. Indeed, the government

15  is simply guessing—and asking the Court to guess about what was said and what Mr. Jackson

16  understood—again, attempting to overlay a patina of criminality to manufacture probable cause.

17        The government cites two conversations to show that Mr. Jackson "must have known"

18  UCE-4599 was involved with "La Cosa Nostra." On May 30, 2012 "Jackson was present while

19  UCE 4599 and UCE 4773 discussed their investment in an illegal marijuana grow in Mendocino

20  County." (Opp. at 15). They also supposedly discussed using a nightclub/bar in Atlanta to

21  launder UCE-4599's illegal money. (*Id.*) The government attaches a FBI-302 to show that this is

22  what the conversation was about.[3] The audio and draft transcription (Chatterjee Decl. ISO Mot.,

23

24  The other conversation the government references, a March 1, 2012 between UCE-4773 and ▮▮▮▮
25  ▮▮▮▮ in which ▮▮▮▮▮▮ purportedly says "You pay to play here. We got it. We know this. We
    are the best at this game; uh, better than New York. We do it a little more sophisticated than New
26  Yorkers. We do it without the mafia." Despite the "buzzwords" there is no specific promise of
    official action to UCE-4773 in exchange for contributions.   Further, such statements have no
27  bearing on the probable cause analysis as to Mr. Jackson.

28  [3] The government notes that it cannot locate a Bates-stamped version of Government Exhibits 5
    and 6. Undoubtedly, this is because these FBI-302s are now being produced for the very first

Ex. 12) reveals that the terms "illegal" or "marijuana grow" are never used by the agents. At most, an unidentified business "up north" is described. At no point is "laundering" illegal money discussed. During the second conversation the government references, a September 20, 2012 conversation, UCE-4599 "continued to present himself as a person with a powerful and connected 'family' . . . ." (Opp. at 15.) This "family" is never described as "La Cosa Nostra."

6.     Agent Quinn's assertion that on May 25, 2011, Mr. Jackson told UCE-4599 that "if UCE 4599 wanted to contribute $5,000 to Senator Yee's campaign, the money could be placed in different accounts under multiple names at a rate of $500 each" is false. (First Quinn Affidavit at 18.) The government contends that Mr. Jackson made this statement. (Opp. at 15.) In support, the government relies on FBI-302s, not a transcript. The reason is that nowhere in the three-plus hour recording does Mr. Jackson make this statement. (Chatterjee Decl. ISO Reply, Ex. 29.)

7.     The government does not deny that Agent Quinn's assertion that Mr. Jackson asked UCE-4599 to "contribute" $3,000 on June 24, 2011 (First Quinn Affidavit at 18) is false. Instead, the government argues that the difference between "contribute" and "raise"—which is what Mr. Jackson actually said—is trivial. The government is wrong. The difference is material. A "contribution" is "a payment, a forgiveness of a loan, a payment of a loan *by a third party*, or an enforceable promise to make a payment except to the extent that full and adequate consideration is received, unless it is clear from the surrounding circumstances that it is not made for political purposes." Cal. Gov't Code § 82015; S.F. Campaign & Gov't Conduct Code § 1.104(g) (emphasis added). A contribution comes from a singular source and is subject to limits for each election cycle. A request to "raise" money, on the other hand, indicates a request to solicit money from multiple sources. Neither state nor local law prohibits such a request. The government's intentional choice of words carries the connotation, and misrepresentation, that Mr. Jackson was violating the law.

8.     Agent Quinn's assertion that sometime before September 20, 2011 "4599 told Jackson that his friend [4773] was a businessman who assisted UCE 4599 in laundering money"

_____

time. It begs the question, what other materials has the government yet to produce in this case that has just now reached its one year mark?

1    (First Quinn Affidavit at 19) is false.  Nothing the government says in its opposition suggests

2    otherwise.  They concede that UCE-4599 "may not have overtly used the phrase 'laundering

3    money.'" (Opp. at 16.)  Yet, the government argues that it should have been clear to Mr. Jackson

4    "from UCE-4599's 'legend'" that UCE-4773 assisted UCE-4599 in laundering money based on a

5    September 13, 2011 conversation.  (*Id.*)  Once again, the government is guessing and attempting

6    to manufacture criminality.  Nowhere in the government's evidence does UCE-4599 describe

7    UCE-4773 as assisting him with money laundering or anything vaguely suggestive of such

8    activity.  Apparently, telling someone that they've "helped my family out a lot," in government

9    agent-speak means "this guy helps me launder money."  If this is in code, the government failed

10   to provide the "legend" to Mr. Jackson to decipher UCE-4599's words.[4]

11         9.      As to Agent Quinn's assertion that Mr. Jackson told UCE-4773 that "he broke up

12   the money among straw donors in order to make conduit contributions," the affidavit does not

13   identify when this conversation took place.  In its opposition that the government alleges that it

14   took place on October 11, 2011, and only relies on 302s.

15         10.     Agent Quinn falsely stated that by October 14, 2011 UCE-4773 had contributed

16   $11,000 to Senator Yee's campaign.  (First Quinn Affidavit at 22.)  Once again, the government

17   conflated "contribution" and "raised" in order to manufacture probable cause.  (See Opp. at 19.)

18   Once again, the distinction is material.  UCE-4773 legally contributed $500, arranged for his wife

19   to legally contribute $500, and raised an additional $10,000 through undercover agents posing as

20   donors at a fundraiser hosted by UCE-4773.  The affiant's deliberate choice of the word

21   "contribute" was made to suggest illegal conduct when the underlying facts show legitimate

22   fundraising activity.

