MELINDA HAAG (CABN 132612)
United States Attorney

DAVID R. CALLAWAY (CABN 121782)
Chief, Criminal Division

WILLIAM FRENTZEN (LABN 24421)
SUSAN E. BADGER (CABN 124365)
S. WAQAR HASIB (CABN 234818)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    william.frentzen@usdoj.gov
    susan.badger@usdoj.gov
    waqar.hasib@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br><br>   v.<br><br>LELAND YEE and<br>KEITH JACKSON<br><br>    Defendants. | No.: CR 14-0196 CRB<br><br>GOVERNMENT'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO SUPPRESS WIRETAP EVIDENCE<br><br>Date: July 7, 2015<br>Time: 9:30 a.m.<br>Court: Hon. Charles R. Breyer<br><br>**UNDER SEAL** |

1

**TABLE OF CONTENTS**

2   I.      INTRODUCTION ................................................................................................1

3   II.     FACTUAL BACKGROUND ...............................................................................1

4   III.    LEGAL BACKGROUND ....................................................................................3

5   a.      Applicable Law Regarding *Franks* ...................................................................3

6   b.      Applicable Law Regarding Probable Cause .......................................................6

7   c.      Applicable Law Regarding Necessity.................................................................6

8   d.      Applicable Law Regarding Minimization ..........................................................8

9   IV.     ARGUMENT.....................................................................................................11

10  a.      The Wire 3 Affidavit Contained No Material Misrepresentations or Omissions .........................11

11  b.      None of the Alleged Misstatements or Omissions Require a hearing ..............30

12  c.      There was Probable Cause in Wire 3 to Intercept Target Telephone 2 ............35

13  d.      Wire 3 and Wires 4-7 Did Not Rely On Previous Affidavits To Establish Necessity...................40

14  e.      The Government Was Not Required to Recruit Additional Informants In Order to Demonstrate Necessity.............................................................................42

15
    f.      The Government Adequately Demonstrated For Necessity Purposes Why Keith
16          Jackson Could Not Be Approached as a Confidential Witness .......................45

17  g.      Shortcomings of Telephone Records, Trash Runs, Mail Covers, and Physical
18          Surveillance......................................................................................................47

    h.      Wiretaps Were Necessary To Progress The Investigation, Not To Replace UCE 4773 ..............48
19
    i.      The Government Complied with Minimization Requirements During the Wiretaps...................48
20
    V.      CONCLUSION..................................................................................................61

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Franks v. Delaware*, 438 U.S. 154 (1978) ................................................................. 3, 4, 30

*Illinois v. Gates*, 462 U.S. 213 (1983) ............................................................................. 5, 6

*Ippolito*, 774 F.2d 1482 (9th Cir. 1985) .......................................................................... 4, 6

*Scott v. United States*, 436 U.S. 128 (1978) ..................................................... 8, 9, 10, 52

*Skilling v. United States*, 561 U.S. 358 (2010) .................................... 31, 32, 34, 35

*United States v. Aviles*, 170 F.3d 863 (9th Cir. 1999) ........................................................ 6

*United States v. Baker*, 589 F.2d 1008, 1013 (9th Cir. 1979) ...................................... 7, 43

*United States v. Bennett*, 219 F.3d 1117 (9th Cir. 2000) .............................................. 30, 43

*United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001) ............................ passim

*United States v. Botero*, 589 F.2d 430 (9th Cir. 1978) ................................................... 4, 5

*United States v. Burnes*, 816 F.2d 1354 (9th Cir. 1987) ...................................................... 4

*United States v. Canales-Gomez*, 358 F.3d 1221, 1225 (9th Cir. 2004) ................. 6, 7, 8, 43

*United States v. Capra*, 501 F.2d 267 (2d Cir. 1974) ......................................... 57, 58, 59

*United States v. Carneiro*, 861 F.2d 1171, 1178 (9th Cir. 1988) ...................... 7, 35, 40, 43

*United States v. Chavez-Miranda*, 306 F.3d 973 (9th Cir. 2002) ......................................... 4

*United States v. Chesher*, 678 F.2d 1353 (9th Cir. 1982) ..................................................... 4

*United States v. Cox*, 462 F.2d 1293 (9th Cir. 1972) .................................................... 9, 60

*United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008) ................................................ 4

*United States v. Dicesare*, 765 F.2d 890 (9th Cir. 1985) ...................................................... 4

*United States v. Dumes*, 313 F.3d 372 (7th Cir. 2002) ...................................................... 57

*United States v. Fernandez*, 388 F.3d 1199, 1235-36 (9th Cir. 2004) .......................... 7, 30

*United States v. Garcia Villalba*, 585 F.3d 1223, 1230 (9th Cir. 2009) .............................. 7

*United States v. Gil*, 58 F.3d 1414 (9th Cir. 1995) ............................................... 5, 12, 28

*United States v. Gourde*, 440 F.3d 1065 (9th Cir. 2006) (.................................................... 5

*United States v. Homick*, 964 F.2d 899 (9th Cir. 1992) .............................................. 10, 57

*United States v. Johns*, 948 F.2d 599 (9th Cir. 1991) .......................................................... 5

1    *United States v. Kelley*, 482 F.3d 1047 (9th Cir. 2007) .................................... 5

2    *United States v. Licavoli*, 604 F.2d 613 (9th Cir. 1979) ................................. 35

3    *United States v. McGuire*, 307 F.3d 1192, 1197 (9th Cir. 2002) ............ 7, 8, 9, 53

4    *United States v. McQuisten*, 795 F.2d 858 (9th Cir. 1986) ............................ 4

5    *United States v. Meling*, 47 F.3d 1546 (9th Cir. 1995) ................................. 6

6    *United States v. Perdomo*, 800 F.2d 916 (9th Cir. 1986) ............................... 4

7    *United States v. Pitts*, 6 F.3d 1366 (9th Cir. 1993) ..................................... 5

8    *United States v. Rivera*, 527 F.3d 891 (9th Cir. 2008) ........................... passim

9    *United States v. Santora*, 600 F.2d 1317 (9th Cir. 1979) ............................ 40

10   *United States v. Scully*, 546 F.2d 255(9th Cir. 1976), ............................... 9, 60

11   *United States v. Simpson*, 813 F.2d 1462 (9th Cir. 1987) ......................... 43, 46

12   *United States v. Smith*, 893 F.2d 1573, 1582 (9th Cir. 1990) ......................... 7

13   *United States v. Staves*, 383 F.3d 977 (9th Cir. 2004) ................................. 6

14   *United States v. Torres*, 908 F.2d 1417, 1423 (9th Cir. 1990) .................... passim

15   *United States v. Tortorello*, 480 F.2d 764 ............................................. 35

16   *United States v. Turner*, 528 F.2d 143 (9th Cir. 1975) ..................... 8, 10, 11, 60

17   *United States v. Ventresca*, 380 U.S. 102 (1965) ....................................... 5

18   *United States v. Webster*, 734 F.2d 1048(5th Cir. 1984), ............................ 43

19                               **FEDERAL STATUTES**

20   18 U.S.C. § 1346 ..................................................................... 59

21   18 U.S.C. § 2518(1)(c) ........................................................... 3, 41, 42

22   18 U.S.C. § 2518(1)(b) ............................................................... 3

23   18 U.S.C. § 2518(3) .................................................................. 6

24   18 U.S.C. § 2518(3)(a) ............................................................... 6

25   18 U.S.C. § 2518(5) ....................................................... 3, 8, 49, 52

26   18 U.S.C. §§ 2518(1) ................................................................. 6

27   18 U.S.C. §§ 2518(1), (3) ............................................................ 6

28

# LIST OF GOVERNMENT EXHIBITS

| | |
|---|---|
| Exhibit 1: | FBI 302 describing meeting on August 5, 2010 |
| Exhibit 2: | FBI 302 describing meeting on May 25, 2011 |
| Exhibit 3: | Draft transcript of phone call on September 26, 2011 |
| Exhibit 4: | Audio of phone call on September 26, 2011 |
| Exhibit 5: | FBI 302 describing meeting on May 30, 2012 |
| Exhibit 6: | FBI 302 describing meeting on September 20, 2012 |
| Exhibit 7: | FBI 302 describing meetings in October of 2011 |
| Exhibit 8: | Draft transcript of meeting on October 14, 2011 |
| Exhibit 9: | Audio of meeting on October 14, 2011 |
| Exhibit 10: | Draft transcript of phone call on November 3, 2011 |
| Exhibit 11: | Draft transcript of phone call on November 5, 2011 |
| Exhibit 12: | Draft transcript of portion of meeting on January 18, 2012 |
| Exhibit 13: | Draft transcript of phone call on January 27, 2012 |
| Exhibit 14: | Draft transcript of phone call on February 7, 2012 |
| Exhibits 15-19: | Orders authorizing wiretaps |
| Exhibit 20: | Declaration of Special Agent Maya Clark |
| Exhibits 21-25: | Minimization Instructions |
| Exhibit 26: | Declaration of Special Agent James Folger |
| Exhibit 27-28: | Charts regarding wiretap minimizations |
| Exhibit 29-30: | Linesheets |
| Exhibit 31: | Draft transcript of phone call on September 13, 2011 |
| Exhibit 32: | Draft transcript of phone call on February 15, 2012 |

I.    **INTRODUCTION**

Defendants Keith Jackson and Leland Yee have filed motions to suppress certain wiretap evidence obtained in this case on a myriad of grounds.   The United States hereby files this consolidated opposition to both motions.  For the reasons discussed below, both of the defendants' motions are entirely without merit, and should be denied.

Although the Jackson and Yee cite a number of instances, primarily in the first wiretap affidavit, which they claim are material false statements and omissions, the number pales dramatically in light of the hundreds, if not thousands, of pieces of evidence cited by the affiant agents over the course of the five wiretap affidavits in support of the Title III surveillance in this case.  Not only are the alleged misstatements not false or misleading, they are also immaterial in light of the overwhelming amount of evidence supporting probable cause to believe that the defendants and others were engaged in the target offenses.  Further, neither defendant has presented evidence showing that any alleged false statements or material omissions were made intentionally or recklessly.  Accordingly, neither Jackson nor Yee have met the requisite burden for the evidentiary hearing they demand, and there is no basis to suppress the evidence obtained from the wiretaps.

Similarly, despite Jackson's and Yee's efforts to suggest otherwise, the government demonstrated the requisite necessity for each of the wiretaps.  In each of its wiretap affidavits, the government detailed the investigative techniques that had been tried and failed for lengthy period of time, and therefore, why the wiretaps were necessary.

Finally, as discussed below, in monitoring the wiretaps authorized by the Court, the government employed a variety of procedures to avoid listening to calls that were unrelated to the target offenses, while still pursuing the surveillance authorized by the Court.  An analysis of how the wiretap monitors undertook their task demonstrates that they acted reasonably and actively engaged in the requisite minimization.

II.    **FACTUAL BACKGROUND**

This case involves a lengthy investigation by the San Francisco office of the Federal Bureau of Investigation into organized crime.  The investigation began in approximately 2010, when undercover

1  FBI employees (herein, UCEs") were introduced to Kwok Cheung Chow, a/k/a "Raymond Chow," a/k/a

2  "Ha Jai," a/k/a "Shrimpboy."  Over the course of the investigation, UCEs met with Chow and his

3  associates, and engaged in a wide variety of crimes with them.  The offenses included firearms

4  trafficking, drug trafficking, money laundering, trafficking in contraband cigarettes, murder for hire, and

5  public corruption offenses.  One of these associates was Keith Jackson, whom UCEs met for the first

6  time on August 5, 2010, at a restaurant in San Francisco with Chow.  Gov. Exhibit 1 (Bates US 608080

7  – US 608085);[1] *see also* Jackson Mot. Exhibit 18 at pg. 17 (Bates US 400287).  Jackson subsequently

8  engaged with UCEs to obtain campaign donations for Leland Yee in excess of statutory contribution

9  limits; Yee at the time was running for Mayor of San Francisco.  The first solicitation for campaign

10  donations occurred on May 25, 2011.  Gov. Exhibit 2 (Bates US 608214 – US 608218)

11       The investigation continued using traditional investigative techniques for several more months,

12  at which point FBI agents submitted several applications to intercept oral, wire and electronic

13  communications involving Chow, Jackson, and others.  The first application, seeking to install a

14  microphone and video camera inside a car driven by Chow's associate George Nieh, was approved by

15  then-Chief Judge James Ware of the Northern District of California on January 17, 2012.  Subsequent

16  applications targeted telephones used by Jackson, Leland Yee, and others, and were authorized by this

17  Court.  Wiretaps authorized as part of this investigation are summarized in the table below.

18

| Wire | Date approved | Approving judge | Target facilities | Attached as Exhibit? |
|------|---------------|-----------------|-------------------|----------------------|
| 1 | 1/17/12 | Ware, C.J. | Mercedes Benz bearing license plate 6LRV984 used by George NIEH to drive Kwok Cheung CHOW | No |
| 2 | 4/13/12 | Ware, C.J. | Mercedes Benz bearing license plate 6LRV984 used by George NIEH to drive Kwok Cheung CHOW; Telephone used by George NIEH | No |
| 3 | 11/13/12 | Breyer, J. | Telephone used by Keith JACKSON Telephone used by Leland YEE | Attached to Jackson Mot. as Exhibit 18 |
| 4 | 2/8/13 | Breyer, J. | Telephone used by Keith JACKSON | Attached to Jackson Mot. as Exhibit 19 |
| 5 | 4/3/13 | Breyer, J. | Telephone used by Keith JACKSON Telephones used by Leland YEE | Attached to Jackson Mot. as Exhibit 20 |
| 6 | 5/9/13 | Breyer, J. | Telephone used by Keith JACKSON Telephone used by Leland YEE Telephone used by unindicted co-conspirator | Attached to Jackson Mot. as Exhibit 21 |

27

---

[1] The government's exhibits are filed separately under seal as Exhibits in Support of Consolidated Opposition to Defendants' Motions to Suppress Wiretap Evidence

UNITED STATES' CONSOLIDATED OPP. TO MOT. TO SUPPRESS
CR-14-0196- CRB

| Wire | Date approved | Approving judge | Target facilities | Attached as Exhibit? |
|------|---------------|-----------------|-------------------|----------------------|
| 7 | 7/1/13 | Breyer, J. | Telephones used by Leland YEE | Attached to Jackson Mot. as Exhibit 22 |

In their motions to suppress, Jackson and Yee primarily attack Wire 3 in the table above, but move to suppress subsequent Wires 4 through 7 by extension as well. They do not attack Wires 1 and 2.[2]

## III.   LEGAL BACKGROUND

Jackson and Yee attack Wire 3 and subsequent Wires 4-7 on four main grounds. First, they allege that the affidavit in of support Wire 3 and the affidavits in support of subsequent Wires 4-7 contained material omissions and misrepresentations, and that the evidence obtained from those wiretaps should therefore be suppressed pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). Next, they allege that the Wire 3 affidavit and subsequent affidavits were lacking for both probable cause, *see* 18 U.S.C. § 2518(1)(b), and necessity, *see* 18 U.S.C. § 2518(1)(c). Finally, they allege that the United States did not properly minimize interceptions. *See* 18 U.S.C. § 2518(5). All four arguments are meritless. Before responding to each of these arguments, however, the United States below sets forth the applicable law in each area.

### a.   Applicable Law Regarding *Franks*

In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court considered an attack on the truthfulness of a warrant affidavit. The Court explained that

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.

---

[2] The government anticipates that other defendants will move to suppress Wires 1 and 2. Those motions are due on May 28, 2015. Docket No. 745.

*Id.* at 171-172.

The Ninth Circuit has established a five-prong test that the defendant must satisfy in order to justify a *Franks* hearing:

> (1) the defendant must allege specifically which portions of the warrant affidavit are claimed to be false; (2) the defendant must contend that the false statements or omissions were deliberately or recklessly made; (3) a detailed offer of proof, including affidavits, must accompany the allegations; (4) the veracity of only the affiant must be challenged; (5) the challenged statement must be necessary to find probable cause.

*United States v. Perdomo*, 800 F.2d 916, 920 (9th Cir. 1986) (citing *United States v. Dicesare*, 765 F.2d 890, 895 (9th Cir. 1985)); *see United States v. Craighead*, 539 F.3d 1073, 1080 (9th Cir. 2008) ("To justify a hearing, a defendant must make specific allegations, allege a deliberate falsehood or reckless disregard for the truth, and accompany such a claim with a detailed offer of proof."); *United States v. Ippolito*, 774 F.2d 1482, 1485 (9th Cir. 1985)(any "false statements must be material to a finding of probable cause"). The defendant bears the burden of proof and must make a "substantial showing" to be entitled to a hearing. *See United States v. Chavez-Miranda*, 306 F.3d 973, 979 (9th Cir. 2002).

The Supreme Court was careful to limit its decision in *Franks* so that hearings would not become "commonplace;" *Franks* hearings are not "obtainable on a bare allegation of bad faith." *United States v. Chesher*, 678 F.2d 1353, 1360 (9th Cir. 1982). Instead, "[t]here is, of course, a presumption of validity with respect to the affidavit supporting the . . . warrant." *Franks*, 438 U.S. at 171; *see also United States v. Burnes*, 816 F.2d 1354, 1357 (9th Cir. 1987) ("'In doubtful cases, preference should be given to the validity of the warrant.'") (*quoting United States v. McQuisten*, 795 F.2d 858, 861 (9th Cir. 1986)). As noted above, the defendant's attack on the affidavit "must be accompanied by an offer of proof" that includes "[a]ffidavits or sworn or otherwise reliable statements of witnesses." *Franks*, 438 U.S. at 171. In addition, "[a]llegations of negligence or innocent mistake are insufficient," and impeachment of "any nongovernmental informant" is not permitted. *Id.*; *see also id.* n. 8 ("[I]f the warrant affiant had no reason to believe the information was false, there was no violation of the Fourth Amendment."); *United States v. Botero*, 589 F.2d 430, 432 (9th Cir. 1978). *Franks* hearings are not permissible "for purposes of discovery or obstruction" but must be reserved for instances where there are serious and documented

1  concerns regarding the affiant's intentional, and not merely negligent, untruthfulness. *Id.* at 170. The

2  standard of veracity does not require perfect truth "in the sense that every fact recited in the warrant

3  affidavit is necessarily correct" because the affidavit may be "founded on hearsay and upon information

4  received from informants, as well as upon information within the affiant's own knowledge that

5  sometimes must be garnered hastily." *Id.* at 165. All that is required is that "the information put forth is

6  believed or appropriately accepted by the affiant as true." *Id.*

7       Materiality under *Franks* necessarily requires a consideration of probable cause. "[P]robable

8  cause means a 'fair probability' that contraband or evidence is located in a particular place. Whether

9  there is a fair probability depends upon the totality of the circumstances, including reasonable

10  inferences, and is a 'commonsense, practical question.' Neither certainty nor a preponderance of the

11  evidence is required." *United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir. 2007) (*quoting Illinois v.*

12  *Gates*, 462 U.S. 213 (1983) and *United States v. Gourde*, 440 F.3d 1065 (9th Cir. 2006) (*en banc*)).

13  Because a finding of probable cause is a "commonsense, practical question," the initial "determination

14  should be paid great deference. This deferential approach is the antithesis of a 'grudging or negative

15  attitude' toward search warrants and 'a hypertechnical rather than a commonsense' analysis." *Gourde*,

16  440 F.3d at 1069 (quoting *United States v. Ventresca*, 380 U.S. 102 (1965)) (additional quotation marks

17  and citations omitted). The initial fact-finder "is permitted to draw reasonable inferences about where

18  evidence is likely to be kept based on the nature of the evidence and the type of offense," *United States*

19  *v. Terry, as amended*, 911 F.2d 272, 275 (9th Cir. 1990), and may also rely on the training and

20  experience of law enforcement officers in interpreting the conduct set forth in the affidavit, *see United*

21  *States v. Gil*, 58 F.3d 1414, 1418 (9th Cir. 1995). As the Ninth Circuit sitting *en banc* colorfully

22  explained, a reviewing court "[is] not in a position to flyspeck the affidavit through *de novo* review."

