# EXHIBIT 20

# (To be filed under seal)

Government's Exhibit

MELINDA HAAG (CABN 132612)
United States Attorney

DAVID R. CALLAWAY (CABN 121782)
Chief, Criminal Division

WILLIAM FRENTZEN (LABN 24421)
SUSAN E. BADGER (CABN 124365)
S. WAQAR HASIB (CABN 234818)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    William.Frentzen@usdoj.gov
    Susan.Badger@usdoj.gov
    Waqar.Hasib@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 14-0196 CRB |
| Plaintiff, | |
| v. | DECLARATION OF MAYA N. CLARK IN SUPPORT OF UNITED STATES' CONSOLIDATED OPPOSITION TO LELAND YEE'S AND KEITH JACKSON'S MOTIONS TO SUPPRESS WIRETAP EVIDENCE, OR IN THE ALTERNATIVE, DEMAND FOR *FRANKS* HEARING |
| KWOK CHEUNG CHOW, et al., | |
| Defendants. | |
| | Date: July 7, 2015 |
| | Time: 9:30 a.m. |
| | Court: Hon. Charles R. Breyer |
| | **UNDER SEAL** |

I, Maya N. Clark, Special Agent with the Federal Bureau of Investigation, declare as follows:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since September 2011. I am currently assigned to the San Francisco Division's Public Corruption Squad, and am one of the agents assigned to the investigation of defendants Leland Yee, Keith Jackson, and others. During my employment with the FBI, I

DECLARATION OF MAYA N. CLARK
CR 14-0196 CRB           1

have received formal classroom and field training at the FBI Academy in Quantico, Virginia. My training and experience includes, but is not limited to, white collar fraud, public corruption, organized crime, and identity theft. I have also received additional formal and on-the-job training from the FBI, as well as from the United States Attorney's Office and other federal agents who have done extensive work in the areas of financial crimes and public corruption. Prior to joining the FBI, I was an Assistant Commonwealth's Attorney in Chesterfield County, Virginia. In that capacity, I prosecuted hundreds of cases and was responsible for the legal training of local police, sheriff, and fire personnel. In the course of my employment as a federal law enforcement officer, I have participated in several investigations involving fraud, bribery, and identity theft.

2. During my training at the FBI Academy in Quantico, I received technical training in the use of Voicebox, the system employed to intercept electronic communications authorized by the court under Title III. I have also received training from Voicebox in the use of the system. I received legal training at Quantico on Title III electronic communications interception. While assigned to the Richmond, Virginia FBI Division, I participated in monitoring Title III interceptions for a total of approximately 32 hours. I also participated in monitoring Title III interceptions during an investigation conducted by another squad in the San Francisco Division.

3. There were five different 30-day periods during which the district court authorized the interception of electronic communications over telephones known to be used by Leland Yee and/or Keith Jackson. I was assigned the position of Wireroom Administrative Agent for each of the 30-day periods. In addition to the training and experience described above, I consulted with my supervisor and with other Wireroom Administrative Agents on the protocols and procedures for supervising the wireroom operations.

4. As the Wireroom Administrative Agent for the instant wiretap authorizations, I was responsible for operational logistics. Both agents and support staff monitored, that is, listened to, electronic communications. I was responsible for making sure that all shifts were adequately staffed. In the case of monitoring by support staff, an agent was required to be

1  present in the wireroom at all times. As Wireroom Administrative Agent, I was also
2  responsible for making sure that the minimization requirements were met by the monitoring
3  agents and staff. For each of the each 30-day interception periods authorized by the court,
4  one of the three Assistant United States Attorneys assigned to the investigation (AUSA
5  William Frentzen, AUSA Susan Badger, AUSA Waqar Hasib) prepared written minimization
6  instructions that were to be followed by the agents. At the beginning of each 30-day period
7  of interception, the FBI held a session during which one of the three AUSAs read the
8  minimization instructions out loud to all the personnel, including monitoring agents, who
9  were going to be involved in the interception process. The reading of the instructions was
10 recorded on audio. The AUSA and one or more of the case agents assigned to the
11 investigation were available to answer questions during the briefing session. I was
12 responsible for ensuring that personnel, including all agents and staff assigned to monitor the
13 wire, attended the briefing sessions. Each attendee was required to sign the minimization
14 instructions. In addition, each monitor was required to read the affidavit in support of the
15 wiretap application that was submitted to the court and the court's order authorizing the
16 wiretap. I also ensured that any monitor that did not attend the briefing session listened to
17 the recording of the reading of the minimization instructions; read the minimization
18 instructions, affidavit, and order; and signed the instructions. In addition to the above, in my
19 capacity as Wireroom Administrative Agent, I made efforts to ensure that each monitor had
20 case-based knowledge and was sufficiently familiar with the facts of the investigation in
21 order to assess whether a call was related to the investigation or not, and thus to carry out the
22 minimization instructions.