23         11.     Contrary to Agent Quinn's assertions, Senator Yee did not acknowledge UCE-

24   4773's October 14, 2011 statement describing his donations as "too much money . . . not to get

25   something." (First Quinn Affidavit at 23.)  The government fundamentally misrepresents this

26

27   [4] The government's reference in its opposition to unspecified conversations of "blatant
     criminality" should be given no weight. *See, e.g.*, *United States v. Meling*, 47 F.3d 1546, 1551-52
     (9th Cir. 1995) (scope of reviewing court's analysis is limited "only to the four corners of the
28   wiretap application.").

1   conversation, claiming that Senator Yee adopted the Agent's statement that "It's too much money

2   . . . Not to get something back." (Opp. at 20.)  In this portion of the conversation, dominated by

3   UCE-4773, Senator Yee says "right" 28 times in a row and nothing else. (Gov't Ex. 8.)  Far from

4   an "unequivocal acknowledgement" that what UCE-4773 is saying is correct (see Opp. at 20),

5   these interjections are the equivalent of "I'm listening."  When Senator Yee finally made a

6   statement of substance, he told UCE-4773 that he carefully follows fundraising rules and

7   regulations. (Gov't Ex. 8.)  Nowhere in the conversation did Senator Yee tell UCE-4773 that he

8   agrees with the statement "it's too much money not to get something."

9         12.   Agent Quinn falsely states "[t]hat throughout the remainder of the 2011 Mayoral

10   campaign JACKSON and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ contacted UCE-4773

11   via telephone to ask for additional contributions *beyond the campaign finance limit*." (First Quinn

12   Affidavit at 24) (emphasis added.)  The government ignores the crux of the misrepresentation and

13   instead recounts a November 3, 2011 conversation in which ▮▮▮▮▮▮ asks UCE-4773 if he can

14   "possibly raise us any (UI)" dollars?" (Opp. Ex. 10.)  She never asks UCE-4773 to contribute

15   "beyond the campaign finance limit."  The transcript makes clear that she asked UCE-4773 to

16   raise money like he previously did in that "first bundle" when he hosted a fundraiser for Senator

17   Yee.  The government then cites a November 5, 2011 conversation between Mr. Jackson and

18   UCE-4773 to provide further support of Agent Quinn's assertion in the affidavit.  Ultimately, this

19   effort fails.  Nowhere in the excerpt quoted by the government or in the draft transcript provided

20   as Government Exhibit 11 does Mr. Jackson solicit UCE-4773 for a campaign contribution, let

21   alone one "beyond the campaign finance limit."

22         13.   Agent Quinn's misrepresentation of the January 18, 2012 conversation between

23   Senator Yee, ▮▮▮▮▮▮ and UCE-4773 is significant. (First Quinn Affidavit at 25.)  The

24   government excerpts this portion of the affidavit and contends that Agent Quinn was truthful in

25   informing the Court that Senator Yee "acknowledged that UCE 4773 had already contributed the

26   legal maximum amount." (Opp. at 22.)  Mr. Jackson does not dispute this.  The misrepresentation

27   is in the phrasing and the sentence immediately following it: "In light of that fact, UCE 4773

28   asked how he could make a $10,000 contribution, to which Senator YEE responded to the effect

1    of: 'Just give the checks to her ███████████, just how we did it before.'" (First Quinn

2    Affidavit at 25.)  Senator Yee does not, as implied by Agent Quinn, ignore the individual

3    contribution limit and demand payment from UCE-4773.  Rather, it is UCE-4773 who is (again)

4    trying to contribute in excess of local campaign limits.  Senator Yee and ████████ correctly tell

5    him that he cannot contribute personally, but that he can raise money from others "just how we

6    did it before."

7           14.     Agent Quinn falsely represents that UCE-4773's payments to Mr. Jackson for

8    consulting services were "under the table."  (First Quinn Affidavit at 29.)  Not only does the

9    government concedes that neither Mr. Jackson nor UCE-4773 referred to these payments as

10    "under the table," (Opp. at 23) but, without question, UCE-4773 presented himself as a legitimate

11    business person, who sought Mr. Jackson's help in developing business in the Bay Area involving

12    at least ten unquestionably legitimate business projects, including real estate development in

13    San Francisco.  Further, UCE-4773 personally paid Mr. Jackson with checks, at least $16,000.

14    Again, to manufacture probable cause and a patina of criminality, the government reverts to a "he

15    must have known" argument.  Not only does this argument contradict the undisputed evidence

16    that Mr. Jackson was paid for legitimate business consultation, but the government's evidence

17    does not demonstrate any illegal payment to Mr. Jackson.  It further demonstrates that the

18    government made misrepresentations deliberately or recklessly.

19       •  On September 13, 2011 UCE-4599 describes UCE-4773 as "one of the guys my

20          family does business with," a "heavy hitter," and someone who wants to do business

21          in San Francisco who "knows the deal."  (Opp. at 23).  Mr. Jackson had not even met

22          UCE-4773 at this point and it is impossible to describe any actual relationship they

23          developed as "under the table."

24       •  On September 26, 2011, UCE-4773 told Mr. Jackson he "was not used to talking

25          business on that line, 'not the kind of business you and I are going to be doing . . . .'"