23  *Gourde*, 440 F.3d at 1069. Rather, a decision that probable cause exists should only be reversed if the

24  decision amounted to clear error. *See Gil*, 58 F.3d at 1418; *United States v. Pitts*, 6 F.3d 1366, 1369 (9th

25  Cir. 1993). "In doubtful cases, the reviewing court should give preference to the validity of the warrant."

26  *United States v. Johns*, 948 F.2d 599, 602 (9th Cir. 1991) (citation omitted).

27

28

1    The same principles and procedures apply when a defendant seeks to challenge a wiretap

2  affidavit.  Such a challenge may be based on the issuing judge's finding of necessity as well as probable

3  cause, as necessity is "material to the issuance of a wiretap order." *Ippolito,* 774 F.2d at 1485; *see also*

4  *United States v. Aviles*, 170 F.3d 863, 866 (9th Cir. 1999).  Even if a statement is deemed intentionally

5  or recklessly false, it must still be found "material" to satisfy the *Franks* standard.  "False statements are

6  material if the wiretap application purged of the false statements would not support findings of probable

7  cause and necessity." *United States v. Staves*, 383 F.3d 977, 982  (9th Cir. 2004) (internal citations

8  omitted).  An omission that is not misleading is not a "false statement" for purposes of *Franks*.  *Staves*,

9  383 F.3d at 982 (citing *United States v. Stanert*, 762 F.2d 775, 781(9th Cir. 1985).

10    **b.  Applicable Law Regarding Probable Cause**

11    18 U.S.C. § 2518(3) allows for courts to authorize wiretaps if an applicant shows probable cause

12  that

13        (a) an individual is committing, has committed, or is about to commit specified offenses;

14        (b) communications relevant to that offense will be intercepted through the wiretap; and …

15        (d) the individual who is the focus of the wiretap investigation will use the tapped phone

16  18 U.S.C. § 2518(3)(a), (b), (d).  Courts will uphold a wiretap if, looking only to the four corners of the

17  wiretap application, there is a "substantial basis" for these findings of probable cause.  *United States v.*

18  *Meling*, 47 F.3d 1546, 1552 (9th Cir. 1995)(internal citations omitted); *see also Illinois v. Gates*, 462

19  U.S. 213, 236 (1983).

20    **c.  Applicable Law Regarding Necessity**

21    The "necessity" requirement for a wiretap authorization has two elements: first, the application

22  must include a "full and complete statement" as to whether other investigative techniques have been

23  tried and failed, or why they reasonably appear unlikely to succeed or too dangerous; and second, the

24  government must show that the wiretap was necessary, *i.e.*, that "normal investigative procedures have

25  been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."

26  *See* 18 U.S.C. §§ 2518(1), (3).  With regard to necessity, courts review the issuing judge's decision that

27  wiretap interception was necessary "under an abuse of discretion standard." *United States v. Canales-*

28

UNITED STATES' CONSOLIDATED OPP. TO MOT. TO SUPPRESS
CR-14-0196- CRB

1   *Gomez*, 358 F.3d 1221, 1225 (9th Cir. 2004).

2        The necessity requirement is not rigid.  The judge authorizing "a wiretap has considerable

3   discretion" with regard to necessity.  *United States v. McGuire*, 307 F.3d 1192, 1197 (9th Cir. 2002).

4   The purpose of the necessity requirement is "to ensure that wiretapping is not resorted to in situations

5   where traditional investigative techniques would suffice to expose the crime." *United States v.*

6   *Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001).  While a wiretap should not normally be the initial step

7   of the investigation, "law enforcement officials need not exhaust every conceivable alternative before

8   obtaining a wiretap." *McGuire*, 307 F.3d at 1196-97; *United States v. Smith*, 893 F.2d 1573, 1582 (9th

9   Cir. 1990) (wiretap should not be used routinely as first step, but it need not be last resort); *United States*

10  *v. Fernandez*, 388 F.3d 1199, 1235-36 (9th Cir. 2004); *see generally United States v. Rivera*, 527 F.3d

11  891 (9th Cir. 2008).  In *Rivera*, the Ninth Circuit held that this common sense approach is used "to

12  evaluate the reasonableness of the government's good faith efforts to use traditional investigative tactics

13  or its decision not forgo such tactics based on the unlikelihood of their success or the probable risk of

14  danger involved with their use." *Rivera*, 527 F.3d at 902 (citation and internal quotations omitted).

15       Furthermore, necessity must be evaluated in relation to the goals of the overall investigation.

16  "The statute does not mandate the indiscriminate pursuit to the bitter end of every non-electronic device

17  as to every telephone and principal in question to a point where the investigation becomes redundant or

18  impractical or the subjects may be alerted and the entire investigation aborted by unreasonable insistence

19  upon forlorn hope." *United States v. Baker*, 589 F.2d 1008, 1013 (9th Cir. 1979).

20       In upholding wiretap necessity, the Ninth Circuit has emphasized that the government is entitled

21  to more leeway in its investigative methods when it pursues a conspiracy.  *United States v. Garcia*

22  *Villalba*, 585 F.3d 1223, 1230 (9th Cir. 2009)(citing *McGuire*, 307 F.3d at 1197-98).  In *McGuire*, the

23  Court explained that conspiracies pose "special dangers," since "[u]nlike individual criminal action,

24  which comes to an end upon the capture of the criminal, collective criminal action has a life of its own."

25  *McGuire*, 307 F.3d at 1197.  As such, courts have held that if normal investigative means cannot reveal

26  the entire scope of a conspiracy, necessity for wiretapping has been demonstrated.  *Id.*; *United States v.*

27  *Carneiro*, 861 F.2d 1171, 1178 (9th Cir. 1988); *see also Rivera*, 527 F.3d at 902 (stating that necessity

28

UNITED STATES' CONSOLIDATED OPP. TO MOT. TO SUPPRESS
CR-14-0196- CRB

1    upheld where traditional investigative techniques lead to apprehension and prosecution of main

2    conspirators, but not of "satellite conspirators.") (citation and internal quotations omitted).  Even where

3    normal investigative procedures have been successful in developing evidence against some conspiracy

4    members, necessity still exists where the investigation's objective is to discover the full scope of the

5    illegal enterprise.  *Canales Gomez*, 358 F.3d at 1226.

6         In addition, boilerplate conclusions regarding traditional investigative techniques are permitted

7    in wire affidavits.  While the panel in *Blackmon* criticized what they called "boilerplate" language, the

8    panel did not hold that this type of language could never be considered, particularly when it was

9    combined with language specific to each individual investigation.  The court's concern in *Blackmon* was

10   not that one section of the affidavit lacked particularized facts, but that the affidavit as a whole *only*

11   contained boilerplate language.  *See Blackmon*, 273 F.3d at 1210-11.  In fact, the Ninth Circuit has

12   expressly held that "[t]he presence of conclusory language in [an] affidavit will not negate a finding of

13   necessity if the affidavit, as a whole, alleges sufficient facts demonstrating necessity." *United States v.*

14   *Torres*, 908 F.2d 1417, 1423 (9th Cir. 1990).

15        **d.  Applicable Law Regarding Minimization**

16        Title III requires that wiretapping or electronic surveillance "be conducted in such a way as to

17   minimize the interception of communications not otherwise subject to interception under this chapter

18   ...." 18 U.S.C. § 2518(5).  "Minimization requires that the government adopt reasonable measures to

19   reduce to a practical minimum the interception of conversations unrelated to the criminal activity under

20   investigation while permitting the government to pursue legitimate investigation." *McGuire*, 307 F.3d

21   1192, 1199 (9th Cir. 2002); *Torres*, 908 F.2d at 1423.  The Supreme Court has held that "[t]he statute

22   [authorizing interceptions] does not forbid the interception of all nonrelevant conversations, but rather

23   instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of

24   such conversations." *Scott v. United States*, 436 U.S. 128, 140 (1978). *Also see, United States v.*

25   *Turner*, 528 F.2d 143, 156 (9th Cir. 1975)("The statute does not require that all conversations unrelated

26   to the criminal activity specified in the order be free from interception.")

27        The Ninth Circuit has held that "[t]he minimization techniques used 'do not need to be optimal,

28

1    only reasonable ....'" *Rivera*, 527 F.3d at 904, *quoting United States v. McGuire, supra*, at 1202.  In

2    *Scott*, the Supreme Court stated that "[b]ecause of the necessarily *ad hoc* nature of any determination of

3    reasonableness, there can be no inflexible rule of law which will decide every case." *Scott, supra,* at

4    139.  Instead, the determination whether the agents conducted the surveillance in a manner so as to

5    reasonably minimize listening to calls unrelated to the criminal activity under investigation "will depend

6    on the facts and circumstances of each case." *Id.* at 140.  *Also see, McGuire,* 307 F.3d at 1199-1200

7    (compliance with minimization requirements "requires examination of the monitoring officers' conduct

8    in light of the particular circumstances.")

9        "The government has the burden to show proper minimization." *Rivera,* 527 F.3d at 904.  In

10    addressing generalized attacks on minimization efforts, as opposed to motions to suppress specific

11    conversations because they were not properly minimized, the Ninth Circuit has held that the government

12    need only show "a *prima facie* case of compliance with the minimization requirement." *Id.; Torres,* 908

13    F.2d at 1423.

14        In *United States v. Cox*, 462 F.2d 1293, 1299-1302 (9th Cir. 1972), the Ninth Circuit rejected a

15    claim by defendants that the government failed to properly minimize the interception of telephone

16    conversations.  In so holding, the Court stated:  ""Furthermore, even if the surveillance in this case did

17    reflect a failure to minimize, it would not follow that Congress intended that as a consequence all the

18    evidence obtained should be suppressed." *Id.* at 1301.  Referring to the Title III provisions, the Court

19    added:  "Clearly Congress did not intend that evidence directly within the ambit of a lawful order should

20    be suppressed because the officers, while awaiting the incriminating evidence, also gathered extraneous

21    conversations." *Id.*  Thus, while the intercepted conversations beyond the scope of the court's

22    surveillance authorization could be suppressed, those "the warrant contemplated overhearing would be

23    admitted." *Id.*  Accordingly, suppression of all wiretap evidence for failure to minimize is far from a

24    foregone conclusion, and the Ninth Circuit cases cited by Yee and Jackson do not hold otherwise.

25    Specifically, *United States v. Scully*, 546 F.2d 255, 262 (9th Cir. 1976), *vacated on other grounds, U.S.*

26    *v. Cabral*, 430 U.S. 902 (1977), relied upon by Yee, expresses a view of the appropriate remedy.

27    However, that statement was dicta, was not essential to the issue being decided, did nothing to

28

UNITED STATES' CONSOLIDATED OPP. TO MOT. TO SUPPRESS
CR-14-0196- CRB

1    undermine *Cox*.  Similarly, in *United States v. Turner*, 528 F.2d 143, 156 (9th Cir. 1975), cited by

2    Jackson, the Court merely described the different positions of the parties as to the correct remedy.  The

3    Court specifically stated that it did not need to reach that issue because it found that the government

4    complied with the minimization requirement.  *Id.*

5       In analyzing the reasonableness of the government's minimization efforts, the courts have

6    focused on the procedures followed by agents monitoring the wiretap.  *Scott*, 436 U.S. at 139.  *Also see*,

7    *Rivera*, 527 F.3d at 904; *Torres*, 908 F.2d at 1423; *Turner*, 528 F.2d at 157.  The courts have found the

8    employment of a variety of procedures and practices sufficient to establish a *prima facie* case of

9    compliance with the minimization requirement.  For example, in *Torres, supra*, the Ninth Circuit

10    approved the utilization of the following procedures as supporting a *prima facie* case of proper

11    minimization:  (1) monitoring agents were instructed on the requirements and need for minimization; (2)

12    the monitoring agents were also required to read and sign a typed copy of the minimization guidelines;

13    and (3) a DEA agent and an AUSA made themselves available for consultation on a 24-hour basis.

14    *Torres*, 908 F.2d at 1423.

15       In emphasizing the focus on procedure, the courts have held that reliance on numbers, such as

16    the percentage of conversations determined to be unrelated to the investigation or the number of

17    minimized calls, is of limited usefulness in the minimization analysis.  This is largely due to the fact that

18    the appropriate minimization procedures in any given investigation need to be evaluated in light of the

19    specific facts and circumstances of that case.  In *Scott*, the Supreme Court upheld a finding of

20    reasonableness of the government's minimization efforts even where the defendant complained that a

21    large percentage of the calls monitored were non-pertinent.  The Court stated, "blind reliance on the

22    percentage of nonpertinent calls intercepted is not a sure guide to the correct answer [about

23    minimization]."  *Scott*, 436 U.S. at 140.  "Such percentages may provide assistance, but there are surely

24    cases, such as the one at bar, where the percentage of nonpertinent calls is relatively high yet their

25    interception was still reasonable."  *Id.  Also see, Rivera*, 527 F.3d at 907 (finding that the fact that only

26    203 of 4,561 intercepted calls were minimized "did not render the DEA's minimization efforts

27    inadequate."); *United States v. Homick*, 964 F.2d 899, 903 (9th Cir. 1992)(noting that where many calls

28

UNITED STATES' CONSOLIDATED OPP. TO MOT. TO SUPPRESS
CR-14-0196- CRB

1  were brief in duration, the listener frequently cannot determine a particular call's relevance to the

2  investigation before the call is terminated, thus explaining why some non-pertinent calls were not

3  minimized); *Turner*, 528 F.2d at 157 (finding minimization efforts reasonable where monitors

4  minimized approximately one-third of calls longer than one minute).

5  **IV.    ARGUMENT**

6      **a.    The Wire 3 Affidavit Contained No Material Misrepresentations or Omissions**

7          Both Jackson and Yee demand a *Franks* hearing, claiming that there are numerous material

8  misstatements in FBI Special Agent Quinn's November 12, 2012 wiretap affidavit (Wire 3, in the table

9  above at pgs. 1-2, herein referred to as "the Wire 3 affidavit" and attached as Exhibit 18 to Jackson's

10  motion to suppress).  A closer look, however, at each of the defendants' purported misstatements reveals

11  that the Wire 3 affidavit was in fact entirely truthful and accurate.  Further, even if this Court purged the

12  purported misstatements from the Wire 3 affidavit, which the government by no means concedes is

13  necessary, there would still be ample probable cause and necessity supporting the authorization of a

14  wiretap.  Accordingly, defendants have failed to meet the requisite burden for a *Franks* hearing.

15          Below the government addresses each of the defendants' purported misstatements individually.

16      1.  Purported Misstatement #1: Affiant Reviewed All Recorded Conversations And/Or
            Reports of Conversations Involving UCE 4773

17

18          Jackson identifies 17 purported untruthful statements in the Wire 3 affidavit.  Jackson Mot. pgs.

19  2-8.  The first is Special Agent Ethan Quinn's statement in the Wire 3 affidavit that he reviewed all

20  recorded conversations and/or reports of conversations involving UCE 4773.  Jackson speculates that it

21  is "doubtful" that Agent Quinn listened to every such conversation.  Jackson Mot. at pgs. 2-3.  Jackson

22  offers no basis for his speculation, other than his own estimation that there were hundreds of hours of

23  recordings leading up to the application of Wire 3.  This purported misstatement, then, is nothing more

24  than a suspicion by Jackson that the FBI may not have conducted proper due diligence before submitting

25  the Wire 3 affidavit.

26          Jackson further speculates that to the extent that Agent Quinn relied on reports of UCE 4773 in

27  preparing the Wire 3 affidavit, UCE 4773 may have mischaracterized the nature of conversations he had

28  with targets in those reports.  Again, JACKSON offers no basis for this speculation, merely his own

UNITED STATES' CONSOLIDATED OPP. TO MOT. TO SUPPRESS
CR-14-0196- CRB

1    suspicions.[3] *See, e.g., United States v. Gil*, 58 F.3d 1414, 1418 (9th Cir. 1995)(affiant may rely on the

2    training and experience of fellow law enforcement officers in interpreting conduct set forth in affidavit).

3            2.   Purported Misstatement #2: From September 2011 Onward, UCE 4773 Has Been
                  Solicited by JACKSON and Others to Make Unlawful Payments to Certain Campaigns

4            Next, Jackson alleges that it was false for Agent Quinn to say that UCE 4773 had been solicited

5    by Jackson and others since September 2011 onward to make unlawful payments to certain campaigns.

6    Jackson alleges that it was UCE 4773 who first suggested the idea of making donations in excess of

7    campaign contribution limits.  Jackson Mot. pg. 3.  For support, he cites to an excerpt of a transcript,

8    prepared by his defense team, of a telephone call between Jackson and UCE 4773 that took place on

9    September 26, 2011.  Jackson Mot. Exhibit 1.  Jackson's transcript, however, is selective, inaccurate,

10   and highly misleading.  For comparison purposes, the government's draft transcript of the entire

11   telephone call is attached as Government Exhibit 3.  But the Court need not resolve any issues of

12   competing transcripts at this time.  Rather, the government submits the audio from the telephone call as

13   Government Exhibit 4, so that the Court can hear for itself how, in response to UCE 4773 suggesting

14   that Jackson take a lump sum of $5,000 and break it up into smaller donations, Jackson clearly and

15   audibly replies "we can do that too."  Agent Quinn's Wire 3 affidavit accurately reflects Jackson's reply.

16   So does the government's draft transcript.  Jackson's purported transcript, in contrast, selectively

17   replaces "we can do that too" with "U/I," or unintelligible.  *Compare* Gov. Exhibit 3 and Gov. Exhibit 4

18   at 04:27 et. seq. *with* Jackson Mot. Exhibit 1.

19           Government Exhibits 3 and 4 also demonstrate how the September 26, 2011 discussion regarding

20   campaign donations began.  Specifically, UCE 4773 told Jackson that he was going to send a donation

21   for $500 in his wife's name but without her knowledge; Jackson then advised UCE 4773 that "they

22   won't call her" if UCE 4773 wrote his wife's occupation on the check.  Gov. Exhibit 3 at pg. 2.  In other

23   words, from the very inception of the discussion about campaign donations in September of 2011, UCE

24   4773 and Jackson were discussing making unlawful payments to Yee.

25

26

27           [3] The Court will recall that this is not the first time that defendant JACKSON has attacked UCE
     4773's credibility.  Thus far, this Court has not entertained such attacks.  *See* Transcript of October 10,

28   2014 Hearing at pgs. 7-27.

1    Moreover, Agent Quinn's Wire 3 affidavit describes how, just a few minutes after the September

2    26, 2011 call with Jackson ended, UCE 4773 received a call from Yee, addressing future meetings to

3    raise money.  Wire 3 affidavit (Jackson Mot. Exhibit 18) at pg. 21 lines 6-7.  Thus began the long

4    relationship between Jackson, Senator Yee, and UCE 4773, with Jackson and Senator Yee continually

5    soliciting UCE 4773 for campaign donations, and UCE 4773 asking for official actions in return.  *See*,

6    *e.g.*, Wire 3 affidavit (Jackson Mot. Exhibit 18) at pg. 21, lines 16-19 (describing how on September 30,

7    2011, YEE told UCE 4773 that if one donor gave in their own name and their spouse's name, then "one

8    donor literally can give $1,000"); Wire 3 affidavit (Jackson Mot. Exhibit 18) at pg. 21-22 (noting

9    additional requests for campaign funds from Jackson in October of 2011).  It should also be noted that

10   that it was Jackson who first suggested to undercover agents the idea of giving $5,000 as a lump sum

11   and then putting it into different accounts, back on May 25, 2011.  Gov. Exhibit 2.  Wire 3 Affidavit

12   (Jackson Mot. Exh. 18, at 18).   Granted, that discussion was between Jackson and another undercover

13   agent, UCE 4599, not UCE 4773.  But, to the extent that Jackson is contesting the suggestion in the

14   Wire 3 affidavit that he did not initiate the idea of breaking up campaign donations, Jackson is clearly

15   wrong.