23  5. The wireroom in which the interceptions were monitored is a secure room in the San
24 Francisco Division. In the wireroom, information was posted that included the names and
25 contact information for SA Ethan Quinn and SA Jennifer Garlie, the case agents most
26 familiar with the investigation; our squad's Supervisory Special Agent; our squad's Relief
27 Supervisory Special Agent; the Assistant Special Agent in Charge; District Counsel;
28 Assistant District Counsel; AUSAs Frentzen, Badger, and Hasib; and agents and staff who

could provide technical assistance. The information included telephone numbers at which each of these individuals and I could be reached 24/7. A copy of the Affidavit and Application for the Title III authorization, the court's order, and the minimization instructions was always available in the wireroom.

6. For each of the five 30-day sessions, the wireroom had two shifts of monitoring agents. The wires were not monitored 24 hours a day. The times and lengths of shifts varied among the sessions based on data received through pen registers that showed when calls were being made and on personnel and resource limitations. The shifts were as generally as follows, with variations on a day-to-day basis. During the first two 30-day sessions, there were two shifts: from 7:00 a.m. to 3:00 p.m. and from 2:00 p.m. to 10:00 p.m. During the third 30-day session, there were two shifts: from 8:00 a.m. to 4:00 p.m. and from 4:00 p.m. to midnight. For the fourth and fifth 30-day sessions, there were two shifts: from 7:00 a.m. to 3:00 p.m. and from 3:00 p.m. to 11:00 p.m. Even though some of these shifts did not technically overlap, it was not uncommon for monitors from the first shift to stay long enough to brief monitors on the new shift if there was relevant information to impart.

7. The Voicebox system used to monitor calls pursuant to the court's Title III authorization is a computer-based system. Activity on the subject telephone lines included incoming and outgoing telephone calls during which conversations took place; calls that resulted in a voice mail message being left; calls where the phone rang, but there was no answer, either by a person or an answering machine; and text messages.

8. For each shift, one monitor was assigned to monitor one subject, *i.e.* Leland Yee or Keith Jackson, for the entire shift. When activity took place on the line, the computer would alert the monitor, and the monitor would start listening. This is referred to as "live monitoring." If live monitoring was taking place, the Voicebox system would make a recording of the activity. If the activity being live monitored was a conversation, the conversation would be recorded. As noted above, the phone lines were not monitored 24 hours a day. During the periods of time when the phone line was not monitored, the activity, including any conversations taking place, were not recorded. If at any point, the monitor stopped listening

to a conversation, that is, the monitor "minimized" the call, the system would simultaneously stop recording the conversation. In sum, when conversations or other activities were not being listened to, they were not being recorded. There is no back-up recording of those conversations that can be listened to after the fact.

9. The minimization instructions for the five 30-day interceptions of lines used by Leland Yee and Keith Jackson instructed the monitors that for each conversation they monitored, they were required to make a good faith determination whether the conversation was relevant to the illegal activities cited in the minimization instructions. Those illegal activities are the criminal violations that were cited in the Application and Affidavit for the Title III surveillance and in the court's order authorizing the Title III surveillance. The monitor was instructed to listen to the beginning of each conversation for as long as, and only for as long as, it was necessary for the monitor to determine if one of the persons named in the order was a participant and the conversation was pertinent to the subjects and activities cited in the court's order. The monitors were instructed to listen to the conversation usually for no more than "a few minutes," unless they determined that the conversation was pertinent. The monitors were instructed that the law requires that interception be done "in such a way as to minimize the interception of communications not otherwise subject to interception." They were told: "If you determine that the conversation is not a criminal conversation, or is privileged, stop monitoring and begin minimization. If you determine the conversation is pertinent, you will continue the interception." Monitors were instructed that if they determined that a conversation was not pertinent, that is, did not fall within the categories described in the court's order, and stopped listening, they were permitted to spot monitor the non-pertinent conversation periodically in order to determine whether the conversation has become pertinent. The monitors were instructed to "[l]isten, observe, and record for a brief period, only as long as is necessary to determine whether the conversation has become pertinent." If the conversation became pertinent, the monitor was permitted to continue listening. If a non-pertinent conversation was intercepted, then the monitor was required to stop listening / minimize again.