26          (Opp. at 24).  Not only is this statement vague, but it has no bearing on whether

27          payments to Mr. Jackson were legitimate.

28

1    • On January 27, 2012, UCE-4773 purportedly told Mr. Jackson that he was no "goody

2      two-shoes" and is "a part of the game" (Opp. at 24). What game is UCE-4773 a part

3      of? The investment game? The affordable housing game? The redevelopment game?

4      Regardless, this statement has nothing to do with UCE-4773's consulting payments to

5      Mr. Jackson.

6    • On February 7, 2012, UCE-4773 and Mr. Jackson discussed the terms of the contract

7      Mr. Jackson provided him. (Opp. at 24.) A week later, UCE-4773 told Mr. Jackson he

8      did not want to sign a contract. (*Id.*) The government concludes that "they therefore

9      established a relationship of payments without any legal contract." (*Id.*)  The lack of a

10     written contract does not make payments "under the table."

11   • The September 20, 2012 conversation does not concern UCE-4773's fee arrangement

12     with Mr. Jackson.

13        15.     The government must concede that Agent Quinn misrepresented a May 18, 2012

14   conversation between UCE-4773 and Mr. Jackson. Quinn's affidavit states:

15           On May 18, 2012, UCE 4773 spoke with JACKSON over Target
             Telephone 1. Jackson discussed UCE 4773 getting involved in
16           businesses related to the Golden State Warriors moving to San
             Francisco.  JACKSON stated that they are trying to get ▮▮▮▮▮▮▮▮
17           on the "▮▮▮Commission" which "will be good for us."

18   (First Quinn Affidavit at 42.)  The government now backtracks and claims that Agent Quinn was

19   referring to a third party other than Mr. Jackson as the person who was trying to place ▮▮▮▮

20   ▮▮▮▮▮ on the ▮▮▮Commission.  (Opp. 25.)  Clearly the government told the Court otherwise,

21   again attempting to create the patina of criminality.

22        16.     Agent Quinn misrepresents that UCE-4599 and UCE-4773 spoke about their

23   illegal activities, including a marijuana grow "up north" and "cleaning the finances" of UCE-

24   4773's company Madison International.  (First Quinn Affidavit at 42.)  The government contends

25   that "[Mr.] Jackson was present to hear it, and gain a further understanding of the supposed

26   criminal relationship and activities of the two UCEs." (Opp. at 26.)  The government's reliance

27   on the FBI-302 to support Quinn's statement is self-serving and unavailing.  The actual tape

28   recordings show, as noted above (infra III.B.5), that neither agent refers to the operation up north

as involving marijuana.  Likewise, neither UCE discusses "cleaning the finances" of Madison
International:

> UCE-4599    Great, I think your brother could run. I'm telling you man, and
> then we have – we've got to make sure everything is squared away
> with Madison International, I know my dad talked to you about
> that. We've just got to make sure that the books are good, and
> everything seems to be pretty good right now. But I know that's
> it's on the to-do list and I had to mention that to you.

> UCE-4773    Okay. Well, I mean everything is fine with just [inaudible] been
> confused it's, that's over my head. The guys are comfortable, but
> you can only grow so big.

(Chatterjee Decl. ISO Mot. Ex. 12.)  Clearly, Agent Quinn did not review the actual conversation
upon which he based his affidavit.  Such conduct reflects deliberate falsity or at least a reckless
disregard for the truth and calls into question all of Agent Quinn's assertions.  It also calls into
question of the credibility of both UCE-4773, the apparent author of the 302 in question.

      17.    Agent Quinn falsely asserts that Mr. Jackson told UCE-4773 that a $10,000
donation would be broken up into $500 donations to ████████, who was running for ██
██████████. (First Quinn Affidavit at 50.)  The government focuses on the
following statement by Mr. Jackson: "But you can only still give $500 to her per person, so we
can get more people to give to her and then she will turn around and give it to Leland." (Opp. at
26.)  The government argues that Jackson told UCE-4773 that money will be passed through from
████████ to Senator Yee.  Once again the government miscasts the discussion and takes and
improper pronoun reference out of context.  In the very same discussion, Mr. Jackson correctly
explained to UCE-4773 that if Senator Yee raised money for ████████, she would raise money
for him.  (Chatterjee Decl. ISO Mot., Ex. 13.)  Mr. Jackson made clear there was no direct pass
through from ████████ to Senator Yee as the government contends.

### C.    The Government Does Not Deny Making Material Omissions

      Mr. Jackson's brief in support of the motion to suppress identified exculpatory omissions
that undermine the government's probable cause claims.

      1.    On May 25, 2011, Mr. Jackson explained to UCE-4599 the contribution limits for
the 2011 mayoral raise and told UCE-4599 that contributions must be made by check or credit

1    card. (Mot. at 8.)  The government does not challenge this statement, and, in doing so, impliedly

2    concedes that this exculpatory conversation was excluded from the affidavit.  Instead, the

3    government cites purported conversation that cannot be heard in the recording.

4          2.    On October 14, 2011, Senator Yee did not encourage UCE-4773 to contribute in

5    excess of contribution limits and instead advised him that he could legally contribute an unlimited

6    amount to a ballot measure.  (Mot. at 8.)  The government does not challenge this omission in its

7    opposition.