16        Jackson also claims that the Wire 3 affidavit omits any reference in the September 26, 2011, call

17   to Jackson encouraging UCE 4773 to make his wife's donation by credit card.  Jackson apparently

18   overlooked the following statement in the Wire 3 affidavit: "UCE 4773 and JACKSON briefly spoke

19   about UCE 4773's wife's contribution using her credit card."  Wire 3 affidavit (Jackson Mot. Exhibit

20   18) at pgs. 21, lines 2-3.  In short, there was no omission.

21        3.  Purported Misstatement #3: Companies Associated with UCE 4773

22        Jackson takes issue with Agent Quinn's characterization in the Wire 3 affidavit that there were

23   multiple *companies* with which UCE 4773 wanted YEE's official assistance.  According to JACKSON,

24   there was only one company. Jackson Mot. pg. 3.  At best, this argument presents an issue of semantics,

25   not untruthfulness.  In any event, Jackson is wrong.  As explained elsewhere in the Wire 3 affidavit,

26   "[t]o both JACKSON and Senator YEE, UCE 4773 presented himself as a businessman based in

27   Georgia who represents clients who are interested in business and investment opportunities in California

28

1  generally, and the San Francisco Bay area in particular. In essence, UCE 4773 represented himself as a

2  go-between for people with money and people in San Francisco or California who might be able to offer

3  investment opportunities." Wire 3 affidavit (Jackson Mot. Exhibit 18) at pg. 19. Elsewhere in the Wire

4  3 affidavit, Agent Quinn explains how UCE 4773 portrayed himself as having an interest in companies

5  involved in, among other things, affordable housing, senior-assisted living facilities, and technology

6  consulting. Wire 3 affidavit (Jackson Mot. Exhibit 18) at pg. 38, lines 24-28. Thus, there was nothing

7  inaccurate about the use of the plural word *companies*.

8

        4.   Purported Misstatement #4: Agreement to Provide Campaign Contributions In Exchange

9             For Local/Minority-Owned Business Status

10      Jackson takes issue with Agent Quinn's statement in the Wire 3 affidavit that there was an

11  arrangement between Jackson, other interceptees, and UCE 4773, whereby UCE 4773's companies

12  would receive favorable treatment as local or minority-owned businesses, in exchange for campaign

13  payments. Jackson says that there is no evidence this arrangement existed. Jackson Mot. pg. 4. Jackson

14  overlooks, however, a conversation between an interceptee and UCE 4773 on May 7, 2012. *See* Wire 3

15  affidavit (Jackson Mot. Exhibit 18) pg. 42, lines 4-7. In that conversation, the interceptee indicated that

16  she had received a $5,000 check for a political candidate that UCE 4773 had mailed earlier. In the same

17  conversation, the interceptee indicated that she was checking on possible business for UCE 4773, and

18  could do a certification for a local office right away. Jackson also overlooks a March 1, 2012

19  conversation, in which another interceptee told UCE 4773 that she wanted a $10,000 commitment from

20  UCE 4773 for a political candidate. The interceptee further stated "You pay to play here. We got it. We

21  know this. We are the best at this game; uh, better than New York. We do it a little more sophisticated

22  than New Yorkers. We do it without the mafia." Wire 3 affidavit (Jackson Mot. Exhibit 18) at pg. 32,

23  lines 16-18.

24

        5.   Purported Misstatement #5: UCE 4599 Representing Himself as a Marijuana Trafficker, a

25             Money Launderer, and a Member of La Cosa Nostra

26      Jackson alleges it was a misrepresentation to say that UCE 4599 portrayed himself to Jackson as

27  a marijuana trafficker, a money launderer, and an east coast member of La Cosa Nostra, an organized

28

1  crime group.  Jackson's chief complaint appears to be that UCE 4599 never used the phrases "La Cosa

2  Nostra," "mafia," or "trafficker" with Jackson.  Jackson Mot. pg. 4.  This argument is obtuse.  Common

3  sense would suggest that real members of shadowy criminal groups ordinarily would not use the phrases

4  "La Cosa Nostra," "mafia," or "trafficker" in their conversations with conspirators; they would be far

5  more discreet and careful than that.  UCE 4599 may have avoided using language overtly linking

6  himself to organized crime in order to enhance the credibility of his story that he was mafia-connected.

7  However, he still made his character's cover story abundantly clear to Jackson throughout the course of

8  their relationship.  For example, during a May 30, 2012, lunch meeting at a restaurant, Jackson was

9  present at the table while UCE 4599 and UCE 4773 discussed their investment in an illegal marijuana

10  grow in Mendocino County.  They also discussed using a nightclub/bar in Atlanta to launder UCE

11  4599's illegal money.  *See* Gov. Exhibit 5.[4]  During a September 20, 2012, meeting, Jackson, co-

12  defendant Brandon Jackson, and co-defendant Marlon Sullivan solicited UCE 4599 for narcotics

13  business opportunities precisely because of who UCE 4599 had represented himself to be.  During that

14  meeting, UCE 4599 continued to present himself as a person with a powerful and connected "family"

15  who could assist them in their efforts to traffic in narcotics.  UCE 4599 was also known to them to have

16  become affiliated with defendant Chow's organization.  There could have been no remaining question at

17  the conclusion of that meeting as to the illegal nature of UCE 4599's cover story for defendant Jackson.

18  *See* Gov. Exhibit 6.

19        6.  <u>Purported Misstatement #6: Jackson's Statement to UCE 4599 that a $5,000 Donation</u>
         <u>Could Be Placed in Different Accounts Under Multiple Names at a Rate of $500 Each</u>

20

21       Jackson takes issue with Agent Quinn's statement in the Wire 3 affidavit that on May 25, 2011,

22  Jackson told UCE 4599 that if UCE 4599 wanted to contribute $5,000 to Yee, the money could be

23  placed in different accounts under multiple names at a rate of $500 each.  Jackson says this statement

24  does not exist anywhere in the discovery.  Jackson Mot. pg. 4.  It does.  *See* Gov. Exhibit 2 (Bates US

25

---

[4] In the course of reviewing its files while preparing this motion, the government has been unable to locate Bates-stamped versions of Government Exhibits 5 and 6.  In the event that they were not turned over previously, the Government produces them here without Bates stamp numbers, and will produced Bates-stamped copies to all defendants through the discovery coordinator.

1  608218).

2         7.  <u>Purported Misstatement #7: Jackson Asked UCE 4599 To Contribute $3,000</u>

3      Next, Jackson takes issue with Agent Quinn's statement in the Wire 3 affidavit that on June 24,

4  2011, Jackson asked UCE 4599 to "contribute" $3,000.  Jackson contends that he actually asked whether

5  UCE 4599 could "raise" $3,000.  The difference is trivial, in light of the above-described discussion on

6  May 25, 2011.  Specifically, whether "raising" or "contributing," Jackson had already made it

7  abundantly clear to UCE 4599 that if one person wanted to make a lump sum donation over $500, he

8  could do so by using multiple accounts.

9         8.  <u>Purported Misstatement #8: Sometime Before September 20, 2011, UCE 4599 Told</u>
           <u>Jackson that UCE 4773 Was a Businessman Who Assisted in Laundering Money</u>

10

11      Defendant Jackson claims that the following statement is false: "On September 21, 2011, UCE

12  4599 arranged a telephonic meeting between JACKSON who used Target Telephone 1 and UCE 4773,

13  who was posing as UCE 4599's businessman friend from the East Coast.  Sometime before this call,

14  UCE 4599 told JACKSON that his friend was a businessman who assisted UCE 4599 in laundering

15  money."  Defendant Jackson claims this is false.  Although UCE 4599 may not have overtly used the

16  phrase "laundering money," it would have been clear to defendant Jackson from UCE 4599's "legend"

17  what he meant in the following conversation on September 13, 2011:

18      KJ: So the race is between Ed Lee and my guy, Leland Yee.

19      UCE-4599: Okay

20      KJ: And, uh, it's gonna be, it's gonna be a interestin race.

21      UCE-4599: Yeah.

22      KJ: But for us to get to the finish line, we need to bring in, I need to bring in some more money.

23      UCE-4599:   Well, you know, uh, alright, yeah timing's good, you know, uh, I'm gonna be out, I'm gonna be out next week, and actually, one of the guys my family does business with, uh, his name's Mikey.  Or, uh, I call him, I call him Mikey, but

24      he's, his real name is Michael ████  He's uh, he's a really, really good guy.  He's a heavy hitter from the Atlanta area.

25      KJ: Okay

26      UCE-4599:   I think he's, you know, I think he's definitely somebody you should know because he's uh, he's gonna start up, he's lookin at starting up some business in

27      and around this area.  Everything he does, I mean, he's **he's done a lot of work with us and he's helped my family out a lot.**  Uh, but he's uh, **he's got his own**

28      **thing going on** and uh, I think it's worth meeting.  Uh, you know, he's definitely

1    worth meeting. If he's gonna be, he's actually in town for some business so I
     figured, let's tie it together because I, I had mentioned uh, him to you, a couple
2    months back and uh, it's just, it's kinda working, out that way if you're alright
     with it?

3

4    KJ: No that's uh, I'm cool, that's perfect.

5    UCE-4599: Yeah

6    KJ: that's perfect

7    UCE-4599: Yeah

8    KJ:    I really, yeah cause I really wanted to sit down with you and just kind of like, just go over
            some stuff, some scenarios …

9    UCE-4599: Yeah

10   KJ: to see how we can

11   UCE-4599: Yeah

12   KJ: how we can work this thing

13   UCE-4599:  Yeah

14   KJ:    work for, for Leland because he's got a good chance, even if, and Dave, at the end of the
            day if he does not win the mayor's seat, he still got three years in the State Senate.

15

16   UCE-4599: Yeah

17   KJ: so, uh, you know, so I mean the guy he's

18   UCE-4599: Yeah

19   KJ: he's a good guy.

20   UCE-4599: yup

21   KJ: you know, uh, you know, and uh, Raymond, Raymond is totally, totally on board with him.

22   UCE-4599:   alright, yeah, I better, I gotta give, give those guys a call and you know, uh, I, I
                 wanna make sure that, you know, hey look, I, I  wanna be a man of my word you
23               know, and I want to help you out and so when I see you, I'll definitely help you
                 out, but uh, I think you know, uh, I think you'll be interested in, you know, in
                 seeing uh, uh, you know, Michael, seeing what uh

24   KJ: okay,

25   UCE-4599:   you know, what he uh, Mike's a great guy, I think you guys should definitely at
                 least, minimally, talk, trade emails, but I think he's, he's wantin to do a lot of
26               business out here and

27   KJ: Okay

28

UNITED STATES' CONSOLIDATED OPP. TO MOT. TO SUPPRESS
CR-14-0196- CRB

1   UCE-4599:   **he, uh, he knows the deal** and you know, as far as I'm concerned you know
            Keith, you know, I, you know, I you know, **I wanna help out and you know,**
2           **and uh, but there's only certain ways that I can do it,** you know, there's only
            so

3   KJ: yeah, exactly. Yeah, I know, I understand, I understand.

4   UCE-4599: But we'll, we'll make it work for us. You know what I'm saying, so?

5   KJ: Okay

6

7   Gov. Ex. 31(emphasis added).  Given what defendant Jackson knew about UCE 4599 and his "family,"

8   these statements regarding (1) UCE 4773 doing work with the family, (2) helping the family out a lot,

9   (3) knowing the "deal," and (4) being part of the "certain ways" that UCE 4599 could help out were

10  clear statements to defendant Jackson that UCE 4773 was criminally involved with UCE 4599's money

11  and would be the manner through which UCE 4599 could help defendants Yee and Jackson obtain

12  money.

13          Therefore, the affidavit was accurate.  Certainly, it was not intentionally misleading.  Nor would

14  that statement, if erroneous, be material to the probable cause in the Wire 3 affidavit given the blatant

15  criminality of the conversations between defendant Jackson and the UCEs regarding defendant Yee

16  being available to assist for the right price.

17          9.  Purported Misstatement #9: Jackson tells UCE 4773 That He Broke Up a $5,000
18              Donation Among Straw Donors

19          Jackson takes issue with Agent Quinn's statement in the Wire 3 affidavit that in a conversation

20  subsequent to October 11, 2011, Jackson told UCE 4773 that he broke up a $5,000 donation from UCE

21  4773 to Yee among straw donors in order to make conduit contributions.  Specifically, Jackson

22  questions whether this conversation ever occurred.  It did.  Gov. Exhibit 7 (Bates US 607266 – Bates US

23  US 607268).  Jackson also claims that the $5,000 was not a contribution to YEE, but a payment to

24  Jackson for consulting services.  This is incorrect.  Discovery materials plainly show that on October 11,

25  2011, UCE 4773 wrote a check to JACKSON for the purposes of donating it to YEE's campaign.  Gov.

26  Exhibit 7 (Bates US 607266).

27

28          10. Purported Misstatement #10: By October 14, 2011, UCE 4773 Had Contributed $11,000

1       <u>to Senator Yee's Campaign</u>

2       Jackson alleges that the Wire 3 affidavit erroneously refers to money raised by UCE 4773 by

3 October 14, 2011, as contributions from UCE 4773.  As Jackson then goes on to admit, however, the

4 Wire 3 affidavit makes painstakingly clear to the reader the source of every bit of money contributed

5 and raised by UCE 4773 for Yee.  Whether the Wire 3 affidavit makes reference to UCE 4773 having

6 "contributed" – and there were $11,000 of contributions delivered to Jackson and Yee by UCE 4773 at

7 that point – or as "delivering contributions" is immaterial and not misleading when the entirety of the

8 Wire 3 affidavit described each of the various contributions and the sources of money for the

9 contributions that were provided to defendants by UCE 4773.  Jackson admits as much in his Exhibit A

10 at 1: "[t]he affidavit makes clear that by that date, UCE 4773 donated $500 from himself, arranged for

11 his wife to donate $500, arranged for 10 undercover agents to donate $500, and written a check to Keith

12 Jackson for consulting fees for $5,000."  Jackson Mot. Exhibit A, pg. 1.  If the Wire 3 affidavit

13 described this to the Court - and it did - it is difficult, if not impossible, to understand how Jackson can

14 simultaneously claim that that the Wire 3 affidavit misled the Court.  Notably, even the $5,000 check

15 written to "Jackson Consultancy" was not really "for consulting fees."  As described in the Wire 3

16 affidavit, that check was not actually for any consulting by Jackson but was designed to be converted by

17 defendant Jackson into money for defendant Yee's campaign in the form of a disguised bribe.  Wire 3

18 affidavit (Jackson Mot. Exhibit 18) pg. 21 line 28 – pg. 22 line 11.

19

20       11. <u>Purported Misstatement #11: Senator YEE Acknowledges UCE 4773's Statement That It's too Much Money Not To Get Something Back</u>

21       Jackson alleges that in the Wire 3 affidavit Agent Quinn Affidavit misrepresented defendant

22 Yee's conversation with UCE 4773 on October 14, 2011.  Again, Jackson is mistaken.  Even more

23 troubling, though, is that this allegation on Jackson's part misleads the Court.  Jackson states:

24       Agent Quinn quotes UCE-4773 as describing his donations as 'too much money . . . not to get something' and then alleges that Senator Yee

25       acknowledged that statement.  US400293.  This is false.  Senator Yee did not acknowledge that a donation was too much money not to get

26       something in return.

27

28

1  Jackson Mot. at 6.  What actually occurred was the following conversation, at approximately 6:18 into

2  the conversation (emphasis added):

3         UCE 4773: It's too much money . . .

4         LY: **Right.**

5         UCE 4773: . . . not to get something back.

6         LY: **Right, right.**

7  Gov. Exhibit 8 (draft transcript of meeting); Gov. Exhibit 9 at 06:00 – 06:30 (audio recording of

8  meeting).  It is concerning that, given this conversation, Jackson represents in his motion and in a

9  declaration to this Court that Yee did **not** acknowledge the statement by UCE 4773.  Jackson's transcript

10 of the portion of this conversation simply ignores the statements by Yee during that conversation as if

11 they did not occur.  Jackson Mot. Exh. 8.  In his transcript, Jackson claims that the uninterrupted

12 statement by UCE 4773 consists of ". . . I understand I can't put you in that position where I need to ask

13 for something in return, but that's it's too much money and not get something back.  I want you to win, .

14 . . ."  Jackson's inaccurate transcript completely ignores the responses by Yee.  That Yee's actual

15 response to the portion quoted in the Wire 3 affidavit is "Right. . . .  Right," interspersed with the

16 statement by UCE 4773, is Yee's unequivocal acknowledgement of UCE 4773's statement that "it's too

17 much money not to get something back."

18                   12. <u>Purported Misstatement #12: Throughout the Remainder of the 2011 Mayoral Campaign

19                     Jackson and ███████ asked 4773  for additional contributions</u>

20     Jackson contests the truthfulness of the statement in the Wire 3 affidavit that "[t]hroughout the

21 remainder of the 2011 Mayoral campaign JACKSON and ████████████████████

22 contacted UCE 4773 via telephone to ask for additional contributions beyond the campaign finance

23 limit."  Jackson's claim that this statement is false is unsupported.  Agent Quinn's Wire 3 affidavit

24 describes in great detail the requests made to UCE 4773 for additional contributions during October of

25 2011.  Wire 3 affidavit (Jackson Mot. Exhibit 18) at pgs. 21-24.  Furthermore, on November 3, 2011,

26 ████████ solicited UCE 4773 to contribute.  The conversation, a draft transcript of which is attached as

27 Government Exhibit 10, was as follows:

28

UCE 4773:     What can I do for you ███████?

█████:     So I was wondering if you could possibly raise us any (UI) dollars?

UCE 4773:     You know, in all my efforts got tapped out in that first, um, that first, . . .

█████:     That first bundle?

UCE 4773:     (UI), yeah, and um, I think what I wanna do and, (UI) pass this on to the Senator for me is, um, and, you know I'm hoping that it does pan out obviously but um, you know after the election we can uh sit down and, uh and get some things done. I know that doesn't help you out but uh, it's (UI)

█████:     Oh no, that's fine.

UCE 4773:     Is that good?

█████:     No, but let's, let's touch base afterwards.

UCE 4773:     (UI) I'll . . . okay.  Where, where are you on your fundraising goals?

█████:     Good, I mean uh, it'd be great if we could get another ten thousand, um, but yeah, we're good, it's just, we need another ten, you know.

UCE 4773:     Okay.

█████:     I mean, if we can get another ten afterwards, that's good as well, but, . . .

UCE 4773:     Okay, all right, and if,

█████:     I don't know if you're a, able to like, I mean make any commitment afterwards.

UCE 4773:     Um, yeah, well, we can, um, you know, they'll be uh a couple conversations that we'll have to have cause it's so much money for me, for me to part with, and I'll be back that way uh, I think week after next, but right around the week of Thanksgiving or the week after, something like that, so, um, if you, you know right after um he wins the election, so um, can we talk then?

█████:     Yeah, absolutely.

Gov. Exhibit 10.  Thus, ███████ on behalf of defendant Yee, was soliciting UCE 4773 for additional money during the period indicated.

Similarly, on November 5, 2011, defendant Jackson called UCE 4773 and stated that defendant Yee had been trying to reach UCE 4773: "I know the Senator's trying to call you, you ever talk to him?" Jackson stated that he would talk to Yee and have Yee call UCE 4773.  They discussed Yee's prospects in the upcoming election:

UCE 4773:     Well I got my fingers crossed, I mean,

Jackson:     Man, who you telling.  (Laughs)  Who you telling, shit!