10. The monitors were instructed not to listen to calls that could be privileged, including any calls between Leland Yee and his wife, Maxine Yee, or between Keith Jackson and a woman named Pam Gilmore. We thought at the time that Pam Gilmore might be Keith Jackson's wife, but we had not been able to verify that information.

11. At almost all times while the telephone lines were being monitored, either I, SA Ethan Quinn, SA Jennifer Garlie, or SA James Folger was present in the wireroom. We were the four agents assigned to work the investigation and were most knowledgeable of the facts.

12. During my assignment as the Wireroom Administrative Agent for each of the five 30-day intercepts, I was present for as many shifts as possible. I assisted monitors, answered questions, and observed the operations of the monitors. To the best of my knowledge, the monitors followed the minimization instructions and used their best judgment to minimize non-pertinent conversations.

13. The Voicebox system allows the monitor to classify a conversation as pertinent or non-pertinent. While this was not required by the court's order or the minimization instructions, a decision was made to classify calls in this manner as a way of organizing the data for later review by agents, prosecutors, and defense counsel. In some instances, but not all, the monitor listening to the conversation classified the conversation as pertinent or non-pertinent. Such classifications by monitors was preliminary. Each conversation was subsequently reviewed by SA Quinn, SA Garlie, SA Folger, or me. Because we were the most familiar with the case, we would make the final classification of pertinent or non-pertinent. We used the criteria in the court's order and our knowledge of the investigation to make the pertinent / non-pertinent classification.

14. The minimization procedure could take place during calls that were ultimately classified as either pertinent or non-pertinent.

15. In order for government counsel to prepare and submit the Fifteen Day Report to the court during each 30-day period, I or one of the other case agents provided counsel with data about the first fifteen days of each period. That data is reflected in the charts that appear in the Fifteen Day Reports submitted to the court. We either obtained the data from tech agents

DECLARATION OF MAYA N. CLARK
CR 14-0196 CRB                                    6

who queried the Voicebox software, or we ran the searches ourselves and obtained the data.

16. Based my work with the Voicebox system over the course of authorized monitoring of the Leland Yee and Keith Jackson phone lines, I am familiar with the meaning of the terms used in the charts in the Fifteen Day Reports. For the entry designated "Total number of intercepts," that term means all activity detected on that particular phone line for the applicable time period. It includes incoming and outgoing calls during which conversations took place, but it includes more than that. It includes missed calls, i.e. calls where the phone rang, but there was no answer, and no connection to an answering machine; calls where voice mails were left; alerts signaling that the voice mailbox was full; text messages; and calls where there was a technical problem with the phone line and there was no audio and no content. The term does not mean all activity that was monitored. The term includes activity when there was no monitor assigned to monitor the line.

17. The term in the Fifteen Day Report called "number of intercepts flagged as pertinent," means all telephone conversations that were monitored and ultimately classified by the reviewing agents as pertinent. For the reasons explained in paragraph 16 above, it is not correct that "total number of intercepts" minus "number of intercepts flagged as pertinent" yields the number of conversations monitored and classified as non-pertinent.

18. The term called "number of minimized intercepts" means all telephone conversations that were monitored and at least one point during the call, it was user-minimized. In other words, the monitor stopped listening and caused the system to stop recording. A single call could contain a number of such pauses or minimization periods. Each time that happened, the system would record the time that recording stopped and if applicable, the time that recording started again.

19. At all times, if there was a concern that the call could be privileged, it was minimized. In some instances, the Voicebox system was programmed to automatically minimize calls associated with numbers that could involve privileged conversations. That meant that the call was not monitored at all. For instance, starting two weeks into the first 30-day period of interceptions, and continuing from then on, calls between Leland Yee and the number

associated with the Sutton Law Firm were automatically minimized. The same procedures were put in place after the first 30-day period with numbers associated with Pam Gilmore. During the first 30-day period, monitors minimized any calls Jackson and Gilmore. The same was true of any calls between Yee and the Sutton Law firm during the first two weeks of interceptions. We were aware of a cell phone number associated with Maxine Yee, but it was used so infrequently in connection with calls with Leland Yee that automatic minimization was not set up. Monitors user-minimized any such conversations. All such activity was classified as privileged.