8          These material omissions further demonstrate deliberate or reckless conduct.

9    **D.    UCE-4773's Misconduct Was Material and Omitted**

10         The government contends that it "candidly disclosed information about the status of UCE

11   4773 out of an abundance of caution . . . ."  (Opp. at 48.)  This is false.  The government only

12   disclosed the details of UCE-4773's termination from this investigation to the Court when

13   prompted by Mr. Jackson's Motion to Compel (Dkt. No. 424), two years after the First Quinn

14   Affidavit.  Having reviewed the materials that the government chose to produce, this Court

15   indicated that there is potential *Giglio* materials relevant to UCE-4773's credibility.  Mr. Jackson

16   hereby renews his motion to compel and requests the government produced the requested

17   materials.  UCE-4773's credibility is directly at issue.  And he lacks credibility.  His 302s

18   contradict the actual tapes.  (*Compare* Chatterjee Decl. Ex. 12 (showing that UCE-4773 and

19   UCE-4599 never mentioned an illegal marijuana operation or money laundering during a May 30,

20   2012 conversation) *with* Gov't Ex. 5 (UCE-4773's FBI 302 alleging that at this meeting "[UCE-

21   4599] and UCE-4773 discussed their investment in an illegal marijuana grow" and "[UCE-4599]

22   investing in a night club/bar in Atlanta, GA in order to launder [UCE-4599] illegal money.")  The

23   government represented to the Court that the investigation into UCE-4773 did not affect his

24   credibility, yet the facts suggest otherwise.

25         This Court cannot rely on Agent Quinn's representations regarding UCE-4773.  Agent

26   Quinn's numerous misstatements and omissions call into question his credibility and candor.

27   And, because Agent Quinn, by his own admission, relied on statements made by UCE-4773 in

28

1   preparing his affidavit, UCE-4773's credibility is also at issue.  Given the numerous

2   misstatements and omissions, the record here compels a hearing involving both agents.

3   **E.    The Government Continued Making False Representations and Material**
        **Omissions to the Court in the Wiretap Extension Applications**

4

5          The government does not deny that subsequent affidavits incorporated the misstatements

6   and omissions from the November 13, 2012 affidavit.   Each of these affidavits suffers from the

7   same defects as the November 13, 2012 affidavit, and they are fruit of the poisonous tree.  The

8   government fails to address this fatal flaw in each of the subsequent affidavits.  Further, the

9   government fails to rebut the additional false statements and omissions identified in Mr.

10  Jackson's motion.

11         1.     Subsequent affidavits falsely assert that UCE-4599 represented himself as a

12  member of "La Cosa Nostra" a "marijuana trafficker or "money launderer."  The government

13  concedes that these phrases were not used to describe UCE-4599.  The government simply insists

14  that Mr. Jackson must have known and could have "no reasonable doubt about the nature of

15  UCE-4599's cover story." (Opp. at 27.)  As addressed above, this argument is unsupported by

16  the facts.

17         2.     As to Agent Quinn's assertions regarding a November 16, 2012 discussion, the

18  correct transcript is attached as Chatterjee Decl. ISO Reply, Ex. 31.  Agent Quinn summarized

19  this conversation regarding UCE-4773's payment of Mr. Jackson's consulting fee and Senator

20  Yee's request that UCE-4773 help raise $15,000 in campaign contributions and concluded that

21  the "conversation related to the payment of money to Senator Yee for official action and

22  misrepresenting true donors to disguise illegal payments." (Second Quinn Affidavit at 19.)  In

23  making this conclusion, Agent Quinn again ignores the actual statements made in the

24  conversation.  In declining to help raise the $15,000, UCE-4773 showed that he understood that

25  Mr. Jackson and Senator Yee were not "pay to play."  He says: "It's too much money not to get

26  something out of." (Chatterjee Decl. ISO Reply, Ex. 31)

27         3.     Agent Quinn misrepresented Mr. Jackson's December 12, 2012 conversation with

28  CHS#11 by concluding that it must relate to "engaging in manufacture and/or sales of marijuana

or possible bribery." (Second Quinn Affidavit at 72.)  The government's argument is two-fold: 1) Agent Quinn hedged his bets by asserting "possible bribery"; and 2) marijuana is prohibited under federal law.  To the first point, Agent Quinn's conclusion that the conversation involved "possible bribery" is unsupported by the conversation. (Chatterjee Decl. ISO Mot., Ex. 15).  To the second point, the conversation is an emblematic example of federal agents suggesting and initiating criminal activity, which is all the more troublesome in this particular circumstance given marijuana's conflicting legal status of federal and state law.

   4. Agent Quinn misrepresented the nature of events leading to Senator Yee's agreement to provide a proclamation to the CKT on January 22, 2013. (Second Quinn Affidavit at 91.)  The government claims that Agent Quinn provided the correct sequence: First, Mr. Jackson informed Senator Yee on November 20, 2012 that UCE-4599 would "clear up the campaign debt if Yee would help Chow out"; second, "Yee demurred because he did not want to be seen as too close to Chow"; and finally, on January 22, 2013, "Yee agreed to do the proclamation understanding that this official act was in exchange for donation from UCE 4599." (Opp. at 28.) The government is wrong and intentionally conflates two separate requests, one to personally benefit Chow and another to recognize the CKT's banquet.