UNITED STATES' CONSOLIDATED OPP. TO MOT. TO SUPPRESS
CR-14-0196- CRB

| | | |
|---|---|---|
| UCE 4773: | My investment is not as big as yours. |
| Jackson: | Yeah |
| UCE 4773: | Yeah. |
| Jackson: | Man hey, every dollar counts and what you did was big too, so, and he's, he's grateful for that, uh, but we, you know, we got, we gotta make this thing happen man. |
| UCE 4773: | Okay, uh give me a call. |
| Jackson: | But the good, but the good thing about it is, if not still, we got access in Sacramento and uh, and I think the next time you come out, you and I should probably take a trip up there and meet the chief of staff, meet, I want you to meet all the staff people, uh, |
| UCE 4773: | Okay, cool. |
| Jackson: | That way you, you have, you know, when you want to get things done, you know exactly who to talk to. |

Gov. Exhibit 11.

### 13. Purported Misstatement #13: The January 18, 2012 Conversation

Jackson alleges that in the Wire 3 Affidavit, Agent Quinn mischaracterized the January 18, 2012 conversation that took place between Yee, ▮▮▮▮ and UCE 4773. He asserts that the affidavit omits critical statements that contradict "the false narrative" that Agent Quinn presents. For instance, Jackson says that Agent Quinn failed to mention that Yee acknowledged that UCE 4773 had donated his limit. Jackson also states that during the meeting, UCE 4773 discussed bundling money, the way UCE 4773 did it before, and give the checks to ▮▮▮.

When one looks closely at what Agent Quinn wrote in Wire affidavit 3, it is hard to understand exactly what it is that Jackson considers to be a mischaracterization. Agent Quinn wrote:

> "On Wednesday, January 18, 2012, UCE 4773 met with Senator YEE, JACKSON, and ▮▮▮▮ at Senator YEE's office in Sacramento. Some of the conversation revolved around retiring Senator YEE's campaign debt. UCE 4773 discussed the $1000 contribution he had been asked to make. Senator YEE acknowledged that UCE 4773 had already contributed the legal maximum amount. In light of that fact, UCE 4773 asked how he could make a $10,000 contribution, to which Senator YEE responded to the effect of: "Just give the checks to her ▮▮▮▮, just how we did it before."

Wire 3 affidavit (Jackson Mot. Exhibit 8) at pg. 25.

1    What Agent Quinn reported was consistent with Jackson's transcript of the relevant portion of

2 the conversation, as included in his exhibits. *See* Jackson Mot. Exhibit 9. It is also consistent with the

3 government's preliminary transcript of the same part of the conversation. Gov. Exhibit 12, (relevant

4 passage only). What is clear is that Yee and ▮▮▮▮ were asking UCE 4773 for another $10,000; Yee,

5 ▮▮▮ and UCE 4773 each acknowledged that UCE 4773 had already donated his legal limit for the

6 mayoral campaign; and he could provide the money to the campaign – whether it is called

7 "contributions" or "bundling" – the same way he did before, *i.e.* through coming up with the donors on

8 October 13, 2011 as Agent Quinn described at page 22 of the Wire 3 affidavit. In short, in the Wire 3

9 affidavit, Agent Quinn accurately recounted the conversation and did not mislead the Court into thinking

10 that Yee or ▮▮▮ said something incriminating when they did not.

11        14. Purported Misstatement #14: Under the Table Payments

12    Jackson claims that the Wire 3 affidavit mischaracterized his payments from UCE 4773 as

13 "under the table." While Jackson may be correct that the term "under the table" was not expressly used

14 between the two men, Jackson ignores the following from the communications between UCE 4773 and

15 Jackson regarding the nature of their relationship.

16    To begin with, on September 13, 2011, Jackson discussed UCE 4773 with UCE 4599. Jackson

17 discussed the need to bring in more money for defendant YEE's mayoral race. UCE 4599 described

18 UCE 4773 as "one of the guys my family does business with . . ." and that UCE 4773 was a "heavy

19 hitter from the Atlanta area" that defendant Jackson should know. UCE 4599 said that UCE 4773 had

20 helped UCE 4599's family a lot, but had his own thing going. Jackson told UCE 4599 that "Raymond

21 [Chow] is totally on board" with Yee. UCE 4599 told Jackson that UCE 4773 wanted to do a lot of

22 business in San Francisco and that "he knows the deal." Gov. Exhibit 31.

23    By September 26, 2011, Jackson and UCE 4773 discussed UCE 4773 getting money to Yee.

24 "The, the last way is I can get some, some cash through you and then you can just break it up however

25 you, you know, y'all need to break it up . . . ." Gov. Exhibit 3 at pg. 6; Gov. Exhibit 4 at 04:27 *et. seq.*

26 During the same call, UCE 4773 stated to Jackson that his other cell phone did not work that well, and

27

28

1   that UCE 4773 was not used to talking business on that line, "not the kinda business you and I are going

2   to be doing . . . ." Gov. Exhibit 3 at pg. 2; Gov. Exhibit 4 at 00:18 – 00:33.

3      On January 27, 2012, UCE 4773 and Jackson discussed that UCE 4773 did not want Jackson

4   talking about their business with other people. UCE 4773 stated to Jackson: "No, and it's not a problem,

5   yeah, it's not a problem for me, cause, you know it's uh, and, you know I try to, and, and, you know

6   Keith I ain't gonna try to, don't, don't take this as I'm trying to say I'm you know goody two-shoes

7   straight up clean, um, Mr. Clean, you know, I'm, uh I'm, I'm, I'm part of the game, I, I understand, uh,

8   where I fit, I understand where everybody fits, so, . . . ." Gov. Exhibit 13, pg. 8.

9      On February 7, 2012, UCE 4773 and Jackson discussed entering into a contract – the end result

10  of which was that UCE 4773 made it clear he was not interested in contracts. During this conversation,

11  Jackson asked if UCE 4773 reviewed the contract and UCE 4773 said he would get back to Jackson.

12  Gov. Exh. 14. On February 15, 2012, UCE 4773 told Jackson that he did not want to sign the contract,

13  but that they would do some stuff on the side for a while and UCE 4773 would take care of Jackson.

14  Jackson responded that was cool and as long as they were on the same page, Jackson was with UCE

15  4773. They had therefore established a relationship of payments without any legal contract. Gov.

16  Exhibit 32.

17     On September 20, 2012, UCE 4599 "described himself as part of a criminal organization with

18  UCE 4773 as a 'money man' who handled money and made them look 'legitimate.'" Wire 3 affidavit

19  (Jackson Mot. Exhibit 18) at pg. 51.

20     All of these communications would have left no doubt that the nature of the retainer between

21  Jackson and UCE 4773 was not on the "up and up" and was not an above the table legitimate business

22  relationship. The Wire 3 affidavit was not misleading regarding the relationship or the payments,

23  especially when one considers that when UCE 4773 was withdrawn from the investigation, the

24  payments were assumed for a period of time by UCE 4599.

25         15. Purported Misstatement #15: The ████ Commission Conversation

26     Jackson alleges that Agent Quinn's Wire 3 affidavit "is false and misleading" as it describes a

27  conversation between him and UCE 4773 on May 18, 2012. Jackson Mot. at pg. 7. In fact, the Wire 3

28

affidavit was accurate. The totality of the entry is as follows: "On May 18, 2012, UCE 4773 spoke with JACKSON over Target Telephone 1. JACKSON discussed UCE 4773 getting involved in businesses related to the Golden State Warriors moving to San Francisco. JACKSON stated that they are trying to get ▮▮▮▮▮ on the '▮▮ Commission' which 'will be good for us.'" Wire 3 affidavit (Jackson Mot. Exhibit 18) at pg. 42. At Exhibit 11 to his motion, Jackson quotes the conversation to which Agent Quinn was referring. Jackson Mot. Exhibit 11. Again, there was nothing inaccurate in Agent Quinn's description of the conversation that took place.

As stated in the Wire 3 affidavit, an unspecified "they" were trying to get ▮▮▮▮▮ on the ▮▮ Commission and Jackson believed that would be good for himself and for UCE 4773. Contrary to Jackson's claim, at no point in the Wire 3 affidavit did Agent Quinn allege or imply that Jackson was in any sort of position to put someone on the ▮▮ Commission himself. The conversation clearly was included for the information that defendant Jackson was describing public officials, including ▮▮▮▮▮ ▮▮, that he could assist UCE 4773 to influence for their benefit, not because defendant Jackson was some kind of "kingmaker" in San Francisco politics.

16. <u>Purported Misstatement #16: Jackson's Participation in Conversations Between UCEs on May 30, 2012</u>

Jackson's discussion of the May 30, 2012, lunch involving defendant Jackson, UCE 4599 and UCE 4773 is perplexing. Jackson claims that the Wire 3 Affidavit omits that defendant Jackson "was not a part of the 'up north' conversation . . . . Nor was Jackson a part of the conversation regarding Madison International." But the Wire 3 affidavit clearly stated that:

> On May 30, 2012, UCEs 4773 and 4599 (the UCE that has infiltrated the Hop Sing Tong and is posing as mafia from the east coast) went to lunch with JACKSON in San Francisco. During the lunch, **the two UCEs discussed** their investments together, including UCE 4599's operations 'up north' – a reference to his purported marijuana grows. **UCE 4599 advised UCE 4773** that UCE's father wanted to make sure that UCE 4773 is cleaning the finances of 'Madison International.' **The UCEs also discussed** business with UCE 4599's 'family' back on the east coast. JACKSON discussed how he helped CHOW prepare for a media appearance, including how to handle questions about CHOW's criminal activities. During the lunch they also discussed CHOW's desire to find financing to publish his biography.

1   Wire 3 affidavit (Jackson Mot. Exhibit 18) at pg. 42 (emphasis added).  Therefore, the Wire 3 affidavit

2   accurately depicted the speakers in the conversation regarding the business between UCE 4599 and UCE

3   4773.  What Jackson claims was omitted from the Wire 3 affidavit was not, in fact, omitted – it was

4   spelled out accurately.  The significance of this conversation was that Jackson was present to hear it, and

5   gain a further understanding of the supposed criminal relationship and activities of the two UCEs.

6   Notably, Jackson does not deny that he was present to hear this conversation.  *See*, Gov. Exh. 5 (FBI 302

7   report of meeting documenting Jackson's presence).  Further, the Wire 3 affidavit did not inaccurately

8   suggest that defendant Jackson spoke during those particular interactions.  This is simply one more in a

9   string of unsubstantiated claims of misrepresentations by Jackson.

10
11   17. Purported Misstatement #17: The September 19, 2012, Conversation About Breaking Up
        a $10,000 Contribution to YEE into $500 For Another Political Candidate

12      Jackson attacks the following excerpt from Agent Quinn's Wire 3 affidavit: "JACKSON

13   explained that the $10,000 will be broken up into $500 donations to ▮▮▮▮▮▮, who ran for ▮▮▮▮▮

14   ▮▮▮▮▮▮▮▮▮▮.  According to JACKSON, ▮▮▮ would then turn the money over to Senator

15   YEE."  Wire 3 Affidavit (Jackson Mot. Exhibit 18) at pg. 50.  According to Jackson, "Mr. Jackson does

16   not say that the same money will be passed through to Senator Yee."  Jackson Mot. at pg. 8.  But this is

17   precisely what Jackson's own transcript, at his Exhibit 13, attributes to Jackson: "But you can only still

18   give $500 to her per person, so we can get more people to give more to her and then she will turn around

19   and give it to Leland."  So Jackson *did* inform UCE 4773 that ▮▮▮ would give the money to Yee.

20   Jackson also referred to it as "[i]t's like an even swap."  Jackson Mot. Exhibit. 13.  This purported

21   misstatement is therefore neither material– since the government did not allege any criminal activity

22   related to state violations for campaign "swaps" – nor false.

23      18. Purported Misstatement #18: The FBI's Investigation into UCE 4773

24      Jackson contends that the Wire 3 affidavit misrepresented the nature of the investigation into

25   UCE 4773 by the FBI.  Jackson. Mot. at pgs. 9-10.  That allegation is not supported by any facts, as it

26   could not be.  The Wire 3 affidavit candidly disclosed information about the status of UCE 4773 out of

27   an abundance of caution, although no findings had been made against UCE 4773 at that time.  As he did

28

UNITED STATES' CONSOLIDATED OPP. TO MOT. TO SUPPRESS
CR-14-0196- CRB

1   previously in his motion to compel disclosure of information about UCE 4773, Jackson engages in

2   speculation without any actual facts or information.  In response to Jackson's previous motion, the

3   government disclosed to this Court, *in camera* and *ex parte,* the information about the investigation of

4   UCE 4773.  The Court is aware from that information that Agent Quinn in no way misrepresented the

5   nature of the investigation into UCE 4773.

6         19. Purported Misstatements in Subsequent Wires 4-7 about 4599 Being a Member of La

7             Cosa Nostra

8         Jackson attempts to allege that Wires 4-7 contain the same kinds of falsities that he purports to

9   have found in Wire 3.  Once again, though, these claims are entirely without merit.  For example,

10  Jackson claims that as in Wire 3, the affidavits for Wires 4-7 misrepresented that UCE 4599 portrayed

11  himself to Jackson as a marijuana trafficker, a money launderer, and an east coast member of La Cosa

12  Nostra, an organized crime group.  As described above, given the substance of the May 30, 2012, lunch

13  meeting, during which UCE 4599 and UCE 4773 discussed in Jackson's presence their illegal activities,

14  and given the substance of the September 20, 2012, meeting, in which Jackson, Brandon Jackson, and

15  Marlon Sullivan solicited UCE 4599 for narcotics business opportunities, Jackson could have had no

16  reasonable doubt about the nature of UCE 4599's cover story.

17        20. Purported Misstatements in Wire 4 about the November 16, 2012 Conversation Between

18            JACKSON UCE 4773

19        Defendant Jackson alleges misrepresentations regarding a November 16, 2012, conversation with

20  UCE 4773 in Agent Quinn's Wire 4 affidavit.  Jackson Mot. at 12.  Jackson complains about an alleged

21  misrepresentation regarding a November 16, 2012 conversation; however, in making his argument, he

22  references a conversation that took place between Yee and 4773 on October 14, 2011.  See, Jackson

23  Mot. at 12, referring to Chattejee Dec. Exh. 8).  Jackson's allegations about misstatements regarding that

24  conversation appear in his motion at page 6, item 11, and are discussed above at section 11.  As

25  discussed above, Agent Quinn accurately reported the contents of that conversation in the Wire 3

26  affidavit.  It is not mentioned in the Wire 4 affidavit.

27        21. Purported Misstatements in Wire 4 About Marijuana and the Oakland City Council

28

UNITED STATES' CONSOLIDATED OPP. TO MOT. TO SUPPRESS
CR-14-0196- CRB

1    Jackson alleges a misstatement in Agent Quinn's Wire 4 affidavit regarding marijuana and

2   bribery. Jackson Mot. at 12. But it is clear in that affidavit that the conversation could have been

3   regarding bribery or not, as Agent Quinn used the phrase "possible bribery." Jackson and the CHS were

4   discussing city licenses, and whether Jackson knew anyone on the Oakland City Council. It was not

5   unreasonable for Agent Quinn to characterize such a conversation as possibly involving bribery.

6   Further, Jackson's claim is immaterial: in a federal wiretap application, federal law prohibits all

7   marijuana cultivation and sales. As with many of Jackson's claims of falsehoods, it is also a relatively

8   minor and unimportant point in the overall scope of the probable cause supporting the Wire 4 affidavit.

9

10   22.   Purported Misstatements in Wire 4 Regarding UCE 4599 Writing a Check For Yee if Yee
          Issued a Proclamation for the Chee Kung Tong

11    Jackson alleges a misrepresentation in the Wire 4 affidavit regarding UCE 4599's promise to

12   write a check for Yee, if Yee would issue a proclamation to the Chee Kung Tong and Raymond Chow.

13   Jackson characterizes this as a misrepresentation because Agent Quinn failed to say that Yee had already

14   agreed to write the proclamation. Jackson Mot. pg. 13. In fact, the sequence of events was accurately

15   reported by Agent Quinn in the Wire 4 affidavit. Agent Quinn reported that Jackson told Yee on

16   November 20, 2012 that UCE 4599 would clear up the campaign debt if Yee would help out Chow.

17   Jackson Mot. Exh. C, at 23. Yee demurred because he did not want to be seen as too close to Chow. *Id.*

18   at pg. 25-26. But then when Yee met with UCE 4599 in Jackson's presence on January 22, 2013, Yee

19   agreed to do the proclamation, understanding that this official act was in exchange for a donation from

20   UCE 4599. *Id.* at 90-91. The fact that Yee was promised a check in exchange for a proclamation and

21   agreed to issue the proclamation, with the check written later, does not obviate the original bribe

22   agreement.

23   23.   Purported Misstatements in Wire 5 Regarding The Status of the Investigation Into UCE
          4773

24
25    Jackson alleges that the Wire 5 affidavit, submitted by FBI Special Agent Maya Clark, again

26   misrepresented the status of the FBI's investigation in UCE 4773. This is nothing more than a rehash of

     Jackson's previous arguments regarding the investigation of UCE 4773. Like those arguments, this one
27
     is also speculative and unsubstantiated. *See, e.g.,* discussion of Purported Mistatement #18, *supra.*
28

UNITED STATES' CONSOLIDATED OPP. TO MOT. TO SUPPRESS
CR-14-0196- CRB

1       24. <u>Purported Misstatements in Wire 5 That a February 14, 2013, Call between CHS #11 and</u>
2       <u>JACKSON Illustrating JACKSON's Attempting to Secure Projects for CHS #11 In Exchange For Monetary Payments</u>

3       Jackson contests the meaning of quoted information in the Wire 5 Affidavit. Jackson Mot. at 13.

4 But he does not quarrel with the accuracy of the quoted language, only the significance to be drawn

5 from it, and argues that there are permissible innocent inferences. That may be so, but speculating about

6 a different, possibly inculpatory, inference does not render the Wire 5 Affidavit false. It is also a single

7 conversation in the entirety of the facts included in the Wire 5 Affidavit. It is highly unlikely that the

8 Court issued orders to intercept communications on the basis of one inference drawn from one single

9 quote after reading the entire Wire 5 Affidavit. In any event, there was ample basis elsewhere in the

10 Wire 5 affidavit for the inference made by Agent Clark. Wire 5 affidavit (Jackson Mot. Exhibit 20) at

11 pg. 24, lines 1-13. More importantly, Jackson impliedly concedes, through lack of challenge to the

12 contrary, that the remainder of Agent Clark's Wire 5 affidavit was accurate.

13       25. <u>Purported Misstatements Raised by Yee</u>

14       In his motion, Yee refers to and apparently joins Jackson's motion insofar as it identifies

15 particular purported misstatements. Yee Mot. at pg. 5, n. 5. For the reasons discussed above, all of

16 those purported misstatements are in fact true and accurate.

17       Yee also argues that a *Franks* hearing is appropriate because each wiretap affidavit allegedly

18 "rehashed" or carried over its necessity arguments from the preceding affidavit. Yee. Mot. pgs. 16-20.

19 The government addresses this allegation in greater detail below, in the section regarding necessity. *See*

20 *infra.*, Section d - Wire 3 and Wires 4-7 Did Not Rely On Previous Affidavits To Establish Necessity. In

21 short, though, for *Franks* purposes, there was no rehashing: a fair, reasonable reading of each of the

22 contested affidavits demonstrates that each, as a whole, alleged specific, individualized, updated reasons

23 why wiretaps were necessary. In any event, Yee's argument is entirely unsustainable as to the Wire 3

24 affidavit, because Yee does not suggest that any statements were carried over from the preceding

25 affidavit in Wire 2.