20. During the court-authorized wiretaps on the telephone line used by Keith Jackson, some number of monitored calls were between Jackson and one of the FBI undercover agents or the Confidential Human Source. The same is true of some portion of calls on the cell telephone line used by Leland Yee. Those calls were consensual by one party to the call.

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

DATE: April 15, 2015                    _____
                                        MAYA N. CLARK

# EXHIBIT 26

# (To be filed under seal)

Government's Exhibit

MELINDA HAAG (CABN 132612)
United States Attorney

DAVID R. CALLAWAY (CABN 121782)
Chief, Criminal Division

WILLIAM FRENTZEN (LABN 24421)
SUSAN E. BADGER (CABN 124365)
S. WAQAR HASIB (CABN 234818)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    William.Frentzen@usdoj.gov
    Susan.Badger@usdoj.gov
    Waqar.Hasib@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>KWOK CHEUNG CHOW, et al.,<br><br>    Defendants. | No. CR 14-0196 CRB<br><br>DECLARATION OF JAMES A. FOLGER IN SUPPORT OF UNITED STATES' CONSOLIDATED OPPOSITION TO LELAND YEE'S AND KEITH JACKSON'S MOTIONS TO SUPPRESS WIRETAP EVIDENCE, OR IN THE ALTERNATIVE, DEMAND FOR *FRANKS* HEARING<br><br>Date:  July 7, 2015<br>Time:  9:30 a.m.<br>Court:  Hon. Charles R. Breyer<br><br>**UNDER SEAL** |

I, James A. Folger, Special Agent with the Federal Bureau of Investigation, declare as follows:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since August 2012. I have been assigned to the San Francisco Field Division since January 2013. Currently, I am assigned to the Civil Rights / Public Corruption Squad, which investigates abuse of public office in violation of criminal law, to include fraud, bribery,

DECLARATION OF JAMES A. FOLGER
CR 14-0196 CRB         1

extortion, conflicts of interest, and embezzlement. I am one of the case agents assigned to the investigation of Leland Yee, Keith Jackson, and others. I have attended and successfully completed formal classroom and field training at the FBI Academy's Basic Agent Training in Quantico, Virginia where I received twenty-one weeks of instruction in federal law, court procedure, and investigative techniques. I have also received additional formal and on-the-job training from the FBI, as well as from the United States Attorney's Office and other federal agents who have done extensive work in the areas of financial crimes and public corruption. In the course of my employment as a federal law enforcement officer, I have participated in investigations involving public corruption, civil rights, narcotics trafficking, and a number of other federal violations. Before joining the FBI, I received a Juris Doctor and Master of Business Administration degrees from the University of San Francisco.

2. During my training at the FBI Academy in Quantico, I received legal training on Title III electronic communications interception and technical training in the use of Voicebox, the system employed to intercept electronic communications authorized by the court under Title III.

3. I participated in monitoring the electronic communications on telephone lines used by Leland Yee and Keith Jackson, reviewing communications, and classifying them as pertinent or non-pertinent. This included monitoring and reviewing intercepted telephone conversations. Prior to participating in a 30-day surveillance period, I read the agent's affidavit, the court's order authorizing the Title III interceptions, and the minimization instructions. I either attended the session when the AUSA read the minimization instructions out loud, or I listened to the audio of the reading of the instructions.

4. At almost all times while the telephone lines were being monitored, either I, SA Ethan Quinn, SA Jennifer Garlie, or SA Maya Clark was present in the wireroom. We were the four agents assigned to work the investigation and were most knowledgeable of the facts.

5. Through my training and experience, I am familiar with the Voicebox system that was used to monitor the Title III surveillance. Voicebox is a computer-based system through which

authorized individuals can monitor electronic communications including telephone conversations. The Voicebox system also records data pertaining to interceptions. Some data is user-entered. For example, users can classify monitored conversations as "pertinent" or "non-pertinent."