   On November 20, 2012, Mr. Jackson told Senator Yee that UCE-4599 wants to make a campaign contribution and wants Senator Yee's help in having Raymond Chow's ankle monitor removed.  Contrary to the government's claims, Senator Yee stated, "Yeah, sure, that ain't gonna happen man. . . . as much as I want that five thousand, I can't do that man . . . ." (Chatterjee Decl. ISO Reply, Ex. 32.)  Nearly two months later at a lunch, UCE-4599 asked Senator Yee for a proclamation honoring the CKT's 160th anniversary banquet.  There was no mention of campaign contributions during this discussion or leading up to it.  Senator Yee agreed that his office will provide a certificate recognizing the CKT's banquet.  (Chatterjee Decl. ISO Reply, Ex. 33.)  Only after Senator Yee agreed to provide the proclamation—and had left the conversation— did UCE-4599 attempt to manufacture an issue by telling Mr. Jackson "You'll get the proclamation? If he gets it, I'll give him a check.  Plain and simple." (*Id.*)

1    The government contends that "the fact that Yee was promised a check in exchange for a

2    proclamation and agreed to issue the proclamation, with the check written later, does not obviate

3    the original bribe agreement." (Opp. at 28.) The government's argument is circular, conveniently

4    ignoring that there was never an "original bribe agreement."

5        5.    Agent Clark misrepresented the status of the FBI's investigation into UCE-4773.

6    The government asserts that this is "nothing more than a rehash of Jackson's previous arguments

7    regarding the investigation of UCE 4773." (Opp. 28.)  It is. And it is just as much a

8    misrepresentation when made by Agent Clark as it was when made by Agent Quinn.

9        6.    Agent Clark misrepresented the nature of a February 14, 2013 call between

10    CHS#11 and Mr. Jackson discussing Mr. Jackson's consulting business.  She concludes that the

11    conversation "illustrated JACKSON attempting to secure CHS#11 projects and favorable

12    treatment from politicians in exchange for monetary payments." (Clark Affidavit at 24.)  The

13    government admits that there are permissible innocent inferences to be drawn from this

14    conversation.  (Opp. at 29.)  Once again, the government attempts to manufacture criminality.

15    Agent Clark quoted CHS#11 as saying "I don't know. I don't know how you guys do it legit, I

16    think that our toes are on the line, best be careful what you do."  This comment is entirely

17    unrelated to "projects and favorable treatment from politicians in exchange for monetary

18    payments."  No doubt, Agent Clark knew this. She was also well aware that such statements

19    impermissibly color the actual content of the conversation.

20    **III.    THE GOVERNMENT FAILED TO ESTABLISH NECESSITY FOR A WIRETAP**

21        The government fails to establish the statutory necessity requirements to obtain a wiretap.[5]

22    Section 2518(1)(c) requires a full and complete statement as to whether other investigative

23    procedures have been tried and failed.  Here, the government simply defends its boilerplate

24    _____

25    [5] The government contends the appropriate standard of review with respect to necessity is "under
an abuse of discretion standard." (Opp.  at 6.)  This is only partially correct.  The authorizing
court's finding of necessity may be overturned only for abuse of discretion, *but* whether other

26    investigative procedures have been exhausted or why they reasonably appear not likely to succeed
is reviewed *de novo*. *United States v. Lynch*, 367 F.3d 1148, 1159 (9th Cir. 2004).  Further,

27    whether the government's wiretap application complied with the "full and complete statement"
requirement of Section 2518(1)(c)—a crucial component in establishing necessity—is reviewed

28    *de novo*.  *See United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001).

1    language that does little more than describe the inherent limitations of various investigative

2    techniques, each described in isolation.  When viewed in their totality, the government failed to

3    pursue any of the traditional investigative techniques, demonstrating a lack of good faith before

4    resorting to a wiretap application.  Indeed, the government ignores the fundamental point: The

5    government lacked necessity for a wiretap because the agents could have obtained the

6    information they wanted simply by asking Mr. Jackson, who never refused to meet with or to

7    answer their questions.

8          The government's contention that it is entitled to more "leeway" when investigating

9    conspiracies is a thinly veiled effort to avoid the required statutory showing.  (Opp. at 7.)  The

10    government's cases reflect a principle of proportionality with respect to the wiretapping statute.

11    *See United States v. McGuire*, 307 F.3d 1192, 1198 (9th Cir. 2002) ("The more grave the threat

12    posed to our society, the greater the government's leeway in pursuing it.").  In *McGuire*, the

13    government investigated the "Montana Freemen," a violent group of vigilantes located in remote

14    areas bent on overthrowing the United States government.  No such charges are present here that

15    would warrant the type of leeway the government seeks.  Regardless, whether necessity is

16    satisfied turns on whether the government demonstrated that traditional investigative techniques

17    had been exhausted or that they were reasonably unlikely to succeed.[6] As addressed in the

18    Opening Brief, the government satisfied neither prong here.

19        **A.**    **The Government Does Not Deny that It Could Have Obtained Information**

20                 **from Mr. Jackson by Simply Asking Him Direct Questions**

          The government does not dispute that it had unimpeded access to Mr. Jackson and

21    infiltrated nearly every aspect of Mr. Jackson's life, which was pointed out in the Opening Brief.

22

---

23    [6] In *McGuire*, the reviewing court recited from the affidavit a litany of reasons traditional

24    investigative techniques were unlikely to succeed, none of which hinged on the fact that the government was investigating a conspiracy: Physical surveillance was not possible due to the

25    remote, rural location of the group's compound and their alertness to law-enforcement activities; executing a search warrant posed unreasonable risk to life because of the group's known violent

26    tendencies;  federal agents would have had difficulty infiltrating the group with FBI informants given its tight-knit nature; interviewing witnesses would not have helped as the only persons

27    knowledgeable to the group's activities were defendants themselves; cooperating witnesses were only able to provide limited information. *McGuire*, 307 F.3d at 1198.  The circumstances here

28    differ.  Similarly, the government's other cases reflect factually different circumstances and are inapplicable.  *See United States v. Garcia-Villalba*, 585 F.3d 1223 (9th Cir. 2009).