26

27

28

1

2     **b.   None of the Alleged Misstatements or Omissions Require a hearing**

3       A defendant is only entitled to an evidentiary hearing on alleged falsehoods in a wiretap affidavit

4 if he "makes a substantial preliminary showing that a false statement knowingly and intentionally, or

5 with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the

6 allegedly false statement is necessary to the finding of probable cause." *Franks*, at 155-56; *see United*

7 *States v. Fernandez*, 388 F.3d 1199, 1237-38 (9th Cir. 2004) (applying *Franks* to wiretaps); *United*

8 *States v. Bennett*, 219 F.3d 1117, 1124 (9th Cir. 2000) (same).

9       The defendants have entirely failed to meet their burden for obtaining an evidentiary hearing

10 under *Franks v. Delaware,* 438 U.S. 154 (1978). First, as spelled out above, the allegations of

11 misstatements, false statements, and material omissions they identify are each individually and

12 separately inaccurate. Second, assuming *arguendo* that the Court were to determine that one or more of

13 the contested statements actually involved misstatements or material omissions, the government submits

14 that there is absolutely no basis to believe that the affiants made the statements "knowingly and

15 intentionally, or with a reckless disregard for the truth." *Franks* at 155-56. At worst, there may be a few

16 minor mistakes over the course of several lengthy documents. Unlike some affidavits – where an officer

17 or agent might possibly believe that he or she could pull off misleading a Court because the underlying

18 basis for the affidavit, whether informant or unrecorded observation, will never come to light – every

19 communication summarized for the Court by the affiants, with the exception of one expressly noted

20 conversation, was observed by other federal agents and recorded through either a body wire or a

21 recorded telephone line. It was, therefore, known by the affiants and everyone else assisting with in the

22 preparation of the wire affidavits that they would be reviewed in painstaking detail one day. It makes

23 no sense that the affiants would intentionally or recklessly misreport to the Court, knowing there was a

24 record of everything they were summarizing in their affidavit. The fact is that the wire affidavits in this

25 case are incredibly detailed and accurate, and a diligent effort was made to report *all* the facts to the

26 Court – even those that were exculpatory – so that the Court would have the entire record before it.

27       In fact, it is remarkable how far Jackson had to reach in his attempt to point out misstatements in

28

1   the Wire 3 Affidavit. That affidavit is a very lengthy document - 89 pages - and it incorporated two

2   other wiretap affidavits that preceded it. That Jackson can only point out minor and tangential points to

3   try to weave together an allegation of intentional or reckless misstatements is significant in and of itself.

4   While this argument overlaps with the point that there is more than sufficient probable cause in the Wire

5   3 affidavit regardless of any alleged misstatements, it speaks to the overall accuracy of the Wire 3

6   affidavit. Nowhere can Jackson or Yee challenge the core point of the Wire 3 affidavit: that defendants

7   Jackson and Yee were offering to accept campaign contributions in exchange for official acts and that

8   they performed official acts for the money given to them by UCE 4773 and on the pledge of additional

9   payments.

10          On that point, defendant Jackson spends a great deal of time and energy trying to allege that the

11   Quinn Affidavit misrepresented the nature of the campaign contributions given to defendants Jackson

12   and Yee by UCE 4773. Jackson tries mightily to distinguish between contributions given by UCE 4773

13   and contributions "raised" or "bundled" by UCE 4773. The fact of the matter is that, for the probable

14   cause determination of the federal crimes alleged in the Wire 3 affidavit, the distinction does not matter.

15   Campaign contributions to the San Francisco mayoral race in excess of $500 were illegal under local

16   campaign finance laws. For the federal crime of honest services fraud, however, after the Supreme

17   Court's decision in *Skilling*, the government must allege and prove that a scheme to defraud of honest

18   services involved either bribery or extortion. *Skilling v. United States*, 561 U.S. 358, 408-09 (2010).

19   Although it may be indicative of an intent to deceive or cheat, it is insufficient for honest services fraud

20   that a local public official violated their local legal obligations if there is no further proof of bribery or

21   extortion. Therefore, even if every allegation regarding campaign contributions related to the $500 limit

22   was false – and they were not – it would not materially change the probable cause described in the Wire

23   3 Affidavit and found by this Court: that probable cause existed that Jackson and Yee were trading

24   official action by Yee for money and were utilizing the Target Telephones to carry out that scheme.

25   Notably, the defendants cannot make any allegation of misstatements in many of the key "dirty"

26   conversations and activities in the Wire 3 affidavit. For example, they have not and cannot make any

27   allegation of misstatements regarding:

28

UNITED STATES' CONSOLIDATED OPP. TO MOT. TO SUPPRESS
CR-14-0196- CRB

1. Jackson's pledge to UCE 4773 for official action for WellTech on June 2, 2012: "JACKSON stated that Senator YEE told JACKSON that 'whatever [UCE 4773] needs from him . . . he's open to help as much as he can.' JACKSON said that Senator YEE was here for UCE 4773, and that whatever UCE 4773 needed, UCE 4773 just had to tell Senator YEE." And regarding helping WellTech in San Mateo County, "JACKSON stated 'this will be an easy ask for Leland.'" Wire 3 affidavit (Jackson Mot. Exhibit 18) at pg. 42.

2. On June 5, 2012, Jackson stated to UCE 4773: "whatever you need from [Senator YEE], you got him." *Id.* at pg. 43.

3. On June 19, 2012, Jackson's reassurances to UCE 4773, while asking for further contributions: "UCE 4773 asked how Senator YEE felt about UCE 4773's statement that he needed to get something out of it. JACKSON stated that Senator YEE was 'fine with that.' JACKSON stated that Senator YEE told JACKSON to tell UCE 4773 'whatever he could do to help you,' and that UCE 4773 has been committed to Senator YEE 'and [Senator YEE] wants to find a way to help.'" *Id.*

4. On September 4, 2012, at 455 Golden Gate Avenue, UCE 4773 met with Yee and Jackson. During that meeting, as described in the Wire 3 affidavit, UCE 4773 tied his providing another $10,000 to Yee and Jackson to Yee's assistance with the California Public Health Department, ". . . if you can do that then 10 [$10,000] is no problem at all." Yee also discussed how another Secretary of State in California had been caught in a public corruption scandal and commented "if it was done, just do it the right way and don't get caught." *Id.* at pgs. 47-48.

5. On September 10, 2012, Yee asked for the number of the individual at California Public Health Department that UCE 4773 wanted him to contact. *Id.* at 48-49.

6. On September 11, 2012, Yee discussed the parameters of the contact with the Public Health Department further with UCE 4773. *Id.* at 49.

7. On September 18, 2012, defendant Jackson told UCE 4773 to contact defendant Yee. *Id.*

8. On September 20, 2012, UCE 4773 and defendant Yee discussed the letter that defendant Yee would write to the Public Health Department for UCE 4773. *Id.* at 51.

9. On September 24, 2012, UCE 4773 and Jackson discussed a version of the letter that UCE 4773 had sent by email to defendant Yee. They discussed being careful about how they discussed the quid pro quo around defendant Yee. UCE 4773 said "Between you and me, Keith, and you know I won't say this to him, if he can get that letter done, I can hook you up. We'll do it like that." And "JACKSON responded 'okay, I'll just tell him to get that damn letter out man, he needs to . . . .'" They talked about being careful and not wanting their relationship to hit the papers. "UCE 4773 said he would not put any more money out there unless he was getting something. JACKSON agreed, stating 'I understand that and I think he understands that too.'" *Id.* at 52-53.

10. On September 24, 2012, Jackson emailed a draft version of the letter from Yee to UCE 4773. *Id.* at 54.

11. On September 25, 2012, Jackson described that Yee's support of UCE 4773 might be better in a phone call to the Public Health Department than a letter because that was a document that could be used against defendant Yee. *Id.* at 55.

12. On September 26, 2012, Jackson told UCE 4773 to keep the letter and that Yee would make a phone call to the Public Health Department for UCE 4773. *Id.* at 56-57.

13. On September 27, 2012, Yee spoke with UCE 4773, asked for more money and said "so if there's anyway you can get the money sooner rather than later, that will really, really be helpful because, uhm, you know, uhm, Keith is going to have to deal with it. . . . ." *Id.* at 56-57.

14. On October 1, 2012, Jackson solicited money from UCE 4773 and they discussed Yee's comfort level with UCE 4773 and what UCE 4773 wanted done. *Id.* at 57.

15. On October 17, 2012, Jackson and UCE 4773 discussed Yee making the call to someone from the Public Health Department for UCE 4773. *Id.* at 58.

16. On October 18, 2012, Yee and UCE 4773 discussed Yee making the call for UCE 4773 to a person from the Public Health Department. UCE 4773 informed defendant Yee that the person had taken a loan from UCE 4773. *Id.* at 58-59.

17. On October 18, 2012, defendant Yee made the call on behalf of UCE 4773 to the person he

1    believed worked for the Public Health Department. *Id.* at 59-60.

2    18. On October 23, 2012, UCE 4773 and Jackson discussed Yee's efforts to raise more money and

3        UCE 4773's need for the letter of support. *Id.* at 60-61.

4    19. On November 6, 2012, defendant Jackson and UCE 4773 continued to discuss the letter for UCE

5        4773. *Id.* at 61-62.

6        As these unchallenged facts clearly and unequivocally demonstrate, the Wire 3 affidavit

7    provided more than probable cause for the crimes alleged with or without the statements that Jackson

8    erroneously claims were inaccurate. There is no basis for a hearing to determine whether or not the

9    Wire 3 affidavit should have used the word "contribute" or "raise contributions," or to determine who

10   was trying to get particular individuals onto the ▮▮▮▮▮Commission, when the meat of the Quinn Affidavit

11   – the scheme to exchange official action for money – has not been, and cannot be, alleged to have been

12   false or misleading in any capacity.

13       These same unchallenged facts powerfully undercut Jackson's *ipse dixit* claim that "at no time

14   did Mr. Jackson engage in criminal conduct with UCE 4773." Jackson Mot. at 11. As is spelled out in

15   detail in the Quinn Affidavit – and as this Court previously found by issuing the interception order –

16   there was at least probable cause to believe that defendants Jackson and Yee were engaged in several

17   crimes with UCE 4773 and with UCE 4599[5]. As there is clearly more than probable cause to believe

18   that defendants Jackson and Yee were engaged in the criminal conduct listed in the Quinn Affidavit –

19   with or without the portions that defendant Jackson challenges – and that the Target Telephones were

20   utilized to commit those crimes, the communications intercepted should not be suppressed and no

21   *Franks* hearing is required.

22       It is notable that defendant Jackson does not even attempt to explain how the Quinn Affidavit,

23   even stripped of any alleged misstatements, would not still demonstrate probable cause. Jackson Mot. at

24

25   ───────────────
     [5] Notably, Jackson completely ignores the portions of the Wire 3 affidavit that spelled out his
     involvement with UCE 4599 and co-defendants Brandon Jackson and Marlon Sullivan to distribute
26   narcotics. He ignores them because they stand as independent probable cause for the interception of his
     communications and because he cannot refute the statements made about those activities in the Wire 3
27   affidavit. His motion should be denied on that grounds alone. For example, the meeting of September
     20, 2012, between defendant Jackson, defendant Brandon Jackson, defendant Sullivan, and UCE 4599
28   was sufficient by itself to authorize interception of Target Telephone 1 for narcotics trafficking.

1  15-16.  In fact, his analysis in section IV of his motion concludes with the notion that he has pointed out

2  some misstatements.  *Id.*  It never addresses the remaining probable cause.  *Id.*  This omission speaks

3  volumes about the strength of the probable cause presented in the Quinn Affidavit and is a basis to deny

4  defendant Jackson's motion without engaging in the review of each alleged misstatement.

5        Given the inaccurate and peripheral, albeit prolific, nature of defendant Jackson's challenges to

6  the Quinn Affidavit and the overwhelming evidence of probable cause with or without the challenged

7  statements, this Court should deny defendant Jackson's motion to suppress and should not hold a *Franks*

8  hearing.  As a result, no hearing need be conducted as to any of the subsequent affidavits in support of

9  wire and electronic interceptions.

10     **c.  <u>There was Probable Cause in Wire 3 to Intercept Target Telephone 2</u>**

11        Yee argues on several grounds that there was no probable cause in Wire 3 to intercept his

12  telephone, Target Telephone 2.  Yee Mot. Pgs. 5-8.  He first argues that probable cause was lacking

13  because Wire 3 did not name as target offenses several of the offenses with which Yee was ultimately

14  charged, such as honest services fraud and conspiracy to traffic in firearms.  Yee Mot. pg. 5, lines 19-21.

15  This argument is baseless.  The government is unaware of, and Yee does not cite to, any authority

16  suggesting that in order to be sufficient, a wiretap affidavit must identify all, or even any, of the offenses

17  with which an individual is ultimately charged.  To the contrary, "[a]lthough the conversations to be

18  intercepted by electronic surveillance are necessarily identified partly in terms of the suspected offenses

19  to which they will relate, *the content of the communications to be intercepted cannot be known in*

20  *advance, and the authorizing order need not describe every aspect of the criminal activity expected to be*

21  *revealed by the surveillance.*  'The order must be broad enough to allow interception of any statements

22  concerning a specified pattern of crime.'"  *United States v. Licavoli*, 604 F.2d 613, 620 (9th Cir.

23  1979)(emphasis added)(upholding interception of communications relating to theft of painting, even

24  though order authorized interception of communications relating to theft of diamonds), *quoting United*

25  *States v. Tortorello*, 480 F.2d 764, 780 (2nd Cir.), *cert. denied*, 414 U.S. 866 (1973); *see also Carneiro*,

26  861 F.2d at 1179 (approving of interception of communications relating to marijuana trafficking even

27  though defendants initially suspected of trafficking only cocaine).  Moreover, in this particular case,

28

UNITED STATES' CONSOLIDATED OPP. TO MOT. TO SUPPRESS
CR-14-0196- CRB

1   even the most clairvoyant of wiretap affiants could not have accurately predicted all of the offenses with

2   which Yee would ultimately be charged, given the stunning turn that the investigation took when Yee

3   introduced the UCE to someone connected to firearms traffickers in order to facilitate international

4   firearms trafficking deals with the UCE in exchange for money.

5       Yee also argues that Wire 3 lacked probable cause not just for the offenses with which Yee was

6   later charged, but for the target offenses listed in the affidavit itself. This argument is also baseless. In

7   support of this argument, Yee lists various actions that he allegedly took that are described in the Wire 3

8   affidavit, and suggests that those acts were either not criminal in nature, did not involve Target

9   Telephone 2, or did not personally involve Yee. Yee Mot. pgs. 6-7. Yee's list, however, is

10   fundamentally flawed. He cherry-picks those meetings and telephone calls from the Wire 3 affidavit

11   that are most helpful to him, and ignores and mischaracterizes those that are most damaging. For

12   example, the following four excerpts from the Wire 3 affidavit were either overlooked or

13   mischaracterized in Yee's list:

14         On October 14, 2011, at approximately 9:10 p.m, UCE 4773 and Senator
           YEE met with UCE 4773 at the Marriot Marquis coffee shop in San

15         Francisco, CA. During that conversation, UCE 4773 discussed the fact
           that he had already raised $11,000 and was prepared to give another

16         $10,000, but had some concerns. One was a recent San Francisco
           Chronicle article about straw donors breaking up campaign contributions

17         for Mayor Ed LEE in the race for San Francisco Mayor. In that context,
           UCE 4773 said that he knew that he could not give $10,000 as a campaign

18         contribution. UCE 4773 was concerned about the consequences of getting
           caught, in terms of losing momentum in his financial projects and

19         relationships with his clients. Senator YEE responded to these concerns by
           saying that his numbers in the polls were improving; he foresaw winning

20         the election; he was seeking to raise another $300,000 in the next 30 days;
           and was interested in UCE 4773 assisting in raising more money. **Senator**

21         **YEE said that they had to be careful. Senator YEE said that because**
           **he was receiving matching public funds, he would be audited and**

22         **there was a possibility that UCE 4773's money would be examined.**
           **Senator YEE said that UCE 4773 should "cover your tracks," and if**

23         **UCE 4773 thought he could not do that, then he should not**
           **contribute.** UCE 4773 and Senator YEE discussed alternative ways to

24         donate that did not involve limits, and Senator YEE said that UCE 4773
           could contribute $10,000 to a ballot measure that Senator YEE was

25         supporting. He noted that such a contribution would be legal and
           explained that publicity about the ballot measure would feature him in a

26         positive light. **UCE 4773 also told Senator YEE that he was expecting**
           **something for the contributions, i.e. "It's too much money ... not to get**

27         **something," which Senator YEE acknowledged.** Senator YEE stated
           that he would appreciate further contributions of money, and noted he had

28         a lot of friends in Sacramento and that there were "tremendous"

opportunities at the local level, that is, "whoever's gonna be the mayor controls everything." At a later point in the conversation, after UCE 4773 discussed the investors and the capital they could bring to development projects in San Francisco and to the Peninsula, Senator YEE said that if he won the election, he would control $6.8 billion. He said that he was not interested in making money himself, and was seeking the job of Mayor to help the City. However, he also said that he was "more than happy to help friends make money."

Wire 3 Affidavit at pgs. 22-23 (emphasis added).

On September 4, 2012, UCE 4773 met with Senator YEE and JACKSON at 455 Golden Gate Avenue in San Francisco. Senator YEE has a local office in the building and the meeting took place in the mezzanine level cafeteria of the building. Senator YEE mentioned that he would be assisting the campaign for the President of the United States during the following week because they needed some "yellow faces." Senator YEE told UCE 4773 that he was $32,000 away from paying off his outstanding campaign debt and stated ". . . if you can do another $10,000, that would be good. . . . If you give me ten, I've got a tournament coming up in October at Harding Park and I've got a lot of lobbyists coming in . . . so I will comp you for that." UCE 4773 told Senator YEE that he had a meeting set for September 6, 2012, with someone in procurement at the State of California Public Health Department and that he had a good lead on getting a contract with them for the software consulting company run by CHS #12. UCE 4773 told Senator YEE that UCE 4773 was going to need a phone call or two on behalf of the software consulting company. Senator YEE said to just let him know. **Senator YEE then discussed setting up a meeting for UCE 4773 and the software consultants with the chief technology officer. UCE 4773 discussed the desired telephone call again and told Senator YEE " . . . if you can do that then 10 [$10,000] is no problem at all." Senator YEE said to just let him know.** UCE 4773 and Senator YEE then discussed the CALPERS scenario and Senator YEE stated that he could not introduce UCE 4773 because of the scrutiny that would bring. Instead, Senator YEE stated he would introduce UCE 4773 to ▊▊▊▊▊▊ a fund manager in San Francisco. UCE 4773 asked Senator YEE how soon he needed the $10,000 and Senator YEE stated "as soon as possible." UCE 4773 told Senator YEE that bankers don't do as soon as possible and Senator YEE stated by the last week of September. UCE 4773 and Senator YEE talked about UCE 4773 moving to San Francisco and UCE 4773 joked about being registered in San Francisco by November of 2014 when Senator YEE would run for California Secretary of State. Senator YEE laughed and said UCE 4773 didn't need to move to San Francisco, and stated "we can just find you an address . . . there are homeless shelters . . . you don't even have to live there."…

Senator YEE then stated that ▊▊▊▊▊▊▊▊▊▊▊▊▊▊ ▊▊▊▊▊▊ several years ago and that ▊▊▊▊ had to resign because someone on his staff wore a wire for the FBI. ▊▊▊▊ was collecting money in his office which was a no-no and ▊▊▊▊ was giving money to a non-profit and getting back the same amount the same day. **Senator YEE stated that if it was done, just do it the right way and don't get caught.**

Wire 3 Affidavit at pgs. 46-48 (emphasis added).