6. Voicebox collects and stores data about the Title III surveillance while the surveillance is ongoing. I know from experience working with Voicebox that searches can be conducted of the data by entering certain criteria or using specific filters to collect the data. At the request of Assistant United States Attorney Susan Badger, I recently ran searches of the Voicebox data on the Title III surveillances of the lines utilized by Leland Yee and Keith Jackson. I ran searches for each of the fifteen-day periods that correspond to the periods reported in the government's Fifteen Day reports submitted to the Court. The results of those searches are contained in two charts, one entitled "Keith Jackson Wiretaps," and the other entitled "Leland Yee Wiretaps." It should be noted that there are occasional discrepancies between the numbers in the attached charts and what was reported to the Court in the Fifteeen Day Reports. This is due to the fact that the when the numbers for the Fifteen Day Reports were collected, they were collected part-way through the last day of the period instead of at the end of the day. The numbers in the attached chart include the entire day's-worth of interception. Also, the Fifteen Day Report filed on May 24, 2013 stated that it provided numbers from May 10, 2013 through May 20, 2013; however, when I double-checked, I determined that the reported numbers actually ran through May 22, 2013. For the attached charts the numbers are through May 22, 2013.

7. The line "intercepted calls" reflects the number of electronic sessions that Voicebox recognizes as activity on the target telephone line. This includes conversations, both monitored and not-monitored. It also includes text messages, voice mails, calls that are not answered, and calls that result in no-audio / no-content because of some technical difficulty.

8. When a monitored call (e.g. conversation, text message, or voice mail) was reviewed by a reviewing agent, the agent could classify it as "pertinent" or "non-pertinent." It could also be classified as other things, such as "privileged," or "no-audio/no-content." If classified as

"pertinent," Voicebox would record that information. The data on the "pertinent calls" line of the charts reflects all monitored calls that were classified as "pertinent."

9. Voicebox also makes a record of each call that was monitored and at least once in the conversation, the monitor minimized, that is, stopped listening to and stopped recording the conversation. The number of calls during which that took place is reflected in the line in the chart labeled "minimized calls."

10. Voicebox makes a record of all communications that were text messages. That is the entry in the chart labeled "SMS Messages."

11. The minimization instructions provided instructions and criteria for calls that should be considered privileged. Some privileged calls, e.g. calls known to be between Keith Jackson and Pam Gilmore's number, were not even monitored. On the other hand, sometimes calls would be monitored for a brief period of time before the monitor determined that the call was privileged. At that point, monitoring would be minimized and the call marked as privileged. The calls classified as privileged appear on the line in the chart labeled "privileged calls."

12. On occasion, there was activity detected by Voicebox on the target phone line, but which had no audio / no content. The number of those occasions appears in the charts on the line labeled "no audio / no content."

13. The line in the charts labeled "Calls Longer than 2 Minutes" is all intercepted calls, i.e. all activity longer than two minutes in length.

14. The line in the chart labeled "Calls Longer than 2 Minutes and Non-Pertinent" is all calls in Voicebox classified as "non-pertinent" and longer than two minutes in length. This number can include calls that were not monitored.

15. There is no reliable filter or search capability on Voicebox that enables a search to determine the subset of calls classified as non-pertinent that were also monitored.

16. The line on the charts labeled "Calls Longer That 2 Minutes and Pertinent" is the number of calls that were monitored, classified as pertinent, and longer than two minutes in length.

17. The line on the chart labeled "Calls Longer Than 2 Minutes and Minimized" is the number of calls that were monitored, minimized by the monitor at least once during the call, classified

as pertinent, and longer than two minutes in length.

18. The line on the chart labeled "Calls Longer Than 2 Minutes, Minimized, and Non-Pertinent" is the number of calls that were monitored, minimized at least once during the call, classified as non-pertinent, and longer than two minutes in length.

19. In order to obtain the information in the line marked "Percentage of Calls Longer Than 2 Minutes and Minimized," I divided "Calls Longer than Two Minutes and Minimized" by "Calls Longer Than Two Minutes."

20. In order to obtain the information in the line marked "Percentage of Calls Longer Than 2 Minutes, Non-Pertinent, and Minimized," I divided "Calls Longer than Two Minutes, Minimized, and Non-Pertinent" by the "Calls Longer Than 2 Minutes and Non-Pertinent."

21. If a call was classified as "pertinent," that means that it was monitored and classified. However, not all calls classified as "non-pertinent" were monitored. That classification included activity that was not monitored, for example, calls that came in when there was no monitor present and the call was therefore not recorded.

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

DATE: April 16, 2015           _James A. Folger_
                                JAMES A. FOLGER