1   (Mot. at 18.) The government does not deny that Mr. Jackson never refused to meet with the

2   agents and never refused to answer any questions asked by the agents.  Indeed, the agents

3   pretended to be Mr. Jackson's client and paid him a monthly retainer.  The government has made

4   no showing that Mr. Jackson would not have answered questions asked by the agents.

5   Accordingly, the government has no answer to the proposition that, if the agents wanted more

6   information from Mr. Jackson, they could have simply asked him.  Absent a showing otherwise,

7   the government cannot establish necessity for a wiretap.  Simply put, the agents did not need a

8   wiretap because they could have asked Mr. Jackson what they wanted to know.

9   **B.    The Government Failed to Exhaust Other Traditional Investigative Techniques in Good Faith**

10

11          The government notes that it was not required to recruit additional informants in order to

12   demonstrate necessity, as it had already tried and failed. (Opp. 42.) The government misses the

13   point.  There is a requirement that traditional investigative procedures be undertaken in good

14   faith. *See, e.g., United States v. Spagnuolo*, 549 F.2d 705, 710 (9th Cir. 1975) ("To show that

15   'other investigative procedures have been tried and failed' the affidavit must reveal that normal

16   investigative techniques have been employed *in a good faith effort* to determine the identity of

17   those violating the law and to *assemble sufficient evidence to justify their prosecution* and that

18   these efforts have failed to achieve their ends. *The good faith effort* need not have exhausted all

19   possible uses of ordinary techniques.") (emphases added.)  This, the government did not do.

20          Mr. Jackson first met UCEs in the fall of 2010.  In the two years leading up to the first

21   wiretap application—when the government was supposedly making a good faith effort to utilize

22   traditional investigative techniques—the government apparently was able to identify only two

23   potential confidential sources.  All six wiretap applications identify the same two "failed"

24   sources.  One of these sources, referred to as Person A by the government, was never seriously

25   considered as a source given the government's disappointment in her work in a previous,

26   unrelated investigation.  (Opp. at 44.)  The government's opposition is silent with respect to the

27   other identified potential source, ██████████████████.  Unsurprisingly, the government

28   did not pursue ████████ as a source in this branch of its sprawling investigation lest it jeopardize

1    the other branch.  Given what the government knew about these individuals *before* the present

2    investigation, it can hardly be said that a good faith effort was made to identify potential

3    confidential sources prior to seeking a wiretap on Mr. Jackson's phone.  *A two year investigation*

4    *that fails to identify a single potential confidential source is entirely lacking a good faith effort.*

5         The government suggests that approaching Mr. Jackson as a confidential witness would

6    not have worked.  (This, of course, would be different than simply asking Mr. Jackson what the

7    agents wanted to know, as discussed above.)  Agent Quinn, who was not directly in

8    communications with Mr. Jackson, believed that Mr. Jackson would have invoked his Fifth

9    Amendment testimonial privilege, or would have fled or otherwise jeopardized the investigation.

10   (Opp. at 45.)  This is a generic statement that could be said of any suspect in a criminal

11   investigation.  The affiant failed to provide the *specific circumstances* relevant to this case that

12   shaped and informed this belief.  As the Ninth Circuit has explained, the government cannot

13   simply rest on generalizations, but instead, "[M]ust allege *specific circumstances* that render

14   normal investigative techniques particularly ineffective or the application must be denied . . . ."

15   *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir. 1985) (emphasis added).  The showing

16   must be based on "an adequate factual history of the investigation and a description of the

17   criminal enterprise sufficient to enable the district judge to determine, independent of the agent's

18   assertions with respect to his or other agents' experience, that ordinary investigative techniques

19   very likely will not succeed or that their use will imperil life or in some specific way be too

20   dangerous."  *Spagnuolo*, 549 F.2d at 710.  The government failed to make this showing with

21   respect to Mr. Jackson.

22        The government contends that telephone records aided in revealing 1) that there were

23   communications between Jackson, Yee, and other Target Subjects; and 2) that the approximate

24   whereabouts of particular individuals.  (Opp. at 47.)  The government claimed that a wiretap was

25   needed because these records failed to advance the investigation because they did not reveal the

26   *content* of the conversations between Mr. Jackson and others.  (Opp. at 47.)  The Ninth Circuit in

27   *United States v. Blackmon*, 273 F.3d 1204, 1210 (9th Cir. 2001), however, held that statements of

28

1  such "inherent limitations" of an investigative procedure, without more, is insufficient to establish

2  necessity.

3      The government acknowledges that Agent Quinn provided only three examples of why

4  trash runs were either not feasible or had been attempted without success (Opp. at 47):

5  Mr. Jackson lived in an apartment complex, making it too difficult to identify his trash;

6  ███████████  lived a single unit home, making it too difficult to conduct a search without alerting

7  the resident; and Mr. Yee shredded some of his paper trash.  (First Quinn Affidavit at 82.)  The

8  government, however, makes no effort to explain why despite their being *eleven* target subjects of

9  the November 13 wiretap (see First Quinn Affidavit at 5-12), trash searches were apparently only

10  contemplated with respect to *three* individuals.  Three out of eleven, is hardly indicative of a good

11  faith effort.