On September 19, 2012, **UCE 4773 spoke with Senator YEE by telephone over Target Telephone 2.** UCE 4773 requested that Senator YEE write a letter on behalf of the computer consulting company to the California Department of Public Health so that the company could get contracts with that department. Senator YEE stated "why don't you do this? Why don't you draft something for me? And then what I will do I will play with some of the words so I can include. And what I will do, in a letter, I'll indicate I met with whatever that gal's name was, and I was really impressed with her credentials, and the potential of her helping out individuals in my district, San Mateo County. And encouraging her to pursue ideas in the county, but in California, and try and help streamline the process and save us money." The call ended. **Telephone analysis then shows calls between Target Telephone 1 and Target Telephone 2. Senator YEE then called back using Target Telephone 2 and gave UCE 4773 the email address of Senator YEE's wife so that UCE 4773 could send a draft of the letter and Senator YEE could then re-write the letter in his own language. UCE 4773 asked Senator YEE how much debt he had remaining. Senator YEE said $32,000 and that he was hoping to get $10,000 from UCE 4773. Senator YEE stated "what we're interested in doing is getting $10,000 to** ████████████, **who ran for** ████████. **And then. All this is legal. She does $10,000, I do $10,000 and we swap. You've got people who donate to me, they've maxed out. They can't donate anymore. So they write to** ████████. **Then she gets her donors to write $10,000, and we'll swap. It makes it a lot easier, that's all. Okay?" Senator YEE told UCE 4773 to handle it through JACKSON. Following that call, telephone analysis shows calls between Target Telephone 1 and Target Telephone 2. I believe that there is probable cause that those calls related, in part, to the exchange of the letter for additional contributions by UCE 4773 to retire the debt of Senator YEE.**

**On September 19, 2012, approximately 20 minutes after the call with Senator YEE, UCE 4773 received a call from JACKSON using Target Telephone 1. JACKSON stated he had just spoken with Senator YEE. JACKSON reiterated the need for the money.** JACKSON told UCE 4773 that Senator YEE was very comfortable with UCE 4773, but that Senator YEE doesn't want to talk about the money and would prefer if that was handled by JACKSON. UCE 4773 told JACKSON that he understood if Senator YEE didn't want to discuss the money, but that UCE 4773 would ordinarily just keep his money until Senator YEE was comfortable. UCE 4773 told JACKSON that he would discuss it the following day with Senator YEE. JACKSON explained that the $10,000 will be broken up into $500 donations to ████████████, who ran for ████████████. According to JACKSON, ████████ would then turn the money over to Senator YEE. Later that evening, Target Telephone 2 called (916)████████, a telephone number associated with ████. I believe that there is probable cause that the calls over the Target Telephones related, in part, to the exchange of acts by Senator YEE for campaign contributions from UCE 4773.

Wire 3 Affidavit at pgs. 49-50 (emphasis added).

On September 24, 2012, UCE 4773 called JACKSON on Target Telephone 1. **JACKSON stated "Leland [YEE] is all over me, he wants**

UNITED STATES' CONSOLIDATED OPP. TO MOT. TO SUPPRESS
CR-14-0196- CRB

to clean up that debt man, so I got to . . . he called me twice yesterday." UCE 4773 asked if Senator YEE got the email. JACKSON said Senator YEE had everything on his end and would be in Sacramento all week.    JACKSON mentioned Senator YEE's golf tournament that would have Sacramento contacts and lobbyists there. JACKSON stated that the event was for a ballot measure that would help Senator YEE run for Secretary of State and that Senator YEE couldn't do anything until he cleared up his debt. UCE 4773 asked "Can he get me that letter in the next couple of days?" JACKSON stated "Yeah, let me call him now and see where he's at on that . . . and then . . . ." UCE 4773 stated "I know I can't talk to him about it, as far as the letter first . . . ." JACKSON stated "Exactly." I believe this is a reference to UCE 4773 not discussing openly with Senator YEE that the money was for the letter. JACKSON said Senator YEE was anxious to announce for Secretary of State. UCE 4773 said "Between you and me, Keith, and you know I won't say this to him, if he can get that letter done, I can hook you up. We'll do it like that." JACKSON responded "okay, I'll just tell him to get that damn letter out man, he needs to . . . . [UCE 4773], one thing about him with you, he's really appreciative of what you've done and he's in your corner 110% so . . . . He really likes you, man . . . he really wants to . . . he likes the nucleus of our team that we have and, you know, . . . . But he just wants to move forward and be safe you know. That's his biggest concerns because they just jammed up Ed LEE, but he got . . . they investigated him, but he's out, they dropped the charges, but, you know, nobody wants that shit to hit the papers." UCE 4773 stated he didn't want to be in the papers either. UCE 4773 said he would not put any more money out there unless he was getting something. JACKSON agreed, stating "I understand that and I think he understands that too." JACKSON stated he would let UCE 4773 know and asked if Senator YEE was going to send him a copy. UCE 4773 stated he was putting together a couple of California clients in a package to show that the consulting company has relationships there. JACKSON promised to text UCE 4773 to let him know the status. UCE 4773 said that was fine and that he understood it was hard to move fast and that they were worried about getting caught up. UCE 4773 stated he puts the money out there because of JACKSON and JACKSON said Senator YEE understood that. **Following that call, telephone analysis showed multiple calls between Target Telephone 1 and Target Telephone 2.**

Wire 3 Affidavit (Jackson Mot. Exhibit 18) at pgs. 52-53 (emphasis added).  Additional excerpts from the Wire 3 Affidavit that Yee either overlooked or mischaracterized in his motion can be found at pg. 54 line 18 – pg. 55 line 2; pg. 56, line 17 – pg. 57 line 6; and pg. 60 lines 8-17.  In short, Wire 3 contained ample probable cause to believe that the Target Offenses were being discussed on Target Telephone 2.

Yee makes one final argument with respect to probable cause.  He argues that in attempting to establish necessity, the government actually demonstrated a lack of probable cause; that is, because traditional investigative techniques had failed to uncover evidence against Yee, there was insufficient

1  probable cause to support a wiretap.  Yee Mot. at pg. 8.  This is a curious argument to make.  First of all,

2  as demonstrated in the excerpts above and as demonstrated throughout the Wire 3 affidavit, traditional

3  investigative techniques had uncovered significant evidence against Yee, just not enough to achieve all

4  of the goals of the investigation.  More importantly, though, accepting Yee's argument would create a

5  legal conundrum: carried to its logical conclusion, it would mean that whenever the government

6  demonstrates necessity, it must therefore lack probable cause.  This, of course, is entirely inconsistent

7  with the purpose of the necessity requirement.  *See, e.g. Blackmon,* 273 F.3d at 1207 (reasoning that the

8  purpose of the necessity requirement is "to ensure that wiretapping is not resorted to in situations where

9  traditional investigative techniques would suffice to expose the crime.")

10  **d.  Wire 3 and Wires 4-7 Did Not Rely On Previous Affidavits To Establish Necessity**

11  Yee alleges that Wire 3 and subsequent Wires 4-7 are deficient because they carry over necessity

12  arguments from earlier wiretap applications filed against other conspirators with regards to other

13  telephones.  Yee Mot. at pg. 9.  At the outset, this argument plainly fails with respect to Wire 3.  Wire 3

14  was preceded by two wiretaps, Wires 1 and 2, which targeted a telephone used by George Nieh, and a

15  Mercedes Benz that Nieh used to drive Kwok Cheung Chow.  Had the Wire 3 Affidavit attempted to

16  carry over the necessity justifying the previous wiretaps on Nieh's telephone and car, then clearly Wire

17  3 would have been insufficient.  This was precisely the scenario that the Ninth Circuit disapproved of in

18  the cases that Yee cites in his motion.  *See, e.g. United States v. Carneiro,* 861 F.2d 1171 (9th Cir.

19  1988).  In *Carneiro,* the Court approved of an initial wiretap targeting a telephone used by a drug

20  trafficker named McNeil, but suppressed subsequent wiretaps targeting telephones used by McNeil's

21  source, Harty, and Harty's source, Boyd.  The Court suppressed the latter wiretaps because the

22  government had not conducted any traditional investigation into Harty and Boyd, instead carrying over

23  its previous investigation of McNeil to establish necessity as to Harty and Boyd.  *See also United States*

24  *v. Santora,* 600 F.2d 1317, 1322 (9th Cir. 1979)(upholding initial wiretap but suppressing subsequent

25  wiretap that relied "almost entirely" on previous affidavit to establish necessity.")  The carry-over

26  scenario described in *Carneiro* did not occur here.  To the contrary, Wire 3 describes with remarkable

27  detail numerous traditional investigative techniques that agents employed specifically towards Yee and

28

UNITED STATES' CONSOLIDATED OPP. TO MOT. TO SUPPRESS
CR-14-0196- CRB

1   Jackson over the course of several months in an effort to build a case against them.  Wire 3 affidavit

2   (Jackson Mot. Exhibit 18) at pgs. 69-87.

3        Yee's argument that Wires 4-7 carry over the necessity arguments from Wire 3 is equally

4   unavailing.  He claims that the affidavits are "replete with boilerplate, generic language," and lists eight

5   excerpts from the affidavits that he alleges are included verbatim in every affidavit.  This claim is

6   specious.  The eight supposedly boilerplate excerpts he cites appear to be carefully selected from

7   introductory and concluding sentences; he entirely overlooks the wealth of case-specific details unique

8   to each affidavit described in the substantive discussions on necessity.  For example, the first supposedly

9   boilerplate excerpt he cites is in the introductory paragraph in the necessity section, and tracks the

10   language of the necessity requirement set forth in 18 U.S.C. § 2518(1)(c).  Yee Mot. at pg. 10.  The

11   second supposedly boilerplate excerpt he cites is also in the introduction to the necessity section, and is

12   followed immediately by this sentence: "I discuss details, both positive and negative, about the use of

13   each technique with regard to JACKSON, Senator YEE, and the other Target Subjects and Interceptees,

14   the success or failure of the technique, and what the technique has accomplished or failed to accomplish

15   with regard to the goals and objectives of this investigation. When a technique was not employed, I

16   provide an explanation." Wire 3 affidavit (Jackson Mot. Exhibit 18) at pg. 70.

17        The third supposedly boilerplate excerpt Yee cites does not even occur in the Wire 3 affidavit;

18   thus, Yee's claim that the affidavits borrow *verbatim* boilerplate language from each other is somewhat

19   suspicious at best.  Yee. Mot. at pg. 10.  The following similar line *does* appear in Wire 3: "I do not

20   believe that CHS #11 and CHS #12 could be used to fully achieve the goals of the instant investigation."

21   That line is preceded by a lengthy discussion of the successes and failures of CHS #11 and CHS #12

22   leading up to the date that Wire 3 was submitted for authorization.  Along similar lines, Yee's fourth

23   supposedly boilerplate excerpt is pulled from the closing paragraph of the discussion on CHSs, and

24   overlooks the detailed, case-specific discussion of CHS #11 and CHS #12 immediately preceding it.

25   Each subsequent affidavit also discussed CHS #11 and CHS #12, but focused primarily on any new

26   successes they had achieved (or failures they had endured) since the submission of the previous

27   affidavit.  For example, Wire 4 contains a discussion of how CHS #11 had taken an increased role in

28

UNITED STATES' CONSOLIDATED OPP. TO MOT. TO SUPPRESS
CR-14-0196- CRB

engaging with new interceptees, and how CHS #12 was possibly in a position to discuss online voting technology with YEE. Similarly, Wire 5 explains how CHS #11 had recently had direct contact with Yee; Wire 6 candidly explained how CHS #11's importance had recently grown significantly, but that he/she was still encountering difficulties in achieving the goals of the investigation; and Wire 7 explained how Yee was uncomfortable dealing with CHS #11 because he suspected CHS #11 was "wearing a wire." In short, each affidavit contained far more than a "repetitive narrative of predictable, frequently used law enforcement expressions."

In any event, even if this Court finds that there *was* some conclusory language repeated in each affidavit, such language is by no means fatal. The Ninth Circuit has expressly held that "[t]he presence of conclusory language in [an] affidavit will not negate a finding of necessity if the affidavit, as a whole, alleges sufficient facts demonstrating necessity." *United States v. Torres*, 908 F.2d 1417, 1423 (9th Cir. 1990). That is precisely the case here: a fair, reasonable reading of each of the contested affidavits demonstrates that each, as a whole, alleged specific, individualized, updated reasons why wiretaps were necessary. *See also Blackmon*, 273 F.3d at 1210-11 (panel criticized "boilerplate" language, but did not hold that such language could never be considered, particularly when combined with language specific to each individual investigation).

### e.  The Government Was Not Required to Recruit Additional Informants In Order to Demonstrate Necessity

Yee argues that necessity is lacking because the government failed to recruit additional informants. This, however, goes far beyond what is required by statute. 18 U.S.C. § 2518(1)(c) requires the government to describe investigative procedures that have been tried and failed. This the United States did; in each affidavit it identified how it had used particular informants, how those informants had had some limited successes, and how and why they had failed to achieve the overall goals of the investigation. Section 2518(1)(c) does *not* require the government to repeat failed procedures once it has tried them. Indeed, as the Ninth Circuit has noted, "[t]he statute does not mandate the indiscriminate pursuit to the bitter end of every non-electronic device as to every telephone and principal in question to a point where the investigation becomes redundant or impractical or the subjects may be alerted and the

1   entire investigation aborted by unreasonable insistence upon forlorn hope." *Baker*, 589 F.2d at 1013.

2   To the contrary, "the mere attainment of some degree of success during law enforcement's use of

3   traditional investigative methods does not alone serve to extinguish the need for a wiretap." *United*

4   *States v. Bennett*, 219 F.3d 1117, 1122 (9th Cir. 2000).

5      The Ninth Circuit's decision in *United States v. Rivera*, 527 F.3d 891 (9th Cir. 2008) is

6   particularly instructive in this regard. There, defendants argued that a wiretap should have been

7   suppressed because law enforcement "did not use traditional investigative techniques as much as it could

8   have." *Id.* at 903. In particular, defendants argued that law enforcement could have made additional use

9   of confidential sources. The Ninth Circuit rejected defendants' arguments, reasoning that "we have

10  repeatedly held that 'law enforcement officials need not exhaust every conceivable alternative before

11  obtaining a wiretap.'" *Id.*, *quoting Canales-Gomez*, 358 F.3d at 1225-26 (other citations omitted); *see*

12  *also Carneiro*, 861 F.2d at 1178, *citing with approval United States v. Webster*, 734 F.2d 1048, 1055

13  (5th Cir. 1984), *cert. denied*, 469 U.S. 1073 (1984)(courts will not invalidate a wiretap order because

14  defense lawyer are able to suggest *post factum* some investigative technique that might have been used

15  and was not).

16     *United States v. Simpson*, 813 F.2d 1462 (9th Cir. 1987), to which Yee cites for support, is

17  plainly distinguishable. There, a wiretap affidavit portrayed an informant as "an innocent, uninvolved

18  eavesdropper" to a defendant's drug dealing activities, and claimed that the defendant had insulated

19  himself so that no informants could be used to penetrate the defendant's organization. *Id.* at 1471. The

20  affidavit did *not* disclose that the informant had a sexual relationship with the defendant, had been

21  present on several occasions when the defendant had engaged in drug deals, and had become trusted

22  enough to be permitted to identify potential drug customers for the defendant. The affidavit also

23  referred to the same informant as both "Source Two" and "Individual A." The Ninth Circuit upheld

24  suppression, concluding that "the specific facts withheld from the issuing judge about [the informant]

25  reveal that traditional techniques could have led to the successful infiltration of the entire enterprise."

26  *Id.* at 1472. Here, even assuming the Court agrees that the government should have used additional

27  informants beyond CHS #11 and CHS #12, defendant's motion is devoid of any indication that such

28

1  hypothetical and unidentified informants could have "led to the successful infiltration of the entire

2  enterprise." Accordingly, *Simpson* is distinguishable.

3       Jackson goes one step further than Yee, identifying particular individuals that he believes the

4  government ought to have attempted to use as an informant before seeking a wire. For example,

5  Jackson suggests that the government should have made more use of one of the target subjects listed in

6  Wire 3, who, as was disclosed in Wire 3, had previously been a source for the FBI from May of 2007 to

7  May of 2008 (herein referred to as Person A). Jackson claims that it is unclear why the government did

8  not attempt to utilize this source in the instant investigation. Jackson Mot. pg. 18, lines 23-24. In fact,

9  Wire 3 sets forth with remarkable clarity why that source was not used:

10

11           [Person A] was opened as a source by FBI for approximately one year
             from May 2007 to May 2008. [Person A] was closed, however, due to

12           being unproductive. I have considered whether to approach [Person A]
             directly in an effort to further advance the instant investigation into the
             commission of the Target Offenses by the Target Subjects and

13           Interceptees. I have decided not to do this, as [Person A] has not
             previously fully demonstrated a willingness as a source to actually provide

14           information. Furthermore, as [Person A]'s conduct is the subject of the
             investigation into the ongoing Target Offenses in this Affidavit, it is too

15           dangerous to the overall investigation to approach [Person A] at this time.

16  Wire 3 (Jackson Mot. Exhibit 18) at pg. 78, lines 18-25.

17       Jackson further suggests that the government ought to have made more use of an individual

18  [herein referred to as Person B] who ███████████████████ and who previously

19  wore a wire for the FBI "to meet with one of the identified Target Subjects and Interceptees in an

20  unrelated matter." Jackson Mot. pg. 19. Jackson's own description, however, abundantly demonstrates

21  why the FBI never used Person B to investigate Jackson and Yee: Person B's previous cooperation was

22  *unrelated* to the instant matter. Jackson also overlooks another critical reason why Person B could not

23  be used to advance the investigation into Jackson and Yee: ███████████████████

24  ████████████████████████████████████████████████

25  ████████████████████████████████████████████████

26  ████████████████████████████████████████████████

27  ██████████. It is even more unreasonable to suggest that the government should have pursued this

28

1  farfetched idea as an investigative technique before seeking a wiretap.

2

    **f.**   **The Government Adequately Demonstrated For Necessity Purposes Why Keith**
3          **Jackson Could Not Be Approached as a Confidential Witness**

4         Jackson argues that the government "should have been required to show why it would be unable

5  to obtain any and all of the information relayed on the telephone intercepts by simply asking Mr.

6  Jackson questions." Jackson Mot. at pg. 18. In fact, the government *did* show why this investigative

7  technique would not work. Specifically, the Wire 3 affidavit explains that

8                 I have also considered using the grand jury to secure the testimony of
               JACKSON, ▮▮▮▮▮▮▮▮▮▮▮▮, who are at this time the
9                 only individuals of whom I am aware who may have sufficient knowledge
               of YEE and ▮▮▮, and their potential associated criminal activities.
10                However, I believe that it is reasonably likely that those individuals would
               invoke their Fifth Amendment testimonial privilege and refuse to testify. I
11                believe it would be unwise to seek immunity for these individuals, because
               immunity would foreclose their prosecution, despite these being the most
12                culpable members of this organization, outside of potentially ▮▮▮▮▮▮▮
               and Senator YEE. Additionally, based on my training and experience, I
13                believe that the service of a grand jury subpoena upon the Target Subjects
               and Interceptees would only alert them to the existence of this
14                investigation, causing them and others to become more cautious in their
               activities, flee to avoid further investigation and prosecution, or otherwise
15                compromise the investigation.

16 Wire 3 Affidavit 85 lines 6-17. Subsequent wires contemplated approaching Jackson outside of the

17 grand jury context as well, but concluded that it would be too risky to do so. *See, e.g.*, Wire 4 Affidavit

18 at pg. 110 (stating that "JACKSON and other Target Subjects and Interceptees are not viable

19 cooperating witnesses at this particular time given their roles in the overall conspiracies and the risk and

20 danger to the undercover investigation from approaching them.")