12      The government's claim that the affiant provided "tangible, non-boilerplate examples" of

13  why mail covers were insufficient to achieve the goals of the investigation is generous.  Agent

14  Quinn asserts that the mail covers provided no useful information beyond the fact that the targets

15  received mail at their respective addresses.  (First Quinn Affidavit at 82.)  He also concludes,

16  based on his training and experience, that because of the "relatively slow pace" of the U.S. Mails,

17  criminals prefer other forms of communication.  *(Id.)*  First, if all he can determine is that the

18  targets received mail at their respective addresses, it begs the question of how much actual effort

19  went in to utilizing this long-standing investigative technique.  Second, the generic generalization

20  about criminals not liking the slow pace of the U.S. Mail is exactly the kind of boilerplate

21  statement unsupported by the specific facts of the case that the Ninth Circuit has said is

22  insufficient to establish necessity.  Notwithstanding the slow pace of the traditional mails, the

23  government provides no response as to why a search warrant for Mr. Jackson's emails was not

24  requested until a week after his arrest in 2014.

25      Lastly, the government contends Agent Quinn described "in great detail some of the

26  limited successes that agents achieved using physical surveillance." (Opp. at 48).  The "extensive

27  detail" is limited to describing an effort to physically surveil Senator Yee's adult son who is not

28  now, and has never been identified as, a target in this investigation.  (First Quinn Affidavit at 79.)

1  With respect to Mr. Jackson, the affiant states that he is "secretive" and "guarded," but offers no

2  factual support for these bald and erroneous conclusions.  (*Id.*)  This is far from a full and

3  complete statement as to why physical surveillance is insufficient, and it is far from describing a

4  good faith effort to utilize this technique.

5       In sum, the affidavit fails to demonstrate a good faith effort to utilize traditional

6  investigative procedures and does little more than recount the inherent limitations of the

7  techniques described.  As the Ninth Circuit said in *Blackmon*:

8           That pen registers do not reveal the identity of callers; that
          [criminals] know it is in their best interest to reveal as little as
9          possible; that witnesses cannot lead to the prosecution of an entire
          [criminal] organization; and that traditional investigative methods
10         do not reveal all are generic problems of police investigation.  Their
          generic nature does not dissipate simply because the government
11         claims a vast investigative purpose.

12 *Blackmon*, 273 F.3d at 1211.  Here, as in *Blackmon*, the government has failed to establish the

13 necessity of a wiretap.

14      **C.    The Government Manufactured Necessity Because It Wanted a Wiretap to**
15            **Replace UCE-4773, Who Was Terminated From the Investigation**

16      The government's claim of necessity is subterfuge because the government wanted the

17 wiretap to replace UCE-4773, who was terminated from the investigation.  The government

18 writes that there is no basis for suspecting the sudden need for a wiretap was related to UCE-

19 4773's removal from the case.  (Opp. at 48).  The government also adds that UCE-4773 was

20 replaced with other "similarly positioned UCEs and informants, including UCE 4180 and CHS

21 #11."  (*Id.*)  The circumstances leading to the wiretap application suggests otherwise.

22      The government does not contest that UCE-4773 was the lead investigator.  As the lead

23 investigator, UCE-4773 was undoubtedly responsible for determining the scope of the

24 investigation and the methods used.  His decision not make a good faith effort to utilize

25 traditional investigative procedures is material to the government's assertion that the requisite

26 necessity for a wiretap was demonstrated.  The Court is also aware of matters affecting UCE-

27 4773's credibility.  The Court should grant a hearing on this factor alone.

28

1    The government also does not contest that UCE-4773 had injected himself into

2    Mr. Jackson's life more than any other undercover or confidential source.  Contrary to the

3    government's position, UCE-4773's role in this case, and in Mr. Jackson's life, did not

4    "diminish."  It ended abruptly.  UCE-4773 was in constant contact with Mr. Jackson until

5    November 20, 2012—the last known interaction between the two—a mere seven days after the

6    government sought a wiretap on Mr. Jackson's communications.  By this time, the government

7    was already aware that UCE-4773 was under investigation and would be unavailable going

8    forward.  That UCE-4773 was never reinstated supports this contention.

9    The government contends that UCE-4773 was replaced by new UCEs and informants and

10   not the wiretap.  The government fails to inform the Court that one of these "replacements" did

11   not make an appearance until the government was well into conducting the second authorized

12   wiretap.  UCE-4180 did not meet Mr. Jackson until March 14, 2013, four months *after* the

13   government had begun monitoring Mr. Jackson's telephone communications.

14   The other "replacement," CHS#11, had been a part of the investigation since at least May 30,

15   2012 when Mr. Jackson took him to meet officials from a company engaged in redeveloping San

16   Francisco's Hunters Point neighborhood.  CHS#11 is not an FBI agent—but just a confidential

17   source.  If the government is suggesting that CHS#11 was brought in to replace UCE-4773, then

18   the government was aware of UCE-4773's misconduct since at least May 2012.