21        If anything, Jackson's claim that UCEs and informants had "unimpeded access" to him

22 reinforces why a wiretap was necessary in this case. UCEs first met Jackson in 2010, and the first

23 discussion of campaign donations in excess of contribution limits occurred in May of 2011. By

24 November of 2012, despite countless meetings and telephone calls with Jackson, the goals of the

25 investigation were still unaccomplished. Specifically, the Wire 3 Affidavit explains that

26                [W]hile both JACKSON and ▮▮▮▮▮ repeatedly have reassured UCE 4773
               that YEE and ▮▮▮ are made aware of UCE 4773's "bundled" and conduit
27                campaign contributions in excess of the $500 limits, and that they are
               grateful for them, those conversations with YEE and ▮▮▮ do not occur in
28                the presence of UCE 4773. This remains the case even though UCE 4773

1    has been working as an undercover in this investigation for approximately
2    one year.

3    Wire 3 affidavit (Jackson Mot. Exhibit 18) at pg. 73, lines 24-28. Further on, the affidavit explains that

4          [I]t is clear that JACKSON is a part of Senator YEE's inner circle of trust,
           and discusses a wide range of criminal activities with him. For example, as
5          discussed in further detail above, JACKSON appears to frequently speak
           with Senator YEE about criminal activity related to the retirement of his
6          debts and the accumulation of money, and providing consideration to UCE
           4773 in exchange for payments to Senator YEE's campaign. JACKSON
7          has repeatedly assured UCE 4773 that Senator YEE is aware of the nature
           of the manner of receiving the contributions because JACKSON has
8          shared that with Senator YEE and that, therefore, Senator YEE has told
           JACKSON he is grateful to UCE 4773 and willing to provide official acts
9          for UCE 4773….. Target Telephone 1 is JACKSON's primary telephone,
           and based on pen register data, JACKSON appears to use Target
10         Telephone 1 to frequently communicate with the other Target Subjects and
           Interceptees. For example, during the September 21, 2011 meeting
11         between UCE 4773, JACKSON, and Senator YEE, pen data shows that
           JACKSON used Target Telephone 1 to contact ███████ and ██████,
12         an associate of JACKSON who has met with UCE 4773 on numerous
           occasions. Immediately after the October 11, 2011 meeting between UCE
13         4773 and JACKSON, during which UCE 4773 made an unlawful $5,000
           contribution, JACKSON used Target Telephone 1 to contact ██████ and
14         ██████. Immediately following the December 10, 2011, dinner
           between UCE 4773 and JACKSON, during which they discussed
15         redevelopment in San Francisco, JACKSON used Target Telephone 1 to
           contact ███████ and CHOW. On March 1, 2012, before and after
16         JACKSON called UCE 4773 to solicit $10,000 for Mayor LEE, he used
           Target Telephone 1 four times to contact ██████. On April 19, 2012,
17         following a call from JACKSON to UCE 4773 to request $5,000 for
           Mayor LEE, followed by another $5,000 for Mayor LEE, JACKSON used
18         Target Telephone 1 to contact ██████. Senator YEE uses Target
           Telephone 2 to communicate with JACKSON, ██████, and others
19         regarding his solicitations of illegal contributions and his efforts to repay
           those contributions with official action.

20         In addition, on a number of occasions, pen data shows that shortly after
           UCE 4773 and JACKSON spoke over Target Telephone 1 about
21         consideration UCE 4773 expected in exchange for any further contribution
           to Senator YEE, e.g., a letter of recommendation or a phone call to a state
22         agency, there has been contact between Target Telephone 1 and Target
23         Telephone 2, Senator YEE's telephone. That indicates that JACKSON and
           Senator YEE were discussing providing official acts in exchange for UCE
24         4773's money. However, it is necessary to intercept the actual
           conversations between JACKSON and Senator YEE to determine Senator
25         YEE's knowledge of, and involvement in, criminal activity.

26
27   *Id.* at pgs. 74-75.

28
     UNITED STATES' CONSOLIDATED OPP. TO MOT. TO SUPPRESS
     CR-14-0196- CRB

### g.  Shortcomings of Telephone Records, Trash Runs, Mail Covers, and Physical Surveillance

Jackson suggests that the government's description of the shortcomings of several investigative techniques was deficient.  For example, Jackson suggests that the description in the Wire 3 affidavit of the analysis of telephone records "failed to state what information was gleaned from these techniques."  Jackson Mot. pgs. 19-20.  This is not true.  The Wire 3 affidavit plainly explained that agents had obtained "multiple" pen registers and trap and trace devices on target subjects and interceptees, which revealed that there were "communications between Jackson, Yee, and the other Target Subjects and Interceptees."  Wire 3 affidavit (Jackson Mot. Exhibit 18) at pg. 81, lines 8-17.  The Wire 3 affidavit also explained how cell site data had allowed agents to ascertain the approximate whereabouts of particular individuals.  But, the affidavit also explained how pen registers and trap and trace devices did not reveal the content of particular communications.  The affidavit provided a specific example of how telephone records had been used to show multiple telephone calls between Jackson, Yee, and Yee's chief of staff shortly after a call between UCE 4773 and Jackson, but because the content of those calls was unknown, Agent Quinn could only speculate about their significance.  Wire 3 affidavit (Jackson Mot. Exhibit 18) at pg. 61, lines 7-19.  This is precisely the kind of analysis that the Ninth Circuit called for in *United States v. Blackmon*, 273 F.3d 1204, 1210 (9th Cir. 2001).

Jackson's argument regarding the discussion of trash searches in Wire affidavit 3 is particularly specious.  Agent Quinn set forth three specific examples of why trash runs were either not feasible, or had been attempted without any success.  Of particular note, Agent Quinn explained that Yee shredded much of his trash, and that Jackson lived in a multi-unit building with numerous residents sharing trash facilities.  Wire affidavit 3 (Jackson Mot. Exhibit 18) at pg. 82, lines 4-10.

Jackson further takes issue with the discussion in the Wire 3 affidavit regarding mail covers.  Again, though, this section provided tangible, non-boilerplate examples of why mail covers had not worked to achieve all of the goals of the investigation.  *Id.* at pg. 82.  His suggestion that the government should have employed email search warrants is equally unfounded; Agent Quinn explained why he believed search warrants would be unproductive.  Wire affidavit 3 (Jackson Mot. 18) at pgs. 85-86.

1    Finally, Jackson's perfunctory criticism of the physical surveillance section of Agent Quinn's

2    Wire 3 affidavit is unconvincing. Jackson Mot. pg. 21. In particular, Agent Quinn described in great

3    detail some of the limited successes that agents achieved using physical surveillance, such as following

4    one of Yee's family members suspected of receiving illicit payments. Agent Quinn also explained how

5    at least one interceptee wanted to conduct meetings with UCEs in private locations not amenable to

6    physical surveillance, such as offices within San Francisco City Hall. Wire 3 affidavit (Jackson. Mot.

7    Exhibit 18) at pg. 79.

8    ### h.   Wiretaps Were Necessary To Progress The Investigation, Not To Replace UCE 4773

9

10    Jackson argues that the true reason the government sought a wire in November of 2012 was to

11    replace UCE 4773, "its lead investigator, who was removed for misconduct" with a wiretap. Jackson

      Mot. at pg. 21. This is a particularly disingenuous argument for a number of reasons. First, it is
12
      abundantly clear from Wires 4-7 that the government did not, as Jackson intimates, replace UCE 4773
13
      with a wiretap. Rather, as UCE 4773's role diminished, the government replaced UCE 4773 with other
14
      similarly-positioned UCEs and informants, including UCE 4180 and CHS #11. See, e.g., Wire 4
15
      affidavit (Jackson Mot. Exhibit 19) at pg. 107 at lines 6-12 (describing how CHS #11 had taken on an
16
      increased role while internal FBI investigation into UCE 4773's program was pending); Wire 5 affidavit
17
      (Jackson Mot. Exhibit 20) at pg. 87, lines 23-24 ("The importance of CHS #11 has increased
18
      significantly as UCE 4773 was temporarily removed from the investigation due to FBI's ongoing
19
      program review"); *Id.* at pg. 90, lines 21-25 (describing how CHS #11 has worked to introduce UCE
20
      3869 into the role that UCE 4773 had previously assumed); *Id.* at pg. 91, line 10 (noting that UCE 4599
21
      had been used in a more substantial capacity since the withdrawal of UCE 4773). Second, for reasons
22
      discussed above, Jackson's attempts to attacks UCE 4773's credibility are without any factual basis.
23
      ### i.   The Government Complied with Minimization Requirements During the Wiretaps
24
      As explained above, the Court authorized five separate 30-day periods during which the
25
      government was authorized to monitor electronic communications on telephones known to be used by
26
      Yee and/or Jackson. The first period ran from November 14, 2012 through December 13, 2012; the last
27

28
      UNITED STATES' CONSOLIDATED OPP. TO MOT. TO SUPPRESS
      CR-14-0196- CRB

1    period ran from July 2, 2013 through July 31, 2013.  Based on data reported in the government's Fifteen

2    Day Reports submitted to the Court in conjunction with each of the five 30-day periods of wire

3    interceptions, Yee and Jackson make generalized assertions that the government failed to properly

4    minimize telephone conversations monitored pursuant to the Court's Title III authorization.  Yee and

5    Jackson interpret the data in the Fifteen Day Reports as showing that government agents monitoring the

6    conversations on their telephone lines listened to a vast number of conversations that were not pertinent

7    to the investigation authorized by the court.  On that basis, Yee and Jackson argue that the government

8    exceeded its authorization under the Court's Title III order and violated their Fourth Amendment rights,

9    thus warranting suppression of all evidence obtained as a result of the wiretaps.  Yee Mot. at pgs. 22-25;

10   Jackson Mot. at pgs. 22-23.

11          The defendants' motions should be denied.  First, their interpretation of the data in the Fifteen

12   Day Reports is incorrect and their conclusions about what the data shows are simply wrong.  Second, the

13   courts have held that the proper way to evaluate the efforts of government agents to reduce their

14   interception of conversations unrelated to the criminal activity under investigation is not by relying on

15   statistics.  Instead, the district court should examine the procedures actually employed by government

16   agents when they monitored the conversations and any other electronic communications.  The proper

17   test is whether the government took reasonable measures to minimize the interception of conversations

18   unrelated to the criminal investigation, while still pursuing its legitimate investigation.  When the

19   procedures employed by the government in the instant investigation are reviewed and measured by

20   appropriate criteria, they demonstrate that the government acted reasonably and properly carried out the

21   Court's Title III order.  Further, even though statistics are not the benchmark for this analysis, when the

22   relevant data about the surveillance is reviewed and interpreted correctly, it confirms the conclusion that

23   the government monitors acted diligently to minimize listening to conversations unrelated to the

24   activities under investigation.

25          1.   The Minimization Procedures Employed By the Monitors Were Reasonable

26          The procedures utilized here were consistent with those the Ninth Circuit has found to

27   demonstrate proper minimization.  In *United States v. Rivera*, 527 F.3d 891, 904 (9th Cir. 2008) the

28

UNITED STATES' CONSOLIDATED OPP. TO MOT. TO SUPPRESS
CR-14-0196- CRB

1    Ninth Circuit concluded that agents met the requirements of 18 U.S.C. § 2518(5).  In doing so, the Court

2    considered the presence of a number of factors, including:  (1) all monitors were required to read the

3    agent's wiretap affidavit, the court order authorizing the wiretap, and the minimization instructions; (2)

4    the Assistant United States Attorney personally instructed the monitors on the first day of the wiretap;

5    (3) each new monitor was required to read the affidavit, order, and instructions, and confirm by signing

6    the documents; (4) the agent in charge of the monitoring had also been instructed on the minimization

7    provisions; (5) the content of the minimization instructions themselves, which specified the procedures

8    for minimizing and allowed the monitor to listen to a call "for a reasonable time, usually not more than

9    two minutes," in order to determine if it was relevant; (6) the fact that all monitors were told that if they

10   had questions, they could ask the on-site agent or could contact the AUSA or lead case agent, who were

11   available at all times; (7) more seasoned agents were available to answer questions; (8) there was an

12   overlap in shifts so that information could be shared; and (9) the monitors were instructed not to listen to

13   privileged calls, including calls between spouses.  *Rivera,* 527 F.3d at 904-905.

14          The Court's orders in the instant case authorizing the wiretaps listed the statutes under

15   investigation and the names of the individuals who were "Target Subjects and Interceptees," and

16   authorized, among other things, the monitoring of wire communications over specific phone lines.  *See,*

17   Orders Authorizing Interception of Wire Communications and Obtaining of GPS Location Information,

18   Gov. Exhibits 15 through 19.  The orders directed that: "… monitoring of wire communications must

19   terminate immediately when it is determined that the communications are unrelated to communications

20   subject to interception under 18 U.S.C. Chapter 119." *See e.g.,* Exh. 15, p. 9.  Interception was to be

21   terminated "unless it is determined during the portion of the conversation already overheard that the

22   conversation is criminal in nature.  If the communication is minimized, the monitoring agent shall spot

23   check to ensure that the conversation has not turned to criminal matters." *Id.,* pp. 9-10.

24          All agents and staff assigned to monitor the Yee and Jackson telephone lines were required to

25   read the agent affidavit which detailed the investigation; the Court's order authorizing the wiretap; and

26   the minimization instructions prepared for each 30-day period. *See,* Declaration of Maya N. Clark in

27   Support of United States' Consolidated Opposition to Leland Yee's and Keith Jackson's Motions to

28

1   Suppress Wiretap Evidence, or in the Alternative, Demand for *Franks* Hearing, (hereafter "Clark Dec."),

2   Gov. Exhibit 20 at ¶ 4.  At the beginning of each period, the FBI held a session during which an AUSA

3   read the minimization instructions out loud to all agents and other personnel who would be involved in

4   monitoring or assisting with the wiretap.  *Id.*  All attendees were required to sign the minimization

5   instructions.  *Id.*  The reading was recorded on audio and any monitor who was not present for the

6   reading was required to listen to the instructions before engaging in monitoring and sign a copy of the

7   instructions.  *Id.*  A copy of the instructions, affidavit, and court order were also maintained in the

8   wireroom at all times.  *Id.* at ¶ 5.

9        Special Agent Clark, one of the case agents familiar with the investigation, was assigned as the

10  Wireroom Administrative Agent responsible for operational logistics during the five 30-day sessions.

11  Clark Dec., ¶ 4.  Agent Clark was familiar with the Voicebox system used for monitoring the electronic

12  communications, procedures for supervising the wireroom, and the minimization instructions.  *Id.* at

13  ¶ ¶ 2-4.  She ensured that all monitors read the affidavit, order, and instructions, and made efforts to

14  make sure that each monitor was familiar with the facts of the investigation.  *Id.* at ¶ 4.  Throughout each

15  30-day period, SA Clark was either present in the wireroom or available by phone to answer questions.

16  *Id.* at ¶ ¶ 5, 11-12.  She assisted monitors, fielded questions, and observed the operations of the monitors

17  to ensure that proper monitoring and minimization procedures were being followed.  *Id.* at ¶ 12.

18       The minimization instructions themselves provided correct guidance to the monitors for

19  complying with the requirement that they make reasonable efforts not to listen to conversations

20  unrelated to the illegal activity under investigation.  *See,* United States' Instructions, Gov. Exhibits 21

21  through 25.  The instructions stated:  "Minimization requires that the agents make a good faith

22  determination of whether any conversation is relevant to those illegal activities" authorized for

23  investigation by the Court's order.  *See e.g.* Gov. Exhibit 21 at ¶ 4.  The instructions explained and

24  directed that any conversation, or part of conversation, that was listened to (monitored), must be

25  recorded.  Similarly, if the conversation was not being monitored, it would not be recorded.  *Id.* at ¶ 5.

26  The instructions directed:

27                You should listen to the beginning of each conversation for as long as, and
                  only for as long as, it is necessary for you to determine if one of the

28

UNITED STATES' CONSOLIDATED OPP. TO MOT. TO SUPPRESS
CR-14-0196- CRB

persons named above is a participant and the conversation is pertinent to the subjects and activities targeted by the Court Order, but in any case, usually no longer than a few minutes unless the conversation is pertinent, that is, the conversation is within the scope of our authorization and not privileged. Title 18, United States Code, Section 2518(5) requires that interceptions be done 'in such a way as to minimize the interception of communications not otherwise subject to interception.' If you determine that the conversation is not a criminal conversation, or is privileged, stop monitoring and begin minimization. If you determine that the communication is pertinent, you will continue the interception."

Gov. Exhibit 21 at ¶ 9.

The instructions then directed the monitors: "If you determine during the initial few minutes that a conversation does not fall within the categories specified in the Order, that is, it is not pertinent, or that the conversation falls within one of the privileges discussed below, the recording and listening devices must be turned off." Gov. Exhibit 21 at ¶ 10. Finally, the instructions directed that it was possible that while the recording of a non-pertinent conversation was turned off, the conversation could turn to the matters under investigation. *Id.* at ¶ 11. Therefore, the monitor was permitted to spot monitor, that is, check the conversation by activating the monitoring and recording device in order to determine "if the nature of the conversation has changed so that it has become pertinent." *Id.* The monitor was directed to spot monitor only as long as necessary to determine if the conversation had become pertinent. *Id.* The instructions provided that spot monitoring could continue through the conversation. *Id.* *Also see*, Clark Dec. at ¶ 9.

These minimization instructions followed what was lawfully required. Further, by giving the monitors the flexibility to listen to a call for as long as it took to determine whether the call related to the activities under investigation, but usually no more than a few minutes, the instructions took into account the specific facts and circumstances of the investigation, which involved a number of target subjects and interceptees and a variety of offenses, including fraud, public corruption, money laundering, and drugs. "[W]hen the investigation is focusing on what is thought to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise." *Scott*, 436 U.S. at 140. This is because "unlawful conspiracies do not always lay bare their plans in explicit

1    words." *McGuire*, 307 F.3d at 1201.  Further, once monitoring started in this case, agents heard

2    discussions about a wide range of subjects related to campaign fund-raising, and some of those activities

3    were illegal or potentially illegal.  Just two examples are conversations discussing what Yee called "the

4    switcheroo," where he and a failed candidate for ███████████████ appeared to be engaged

5    in a scheme whereby Yee's maxed-out donors would be told to donate to that candidate and *vice versa*;

6    and a scheme heretofore unknown to the government where Yee and Jackson conspired to extort

7    campaign contributions from a member of the California State Athletic Commission in exchange for

8    Yee's favorable vote on legislation affecting the Commission.

9         The minimization instructions also addressed how monitors were to deal with privileged

10   communications, which required monitors to stop interception immediately.  *See e.g.* Exh. 21, at ¶ 18;

11   Clark Dec. at ¶ 10.  Further, procedures were put in place so that calls to and from phone lines known to

12   be associated with Yee's counsel and the woman believed to be Jackson's wife were automatically

13   classified privileged and were not monitored.  Clark Dec. at ¶ 19.

14        Information was posted in the wireroom providing the contact information for Special Agents

15   Ethan Quinn and Jennifer Garlie, the two primary case agents at the time; Agent Clark; the agents' FBI

16   supervisor; the relief supervisor; the Assistant Special Agent in Charge; District Counsel; Assistant

17   District Counsel; the three AUSAs working on the case; and agents and staff who could provide

18   technical support.  Clark Dec. at ¶ 5.  The information included telephone numbers at which all these

19   individuals could be reached twenty-four hours a day / seven days a week.  *Id.*  At almost all times

20   while the lines were being monitored during each period, one of the four case agents – each of whom

21   was knowledgeable about the facts of the investigation -- was present in the wireroom.  *Id.* at 11.

22        For each 30-day period, there were two shifts of monitors covering the hours from approximately

23   7:00 a.m. or 8:00 a.m. to 10:00 p.m. or 11:00 p.m. Clark Dec. at 6.  Sometimes the shifts overlapped, but

24   even when they did not, it was not uncommon for monitors from the first shift to stay long enough to

25   brief second-shift monitors on relevant developments.  *Id.*

26        In sum, the procedures implemented for monitoring Yee's and Jackson's phone lines and

27   minimizing the monitoring of conversations unrelated to the activities under investigation met the

28

1    requirements set out by the Ninth Circuit in *Rivera* and *Torres*, 908 F.2d at 1423, and were reasonable in

2    light of the circumstances of the investigation.