19   **IV.    THE GOVERNMENT'S VIOLATION OF ITS DUTY TO MINIMIZE THE**

20   **         INTERCEPTION OF NON-PERTINENT CONVERSATIONS WARRANTS**
     **         SUPPRESSION**

21   The Ninth Circuit has noted that "[t]he minimization provision reflects and substantially

22   implements Congress's intent to limit interceptions.  There must be suppression if the government

23   has failed to comply substantially with the minimization requirement."  *United States v. Scully*,

24   546 F.2d 255, 262 (9th Cir. 1976), *vacated on other grounds sub nom. United States v. Cabral*,

25   430 U.S. 902 (1977).  It is the government's burden of proving compliance with this requirement.

26   *United States v. Rivera*, 527 F.3d 891, 904 (9th Cir. 2007).[7]

27

28   [7] The government advocates an unspecified, yet deferential, standard of review with respect to the
     minimization requirement.  (Opp. 8-11).  Again, the appropriate standard of review is *de novo*.

1    From November 2012 through June 2013, the government intercepted 16,879

2  communications over Mr. Jackson's cell phone. This the government does not dispute. Instead,

3  the government challenges Mr. Jackson's interpretation of the data—previously provided to this

4  Court in the form of Fifteen-Day Reports—used to assess the government's compliance with the

5  minimization requirements. (Opp. at 54-55.) It is troubling that in "instructing" the Court and

6  Mr. Jackson how the data should be interpreted that the government for the first time provides

7  information to the Court that should have been included in the Fifteen-Day Reports. In addition,

8  for the first time, the government "corrects" the data previously disclosed to the Court. Not only

9  do these corrections call into question the veracity of other statements made by the government in

10  the affidavits, these *ex post facto* efforts to satisfy the minimization requirement are insufficient.

11  Suppression of all communications is warranted.

12    The government provides an elaborate analysis of the data provided to this Court in the

13  Fifteen-Day reports. Central to this analysis is the tacit admission that the Fifteen-Day Reports

14  excluded relevant information. The figures presented in the Fifteen-Day Reports were

15  straightforward. They included the "Total number of intercepts," "Number of intercepts flagged

16  as pertinent, "Number of minimized intercepts," "Number of minimized intercepts flagged as

17  pertinent, and "Number of intercepts flagged as privileged." Using these figures Mr. Jackson

18  correctly concluded that 16% of the communications were deemed pertinent; the government

19  minimized only 6% of the communications and 84% were unrelated to the investigation. (Mot. at

20  22-23). Now, the government contends that the proper analysis of this data requires consideration

21

22

---

23  *United States v. Bennett*, 219 F.3d 1117, 1123 (9th Cir. 2000) ("We review de novo whether law
enforcement officials properly minimized the interception of nonrelevant phone conversations
24  during the course of the wiretaps."). The government also contends that the suppression of all
wiretap evidence for violation of the minimization requirement is "far from a foregone
25  conclusion." (Opp. at 9). The government mischaracterizes the panel's position on the total
suppression of the wiretaps for failure to follow minimization requirements as "merely [a
26  description of] the different positions of the parties as to the correct remedy." (Opp. at 10.). The
court was unequivocal: "In a case where it is clear that the minimization provision of the order
27  was disregarded by the Government throughout the period covered by the order, a total
suppression might well be appropriate. We assume, arguendo, that such should be the rule."
28  *United States v. Turner*, 528 F.2d 143, 156 (9th Cir. 1975).

1    of additional information; information the government provides for the first time in Exhibit 27 to

2    its opposition.

3         It its opposition, the government urges the Court that the only interceptions relevant to the

4    minimization analysis are those over two minutes.  (Opp. at 57.)  The Fifteen-Day reports are

5    silent as to the number of communications over two minutes.  This information is provided to the

6    Court for the first time in Government Exhibit 27.

7         The government also instructs in its opposition that the "Total number of wire intercepts"

8    figure provided in the Fifteen-Day Reports includes "calls where the phone rang, but there was no

9    answer and no connection was made to an answering machine, calls where voice mails were left,

10   alerts signaling that the voice mailbox was full, text messages, and calls where there was a

11   technical problem with the phone line and there was no audio and no content." (Opp. at 55.)  The

12   actual number of completed calls a not included in the reports.  The figures in government Exhibit

13   27 that the government urges the Court to consider are premised on completed calls, information

14   not previously provided

15        Also troubling is the government's correction of data previously provided to the Court.

16   The Declaration of Special Agent James Folger informs the Court "that there are occasional

17   discrepancies between the numbers in the attached charts [Gov't Exs. 27 & 28] and what was

18   reported to the Court in the Fifteen Day Reports." (Gov. Ex. 26, Decl. James Folger at 3.)  Agent

19   Folger attempts to explain these discrepancies away by informing the Court that the original

20   figures provided contained data "collected part-way through the last day of the period instead of

21   at the end of the day."  Although this discrepancy may seem trivial to the government, it means

22   the government denied this Court information relevant to the assessment of compliance with the

23   minimization requirement.  These are reports that were provided, in some cases, over three years

24   ago and it was the data in these reports that the Court relied upon in assessing the government's

25   minimization efforts.

26

27

28

1    **V.      CONCLUSION**

2         For all of the reasons stated above, Defendant's Motion to Suppress all communications

3    intercepted pursuant to wiretap and all evidence obtained as a result of the tainted interceptions

4    should be granted.

5
     Dated: April 28, 2015                        Respectfully submitted,
6
                                                  MORRISON & FOERSTER LLP
7

8
                                           By:    _/s/ James J. Brosnahan_
9                                                 JAMES J. BROSNAHAN

10                                                Attorneys for Defendant
                                                  KEITH JACKSON
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28