    2.    Accurate Interpretation of Data Regarding the Number of Minimized Conversations
Confirms That the Government Engaged in Reasonable Efforts to Avoid Listening To
Conversations Unrelated to the Criminal Activity Under Investigation

5        Using information in the Fifteen Day Report the government prepared for the Court during

6    each 30-day surveillance period, Yee and Jackson deduce that (1) of the calls monitored by the

7    government, a vast number were unrelated to the investigation, and (2) of that vast number, the

8    government minimized only a small portion.  Yee and Jackson thus conclude that the government failed

9    to fulfill its duty to avoid listening to conversations unrelated to illegal activity.  For instance, Jackson

10   asserts the Reports show that for the relevant periods, the government listened to 8,000 of his calls and

11   only 16% were deemed pertinent, or related to the investigation, and 84% were unrelated to the

12   investigation.  He also asserts that the government only minimized 6% of all the calls it listened to.  *See*,

13   Jackson's Motion to Suppress Wiretap Evidence, at 23.[6]  Yee draws similar conclusions from his

14   interpretation of the information in the Fifteen Day Reports.  He claims the Reports show that 91% of

15   the conversations monitored on Yee's lines were unrelated to the investigation, and the government

16   minimized only 10% of the calls it listened to.  *See*, Yee's Motion to Suppress Wiretap Evidence, at 21-

17   22.  Yee also asserts that "a staggering 80 percent of the calls that the government itself characterized as

18   non-pertinent were not minimized."  *Id.* at 22.  (The government notes that while it can see how Yee

19   arrived at the 91% figure, it has not been able to determine how Yee came up with the latter 80%

20   figure.[7])

21       Jackson's and Yee's conclusions are simply wrong.  In coming to those conclusions, they

22   misunderstand the data in the Fifteen Day Reports and make faulty assumptions.  First, they incorrectly

---

[6] The Fifteen Day Reports are included in Yee's Exhibits at Exhibits H – L.

[7] There are other issues with Yee's analysis.  First, he incorrectly claims that during the fifteen days covered by the April 2013 report for telephone line 3, there were no minimized calls.  *See*, Yee Motion at 22.  In fact, the Fifteen Day report shows there were eighteen minimized calls.  Yee Exh. J at p. 18.  Further, Yee's math is incorrect.  On page 21 of his motion, Yee states that the Reports show that the government intercepted 6,929 of his calls.  However, the figures in his chart for total intercepted calls (which are correct) add up to 6,608, not 6,929.

1  assume that the entry on the Fifteen Day Reports designated "Total Number of Wire Intercepts" means

2  the total number of calls that were actually monitored / listened to.[8]  This is not the case.  The Voicebox

3  system has specific nomenclature for certain data, and in this instance "total number of wire intercepts"

4  means *all* activity detected on a particular phone line for the applicable time period.  Clark Dec. at ¶ 16.

5  That includes incoming and outgoing calls during which conversations took place, but it includes more

6  than that.  *Id.*  It includes missed calls, *i.e.* calls where the phone rang, but there was no answer, and no

7  connection was made to an answering machine; calls where voice mails were left; alerts signaling that

8  the voice mailbox was full; text messages; and calls where there was a technical problem with the phone

9  line and there was no audio and no content.  *Id.*  The term includes activity and conversations that were

10 not monitored because there was no monitor assigned to the line at that time.  *Id.*  The term also includes

11 conversations that were privileged and not monitored.  *Id.*  Thus, the number of conversations that were

12 monitored / listened to is less than the figure for "total number of wire intercepts" section in the Fifteen

13 Day Report.

14      Second, the defendants incorrectly assume that if they simply subtract the number of calls

15 categorized as "pertinent" from the "total number of wire intercepts," the resulting figure is the number

16 of calls listened to and determined to be unrelated to the investigation.  The entries in the Fifteen Day

17 Reports designated "Number of Intercepts Flagged as Pertinent" encompass all telephone conversations

18 that were monitored, reviewed, and ultimately classified by the reviewing agents as pertinent.  Clark

19 Dec. at ¶ 17.  However, as explained above, not all intercepts were monitored.  Therefore, it is incorrect

20 to assume that the difference between "total number of intercepts" and the "number of intercepts flagged

21 as pertinent" yields the number of calls listened to and classified as non-pertinent.  *Id.*  Accordingly,

22 both Jackson's and Yee's conclusions about the number of monitored conversations that were

23 determined to be unrelated to the investigation is incorrect.[9]

24 _____

25 [8] The data that appears in the Fifteen Day Reports is information that the agents obtained by making queries of the Voicebox system employing certain filters and parameters.  That information was passed on to the AUSA for inclusion in the Fifteen Day Reports.  Clark Dec. at ¶ 15.

26

27 [9] Limitations in the Voicebox software and search capabilities limit the ability to search for reliable statistics showing all calls that were monitored and classified by an agent as non-pertinent.  *See*, Declaration of James A. Folger in Support of United States' Consolidated Opposition to Leland Yee's and Keith Jackson's Motions to Suppress Wiretap (hereafter "Folger Dec."), Exh. 26, ¶ 15.

28

1    Third, Yee and Jackson appear to assume that minimization occurred only on conversations that

2  were classified as non-pertinent.  This is also incorrect.  In this context, "minimization," and "number of

3  minimized intercepts" as used in the Fifteen Day reports, mean all telephone conversations that were

4  monitored and at least at one point during the call, the monitor elected to minimize the call.  Clark Dec.

5  at ¶ 18.  In other words, the monitor stopped listening and caused the system to stop recording.  This

6  minimization procedure could take place during calls that were ultimately classified as either pertinent

7  or non-pertinent.  *Id.* at ¶ 14.

8    Thus, the information in the Fifteen Day Reports does not support Jackson's and Yee's

9  assertions that a large percentage of their conversations were unrelated to the investigation and the

10 government failed to minimize when it should have.  To the contrary, when the information in the

11 Reports is interpreted correctly and supplemented with additional data obtained through the Voicebox

12 system, it becomes apparent that monitors reasonably utilized the minimization process in this case.

13    It is worth clarifying at this point that "pertinent" and "non-pertinent" are not terms used in the

14 Title III statute, nor was classifying calls as pertinent or non-pertinent required by the Court's wiretap

15 orders.  The Voicebox system provided the case agents the ability to use this classification feature as a

16 means of organizing evidence for later review by agents, prosecutors, and defense counsel.  Clark Dec.

17 at ¶ 13.  The agents took advantage of this feature and for each conversation monitored, a case agent

18 reviewed the call and classified it as pertinent or non-pertinent to the investigation, or privileged.  *Id.*

19 This was a means of focusing on the conversations and other communications that were believed to have

20 some potential evidentiary value, and setting aside the rest.  Further, it is important to understand that

21 while all calls that were ultimately classified as pertinent were listened to, the same is not true of all calls

22 ultimately classified as non-pertinent.  The latter classification included activity that was not monitored,

23 for instance, calls that came in when there was no monitor present to listen.  Folger Dec., Exh. 26, at

24 ¶ 21.

25    In order to assist the Court and the defendants in understanding how the minimization process

26 worked in this case, SA James Folger, one of the case agents, recently ran searches of the Voicebox

27 system using specified parameters and filters.  The results appear in the charts titled "Keith Jackson

28

1   Wiretaps" and "Leland Yee Wiretaps," filed separately as Gov. Exhibits 27 and 28.  In his Declaration,

2   SA Folger explains the entries in the chart.  Exh. 26, at ¶¶ 6-21.

3          Both charts follow the same pattern.  The three entries labeled "Total Number of Intercepted

4   Calls," "Pertinent Calls," and "Minimized Calls," track the same data that Yee and Jackson pulled from

5   the Fifteen Day Reports and include in their motions as the basis for their conclusions.[10]  As explained

6   above, "intercepted calls" does not mean all monitored conversations.  *Also see*, Folger Dec., at ¶ 7.  For

7   instance, for the first period of surveillance on Jackson's phone, the total number of monitored

8   conversations is something less than 1,897.  *See*, Gov. Exhibit 27.  At the very least, one would have to

9   deduct the number of SMS messages (texts), privileged calls, and calls with no audio/content.  Referring

10  to the information on the first column of SA Folger's chart, the total interceptions in those three

11  categories add up to 832.  *Id.*  When those 832 interceptions are subtracted from the total of 1,897, that

12  leaves 1,074 interceptions.  At most, then, 1,074 conversations were monitored.  However, due to other

13  variables, even this is not a certain figure for all monitored conversations.

14         More important is the analysis in the bottom two-thirds of each chart, which addresses all calls

15  (conversations and text messages) that were longer than two minutes in length.  This is critical because it

16  is not necessary or practical to minimize short calls, and the courts have adopted this view.  *See e.g.*,

17  *United States v. Homick*, 964 F.2d 899, 903 (9th Cir. 1992)("Because many telephone calls are brief in

18  duration, a listener frequently cannot determine a particular call's relevance to the investigation before

19  the call is completed.");  *United States v. Dumes*, 313 F.3d 372, 380 (7th Cir. 2002)("We certainly agree

20  that minimization of short calls is not required.");  United States v. Capra, 501 F.2d 267, 275-76 (2d Cir.

21  1974)(calls lasting less than two minutes need not be minimized).  As reflected in SA Folger's charts,

22  the vast majority of calls on Yee's and Jackson's phones were shorter than two minutes.  *See*, Gov.

23  Exhibits 27 and 28 (compare "Calls Longer Than Two Minutes" with "Total Number of Intercepted

24  Calls").  That alone explains why the total number of minimized calls for each session was not large.

25         Taking the analysis a step further, the data on the Folger charts undermines Yee's and Jackson's

26

27  _____

28  [10] At Paragraph 6 of his Declaration, SA Folger explains some minor discrepancies that are not material to the present issues.  *See*, Exh. 26.

UNITED STATES' CONSOLIDATED OPP. TO MOT. TO SUPPRESS
CR-14-0196- CRB

1  claim that the government completely ignored its duty to take reasonable steps to minimize, or reduce

2  the interception of calls determined to be non-pertinent, or unrelated to the investigation.  In order to

3  properly address that claim, one must focus on calls longer than the several minutes it took to determine

4  whether a call was pertinent or non-pertinent.  For purposes of the present argument, the Folger analysis

5  uses the two-minute mark, but it could have been longer in this case given the complexity of the matters

6  under investigation.  For both Jackson and Yee, the figures highlighted in yellow in the Folger charts are

7  instructive.  For instance, in the first period of interception on Jackson's phone, monitors minimized

8  38.86% of calls longer than two minutes.  Gov. Exhibit 27.  That is not an insignificant percentage.

9  Further refining the analysis, monitors minimized 69.14% of calls longer than two minutes that were

10  ultimately determined to be non-pertinent.  *Id.*  For all of the Jackson interceptions, monitors minimized

11  42.94% of such calls.  *Id.*  There are similar results for the data on the Yee interceptions.  Gov. Exhibit

12  28.  For all of the Yee interceptions, monitors minimized 41.92% of calls longer than two minutes that

13  were ultimately determined to be non-pertinent.

14  Again, these are not insignificant figures.  They demonstrate that monitors were actively

15  engaging in minimization and were doing so at a rate that was reasonable in light of the specific

16  circumstances of the instant investigation, which involved a wide range of relatively complex illegal

17  activities.

18  Yee's citation to session 2101, a call to Yee by a friend on December 4, 2012, as an example of

19  the government's failure to minimize non-pertinent calls is unpersuasive.  In fact, the informal transcript

20  of the call, or linesheet, a full copy of which is provided in the United States' exhibits at Gov. Exhibit

21  29, shows that the monitors minimized the call six separate times during the call.  *See*, Gov. Exhibit 29,

22  at US-808382, chart at end of call labeled "Minimization Event."  In other words, the monitor listened,

23  minimized, spot-checked, minimized, etc. throughout the call.  At one point when the monitor spot-

24  checked, Yee and the friend were talking about the fact that Yee was running for Secretary of State and

25  raising campaign funds.  *Id.* at US-808380 – US-808381.  That conversation was related to the matters

26  under investigation.  When the conversation turned away from that topic and became more personal, the

27  monitor minimized again.  *Id.* at US-808382.

28

UNITED STATES' CONSOLIDATED OPP. TO MOT. TO SUPPRESS
CR-14-0196- CRB

1    Session 3295, a call on April 7, 2013 by Yee to an unidentified female while Yee was at the

2    airport, is similarly unhelpful to Yee's argument.  The linesheets for that call and the relevant follow-up

3    calls are provided in the United States' exhibits at Exhibit 30.  The first call, session 3295, lasted

4    approximately seven minutes.  *See*, Exh. 30, page US-808785, time stamps.  The monitor listening to

5    call 3295 reasonably did not minimize the call because the call started with the woman talking about

6    Yee's help in connection with a liquor license she was trying to obtain.  She explained difficulties and

7    Yee responded, "so it's a good thing that I didn't touch anything, huh?"  *Id.* at US-808785.  The woman

8    said "…I am talking about the liquor license.  No, it is not good that you didn't touch it."  *Id.*  In light of

9    the fact that in connection with this and the preceding wiretaps, the government was investigating

10   potential corruption by Yee, especially in relation to his performance of official acts in exchange for

11   money, it was reasonable to listen to and not minimize this part of the conversation.  The same holds

12   true for the next part of the conversation, where it is difficult to understand what Yee and the woman

13   were discussing.  *Id.* at US-808786.  Then the conversation turned to Yee's run for Secretary of State

14   and fund-raising and the call ended shortly thereafter.  *Id.* at US-808786 – US-808787.  Those topics

15   clearly fell within the parameters of the investigation and it was reasonable not to minimize.  The two

16   calls between Yee and the woman that followed immediately after were also monitored reasonably.  Call

17   3296, which took place within minutes of the previous call, only lasted one minute and was not

18   minimized because it was so short.  *Id.* at US-808787.  The next call, session 3297, two hours later, was

19   approximately four minutes in length and was minimized two minutes in (at 09:03:31), was spot-

20   checked, and then minimized again at 09:04:24.  *Id.* at US-808788.  This procedure confirms the

21   reasonableness of the monitor's actions and the fact that minimization was taking place when it should.

22       Finally, Yee's argument that the majority of calls designated by the government as "pertinent"

23   had nothing to do with the investigation is untenable.  In support of this claim, Yee asserts that the

24   majority of the calls labeled pertinent by the government intercepted during the first session dealt with

25   non-pertinent subjects such as fund-raising, campaign donations, and initiation of Yee's run for

26   Secretary of State.  *See*, Yee Motion, at p 24.  In arguing that these topics had nothing to do with the

27   Target Offense cited in the Court's order authorizing the wiretap, Yee completely ignores the fact that

28

UNITED STATES' CONSOLIDATED OPP. TO MOT. TO SUPPRESS
CR-14-0196- CRB

1  honest services fraud (18 U.S.C. § 1346) was included in the Court's Orders and the Affidavits that

2  formed the basis for the Court's order dealt extensively with evidence of Yee's and Jackson's schemes

3  to exchange official acts for donations to Yee's campaigns. *See e.g.*, Exh. 15, at p. 2.

4        In any event, contrary to Yee's and Jackson's assertions, the Ninth Circuit has not expressly held

5  that suppression of all the fruits of a wiretap is required when the government has failed to fulfill its duty

6  to minimize. In *United States v. Cox*, 462 F.2d 1293, 1299-1302 (9th Cir. 1972), the Ninth Circuit

7  rejected the defendants' argument that claim that the government failed to properly minimize the

8  interception of telephone conversations. In so holding, the Court stated: ""'Furthermore, even if the

9  surveillance in this case did reflect a failure to minimize, it would not follow that Congress intended that

10  as a consequence all the evidence obtained should be suppressed." *Id.* at 1301. Referring to the Title III

11  provisions, the Court added: "Clearly Congress did not intend that evidence directly within the ambit of

12  a lawful order should be suppressed because the officers, while awaiting the incriminating evidence, also

13  gathered extraneous conversations." *Id.* Thus, while the intercepted conversations beyond the scope of

14  the court's surveillance authorization could be suppressed, those "the warrant contemplated overhearing

15  would be admitted." *Id.* Accordingly, suppression of all wiretap evidence for failure to minimize is far

16  from a foregone conclusion, and the Ninth Circuit cases cited by Yee and Jackson do not hold otherwise.

17  Specifically, *United States v. Scully*, 546 F.2d 255, 262 (9th Cir. 1976), *vacated on other grounds, U.S. v.*

18  *Cabral*, 430 U.S. 902 (1977), relied upon by Yee, expresses a view of the appropriate remedy.

19  However, that statement was dicta, was not essential to the issue being decided, did nothing to

20  undermine *Cox*. Similarly, in *United States v. Turner*, 528 F.2d 143, 156 (9th Cir. 1975), cited by

21  Jackson, the Court merely described the different positions of the parties as to the correct remedy. The

22  Court specifically stated that it did not need to reach that issue because it found that the government

23  complied with the minimization requirement. *Id.*

24        In sum, in connection with the Yee and Jackson wiretaps, the government adopted reasonable

25  measures to reduce to a practical minimum the interception of conversations unrelated to the criminal

26  activity under investigation, while still going about the investigation authorized by the Court. Contrary

27  to the assertions of the defendants, the statistics relating to the minimization procedures confirm the

28

UNITED STATES' CONSOLIDATED OPP. TO MOT. TO SUPPRESS
CR-14-0196- CRB

1  reasonableness of the government's efforts.  As such, the government has met its burden of establishing

2  a *prima facie* case of compliance with the minimization requirement and Yee's and Jackson's motions to

3  suppress all intercepts should be denied.

4  **V.    CONCLUSION**

5      When Jackson's and Yee's attacks on the wiretaps are taken apart and analyzed carefully, it

6  becomes clear that there are many allegations, but no substance.  The wiretap applications in this case

7  were detailed and dense for a very good reason: the government wanted to the Court to know all the

8  facts, whether favorable, unfavorable, or neutral, so that the Court could make a fully informed decision

9  as to probable cause and necessity.  Further, the government did not want any evidence obtained through

10  the wiretaps to be suppressed down the line.  Accordingly, and as amply demonstrated above, the agents

11  who provided affidavits to the Court were thorough and accurate.  Despite Jackson's attempts to suggest

12  otherwise, the original Quinn Affidavit and those that followed contained no material misstatements or

13  omissions.  There are no material matters at issue and as such, Jackson has failed entirely in meeting the

14  burden required for an evidentiary hearing under *Franks*.

15      Given the overwhelming evidence reported in the wiretap applications establishing probable

16  cause to believe that the target offenses, including honest services fraud, were being committed,

17  Jackson's and Yee's attempts to suppress the wiretap evidence for lack of probable cause also fail.

18      Similarly, as discussed in detail above, the government more than met the requirements of

19  necessity in obtaining the wiretaps.

20      Finally, in establishing and carrying out reasonable procedures to minimize the interception of

21  conversations and other communications unrelated to the illegal activities under investigation, as

22  confirmed by the record of active minimization in which the monitors engaged, the government fully

23  complied with the Court's minimization requirements.

24      For all these reasons, Yee's and Jackson's motions to suppress the evidence obtained as the

25  ///

26  ///

27  ///

28

1   result of the wiretaps should be denied.

2

3                                         Very truly yours,

4                                         MELINDA HAAG
                                          United States Attorney
5

6                                         WILLIAM FRENTZEN
                                          SUSAN BADGER
7                                         S. WAQAR HASIB
                                          Assistant United States Attorneys.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES' CONSOLIDATED OPP. TO MOT. TO SUPPRESS
CR-14-0196- CRB