BRIAN J. STRETCH (CABN 163973)
Acting United States Attorney

DAVID R. CALLAWAY (CABN 121782)
Chief, Criminal Division

WILLIAM FRENTZEN (LABN 24421)
SUSAN E. BADGER (CABN 124365)
S. WAQAR HASIB (CABN 234818)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    William.Fentzen@usdoj.gov
    Susan,Badger@usdoj.gov
    Waqar.Hasib@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.:  CR 14-0196 CRB |
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM |
| v. | |
| LELAND YEE, | Date:  February 24, 2016 |
| Defendant. | Time:  10:00 a.m. |
| | Court:  Hon. Charles R. Breyer |

1

## TABLE OF CONTENTS

2  INTRODUCTION ...................................................................................................................1

3  DISCUSSION .......................................................................................................................1

4      A.     Offense Conduct ....................................................................................1

5           1.     Bribery Schemes / Honest Services Fraud / Hobbs Act Extortion ........................4

6                (a)    Well Tech Bribe ..........................................................4

7                (b)    Chee Kung Tong Proclamation Bribe ........................10

8                (c)    CSAC Extortion Scheme ..........................................12

9                (d)    Workers Comp Extortion Scheme ............................16

10                (e)    Medical Marijuana Legislation Bribe ......................21

11           2.     Weapons Trafficking ...............................................................26

12           3.     Money Laundering...................................................................33

13      B.     Calculation of Sentencing Guidelines ...........................................35

14      C.     Government's Sentencing Recommendation .................................37

15           1.     Nature and Circumstances of the Offenses ............................37

16           2.     History and Characteristics of the Defendant ........................40

17           3.     Reflecting Seriousness of Offense, Promoting Respect for Law, &
18                  Providing Just Punishment...................................................43

19      D.     Potential Defense Request for Variance .......................................45

    CONCLUSION...................................................................................................................47

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## FEDERAL CASES

*United States v. Archdale*, 229 F.2d 861, 869 (9th Cir. 2000)........................................................36

*United States v. White*, 663 F.3d 1207 (11th Cir. 2011) ........................................................ 36

## FEDERAL STATUTES

18 U.S.C. § 3553 (2012) ........................................................................................................ 45

18 U.S.C. § 1951(a) (2012) .................................................................................................... 21

18 U.S.C. § 1956(h) (2012) ................................................................................................... 33

18 U.S.C. § 1962(d) (2012) ..................................................................................................... 1

18 U.S.C. § 3353(a) (2012) ................................................................................................... 43

18 U.S.C. § 3553(a) (2012) ..................................................................................................... 1

## OTHER

U.S.S.G. § 1B1.3 ............................................................................................................ 35, 36

U.S.S.G. § 2C1.1 .................................................................................................................. 44

U.S.S.G. § 5H1.6 ........................................................................................................... 45, 46

U.S.S.G. § 2C1.1(b)(2) ........................................................................................................ 35

**INTRODUCTION**

On July 1, 2015, pursuant to a plea agreement with the United States, defendant Leland Yee entered a guilty plea to Count Two of the Second Superseding Indictment in the above-captioned case, charging him with conspiracy to conduct and participate in the affairs of an enterprise through a pattern of racketeering, in violation of 18 U.S.C. § 1962(d).  Sentencing is scheduled for February 24, 2016 at 10:00 a.m. before this Court.  The United States submits its sentencing memorandum in order to discuss the offense conduct and the applicable sentencing guidelines, and to make its sentencing recommendation.  As discussed below, based on all relevant considerations as set forth in 18 U.S.C. § 3553(a), the government recommends that the Court impose a sentence of  96 months in custody, three years supervised release, and a fine of $25,000.  For all the reasons set forth below, such a sentence is sufficient, but not greater than necessary, to fulfill the purposes of sentencing.

**DISCUSSION**

A.     **Offense Conduct**

Senator Leland Yee pled guilty to a racketeering conspiracy that involved three different, but related, areas of criminal activity:  (1) honest services fraud in which he exchanged official acts for money; (2) a weapons trafficking conspiracy; and (3) money laundering.  Yee and his co-conspirator and co-defendant, Keith Jackson, engaged in these crimes in furtherance of the purpose of the enterprise, that is, to obtain campaign contributions to elect Yee to public office, and to provide financial support for themselves.

Yee's and Jackson's crimes unfolded over the course of almost three years – from May 2011 through March 2014.  During that period of time, Yee was a California State Senator who was termed out as of December 2014, and was running for a different elected office.  First, Yee ran for mayor of San Francisco in the election held in November 2011.  When he did not win that election, he ran for Secretary of State in the election to be held in November 2014, with the primary in June 2014.

Jackson was a long-time associate of Yee.  During the course of the racketeering conspiracy, Yee and Jackson aggressively raised money for the two campaigns and retire the debt that Yee incurred from the failed mayoral race.  As to the Secretary of State election in particular, Yee was in a race against a close competitor, then-State Senator Alex Padilla.  Once Yee announced his intention in November 2012

to run in that election, he was required to publicly file quarterly financial reports showing how much money he had raised.  Intercepted phone conversations on Yee's and Jackson's phones revealed a consuming and relentless push to obtain campaign donations in order to appear competitive with Padilla and others.  During the five 30-day periods that their phone conversations were intercepted, Yee and Jackson spoke daily.  Fundraising was almost always a topic of conversation.  As part of this push, Yee also needed to retire approximately $70,000 in mayoral race debt.

In the course of this intense drive to raise millions of dollars in a relatively short time, Yee revealed himself to be several things.  First, Yee was an elected official who understood perfectly well what it means to "pay to play," the line that public officials may not cross in that regard, and the potential consequences of prosecution and prison time.  On more than one occasion, Yee told undercover FBI agents that exchanging official acts for money could send him to jail and he did not want to be indicted.

Second, Yee showed himself to be a public official who was prepared to cross that line to raise money in order to remain in public office for another eight years.  As discussed below, in response to unrelenting requests by Yee and Jackson for money, three separate undercover agents requested specific official acts from Yee in exchange for the money.  Yee agreed to and performed those acts.

Third, Yee demonstrated he was a public servant who was willing to betray the trust of those who elected him by being prepared to sell his vote to the highest bidder.  The investigation revealed that Yee concocted two schemes in which he was prepared to exchange his vote on pending legislation for campaign donations.

Finally, Yee showed himself to be a manipulative schemer who sought to insulate himself from possible prosecution by putting himself in a position of deniability should he be scrutinized by law enforcement.  Yee used Jackson as an intermediary and spokesman to deal with the undercover agents.  Yee coached and directed Jackson.  If the time came, Yee was prepared to blame Jackson and claim he did not know what Jackson was saying to others.  In fact, Yee stated this quite plainly to UCE 4180, one of the undercover FBI agents.  During a conference call with UCE 4180 and Jackson on June 9, 2013, Yee said things were tense in Sacramento, with people assuming lobbyists were wearing wires.  UCE 4180 said Yee did not need to worry about him; he -- UCE 4180 -- was the one with the most to worry

1    about. Yee responded: "If there's a problem, I ain't going after you, I'm going after Keith." They

2    laughed and UCE 4180 said that sounded like a plan. Yee added: "Keith is going to have to do a lot of

3    explaining. If you have any problems, go after Keith, don't go after me." [1]

4          That is exactly how RICO conspiracies operate, with one powerful player intentionally insulated

5    so that he can claim lack of knowledge in the event of prosecution. It is not always possible for law

6    enforcement to break through the insulation and establish the knowing participation of someone such as

7    Yee. However, in the instant investigation, Yee's knowledge and full involvement in Jackson's

8    interactions with the undercover agents, as well as Yee's role in the enterprise, became crystal clear once

9    Title III interceptions began on Yee's and Jackson's phones in November 2012. Yee corroborated

10   Jackson's statements to the undercover agents that Jackson was discussing everything with Yee, was

11   reporting back from Yee, Yee knew what was going on, and Yee approved.

12         Further, the Title III interceptions revealed two extortion schemes devised by Yee and in which

13   he tutored and directed Jackson. The first was Yee's plan to leverage his Senate committee vote on an

14   upcoming decision to dissolve the California State Athletic Commission as a means to obtain campaign

15   contributions from individuals interested in keeping the Commission alive. In the second scheme, Yee

16   was prepared to vote for or against pending legislation on workers compensation for professional

17   athletes playing in California depending on which competing interest gave him the most money.

18         The offenses that Yee committed in furtherance of the racketeering enterprise, and his

19   involvement and knowledge of the crimes, are described as follows. Because Yee has argued to the

20   Probation Officer that he often did not know what Jackson was doing; he never gave Jackson the

21   authority to act as his agent or make representations on his behalf; and some (unidentified) transactions

22   were completed without Yee's knowledge, the following focuses on evidence showing that these

23   arguments are baseless.

24

25   _____

26   [1] Bodywire recording 1D144, 6/9/2013. The government notes that there were hundreds of
     conversations recorded by the undercover agents via bodywires and through Title III interceptions on
     Yee's and Jackson's phones during the course of the investigation. The contents of a number of the
27   recordings are described herein in order to accurately reflect the nature of the conversations and Yee's
     knowledge and participation. In some instances as indicated, the government has provided the Court
28   with copies of the recordings. In other instances where the government quotes from the recordings,
     references are provided to assist the defense.

SENTENCING MEMORANDUM
CR 14 0196 CRB                    3

1. **Bribery Schemes / Honest Services Fraud / Hobbs Act Extortion**

   (a)   **Well Tech Bribe**

During a meeting of Yee, Jackson, and FBI undercover agent UCE 4773, known to Yee and Jackson as Mike King, on September 4, 2012, Yee asked UCE 4773 for a $10,000 donation in order to help clear up debt remaining from the mayoral race.  UCE 4773, who was posing as businessman with a number of clients interested in contracts with public agencies in California, told Yee that "ten was no problem at all" if Yee would make a phone call or two to the California Department of Public Health, which was purportedly considering one of UCE 4773's clients for a contract.  Without hesitation, Yee responded, "Just let me know."[2]  On October 18, 2012, Yee participated in a phone call set up by the FBI in which Yee thought he was talking to a manager with the Department of Public Health.  Yee, who was calling in his capacity as State Senator, told the manager that he was familiar with the issues involved in the contract, and would be a supporter of the DPH working with UCE 4773's client.  At the close of the call, Yee asked UCE 4773, who was on the call, whether UCE 4773 was okay.  UCE 4773 responded that he was.  On November 19, 2012, UCE 4599 -- known as Dave Jordan -- provided $10,000 in cash to Jackson on behalf of UCE 4773 for the phone call and a forthcoming letter from Yee on behalf of the client.  Jackson promptly informed Yee of the $10,000 payment.

The evolution of this bribe was slow and started a year earlier, when Yee was running in the San Francisco mayoral race.  The relationship between UCE 4773, Yee, and Jackson started in September 2011 after Jackson solicited UCE 4599 to make donations over the $500 limit to Yee's campaign. Jackson told UCE 4599 that if UCE 4599 donated $5,000, Jackson would get the money to the campaign in $500 increments from different donors.  UCE 4599 was involved in the investigation of Raymond "Shrimpboy" Chow, and rebuffed Jackson's requests.  However, the FBI introduced UCE 4773 under the guise of UCE 4599's colleague in an effort to determine whether Jackson's corrupt solicitations were limited to him or were part of the campaign's operation.  UCE 4773 posed as a businessman based in Atlanta who represented investors who were interested in projects and contracts in the Bay Area.

---

[2] In connection with this filing, the government has submitted select recordings to the Court so that it may listen to critical passages and hear Yee's and Jackson's voices.  The recordings are collected in Exhibit A, filed separately.  The recording cited here is 1D43, 9/4/2012, and the timestamp for the passage cited above is 1:42:07.   The conversation is discussed in more detail below.

After a phone introduction, UCE 4773 first met both Yee and Jackson at a fundraiser on September 21, 2011 and made a $500 donation to Yee's campaign.  From this first meeting, both Yee and Jackson aggressively pursued UCE 4773.  Within two days of their first meeting, Jackson was soliciting UCE 4773 to hire him as a consultant and said he would send UCE 4773 a contract.  UCE 4773 never entered into a contract with Jackson.  Both Yee and Jackson immediately sought more donations from UCE 4773.  Within five days of the first meeting, Yee was asking UCE 4773 to raise $20,000.

Jackson told UCE 4773 that Yee needed to raise $30,000 in 30 days and pressed UCE 4773 for money.  When UCE 4773 said the money was not the problem, but he was not going to get bogged down finding separate $500 donors, Jackson said he break up the money among straw donors.  On October 11, 2011, UCE 4773 wrote a check payable to Jackson for $5,000 as a donation to the campaign; the next day, Jackson told UCE 4773 that he had already started processing the donations through seven San Francisco residents so that Yee could get matching SF funds.

Starting as early as two days after their first meeting, and continuing through numerous conversations with Jackson, UCE 4773 expressly told Jackson "there was no free money."[3]  UCE 4773 eventually said the same thing to Yee.  Jackson repeatedly assured UCE 4773 that Yee could be helpful to UCE 4773.  However, Jackson cautioned that Yee "can't have those conversations."[4]  UCE 4773 had a distinctly more low-key demeanor than UCE 4599 and in the early stages of the relationship with Yee and Jackson, he did not press for any specific official acts from Yee.  However, he made it clear that, as he put it, he was going to "need something on the other end" for his investments in Yee.[5]  Jackson responded:  "He knows how the game is played."  When UCE 4773 told Jackson that he needed to know that Yee was aware of his contributions, Jackson said, "He can't have those conversations," but added: "He will know."[6]  In subsequent conversations with UCE 4773, Jackson said that he told Yee about UCE 4773's contributions.

---

[3] 9/23/2011 phone conversation, 1D1, CCR0012

[4] 9/26/2011 phone conversation, 1D2, 080117PM

[5] 10/11/2011 meeting, 1D7

[6] 9/26/2011 phone conversation, 1D2, 080117PM

It was clear from UCE 4773's initial interactions with Yee and Jackson that Jackson was playing the role of intermediary and candid spokesman when Yee could not have such conversations with UCE 4773. While Jackson took that role, Yee initially took a more oblique approach. With UCE 4773 and the other two undercovers with whom he dealt, Yee tried to separate talk of official acts from talk of payment. Yee never rejected the undercovers or walked away from them. He took their money in exchange for official acts. He just did not want them to *talk* in such a way as to link official acts with payment of money.

For instance, during a September 26, 2011 phone conversation when Yee asked UCE 4773 to raise $20,000, UCE 4773 broached the subject of how they could talk about "things that happen later. Do you have to separate the two?" Yee responded that they did. He told UCE 4773 that he could take the money at an event and discuss larger state issues. Yee said that after, "you and I can talk in specific terms about what your clients want." Yee told UCE 4773 they could have a "frank discussion." [7]

As the mayoral campaign progressed, Yee and Jackson continued to pursue UCE 4773. During a phone conversation with Jackson on October 12, 2011, Jackson told UCE 4773 that he just got off the phone with Yee and Yee wanted UCE 4773 to think of "how he [Yee] can be helpful." When UCE 4773 and Jackson met the next day, UCE 4773 told Jackson: "I can't spend it without getting something on the other end." Jackson acknowledged that, and said: "none of us want to get caught." Jackson then added, "he wanted me to tell you, 'you got me.' …. Whatever you need, he wants to do it. Whatever you need from this point on, you got." UCE 4773 told Jackson that he was at the point where he needed to have a conversation with Yee: "I gotta see it in his eye." UCE 4773 said that however Yee wanted to put it, Yee needed to assure UCE 4773 that Yee has his back.[8]

The next day, October 14, 2011, UCE 4773 and Yee spoke on the phone. Yee said he wanted to extend the hand of friendship, appreciation, and willingness to work with UCE 4773. When UCE 4773 said he wanted to make sure that Yee was aware of his contribution, Yee said that Jackson mentioned that.

Later the same day, October 14, 2011, Yee, Jackson, and UCE 4773 met at a Starbucks in San

---

[7] 9/26/2011, 1D2, 081949PM

[8] 10/13/2011 meeting, 1D7, CCR0004

Francisco.[9]  UCE 4773 discussed the "5" that he raised through donors who attended a function the day before, along with the "5" he gave "Keith."  UCE 4773 said he was ready to do more, but was worried about a recent local news article about straw donors being prosecuted.  UCE 4773 said:  "With that amount of money, I understand I can't put you in the position of asking for something in return, but it's not much money not to get something."  Yee responded, "Right, right."  UCE 4773 expressed concern about the risk that he was running in being exposed and investigated.  Yee responded:  "You're right … we gotta be careful."  He added, "… you ought to be careful too."  Yee then said, "we've got to get that money, but to the extent that you could find a way to do it, … you know I would appreciate that."

When UCE 4773 continued to express concern about putting a large sum into the campaign, Yee said the campaign was going to be audited "because we took public funding."  That would include looking at where money comes from, "so you gotta be careful about that."  Yee added:  "I would simply say that as long as you cover your tracks you're fine.  But if you don't think you can do that, don't do it."  When UCE 4773 asked if there was some alternative way of getting the money to Yee, Yee suggested that UCE 4773 contribute to a ballot measure that Yee was supporting.  Yee explained that the measure's success would give him a boost.

During the conversation, Yee told UCE 4773 that "this is about a long term relationship."  Yee mentioned that if he won the mayoral race, "we control $6.8 billion, man. Shit."  Yee said he had no interest in making money for himself, but was happy to have his friends make money.  [at 23:20]

Three days after this conversation, Jackson called UCE 4773 to press for an additional $10,000.  On three more occasions before the November 8, 2011 election, Yee contacted UCE 4773 to ask for the $10,000 donation to the ballot measure.  UCE 4773 did not make any additional contributions to Yee or the ballot measure.

All of the above is worth noting because it establishes the dynamics of the relationship between Yee and Jackson; sets the groundwork for Yee subsequently engaging in a *quid pro quo* exchange with UCE 4773; and shows that it was Yee and Jackson pursuing UCE 4773, not the other way around.  Further, it is clear that Yee was involved from the beginning.

---

[9] Recording 10/24/2011, 1D8, recording provided to the Court.  Relevant portion starts at 6:00.

Yee's and Jackson's pursuit of UCE 4773 and his money did not abate after Yee lost the mayoral election. The day after the election, Jackson telephoned UCE 4773 and said there was "a lot of stuff we can do" with Yee as State Senator. Jackson said that Yee was "ready to go," and added that Yee had debt to clean up. [10]

At a meeting between Yee, Jackson, and UCE 4773 at Yee's Sacramento office on January 18, 2012, Yee told UCE 4773 that he was considering running for Secretary of State in the election in November 2014. He said the he could not get started on fundraising until he retired the $70,000 in debt from the San Francisco mayoral race and asked UCE 4773 to raise another $10,000.

This request was just the first in a continuing series of requests for money from UCE 4773 by Yee and Jackson over the course of 2012. Because the requests were not letting up, the FBI developed a specific "ask" for UCE 4773 to convey to Yee. At a meeting with Yee and Jackson on April 7, 2012, Yee said he needed to take care of the remaining debt from the mayoral race. UCE 4773 made the first mention of a client, Well Tech, a software consulting company that was supposedly trying to get a foothold in California. Yee responded by describing areas in the public sector in California that could use that kind of assistance in updating computer systems.

In a phone call on June 2, 2012, Jackson told UCE 4773 that Yee wanted to meet with UCE 4773 the next time he was in town. Jackson related that Yee wanted UCE 4773 to know that Yee was there for UCE 4773: "Whatever you need, you just need to tell him. He's there for you." When UCE 4773 said he needed assistance for the software company, Jackson said: "this will be an easy ask."[11] Four days later, when Jackson said that Yee needed UCE 4773's help with the debt, UCE 4773 repeated that there had to be something specific UCE 4773 was getting out of it. Jackson agreed. On June 19, 2012, when Jackson asked for $10,000, UCE 4773 inquired whether Jackson has passed on his message about needing something specific in return. Jackson responded that Yee was fine with that.

UCE 4773 met with Yee and Jackson at Yee's Senate office in Sacramento on June 26, 2012 and introduced individuals reputedly connected to Well Tech. Toward the end of the meeting, UCE 4773 explained that they wanted to identify opportunities for the business to grow in California. Yee

---

[10] Recording 1D13, 124354PM

[11] Recording 1D35, 124922PM

responded, "OK, let me tell you my situation.  my situation is that um, you  know, we , we want to raise 40,000 and we've just been having a dog of a time … I know you've helped with 5,000 and so one.  You know, what we're looking at is if you can help with another 10."[12]

UCE 4773 was now nine months into the relationship with both Yee and Jackson, and neither had flinched at his insistence that there needed to be a *quid pro quo* for further donations.  As described at the beginning of this section, UCE 4773 made the specific ask of Yee during a meeting on September 4, 2012.  Yee told UCE 4773 that he was $32,000 away from paying off outstanding debt, "and if you can do another $10,000, that would be good." [13]  UCE 4773 he was going to need a phone call from Yee to someone in procurement on behalf of Well Tech in connection with a contract under consideration.  Yee responded:  "Just let me know."  After further discussion about how Yee could assist UCE 4773, UCE 4773 said:  "If you can do that, then 10 is no problem at all."

Yee admitted in his plea agreement that on October 18, 2012, he spoke on the phone with the purported Public Health Department employee in his capacity as State Senator and recommended that the employee consider UCE 4773's client for the grant.  Yee further admitted that he engaged in the call, and also signed a letter on California state letterhead on behalf of the client in exchange for a $10,000 donation from UCE 4773 to retire the mayoral debt.  *See*, Doc. 852, at 3-4.

Yee's understanding of the linkage between his official acts for UCE 4773 and UCE 4773's expected donation became indisputably clear once the Title III interceptions started on his and Jackson's phones on November 14, 2012.  On that first day of interceptions, Yee and Jackson spoke about UCE 4773.  By that time, UCE 4773 had still not paid for Yee's phone call or the promised letter and Yee expressed frustration and anger with UCE 4773.  Jackson mentioned that he had just spoken with UCE 4773, and Yee responded:  "Oh good luck on that one then, shit."[14]  Jackson explained that the letter was important to UCE 4773 and said that if Yee provided the letter, "we're fine."  Yee responded that he talked to the guy [from Public Health] and we're "still not fine.  Now he wants the letter and we're still not going to be fine.  There's always going to be something else."  Yee said he would just raise the

---

[12] Recording 1D61

[13] Recording provided to Court, 1D45, 9/4/2012, relevant portion starts at 1:39:05

[14] Recording provided to Court, 11/14/2012, T3 Leland Yee (LY) cell, Session 81

money without UCE 4773.  Yee complained: "but this guy he's just jerking us around man.  Two months and nothing.  He wants me to talk to this guy and the letter and nothing.  When is it going to end?"  In other words, Yee did what UCE 4773 asked; now Yee wanted to know, "where's the money?"

Two days later, on November 16, 2012, Jackson and Yee spoke again about UCE 4773.  Jackson said if they could just get the letter, then UCE 4773 would do what he needs to do.  Yee replied:  "Yea, well, you just tell Mike to just do it.  Come on, Mike!"[15]  Yee complained that he was busy and "there's got to be some trust around here man, shit."  Yee added:  "This is almost like, you know, a fuckin' date, you know, dating a fuckin' woman, you know, you do this, I do that, you do that, and shit…"  Yee wondered whether UCE 4773 understood that if Yee did not succeed, then UCE 4773 would not have access; Yee referred to the eight years he would be Secretary of State.

As described above, on behalf of UCE 4773, UCE 4599 gave $10,000 in cash to Jackson on November 19, 2012.  The next day, Jackson told Yee that he receive the money from UCE 4773.  On November 23, 2012, Yee spoke to a campaign staffer about working on the $10,000 received from UCE 4773.  This payment led directly to the next bribe scheme.

**(b)   Chee Kung Tong Proclamation Bribe**

As part of his plea, Yee admitted that he agreed with Jackson to provide a certificate on California State Senate letterhead honoring the Chee Kung Tong.  Yee stated that he caused the certificate to be prepared and presented by a staff member of one of his Senate district offices at an event held by the Chee Kung Tong on March 29, 2013.  Yee further admitted that he "provided the certificate in exchange for a $6,800 donation from an individual whom I now know was another undercover employee of the FBI, UCE 4599, to my Secretary of State campaign."  Yee admitted that this constituted honest services wire fraud conspiracy.  Doc. 852, at 4.

Yee obtaining the State Senate certificate honoring the Chee Kung Tong was the direct result of an "ask" by UCE 4599.  On November 19, 2012, when UCE 4599 gave Jackson the $10,000 for the Well Tech call and letter, UCE 4599 said he would provide a campaign donation to Yee if Yee could assist Raymond Chow in getting rid of his ankle monitor.  UCE 4599 asked if Yee could make a call.

---

[15] Recording provided to Court, 11/16/2012, LY 337, at 1:42 to 3:30

The next day, November 20, 2012, when Jackson told Yee that he got UCE 4773's money, he also conveyed the request from UCE 4599, whom Jackson described as UCE 4773's business partner. Jackson said he had a guy who wanted to help "Raymond" out. Yee's reaction was: "Holy Shit." [16] Jackson explained that Raymond was doing good things and no one was standing up for him. Yee asked what they had in mind.

> Jackson:  Just put in a friendly call in to whoever it is. I mean, I don't know who's got Raymond by the balls. It seems the FBI has him by the balls.

> Yee:  Yeah, you know why. And I told him. You know, he wants to remind everybody that he's a hero. Well, fuck, you know, shit, you killed some people, man.  [UI]

> Jackson:  he never killed anybody [laughing]

> Yee:  Yeah, and I never did anything wrong in my life. Shit.  Godamm.

In another phone conversation on November 20, 2012, Yee told Jackson that Chow revels in his previous life as a gangster and should lay low. [17] Jackson explained that the requested help had something to do with Chow's ankle monitor. At that point, Yee said that was not going to happen and added, "Shit, as much as I want that five thousand, I can't do that, man. Shit. Fuck. Shit. … Yeah man, shit yeah, forget that." Yee refused the offer, but unequivocally knew that UCE 4599 was prepared to pay for an official act by Yee. It was not the fact of the request that Yee rejected; it was that the request was too closely connected to Chow. On December 3, 2012, Jackson told UCE 4599 that Yee could not step in right now to help Chow.

Two months later, on January 22, 2013, Yee, Jackson, and UCE 4599 met at the Waterbar Restaurant in San Francisco. UCE 4599 explained that his business might bankroll Chow's book and/or movie deals. UCE 4599 said he was seeking a State of California proclamation for the Chee Kung Tong and Yee said he could do that for the association. After Yee left the meeting, UCE 4599 told Jackson that if Yee provided the certificate, UCE 4599 would write a check. Jackson said he would make it happen.

Yee had now met another potential source of money. On February 12, 2013, Yee told Jackson to

---

[16]   Recording provided to Court, 11/20/2012, KJ 913, 3:15 to end.

[17] KJ 966

1   start collecting checks from UCE 4599.  On February 26, 2012, Yee told Jackson to have UCE 4599 get

2   ten people to donate $6,800 each.  Yee added:  "You just got to be careful.  Dave supports him.  That's

3   ok, I don't care.  But, you know, let's not get too close, okay?  We're going to do a proclamation not to

4   Shrimp Boy, but to the organization.  He's still hot stuff.  So we just got to be careful, man."[18]

5        On March 29, 2013, one of Yee's staffers attended the Chee Kung Tong anniversary celebration

6   dinner in Chinatown and presented a framed certificate from the State Senate signed by Yee.  The staffer

7   said that she was presenting the certificate "officially" from Senator Yee.  At a meeting with Jackson on

8   April 4, 2013, UCE 4599 asked what Yee expected from him.  Jackson responded:  "$6,800."

9        On April 10, 2013, Yee asked Jackson if UCE 4599 had provided a check yet.  On May 6, 2013,

10  UCE 4599 provided Jackson with a check for $5,000 written on his front business account made payable

11  to Yee's Secretary of State campaign.  Yee thanked UCE 4599 for the check three days later.  On July 4,

12  2013, Yee asked Jackson if UCE 4599 had provided any more money.  Jackson conveyed the request

13  and on July 11, 2013, UCE 4599 gave Jackson another check made payable to the campaign for $1,800.

14  Jackson told Yee about the donation.

15        **(c)    CSAC Extortion Scheme**

16        While FBI investigators were monitoring the Title III intercepts on Yee's and Jackson's phones,

17  they discovered a scheme devised by Yee to extort money from an individual affiliated with the

18  California State Athletic Commission (CSAC).  The FBI had nothing whatsoever to do with this

19  activity, there were no undercover agents involved, and it only came to light due to the wiretaps.  The

20  interceptions revealed that Yee came up with the plan and explained it to Jackson.  Yee then instructed

21  Jackson on what to tell the people who had a stake in the CSAC legislation.  That is, Jackson was to (1)

22  represent that Yee was considering voting against the legislation, (2) explain that he, Jackson, had sway

23  over Yee's decision on the issue and could act as the individuals' advocate with Yee; and (3) suggest

24  that Yee needed financial assistance in his Secretary of State campaign.

25        As part of his plea, Yee admitted to this conspiracy.  Yee admitted that as on March 2, 2013, he

26  had a telephone conversation with Jackson during which they agreed to "a conspiracy and plan to extort

27

28

_____

[18] KJ 5820

and obtain money and campaign donations from an individual who had an interest in pending legislation" involving the CSAC.  Yee added:  "At my instruction, my co-conspirator then spoke with that individual and led that individual to believe that I would vote against the legislation unless campaign support was forthcoming from that individual and others who had an interest in the passage of the legislation."  Doc. 852, at 4.

At issue in this scheme was Yee's upcoming vote on the Senate's Business, Professions, and Economic Development Committee on Senate Bill 309, which had to do with extending the life of the CSAC's authority to license and regulate boxing, kickboxing, and martial arts matches in California.  During the call between Yee and Jackson on March 2, 2013, Yee said he had just received a call from a party, referred to here as Individual A, who was concerned about the possible shutdown of the CSAC.  Without a regulating body, there would be no mixed martial arts (MMA) in California.  Yee told Jackson:  "I did a number on [Individual A]."[19]  Yee conveyed to Individual A that he was inclined to vote to shut down the CSAC and the only way he could be convinced otherwise was if someone he trusted could give him reliable information about the Commission.  Yee told Individual A the only such person Yee could think of was Jackson and Yee said he encouraged Individual A and his colleagues to hire Jackson to represent their interests.  Yee told Jackson to get money from Individual A and explain to him how he could be "helpful to Leland."  Yee told Jackson that Individual A was "very motivated … is very interested … So I'm gonna text your number to him and then you try to get him signed up and get some money right away.  And then we can talk about how you can tell him, 'Hey, you know, it would be helpful to Leland' and all that stuff, Okay?"

Jackson willingly went along with the plan and told Individual A, another person affiliated with the CSAC (hereafter, Individual B), and others that Yee was going to shut down the CSAC.  Jackson told Individual A that for a fee, he would be willing to lobby Yee.  Jackson also developed a relationship with Individual B and had a number of conversations with him during March and April of 2013 regarding Yee's purported concerns about the CSAC, how Jackson could lobby Yee on Individual B's behalf, and how Individual B could be helpful to Yee in his run for Secretary of State.  This included

---

[19] Recording provided to the Court, 3/2/2013, KJ 6377, starts at 1:00

1  asking Individual B to make donations to Yee's campaign; use his contacts with fight promoters to get

2  them to donate to Yee's campaign; and get the CSAC Chairman to use his influence with a certain block

3  of voters to assist in Yee's campaign.  Throughout these conversations, on which Yee coached Jackson,

4  Jackson led Individual B to believe there was a real chance that Yee could damage the CSAC, and

5  encouraged Individual B and fight promoters over which Individual B had influence to be financially

6  supportive of Yee.

7         Throughout these interactions, Jackson reported back to Yee on his progress and what he was

8  doing.  Yee regularly asked about the status of donations and coached Jackson on what to say to those

9  interested in the issue.  For instance, on March 3, 2013, the day after Yee told Jackson that he "did a

10 number" on Individual A, Yee told Jackson to tell Individual A:  "You gotta just say, hey, you know,

11 [Individual A] this is a heavy lift.  Can you imagine how the hell we are going to get Leland to vote for

12 this shit?  There ain't nothing for free on this one … You know Leland is stubborn, and shit, you know

13 you guys want that.  He's going to go all out blasting the whole thing at the hearing, man, come on."

14 They also discussed the status of the mayoral debt and Yee asked Jackson to collect more checks.[20]

15        As another example, during a phone conversation on April 5, 2013, Yee and Jackson again

16 discussed the status of the campaign debt.  Yee instructed Jackson on what to say in an upcoming call

17 with Individual B:

18        Yee:  You're going to call him this morning and you say that look, Leland and I had a
          conversation, Senator and I had a conversation … and uh you know, he really wants to,
19        you know, he didn't really want to kill it, but, you know, with all the stuff that's been
          going on, you know, and all the stuff that's going on in his own district where you know, you
20        got boxing with children and betting and all that kind of stuff.  He's got to take a stand and
          uh, he was going to make a motion to go ahead and just sunset the whole thing, and uh,
21        force the issue.  But you know, um, you know I've assured him that, I  -- meaning you –
          have assured him – meaning the Senator – that things will be ok.  [Yee then told Jackson to
22        tell Individual B that Yee would be asking questions of him at the upcoming Committee
          hearing and Individual B just had to answer the questions].
23        And, uh, and … then on the other hand, you know, just don't tie whatever I do to, you know,
24        what he does for you but say, hey, you know the Senator's running for Secretary of State,
          you know, we got to help him, he's a good guy, a reasonable guy, and whatever you can do,
25        [Individual B], you know, uh just uh, you know, uh point me the way and we'll see what we can
26        do the help the Senator, ok?

27 ─────────────────
28        [20] Recording provided to the Court, 3/3/2013, KJ 6461, starting at 4:40. The earlier conversation
   is about debt, collecting and finding checks.

1    Jackson:  OK

2    Yee:  Allright.[21]

3    In a separate conversation on March 6, 2013, Jackson talked about meeting with MMA people.

4 Yee told Jackson "you gotta be really careful with these guys because, you know, this is the kind of stuff

5 that really gets people into trouble pay to play and all that kind of stuff.  So you just got to be real

6 careful that there's no linkage, there's no tie in and everything else like that." [22]  In other words, it's not

7 a problem asking for pay to play; just be careful how you talk about it.  As discussed below, Yee took

8 the same approach with UCE 4180.  Yee also told Jackson to tell Individual B how Jackson got involved

9 in this issue.  That is, not through Yee, but through a call from Individual A to Jackson.  Of course, that

10 was not true.

11    As the scheme progressed and Yee participated in a Committee hearing at which Individual B

12 testified, Jackson joked with Yee during a phone conversation on April 21, 2013 that Yee "could be the

13 guy that kind of like helped save that sport in the State of California."  Jackson then mentioned

14 Individual B.  Yee responded, "yeah, so you know, all I'm interested in is just getting something out of

15 the guy, ok." [23]

16    On April 29, 2013, Yee voted in Committee to extend the life of the CSAC.  In a phone

17 conversation that day, Jackson told Yee that Individual B called Jackson right after the vote and "he was

18 really happy, man."  Yee and Jackson laughed when Yee said that Individual B was "just beaming"

19 during the hearing.   Jackson said that Individual B told him they needed to "get busy for the Senator."

20 Yee responded:  "You tell him that if he works hard and makes me Secretary of State, if there's a way of

21 putting it [the CSAC] under the Secretary of State Office, I am there for him, man."  They both

22 laughed.[24]

23    While Individual B explained to Jackson that he did not have a lot of money to contribute as a

24 donation, he could give the Senator a check for $500.  Jackson told Yee that he stopped Individual B

25

---

26    [21] LY 3109

27    [22] KJ 6850

    [23] LY 4747

28    [24] LY 229

SENTENCING MEMORANDUM
CR 14 0196 CRB          15

1   because the check was in Individual B's name.  Jackson told Individual B he should put the check in his

2   wife's name.  Yee agreed:  "Yeah, he should not put it in his name at all, not good." [25]

3        In September 2013, Jackson convinced another individual affiliated with the CSAC to hold a

4   fundraiser for Yee, which she did.  That individual has advised that the only reason she did so was not to

5   alienate Yee, who still had power in the Senate to de-commission the CSAC.  The fundraising event in

6   September 2013 raised approximately $1,450 for Yee's Secretary of State campaign.

7        **(d)      Workers Comp Extortion Scheme**

8        The second extortion scheme devised by Yee came to light in connection with his dealings with a

9   third undercover agent, UCE 4180, known as Mike Sweets.  UCE 4180 purportedly lived in Arizona,

10  was involved in the medical marijuana business there, and wanted to expand to California.  UCE 4180

11  told Yee he planned to become the "Anheuser Busch" of medical marijuana in California and was

12  looking for statewide legislation that would regularize the industry with features that fit UCE 4180's

13  purported business model.  UCE 4180 posed as a very blunt-speaking entrepreneur who was not shy

14  about overtly asking for official acts in exchange for payment.  While Yee admonished UCE 4180 for

15  such overt *quid pro quo* talk, Yee turned away from UCE 4180.  As discussed in the next section, UCE

16  4180 told Yee and Jackson he would pay for meetings with legislators who were connected with

17  potential marijuana legislation; Yee arranged for and attended two such meetings; and UCE 4180 paid

18  Yee a total of $21,000 for the two meetings.

19       Yee first met UCE 4180 on March 14, 2013.  UCE 4180 talked about his interest in medical

20  marijuana legislation and the confidential source who introduced the two men commented that Yee was

21  running for Secretary of State.  UCE 4180 said he might be interested in a "cash donation."  From here,

22  the relationship between Yee, Jackson, and UCE 4180 developed.

23       During a meeting at Alexander's Steakhouse on May 17, 2013 between Yee, Jackson, UCE

24  4180, Yee's friend Annamaria Leon, and another UCE posing as UCE 4180's girlfriend, UCE 4180

25  discussed marijuana legislation and gave Yee an envelope with $5,000 cash.  UCE 4180 said he was

26  giving the money because that is what Yee wanted, and UCE 4180 expected to see "forward progress"

27

28
_____
[25] KJ 16069, 6/4/2013

1  on the legislation.[26]  At one point, Yee turned the conversation to an entirely different topic:  the next

2  extortion scheme.  The lead- up was a casual conversation about sports, and Yee and Jackson talked

3  about attending a UFC fight in connection with the CSAC matter.  [clip starts at 1:34:22]  Turning from

4  the subject of fights, Jackson mentioned that UCE 4180 had a friend who owned an NFL team.   [at

5  1:40:56]

6         That comment got Yee's attention.  Yee immediately seized on that and said, "Oh … man, you

7  need me, man."  When UCE 4180 asked what Yee needed, Yee said:  "I don't need anything.  You

8  need!  You need.  Or your friend needs…"  Yee told UCE 4180 to tell his friend about the legislation

9  pending in California that would eliminate workers compensation payments – which are funded by NFL

10  owners – when out-of-state players are injured playing in California.  Yee explained that the bill was

11  coming to the Labor Committee on which he sat, and he had some ability to control the vote.  Yee told

12  UCE 4180:  "There is two votes that is needed in order to kill that bill.  Players association wants to kill

13  that bill.  Your friend wants to make sure that bill passes.  The two votes are a guy named 'Padilla' who

14  is running against me and myself.  How I vote, he's gonna vote.  If I vote to kill it, he is going to vote to

15  kill it.  If I vote to support it then he's gonna support it.  *So your friend he should pick up the phone and*

16  *say, 'Hey guys … I can help you you know.' "*  (emphasis added).

17         UCE 4180 said he would call his friend and said the question is going to be "How much does the

18  vote cost?"  Yee  responded:  "No!  We are not going to be that cold blooded, man!"  UCE 4180 said:

19  "OK, well he is … because, dude, he owns an NFL football team."  Yee said:  "I know, I know … but

20  tease him for us."  UCE 4180 said he would be happy to tease him, but would need a number and asked

21  if he could have it by tomorrow.  Yee responded:  "Oh no … we gotta drag it out man!  We gotta milk

22  this thing.  Now I'm gonna want an audience with all the 49ers players.  Oh they are gonna come into

23  my office man."  Jackson interjected:  "I want to get an audience between the fucking owners…"

24         Yee was the one who initiated the idea of UCE 4180 letting his NFL team owner friend know

25  about the pending legislation and suggested that the owner should be reaching out to Yee offering to

26  assist Yee.  It is clear that Yee intended financial assistance and he was preparing to sell his vote to the

27

28  ────────────────
   [26] Recording provided to the Court, 1D134, 5/17/2013

stakeholder who paid the most – the owners or the players.  This became even more clear in subsequent conversations between Yee and Jackson.  The Presentence Report mentions those conversations in paragraph 34.  As one example, Yee and Jackson spoke on May 18, 2013, the day after the meeting at Alexander's Steakhouse. [27]  Yee and Jackson discussed the fact that the family of UCE 4180's NFL team owner friend is "loaded."  Yee said that the bill was coming up in June and "…we gotta get some love out of the players, man."  They discussed the owner of a professional football team who had provided financial support to Yee in the past.  Jackson said, "he needs to do something for you, man."  Yee said that he expected to hear from that owner and came up with a plan to refer that owner to Jackson.  Yee said in order to get leverage with the owner, he would tell the owner that Jackson was hooking Yee up with the players.  Thus, once again Yee was putting Jackson in the role of intermediary with an agenda.  As Yee and Jackson continued to discuss how Yee should vote on the bill, Jackson was blunt:  "Hey Leland, at the end of the day, support the owners, 'cause the players don't write checks."  Yee responded:  "Okay man, Allright, man, shit you're gonna fuck [the name of an NFL player with whom Jackson is friends].  I don't care.  Shit."

UCE 4180 and Jackson spoke on the phone the next day.  UCE 4180 said he was prepared to talk to his friend about the legislation, but UCE 4180 needed a "number" to give to him.  UCE 4180 said he would act as intermediary if Yee provided a "number" to "buy the vote."  Jackson said he would talk to Yee. [28]

Yee and Jackson were surveilled meeting the following day, May 20, 2013, at a Starbucks in San Francisco.  Agents who were present in the café heard Yee mention names of people, including "Sweets," who had contributed to his campaign and heard Yee say "$6,800."  [Note:  $6,800 was the maximum amount an individual was permitted by law to donate to the SOS campaign.]  Yee and Jackson were heard discussing the fact that Yee needed to raise $500,000.  Agents also heard Jackson say something to the effect of "Sweets needs to give [the owner of the team] a number."  To this, Yee replied:  "When we get closer.  Let me figure it out."

---

[27] KJ 13624

[28] 1D134, track 4

When Yee, Jackson, and UCE 4180 met on June 9, 2013, they discussed the workers comp legislation again; Yee said he was going to be meeting with the NFL team owner that he knew.  UCE 4180 offered to walk away from the matter if that is what Yee wanted.  UCE 4180 said he had scheduled, but then canceled, a meeting with his team owner friend because he did not have guidance from Yee.  Yee responded that it would be great if UCE 4180's friend could "be helpful."  UCE 4180 told Yee to tell Jackson what Yee wanted and Jackson could then convey that to UCE 4180.[29]

Conversations continued between Jackson and UCE 4180, with each acting as the intermediary for Yee and the team owner, respectively.  At one point, they were making arrangements for a conference call between Yee and the team owner.  They agreed it was understood that Yee and UCE 4180's friend would not discuss the payment overtly; such discussions would be left to UCE 4180 and Jackson.[30]

As discussed in the section below about the medical marijuana bribe, on the morning of June 22, 2013, Yee and Jackson met with UCE 4180 and another FBI undercover agent at UCE 4180's hotel room at the Marriott Marquis hotel in San Francisco.  The meeting was video and audio-taped.[31]  Early in the meeting, UCE 4180 placed an envelope containing $11,000 in cash on the coffee table and said it was for the meeting with State Senator 1. [at 12:25]  At the end of the meeting, Yee nudged Jackson to pick up the envelope and take it with him.

During the meeting, Yee said that people were "skittish" in Sacramento and there was concern that lobbyists were wearing wires.  Yee had mentioned this to UCE 4180 before.  Yee and UCE 4180 discussed marijuana legislation, and then UCE 4180 turned the conversation to the subject of the workers comp bill.  [starting at 15:45].  Yee talked about the bill at some length and said he had met with three professional sports teams in the Bay Area.  UCE 4180 said his owner friend wanted to know how Yee was going to vote and, "quite frankly, what is the campaign donation that it is going to cost." [21:50].  Yee smiled and crossed his arms; UCE 4180 said he knew that made Yee uncomfortable.  Yee said that he had not yet decided how he was going to vote on the bill.  Yee offered to call UCE 4180 two

---

[29] 1D144

[30] 1D152, track 2

[31] A copy of the video recording has been provided to the Court, 1D158, 6/22/2013

hours before the vote, and UCE 4180 did not like that idea.  Yee expressed concern about saying anything overt over the phone:  "Yeah, because I'm gonna tell you exactly how I'm gonna vote, but I'm not gonna say exactly anything about 'this is what you are going to do for me.'"  Yee added:  "I'm gonna take care of you, I'm gonna protect you -- or he's [referring to Jackson] is going to protect you." [24:05].

UCE 4180 responded that the owner had given him a donation amount for Yee and Yee said, "I appreciate you telling me that.  At the end of the day, I have to decide what is the best public policy. Keith can talk to you about the other stuff."  [starting at 24:25].  UCE 4180 pointed out that Yee "brought this to us" and Yee nodded.  During the discussion, Yee said:  "Tell [the owner] that I [meaning UCE 4180] talked to Leland, laid out why it was important for him to be supportive of you guys and let's see what he does."  Jackson then said:  "So the question is … did you get a commitment from [the owners] … and they ready?"  Yee interjected:  "You guys talk about that."  Yee went on to explain that he controlled two votes on the committee, and "that is why I am the center of attention." [starting at 26:00].  At the end of the meeting, Jackson said to UCE 4180, "Sweets, you and I will talk."

After Jackson picked up the envelope of cash from the coffee table and he and Yee got ready to leave, UCE 4180 asked Jackson and Yee, "do you need to talk about something?"  [at 28:30].   Yee responded by saying, "Keith will walk me down to the car and then he will come back."  Given Yee's statement a short while earlier that he was leaving talk of money to UCE 4180 and Jackson, UCE 4180 reasonably understood Yee to mean that Jackson and Yee would discuss the NFL owner's potential donation and then Jackson would return to discuss it with UCE 4180.

Jackson left with Yee and a short time later returned to the hotel room.  Jackson told UCE 4180 that Yee "is going to be helpful." [32]  When UCE 4180 said he was willing to give Yee more money, Jackson said, "on that note, Leland is going to request that you know, you guys put in a little more." UCE 4180 said that he wanted to help Yee reach his campaign goal through the workers comp issue and in order to do so, Yee "needs to commit."  Jackson replied by saying:  "He's committed."

The exchange then went as follows:

UCE 4180:  What's the number?

_____

[32] This part of the meeting was not video-recorded.  The audio recording is at 1D157.

> Jackson:  Give me a, he said get what you guys are willing to do.
> UCE 4180:  60
> Jackson:  60?
> UCE 4180:  Yeah
> Jackson:  Done
> UCE 4180:  So he'll give me two votes for 60?
> Jackson:  Done

UCE 4180 asked why Yee couldn't just tell UCE 4180 all of this during the meeting and Jackson said Yee is a state senator and he needs to protect himself.  Plus, Yee did not feel comfortable with UCE 4180.  UCE 4180 asked about whether Yee was going to vote for it anyway and is just going to collect $60,000.

> Jackson:  He said "get a number."
> UCE 4180:  Ok, and how do you know the number 60 is high enough?
> Jackson:  I mean, he said 'get a number.'
> UCE 4180:  OK
> Jackson:  You gave me a number.
> UCE 4180:  Right.
> Jackson:  I'm going to meet with him later tonight.
> UCE 4180:  OK
> Jackson:  I'm going to tell him that number.
> UCE 4180:  OK
> Jackson:  And I guarantee it is going to be fine.

Jackson left UCE 4180's hotel room at approximately 8:25 a.m. and FBI agents observed Jackson use his cell phone.  A review of telephone records for June 22, 2013, shows that at 8:25 a.m. Jackson called Yee.  Later that day, at 3:46 p.m., Jackson texted UCE 4180 the message:  "Hey, Sweets, where [sic] all good on this end … kj."  UCE 4180 responded:  "Good to hear.  I will be in touch."

The FBI decided not to go forward with a payment to Yee in connection with the vote on AB 1309, and UCE 4180 subsequently advised Jackson that his team owner friend had changed his mind.

As part of his plea agreement, Yee admitted that this scheme with Jackson constituted a conspiracy to obtain property under color of official right in violation of 18 U.S.C. § 1951(a).

### (e)      Medical Marijuana Legislation Bribe

As an additional part of his plea agreement, Yee admitted that he accepted the $11,000 cash bribe from UCE 4180 on June 22, 2013.  Yee admitted that he knew the money was in exchange for a meeting that he and Jackson agreed to arrange with another State Senator so that UCE 4180 could

1  discuss his purported interest in statewide marijuana legislation.  Yee stated that he arranged for, and

2  attended the meeting, in his capacity as State Senator and colleague of the other State Senator (hereafter

3  referred to as State Senator 1).  Yee admitted that this conduct constituted honest services wire fraud

4  conspiracy in violation of 18 U.S.C. § § 1343, 1346, and 1349.

5      The payment in the hotel room on June 22, 2013 was just one of two bribe payments that Yee

6  accepted from UCE in the course of  Yee's and Jackson's conspiracy to exchange Yee's official acts for

7  money.  On September 17, 2013, UCE 4180 gave Yee $10,000 in cash in exchange for the meeting that

8  Yee set up with a second State Senator (hereafter State Senator 2).  When he did so, UCE 4180 asked

9  Yee what figure Yee would want for putting a medical marijuana bill into the legislative process.  Yee

10  said that legislation was "a heavy lift" and he would need to think about a number.  Yee said he was an

11  "honorable" business person and would not take UCE 4180's money if Yee didn't think he could be

12  successful on the legislation.[33]

13      By the time UCE 4180 became involved with Yee and Jackson, Yee had accepted the $10,000

14  bribe from UCE 4773 in connection with the Well Tech call and letter; provided the Chee Kung Tong

15  certificate in exchange for cash payment from UCE 4599; and launched the scheme to extort money in

16  exchange for the CSAC vote.  In expressing his desires to Yee and Jackson, UCE 4180 was

17  unequivocally candid in his *quid pro quo* talk with Yee and Jackson.

18      On April 6, 2013, at an early stage of the relationship, Jackson told UCE 4180 that he had

19  spoken to Yee about UCE 4180's interests, and Jackson would be acting as the middleman.  Jackson

20  said that Yee could not talk mutual benefit.  UCE 4180 said that the "state's gonna have to take a stand."

21  Jackson replied:  "and he's willing to take a stand."  UCE 4180 said:  "That, sir, means we can get into

22  business together.  Right here, that's the statement I'm looking for."  Yee then joined the April 6 meeting

23  and talked about State Senator 1's interest in marijuana legislation.  When UCE 4180 asked:  "how do

24  we get you elected?"  Yee responded:  "I'm going to leave that to what you think you can handle.  But

25

26  _____

27  [33] Recording 1D205.  On two earlier dates, UCE 4180 arranged to wire a total of $5,500 to Jackson's bank account.  UCE 4180 told Jackson these were payments to Yee's campaign in exchange for Yee's assistance on UCE 4180's legislative goals.  Further, as described in the section above, at the May 17, 2013 dinner at Alexander's Steakhouse, UCE 4180 gave Yee $5,000 cash.  UCE 4180 provided this because he learned that Jackson likely pocketed most of the $5,500.

28

whatever fundraising you can do I would appreciate it." [34]  Earlier, on March 26, 2013, Yee and Jackson talked about wanting to get $10,000 from the individual (a Confidential Human Source) who was a purported colleague of UCE 4773 and who introduced Yee and Jackson to UCE 4180,and $10,000 from UCE 4599.  Jackson said he wanted to "squeeze" $50,000 to $100,000 from UCE 4180.

From this point on, there were numerous conversations between Yee, Jackson, and UCE 4180. Jackson played his role as intermediary and Jackson and Yee consulted regularly on how to deal with UCE 4180 --- including how to get money out of him.  For instance, on May 18, 2013, they discussed getting "eight" so far from UCE 4180.  Yee said UCE 4180 gave him "5" and added:  "I need to turn that into a check."  Yee said UCE 4180 – whom Yee referred to as a "street punk who wants to make some money" -- needed to understand that this is "a long-term investment" and "needs to keep helping us out."  Yee said that if he won, he would have eight years to help out UCE 4180.  Yee again mentioned that it would take some time to turn UCE 4180's money into a check. [35]

Most importantly, Yee continued to interact with UCE 4180 and fulfill UCE 4180's requests even though he was well aware that what he was doing was pay to play.  An example of Yee's understanding of the line he could cross with UCE 4180 is in the May 10 / May 14 sequence of events. On May 10, 2013, Yee and Jackson discussed UCE 4180's request to meet with State Senator 1.  Yee expressed concern about connecting doing things for UCE 4180 with payment of money.  He said: "Shit.  That's pay to play and you can't do that.  You cannot connect.  You could go to jail like that, man."  Jackson laughed and then asked if Yee wanted to maintain the relationship.  Yee said:  "They got to understand this is about long term.  It's not about short term."  [checked; KJ 12523]

On May 14, 2013, Yee and Jackson again discussed the meeting that UCE 4180 requested with State Senator 1.  Jackson asked Yee if it was that hard to arrange and Yee said he could ask, and would be seeing the Senator the next day.  A bit later in the conversation, Yee said in the meantime, "just give me the goddam money, man, shit…. Tell them to write some fucking checks, man."  [checked.  LY 6787]

Despite this awareness of UCE 4180's intentions and pay to play nature of their proposed

---

[34] Recording 1D106

[35] KJ 13624

relationship, Yee did not cut UCE 4180 off.   In fact, Yee went ahead and arranged and attended the meeting between UCE 4180 and State Senator 1 where they discussed marijuana legislation.   On the way to the Sacramento meeting, which took place on June 20, 2013, UCE 4180 told Yee he was willing to make campaign donations to secure support from legislators.   Yee responded:   "You can't do that, man, you go to jail for that."   Yee explained that contributions could not be linked with any items, bills, or amendments.   As they continued to walk to the meeting, Yee asked UCE 4180's undercover girlfriend to keep UCE 4180 under control.   Yee later told her:   "I'm just trying to run for Secretary of State.   I hope I don't get indicted." [36]

The June 22, 2013 between Yee, Jackson, UCE 4180, and UCE 4180's undercover girlfriend at their hotel room is discussed above in the section on the workers comp legislation scheme.   They also discussed marijuana legislation.   In addition, Yee talked about the skittishness of legislators after the FBI search of State Senator Ron Calderon's office.   UCE 4180 put an envelope containing $11,000 in one hundred dollar bills on the coffee table in front of Yee and Jackson and said:   "this is a campaign donation and Keith and you can talk about that.   That's for the meeting with [State Senator1]."   [at 12:25].   The envelope stayed on the coffee table while Yee discussed the upcoming legislation on the workers comp bill.   Yee explained how his vote was critical, how he controlled two votes, and that is why he was the center of attention.   When Yee and Jackson got up to leave, Jackson was distracted talking to UCE 4180.   Yee gestured to the envelope, but Jackson did not notice.   Eventually, Yee walked over to Jackson, tapped him on the shoulder, gestured to the envelope, and said "take that."   Jackson grabbed the envelope and they left.   The money in the envelope is the subject of one of the money laundering charges against Yee and Jackson.

On July 4, 2013, Jackson told Yee that UCE 4180 was coming back to California and wanted to move forward and meet more legislators.   Yee said, "he should just give us the money and then get on with it." [37]   In a phone conversation with UCE 4180 and Jackson on July 13, 2013, Yee said he was going to introduce UCE 4180 to another legislator at an upcoming event.   Yee introduced UCE 4180 to the legislator at an event in Los Angeles that evening.

---

[36] Recording 1D154

[37] LY 9802

When Yee and Jackson spoke two days later, on July 15, 2013, Jackson told Yee that UCE 4180 did not provide any money.  Yee complained:

> Yee:  So he came all the way out here and he didn't get us anything?
> Jackson:  Not a damn thing.
> Yee:  That's so wrong, man.
> Jackson:  Yeah[38]

In another conversation on July 15, 2013, Jackson and Yee complained again about UCE 4180 and demonstrated their expectation of *quid pro quo* from UCE 4180:

> Jackson:  I think I'm gonna walk away.
> Yee:  I don't know, you do what you gotta do, you know.  It's just that, you know, the guy's just dragged, for all the stuff we've done, huh?  What have we come up with?  $15,000?
> Jackson:  Yeah, I know.
> Yee:  $15,000, man, shit.  For what we did, man?  Shit.  You know, we got him close to [State Senator 1].  We got him close to [the legislator].  You know, Steinberg's gonna be gone and then you gonna have … You know, [the legislator], man, shit.  You know, you could have worked that man, shit.  he doesn't see it, you know.[39]

Despite complaining about UCE 4180, both Yee and Jackson continued to deal with him in hopes of getting at least $50,000 out of him.  UCE 4180 expressed dissatisfaction as well and said hereafter he would pay for meetings on a meeting-by-meeting basis.  After that, Yee came up with the idea of introducing UCE 4180 to a second State Senator (hereafter State Senator 2).  The meeting between UCE 4180 and State Senator 2 took place, with Yee and Jackson present, at the State Senator's office on August 25, 2013.

When Jackson met with UCE 4180 on September 17, 2015, Jackson said that Yee was upset because he thought UCE 4180 might be working with someone else and UCE 4180 had not paid for the meeting with State Senator 2.  In response, UCE 4180 showed Jackson $10,000 in cash that he intended to give to Yee at dinner that night.  Later that evening, before Yee arrived at the restaurant, Jackson asked UCE 4180 to contribute another $50,000, without strings, to show good faith.  Once Yee arrived and the three men sat down to dinner, they discussed marijuana legislation and UCE 4180 said he was paying for meetings.  Yee said that was UCE 4180's expectation, and at that point, UCE 4180 gave Yee the envelope containing $10,000 cash.  UCE 4180 said the playing field was now even, referring to the

---

[38] LY 10852

[39] Recording provided to the Court, 7/15/2013, LY 10917, starts at beginning of recording.

1   meeting with State Senator 2.  It was at this meeting that UCE 4180 asked Yee how much he would

2   want to put a medical marijuana bill into legislation and Yee said he would have to think about it. [40]

3        UCE 4180 had two subsequent conversations on the topic, but the matter did not develop further

4   because the FBI was winding down this part of the investigation.

5             **2.    Weapons Trafficking**

6        As part of his plea agreement, Yee agreed that a meeting in which he participated with Jackson

7   and co-defendant Wilson Lim on March 14, 2014 constituted a conspiracy to knowingly import and

8   bring into the United States any firearm and ammunition in violation of 18 U.S.C. § § 371 and 922(l).

9   Doc. 852, at 5.  As to the March 14, 2014 meeting, Yee admitted that he met with Jackson, Lim, and

10  UCE 4599 and discussed UCE 4599 purchasing weapons from the Philippines to import into the United

11  States.  Yee admitted that he and Jackson arranged the meeting with the intention that UCE 4599 would

12  be able to utilize introductions and arrangements from Yee, Jackson, and Lim to purchase weapons,

13  firearms, and arms from other individuals in the Philippines.  UCE 4599 said that he wanted automatic

14  weapons and discussed with Yee, Jackson, and Lim transporting the weapons from the Philippines to the

15  Port of Newark, New Jersey, and then distributing the weapons to others.  *Id*. at 5.   Yee agreed that he

16  engaged in this act as part of the racketeering conspiracy with Jackson.  *Id*. at 3.

17       As with the other offenses described above, there were a number of additional acts in which Yee

18  and Jackson participated in order to further this aspect of the racketeering conspiracy.  And as with the

19  public corruption offenses discussed above, Yee again used Jackson as his buffer and spokesperson.

20  Jackson acted as the middleman up to a point in the weapons trafficking conspiracy, and as the

21  conspiracy progressed, on December 17, 2013, collected a $5,000 contribution from UCE 4599 that

22  went into the Secretary of State campaign. UCE 4599 paid that sum for a promised meeting with a

23  Russian arms trafficker that Yee knew.  When UCE 4599 pressed for the meeting for which he had paid,

24  Yee stepped in to deal with UCE 4599 and to make sure he was not cut out of any relationship that

25  might form between UCE 4599 and the arms dealer.  Eventually, on March 11, 2014, Yee introduced

26  UCE 4599 to Lim.  Lim was not the arms dealer, but had connections in the Philippines to individuals

27

28

---

[40] Recording 1D205

SENTENCING MEMORANDUM
CR 14 0196 CRB                    26

with access to armaments.  As a result of the introduction and as acknowledgement that the deal was moving forward, UCE 4599 gave Yee $6,800 in cash along with a requested list of the kinds of weapons UCE 4599 wanted to purchase.

The evolution of this deal, Yee's central role in it, and the facts showing that Yee had both the wherewithal and the intention to carry through on the plan to traffic arms from the Philippines, are described below and in the related section in the United States' Sentencing Memorandum for Keith Jackson, which the government incorporates herein by reference.

The arms trafficking conspiracy started on August 2, 2013, when Jackson and Brandon Jackson met with UCE 4599 to discuss the purchase of additional firearms from Jackson, Brandon Jackson, and Marlon Sullivan.  Unexpectedly, Jackson told UCE 4599 that Yee was associated with a Russian who was an international arms dealer.  Jackson said the Russian arms dealer was currently shipping large stockpiles of weapons to the Philippines.  UCE 4599 said he would be willing to pay Yee and Jackson if there was a successful arms deal.

When UCE 4599 met with Jackson and Brandon Jackson again on August 5, 2013 and purchased additional firearms, Jackson said he had spoken with Yee about introducing UCE 4599 to the arms dealer.  Jackson said that Yee wanted money for his Secretary of State campaign in exchange.  Although the Title III intercepts were no longer taking place after July 31, 2013 and investigators were not able to confirm Jackson's representations, the representations were entirely consistent with Yee's and Jackson's established pattern of dealing with UCE 4599.  UCE 4599 agreed to make a donation in exchange for an initial meeting.

As UCE 4599 and Jackson continued to meet and engage in firearms sales, a murder for hire conspiracy, and a drug conspiracy with Jackson, Brandon Jackson, and Marlon Sullivan, the arms dealing topic remained on the table.  Jackson related that Yee was cautious, as was the Russian.  UCE 4599 started to express skepticism.  By this time, the FBI was getting ready to wind down the investigation, consummate the drug transaction with the Jacksons and Sullivan, and execute arrest and search warrants.  However, Jackson's insistence that the arms trafficking deal was real prompted the FBI to keep the investigation going.  For instance, on September 13, 2013, Jackson told UCE 4599 that the trafficker was real, it was Yee who approached Jackson with the opportunity, but the dealer wanted to

move slow.  In order to test Jackson and see if there was really something there, UCE 4599 tied any drug deal to results in terms of meeting the arms dealer.

When Jackson met with UCE 4599 on December 3, 2013, he told UCE 4599 that Brandon Jackson and Sullivan had enough money for ten kilos of cocaine.  When UCE 4599 asked about the arms trafficker, Jackson reported that Yee had met with the Russian to hash out a plan and Yee wanted to broker the conversation.

When Jackson, Brandon Jackson, and UCE 4599 met on December 13, 2013, Jackson assured UCE 4599 that Yee was going to call the Russian that day.  Jackson added that the Russian had access to "containers" full of weapons.  Jackson also said that Yee had a Filipino associate who was supplying "heavy" weapons to rebel groups in the Philippines.  Jackson named Dr. Lim and another individual as connected to the source of supply in the Philippines.

Three days later, on December 17, 2013, UCE 4599 gave Jackson a check for $5,000 made payable to Yee's Secretary of State campaign.  UCE 4599 told Jackson he wanted a call from Yee to acknowledge receipt of the check.  During the meeting, Jackson received a call from Yee and gave the phone to UCE 4599.  UCE 4599 mentioned the $5,000 contribution and said he was looking forward to meeting "mutual friends."  The check was deposited to the campaign's account.

Two days later, FBI agents surveilled Yee and Jackson meeting with an individual whom the FBI identified, was Russian, and whom the FBI had reason to believe was connected to arms trafficking.

On January 22, 2014, UCE 4599 had his first discussions with Yee regarding the arms trafficking deal.[41]  Before Yee arrived, Jackson told UCE 4599 that he was confident the weapons deal would happen and he, Jackson, needed to be involved at every step.  When Yee joined the conversation, he told UCE 4599 that he had known the Russian for a number of years and they had a close relationship. [starts at timestamp 47:00].  Yee said the Russian "has things you guys want."  [at 48:00].  Yee cautioned however, that doing business with the Russians is not easy, and not for the "faint of heart." [at 48:28].

---

[41] This was the first of five meetings between UCE 4599 and Yee – also attended by Jackson – during which Yee discussed weapons trafficking with UCE 4599.  The government has provided the Court with the entire audio recording of each conversation so the Court can review the complete conversations.  The recording for the January 22, 2014 meeting is the disc with Recording 1D370, 1/22/2014.

1    Once Yee and UCE 4599 started discussing the matter directly, Yee was very open with UCE

2    4599 about his intentions and strived to convince UCE 4599 that such a deal was doable.  At the first

3    meeting on January 22, 2014, Yee discussed the care that needed to be taken with this kind of activity.

4    [at 48:30].  UCE 4599 said he understood and agreed that safety concerns were "paramount."  UCE

5    4599 said "we're talking millions of dollars."  Yee said he had spoken to the Russian and referred to him

6    by the name "Leon." Yee emphasized trust and that the Russian trusted Yee, but did not know Jackson

7    or UCE 4599.   Yee said this was going to take time.  Yee said the possibility of  a deal with the Russian

8    arms dealer was "real."  [at 54:25].  He said he was not going to lead UCE 4599 on a "wild goose

9    chase."  [at 55:10].  Yee added:  "I know what he can do.  I have seen what he has done in the past on

10   other products and this guy has the relationships."  [at 55:30].  Yee said the Russian had contacts in

11   Russia, the Ukraine, Boston, and Southern California.  [at 57:15].  Yee added:  "Do I think we're going

12   to make some money?  I think we're going to make some money.  Do I think we're going to get the

13   goods?  I think we're going to get the goods."   [starts at 58:00].  Yee said the question now was just the

14   timing and who was going to be directly involved.  Yee then discussed using Jackson as an

15   intermediary, but the Russian needed to be comfortable.

16    Yee mentioned a trip to the Philippines and said that the Muslim countries have sources, as well

17   as Russia, and there are opportunities.  [starting at 1:02:13].  Yee recounted a story about the last time he

18   was in the Philippines and said he was surrounded by "15 armed guards with machine guns protecting

19   me because of Muslims."  [at 59:10].  Yee added:  "It's serious, serious stuff."

20    Jackson then asked what type of weapons UCE 4599 was looking for.  [starts at 1:02:40].  UCE

21   4599 said anything "shoulder fired," "anything missile related."  Yee asked: "Automatic weapons?"

22   UCE 4599 responded:  "Automatic weapons."  Yee clarified and asked "not semi?  full?"  UCE 4599:

23   "Yes, that would be the preference."  He added that if they were talking samples, he was prepared to

24   spend "1/2 million, 2 ½ million, easy."  Yee responded that for that kind of detail, he was going to let

25   UCE 4599 let Jackson know, and Jackson would let Yee know, and Yee would get to the Russian.

26    Yee said he saw their relationship as being "tremendously beneficial, not now, but into the

27   future."  He said when "we become Secretary of State, one of the things is, I don't want to go to jail, so

28

SENTENCING MEMORANDUM

if you make all the money, see what I mean?, and I don't make any, I think that's the best relationship, and there will be tremendous opportunity." [starting at 1:04:30].

At a follow-up meeting between Jackson and UCE 4599 on January 24, 2013, Jackson said that he was working on Yee to set up the meeting with the Russian arms dealer. Jackson said that Yee was afraid of being cut out of the opportunity to make money if UCE 4599 and the Russian deal directly. Jackson added that there was another opportunity to procure weapons through a "Filipino connection." Jackson mentioned that Yee brought up the opportunity to traffic in weapons to Jackson during a trip to Los Angeles. Jackson said he picked up Yee and the Russian at the airport and introduced the Russian to Jackson. Jackson also said that when Yee spoke of traveling to the Philippines and the "15 armed guards," Yee was referring to the rebel group being supplied by the source of supply connected to Dr. Lim.

On February 25, 2014, UCE 4599 met again with Yee and Jackson and UCE 4599 said he wanted to meet the Russian.[42] Yee told UCE 4599 that he understood UCE 4599's concerns about meeting the dealer and assured UCE 4599 that the dealer was "the real deal." Yee agreed to try to set up a meeting, but warned UCE 4599 that the Russian would not discuss firearms openly at the initial meet. UCE 4599 said that he anticipated spending $2 million for the first shipment of weapons. [at 1:00:00]. Specifically, UCE 4599 said that he was looking to obtain a container of weapons. UCE 4599 said something to the effect: "I'm not saying one AK. I'm saying a container of AKs. These are big deals, these. I need this guy to understand he is dealing with professionals and not talking bullshit numbers." Yee told UCE 4599 that he should start by doing small deals with the Russian. He warned that the Russian will not be willing to do business with UCE 4599 unless he, Yee, was involved.

At this same meeting, Yee cautioned that they needed to be careful and referenced the recent indictment of State Senator Calderon. Yee said Calderon brought too many people together. [at 42:00]. Yee repeated that he believed the Russian could get weapons. As to the weapons, Yee said he was "agnostic." He added: "People want to get whatever they want to get. Do I care? No, I don't care. People need certain things." [at 44:00]. Later in the meeting, Yee said that his long career in public

---

[42] Recording provided to the Court, 1D383, starting at approximately 40:45 and continuing through 1:12:40.

1    office was due to being careful and cautious.  He warned that if the Russian ever got caught, he might

2    implicate UCE 4599.  [at 1:04:00]

3           By the time of UCE 4599's meeting with Yee and Jackson on March 5, 2014, Yee had changed

4    the source of weapons from the Russian arms dealer to a source of supply in the Philippines.[43]  Before

5    Yee arrived at the meeting, Jackson told UCE 4599 that he and Yee had met with Yee's friend, Wilson

6    Lim, the previous Sunday.  Lim's nephew would be the point of contact in the Philippines.  When Yee

7    joined the meeting, he talked of rebels in the Mindanao area and said he had visited there approximately

8    two years earlier.  [starting at 48:00]  Yee explained that his friend, Dr. Lim, was from this area, where

9    Muslim rebels are located.  Yee said Lim knew the source of supply of weapons and described how the

10   shipping would take place from a port in the Philippines.  Yee said they have done it before, and they are

11   not strangers to this process.  Yee said that the SOS was surprised to hear that UCE 4599 wanted to

12   spend $2 million for the initial purchase of weapons.  Yee thought $2 million was a lot of money and

13   said "we can't catch attention to any of this stuff."

14          Yee, Jackson, and UCE 4599 then discussed the types of weapons the SOS might be able to

15   supply.  [starting at 54:00].  Yee said "automatic weapons are the equivalent of M-16s."  Yee said he

16   told Lim that if he was UCE 4599, he would not send a boat to the Philippines for fifty rifles.  Yee said

17   he asked about on rocket launchers and "he said that would be fine."  Yee suggested that UCE 4599

18   provide a list.  Yee added  that Lim wanted to know how UCE 4599 planned to remit payment.  UCE

19   4599 said he would deliver $2 million cash.  Yee also said that Lim would not go on the first trip

20   without Yee.  "This is major stuff … not for the faint of heart."  Later, Yee told UCE 4599 to take things

21   one step at a time, get the election out of the way, and there were approximately 100 rifles available.

22   [starting at 1:05:10].

23          When UCE 4599 said that his family in New Jersey wanted to provide support for Yee's

24   Secretary of State bid, Yee said that he appreciated that.  He added:  "I can be of help to you for ten

25   months or I can be of help to you for eight years.  I think eight years is a lot better than ten months."  He

26

27

28
_____

[43]  Recording provided to the Court, 1D390, 3/5/2014, starting at 42:00 and continuing to 1:11:35.

said he hoped the win the Secretary of State seat.  [at 45:20].  Yee explained his needs, and said there was only $100,000 between him and competitor Padilla.  "Whatever you can do get us the money…"

At a meeting on March 11, 2014, Yee introduced Wilson Lim to UCE 4599 and vouched for Lim.[44]  Lim and Yee said that the weapons could be shipped to Manila or the port of Cagayan de Oro.  [at 1:30:28].  They said Manila was the safest.  [1:26:03]  Lim said his contact in the Philippines would be his nephew.  [starting at 1:14:00].  Lim said he preferred it if UCE 4599 would put together a list of weapons he was seeking.  Lim said a captain in the Philippines military would provide the weapons to Lim's nephew.  In response to UCE 4599's inquiry about weapons that were available, Lim responded:  "All kinds of things, we just have to look for it."

Yee discussed the MILF [Moro Islamic Liberation Front] and discussed the factions and weapons that came from the military.  [starting at 1:31:50].  Lim and Yee encouraged UCE 4599 to deal in smaller amounts of weapons initially to avoid attention in the Philippines.  [starting at 1:15:00]  Yee also said that Lim would not go to the Philippines without Yee, and Yee would not be ready to go until November.  He added:  "Once things start to move, it's going to attract attention.  We just got to be extra, extra careful."  [starting at 1:25:14].  Toward the end of the meeting, UCE 4599 agreed he would provide a list of what he was seeking.  [starting at 1:33:30].  UCE 4599 said he was interested in "light, mobile, and devastating."  Yee suggested UCE 4599 "prioritize."

At the end of the meeting, Yee and UCE 4599 discussed "protecting the entire enterprise." [starting at 1:37:00].  Yee said he understood this was probably not a one-time deal with UCE 4599 and they needed to build in layers of protection, avoid "creating evidence and a trail."  Lim asked UCE 4599 if he was "the Mafia."  UCE 4599 acknowledged that he was.  [starting at 1:41:00].

The final meeting on the subject between UCE 4599, Yee, and Jackson took place on March 14, 2014 at the Waterbar Restaurant in San Francisco.[45]  Jackson's wife was also present.  Yee said he was "frantically raising money" [starting at 36:10] and was hoping for money from UCE 4599.  He said he wanted to "get that 100 grand."  [at 37:15].  Yee and Jackson engaged in lengthy discussions about the

---

[44] Recording provided to the Court 1D394, 3/11/2014, starting at 1:08:00.  Lim is difficult to understand due to his health issues.  Oftentimes, UCE 4599 or Yee would repeat what Lim said.  In addition, UCE 4599 reported the content of the conversation in his 302 report.

[45] Recording provided to the Court, 1D396, 3/14/2014, starting at 35:00.

need for money, getting checks, and how they would process large amounts of cash into checks for the campaign.  UCE 4599 told Yee he was prepared to give Yee $6,800 cash and a list of weapons for Yee to give to Lim.

Later that evening, UCE 4599 and Yee walked alone outside the restaurant.  [starting at 1:40:00] About the election, Yee commented, "I've gotta win."  UCE 4599 asked how the list would get to Lim, and Yee said he would look at the list, probably make a Xerox to keep a copy, and then ask Lim to mail the list.  [1:41:38].  Yee explained his understanding that the Muslims were getting the weapons through the Filipino military.  Yee said he did not want to do a "big buy" at first.  [1:43:25]  UCE 4599 explained that his expert advised that $2 million is not much, and discussed profit margins.  Yee asked if there were any priorities, and UCE 4599 said the list was based on what his "subject matter expert" thought they could get.  UCE 4599 gave the $6,800 cash and list to Yee and apologized for cash as opposed to checks.  Yee said it was okay.

### 3.   __Money Laundering__

The third area of criminal activity in which Yee and Jackson engaged as part of the racketeering conspiracy was money laundering.  As part of his plea agreement, Yee admitted that he gave Jackson the $6,800 he received from UCE 4599 on March 14, 2013 knowing that Jackson would arrange to exchange the cash for one or more checks made payable to the Secretary of State campaign.  Jackson did exactly that when he obtained three checks from friends and acquaintances totaling $4,000, and reimbursed each with cash.  Yee agreed that he engaged in a conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).

While not part of the factual basis for the plea, Yee and Jackson engaged in the same conduct in connection with the $11,000 cash (in $100 bills) UCE 4180 gave Yee and Jackson in the hotel room on June 22, 2013.  Jackson called a friend (Friend 1) around June 30, 2013 and asked her to write a check for $5,800 made payable to Yee's Secretary of State campaign.  Jackson told her he would pay her back with cash.  The friend agreed to the request and Jackson picked her up one day at work.  According to Friend 1, Jackson had her drive to Yee's house.  Jackson went inside for five minutes, and came out with a paper bag containing cash.  Jackson peeled off 58 one-hundred dollar bills and gave them to Friend 1.  Friend 1 saw that the bag contained more cash.  Friend 1 gave Jackson the check, which was

eventually deposited to the campaign's bank account.

Jackson also asked Friend 1 if she could have one of her friends do the same thing.  She agreed to ask Friend 2 and Friend 2 agreed to the request.  Friend 2 wrote a check for $4,800 to the campaign and with her mother's permission, wrote one on her mother's business account for $2,000.  Jackson picked up the checks from Friend 2 and gave her $6,800 in cash.  Friend 2's bank records show that she deposited 48 $100 bills to her account.  These two checks were also deposited to the Secretary of State campaign account.

As discussed above, UCE 4599 gave Yee $6,800 cash on March 14, 2014, along with a list of weapons he wanted to purchase.  During the meeting with UCE 4599 and Jackson at the restaurant that evening, Yee pressed UCE 4599 for $120,000 for the campaign and said he needed it by March 17, 2014. [starting at 35:00]   UCE 4599 said he would talk to his father about it and asked if Yee and Jackson could handle "bulk cash."  [at 38:46].  Jackson said he already had "eight people lined up."  Yee cautioned that they had to be "really careful" and asked if the people were solid.  Jackson assured Yee that they were.  Yee added that if UCE 4599 was able to come up with checks, Jackson could take a picture of the check and send it to the campaign finance manager.  Yee said that way, they could file the necessary reporting paperwork.

Friend 1 recalled that Jackson approached her again in mid-March 2014 and asked her to write another check to the Yee campaign.  He asked her to write it out for $1,000 and send a photo of the check to the telephone number Jackson provided.  That was the phone number of the campaign finance manager.  Friend 1 agreed to do so.  She wrote the check and sent the photo, but said Jackson never picked the check up from her.  She tore it up when Jackson was arrested on March 26, 2014.  The check was reported by the campaign on March 17, 2014.

In mid-March 2014, Friend 2 received another request from Friend 1 to write out a check to Yee's campaign.  Friend 2 wrote out a check for $2,000 to the Yee campaign, as well as a $1,000 check on her mother's business account.  Friend 2 recalled giving the checks to either Friend 1 or Jackson; she said she was reimbursed in cash by Jackson.  Campaign bank records show the two checks deposited to the campaign account.

B.      **Calculation of Sentencing Guidelines**

The government understands that the Probation Office is submitting a revised final Presentence Report that reflects a correction to the calculation of the adjusted base offense level for Count Group 1 (¶ 66) to level 28, after deleting the adjustment for abuse of trust in ¶ 64. That correction will result in a Combined Adjusted Offense Level of level 30, rather than level 32. PSR ¶ 82. If Yee qualifies for acceptance of responsibility, that will reduce the total offense level to level 27. PSR ¶ 86. The applicable guideline range will be 70 to 87 months. With those corrections, the government has no objection to the calculation of the sentencing guidelines for Yee.

In the course of making comments on the draft Presentence Report, Yee raised an objection to the inclusion of the $60,000 campaign donation negotiated by Yee and Jackson with UCE 4180 in connection with the workers comp extortion scheme. Yee objected that (1) U.S.S.G. § 2C1.1(b)(2) only applies to benefits received for a payment, and there was no actual payment here; and (2) there was no evidence that Yee intended or committed to the $60,000 donation, and the negotiation of such payment by Jackson was not reasonably foreseeable to Yee. The Probation Officer correctly rejected those objections.

First, § 2C1.1(b)(2) encompasses "the value of anything obtained *or to be obtained* by a public official *or others acting with a public official*, …" (emphasis added).   The Sentencing Commission noted that "[f]ailure to complete the offense does not lessen the defendant's culpability in attempting to use public position for personal gain." Commentary, § 2C1.1.

Second, under U.S.S.G. § 1B1.3, Jackson's agreement as a co-conspirator with Yee to the $60,000 was within the scope of the jointly undertaken criminal activity, in furtherance of that activity, and reasonably foreseeable to Yee. In fact, the events on June 22, 2013 provide strong circumstantial evidence that Jackson discussed the figure with Yee and Yee approved it as Jackson said he did. While in the hotel room, UCE 4180 told Yee that the NFL team owner had given UCE 4180 a figure. Yee told UCE 4180 and Jackson to talk about that. When Yee and Jackson left the room together, Yee said Jackson would be back after Jackson walked him to his car. This was in response to UCE 4180 asking if they needed to talk. When Jackson came back to the room shortly thereafter, Jackson reported Yee said to get "what you guys are willing to do" and "get a number." UCE 4180 told Jackson the number was

60, and Jackson said he would tell Yee that number when he met with him later.  Phone records show a call between Jackson and Yee immediately after Jackson left the room.  Later that day, Jackson texted UCE 4180 that "where [sic] all good on this end."  From this, there is more than sufficient evidence to include the $60,000 in the calculation of the base offense level for § 2C1.1.

Yee's other complaint to the Probation Office about § 2C1.1(b) was that using the loss table from the fraud guideline, as § 2C1.1 instructs, is not an accurate measure of the circumstances of the case.  The Sentencing Commission was quite deliberate in this matter, finding that the value of the bribe or the benefit to be derived from the bribe, whichever is greater, is one measure of the seriousness of the bribery offense.  *See* Commentary to § 2C1.1, Background.  Further, it noted that "for deterrent purposes, the punishment should be commensurate with the gain to the payer or the recipient of the bribe, whichever is greater." *Id*.

Yee's final objection to § 2C1.1 is that the enhancements under subsection (a)(1) for being a public official, and under (b)(3) for being an elected public official were "piling on."  Yee submitted that a base offense level of 14 would be sufficient, without adding any other adjustments.  This objection is baseless, given that each factor addresses a different aspect of Yee's corrupt conduct.  *See*, *United States v. Archdale*, 229 F.2d 861, 869 (9th Cir. 2000)(double counting of a factor is permitted where "each invocation of the behavior serves a unique purpose under the Guidelines.")  The amount of the bribe or value to be received is one measure of the magnitude of the corruption.  The other two enhancements address different concerns.  An additional two points under subsection (a)(1) take into account the increased level of seriousness when the bribery offense is committed by a public official, as opposed to someone who is not in such a position of trust.  If that official is an elected official, as opposed to appointed, the Commission determined that circumstance warrants an additional enhancement under subsection (b)(3).  Both these enhancements, which apply here, are rationally based.  *See*, *United States v. White*, 663 F.3d 1207, 1217 (11th Cir. 2011).  [46]

---

[46] Yee has also objected to the finding, in par. 68 of the PSR, that the arms trafficking conspiracy involved more than 200 firearms.  Keith Jackson has raised the same objection, which was rejected by the Probation Office.  The facts establishing the magnitude and goals of the overall arms trafficking conspiracy, including in the future after the November 2014 SOS election, are discussed above in the Offense Conduct section.  They are further discussed in the United States' Sentencing Memorandum for Keith Jackson.  The government incorporates that discussion by reference here.  All

C. **Government's Sentencing Recommendation**

The government recommends that the Court sentence Yee to 96 months in custody followed by a three-year term of supervised release.  The government additionally recommends that the Court order Yee to pay a fine of $25,000, the minimum fine under the Sentencing Guidelines.  This sentence reflects the serious nature, as well as the breadth and length, of Yee's crimes, which involved a pattern of corruption and cynical abuse of the public trust all in the quest for greater political power.  Apart from providing just punishment for Yee, a lengthy prison term will serve an equally important purpose in promoting deterrence and respect for the law.  Others who may consider taking Yee's path of expediency in order to deal with the intense demands of campaign fundraising will know that the consequences of such conduct are real and severe.

1. **Nature and Circumstances of the Offenses**

The offenses committed by Yee were no one-time straying by a public official from lawful and ethical conduct.  They were a string of numerous serious illegal acts over a period of three years that only ended when Yee and Jackson were arrested.  The crimes included taking at least four bribes, coming up with two schemes to extort money in exchange for Yee's vote on legislation, engaging in a conspiracy to broker arms, and laundering some of the money acquired from these crimes.

The offenses were not committed by a rookie who did not know better and succumbed through inexperience to the powerful pressures of campaign fundraising.  Yee had a long history of holding public office and running campaigns for those positions.  Yee is a seasoned holder of public office who knows better.  One of the sobering questions raised by his conduct here is whether the frequency and breadth of his corrupt conduct over the three years of FBI scrutiny is indicative of how he has conducted himself previously.  This is especially troublesome in light of the fact that the CSAC extortion scheme was only discovered by the happenstance that Yee's phone conversations were being intercepted at the moment when Yee explained the scheme to Jackson and recruited Jackson to participate.

When Yee came into contact with the individuals who apparently had money and might be willing to support him, Yee and Jackson instantly attached themselves to these individuals and pressed them for money.  When the three undercover agents made it clear that their money came with strings attached and they expected Yee to perform acts within his official capacity in exchange for donations,

there was only one time that Yee hesitated and said no.  That was when UCE 4599 asked for a favor for Raymond Chow.  Yee balked not because doing the favor was illegal or unethical; he said no because it was too dangerous for him to be closely associated with Chow.

That was the pattern with Yee.  Apart from that single instance, Yee never hesitated to engage in the *quid pro quo* exchange of official act for money.  When it came to blunt-speaking UCE 4180, who would ask outright how much things cost, there is no evidence that Yee ever hesitated to engage in the act requested in order to acquire campaign donations.  That pattern started with UCE 4773.  When UCE 4773 asked for the Well Tech phone call in exchange for Yee's request for $10,000, Yee did not miss a beat.  He said:  "Just let me know."

Yee may well point to times when he said "you can't do that, that's pay to play."  But that would miss the point.  What Yee said and what he intended and did are two critically different things.  It is one thing to say you can't do that, you can't talk like that, and I am walking away.  It is another to do what Yee did.  It was true:  you can't do that, it *is* pay to play.  Yee said he did not want people talking that way.  But that did not mean that Yee was unwilling to do the acts.  He never walked away.  The evidence throughout this case shows without a doubt that Yee was willing to do the act. He just did not want the undercovers to talk the way they did.  It is probably no coincidence that Yee repeatedly expressed concerns that people were wearing wires.

In repeatedly pursuing the undercover agents, seeking their money, and being willing to exchange acts within his official duties and responsibilities for their money, Yee thoroughly abused the trust the public placed in him.  While the official acts that Yee traded for money ran the gamut from a phone call, to a letter, to access to legislators, to a State Senate honorarium, the most serious without question was his willingness to cast his vote on pending legislation depending on which interested party was willing to pay more.  Jackson captured the essence of the baseness of these schemes when he and Yee discussed how Yee should vote on the athlete's workers comp bill:  "Hey Leland, at the end of the day, support the owners, 'cause the players don't write checks."  Yee did not flinch.  His only comment was that Jackson would be betraying a football player friend.  Yee said, "I don't care."

Voting on legislation is one of the most important duties Yee held and his constituents elected him on the assumption that he would vote only based on their best interests, not based on what would be

1   most profitable for him.  Yee's venality in this regard was a profound abuse of the public's trust.  It is

2   especially so when these were schemes that Yee proposed; they did not come from the FBI.

3          These serious offenses were then compounded by Yee's willingness to engage in arms

4   trafficking in order to come up with more campaign donations from UCE 4599.  Despite the fact that

5   Yee was at the time publicly supporting gun control legislation and was in the news for being the victim

6   of threats from an individual unhappy with Yee's stance, in private, Yee told UCE 4599 he was

7   "agnostic" about the gun trafficking.  People need what they need, he told UCE 4599.

8          Yee's pattern of corruption – where he was well aware of the line that a public official cannot

9   cross and was willing to go over that line repeatedly and without hesitation is unquestionably significant

10  and serious, and the sentence the Court imposes should reflect that seriousness.

11         Yee may argue to the Court, as he did with the Probation Office in connection with preparation

12  of the Presentence Report, that much of the time he was unwitting as to what Jackson was doing with

13  and saying to the undercover agents.  Yee may argue he was out of the loop and did not authorize

14  Jackson to speak for him.  As demonstrated in the recounting above of just some of the evidence, such

15  an argument is baseless.  Jackson shares serious culpability for his whole-hearted participation in Yee's

16  corruption.  However, the overwhelming evidence, as found in the recordings of Yee himself,

17  demonstrates that Jackson consulted with him about all conversations with the undercovers pertaining to

18  Yee, took instructions from Yee, and did Yee's bidding.  As described in the Offense Conduct section

19  above, Yee was not only informed of each bribe, he was fully involved as the decision-maker.  The most

20  vivid and unsettling examples of this are the CSAC and workers comp schemes which Yee designed and

21  in which he instructed Jackson.  Any effort by Yee to minimize his own role and culpability and to shift

22  blame to Jackson should be roundly rejected.

23         Further, any effort by Yee to minimize his role, while unsupportable, would be entirely

24  consistent with Yee's efforts during the course of his criminal conduct to insulate himself behind

25  Jackson.  It was not a matter of Jackson initiating or participating in criminal conduct of which Yee was

26  unaware.  This was a symbiotic relationship where one of Jackson's jobs was to play intermediary and

27  protect Yee so that Yee could later claim – if necessary – that he did not know what was going on.  This

28  is analogous to what Raymond Chow did with George Nieh, as recently established in the trial of Yee's

SENTENCING MEMORANDUM
CR 14 0196 CRB                    39

1  and Jackson's co-defendants.  Jackson was the front man having the conversations, relaying information,

2  and saying "Leland can't have those conversations."  Then, if law enforcement ever appeared, Yee

3  would have the ready-made defense that he did not know what Jackson was doing or saying on his

4  behalf.  Of course, the undercover recordings and, in particular, the Title III interceptions, put the lie to

5  that.

6                 **2.**       **History and Characteristics of the Defendant**

7        In his submissions to the Probation Office, Yee emphasized his years of public service,

8  motivated by wanting to help others and values of compassion and humanitarianism.  Yee spoke of

9  adherence to a personal policy of doing the right thing and lifetime principles of honesty and integrity.

10  While the government does not dispute Yee's years of service in the public sector and accomplishments

11  in those roles, the evidence accumulated over the course of the three-year investigation undermines the

12  image that Yee would like to put forward to the public and the Court.  Yee revealed that he has abused

13  the public trust while serving in his most recent position as State Senator, and as discussed above, this

14  was a pattern of corrupt and dishonest behavior, not some momentary lapse.  These are not the actions of

15  a person committed to principles of honesty and integrity.  Moreover, Yee's own words and conduct

16  severely undermine any contention that his acts as a public official have been motivated solely by the

17  unselfish desire to help others.  That is certainly not what Yee demonstrated when he was willing to

18  trade official acts for money, including his votes on legislation.  As he told one woman with whom he

19  was on intimate terms, he had come to the realization that "at the end of the day, there are people like

20  you who kinda think about the greater good and all that [unintelligible] … no question what really

21  makes the world go around is money."[47]

22        Yee may argue that his dealings with the undercover agents were never motivated by personal

23  greed or a desire to accumulate personal wealth.  Yee may say he was just trying to deal with the

24  realities of getting elected to public office these days, which requires inordinate sums of money.  But

25  one could question whether accumulating money in order to remain in public office and retain power

26  and public stature is not in some ways worse than routing campaign donations to cars, vacation homes,

27

28       [47] LY 1290

women, etc.  This is particularly the case where Yee was engaging in official duties in a corrupt manner in order to hold on to public office.  The voters who elected him expected Yee to act objectively, without personal reward, solely on their behalf of their best interests.  This case demonstrates that Yee did not always do so.  The fact that he committed the instant crimes so he could have eight more years of public office -- this time in a powerful statewide position -- speaks of the most base motivations.

Apart from this, the investigation offered several glimpses into what may be Yee's true character.  What Yee said and did in private, and not for public consumption, reveals a cynical, rather than altruistic, nature.  The fact that Yee would be willing to engage in weapons trafficking and declare himself "agnostic" on the issue while at the same time taking a public stance in favor of gun control has already been mentioned.  Apparently that comment was not just posturing for UCE 4599.  In an intercepted conversation with an unidentified male (UM) on July 28, 2013, Yee revealed a similar cynical attitude toward legislation he was sponsoring on human trafficking.  During the conversation, Yee and the UM discussed, perhaps jokingly, going to prostitutes and Yee bringing Dr. Lim.[48]  The UM mentioned that he knew of some in San Mateo County, and Yee cautioned, "Shit, we cannot have Doc and the Senator go be on the newspaper, man.  Shit.  You crazy or something like that?"  The UM said that the prostitutes won't know Yee, and Yee asked:  "Why? Why? Are they human trafficked in there?"  UM said:  "Yes."  Yee responded:  "Oh Shit, oh my God, I have a bill against human trafficking ok?  Oh shit, and then I'm going to benefit from someone who's been trafficked into the United States, my God."  After a brief exchange, the UM said:  "But it happens all over the place.  It's in (unintelligible) San Mateo."  Yee responded:  "Shit, man, do you think I care man?  All I care about is that the women love me.  That's all I care.  I don't care if it works, the bill works or not, so long as the women think I support women, that's all I care about."   A candid comment such as this substantially undermines claims of being motivated only by compassion and humanitarianism.

Yee demonstrated a different kind of abuse of public trust in his dealings with a female constituent who has discussed her relationship with Yee with the FBI.  In order to protect her privacy, the government here refers to her as Friend A.  The FBI spoke to Friend A because telephone

---

[48] A copy of the recording has been provided to the Court.  LY T3 session 12186, 7/28/2013.

conversations between her and Yee were intercepted pursuant to Title III.  Friend A told the FBI that at a booth at a festival in 2012, she saw a pamphlet about Yee that referred to domestic violence.  She believed that Yee might be able to assist her with court proceedings involving custody of her young daughter.  Friend A returned to the festival the next day and saw Yee at the booth.  She began to cry when she told Yee about her situation.  Yee asked how he could reach her and she provided her cell number.  When she got home, there were already two messages from Yee.  In one, he said he was coming to see her and wanted her home address.  Friend A called Yee and told him the next day was more convenient.  Yee asked what time her children went to bed, and ended up coming to Friend A's home later that night.  Friend A told the FBI that when they met at her home that evening, Yee told her he would try to help and then kissed her.  She reported that from that point on, the relationship was sexual.  Yee proceeded to assist Friend A by referring her to an attorney.  He also loaned her $10,000 in cash.  Friend A used half of the money for an attorney, and still had the remainder when Yee was arrested.  She told the FBI she felt the money was "dirty money" and used it to pay off debts.  Friend A reported that she felt used by Yee, and when he got angry, he would ask for the money back.  She said this scared her because she had ongoing court proceedings.  Friend A told the agents she felt taken advantage of, but needed help and was very grateful to Yee.  She felt she had no one else to turn to and her daughter was safe because of Yee.  An objective view of these events suggests that Yee took advantage of a constituent who was vulnerable and in need for his own selfish purposes.

As further evidence of Yee's lack of honesty and integrity, Yee was not truthful when approached by agents to discuss his dealings with Jackson, David Jordan (UCE-4599), Mike Sweets (UCE 4180), and others.  On March 26, 2014, when the FBI executed arrest and search warrants in this case, two agents went to Yee's house early in the morning and requested a non-custodial interview.  Yee consented to the interview and invited the agents into his home.  Yee then lied to the agents about a number of material matters and minimized other material matters.  Yee's false statements included the following:

- No one ever asked Yee to do anything to support the Chee Kung Tong organization.

- Yee did not know if Jordan donated money to Yee's campaign.

- Jackson never received cash donations for Yee's campaign.

- Sweets may have met State Senator 1, but Yee did not arrange that meeting.
- Yee did not direct Jackson to raise money from Individual B in connection with the CSAC matter.
- Yee never took money from Sweets.
- Yee never asked Jackson to take money on Yee's behalf from Sweets or Jordan.
- Sweets never asked Yee to become involved in California legislation for medicinal marijuana issues.
- Jordan never donated money to Yee's campaign.
- Jordan never asked Yee for a proclamation for the Chee Kung Tong.
- Yee threw away the list of weapons he got from Jordan.  [Note:  the list was found in Yee's house during execution of the search warrant.]
- Yee told Jordan and he and Lim would not be able to assist Jordan with obtaining guns from the Philippines.

These episodes and statements by Yee, along with his offense conduct, demonstrate a venal attitude toward his position as an elected public official and a willingness to abuse his position of trust in any number of ways.  They also reveal a disconnect between the face that Yee puts out to the public and his true nature and character.  They necessarily cast a shadow over his career as a public servant and legislation he has sponsored.

### 3.   Reflecting Seriousness of Offense, Promoting Respect for Law, & Providing Just Punishment

The government anticipates that Yee will seek a lenient sentence from the Court.  Such a sentence would unquestionably undermine, rather than further, the purposes of sentencing as set out in 18 U.S.C. § 3353(a).  One of the primary purposes of sentencing in a case of a corrupt public official is deterrence and promoting respect for the law.  Yee was a State Senator and as the Court is well aware, this case has garnered considerable attention among the public, and particularly among California legislators.  Yee violated the most basic principles of lawful and ethical behavior for a public servant.  In exchange for money, he performed official acts.  He did so for purely selfish purposes of maintaining public office.  Yee also performed the acts for persons of, at best, dubious character.  He even went so

1   far as engaging in a conspiracy to sell and ship arms, including automatic weapons, in order to get

2   money to support his drive for higher public office.  Yee did so without care for the consequences of his

3   acts, and apparently without care for the fact that his acts were crimes.  Yee repeated the mantra that all

4   public officials know well:  you cannot pay to play, you cannot trade acts for money.  Yet, that did not

5   stop him from doing just that.

6         What Yee did is well known to the public and fellow legislators, and it is imperative that they

7   understand that there are severe consequences for such straight-out violation of the rules.  There is a

8   tremendous issue at stake here in terms of deterrence, which becomes clear when one considers the

9   ramifications and message of a lenient sentence – especially where there are no mitigating factors

10  supporting leniency.  The bottom line for everyone paying attention will be the length of the prison

11  sentence imposed.  A slap on the wrist sentence would convey to all public officials in California that

12  the federal Court does not regard flagrant public corruption as particularly serious.  Every person

13  holding elected office and facing the same fundraising challenges as Yee would engage in the obvious

14  calculation:  given the huge financial challenges of raising sufficient money for a successful electoral

15  run, the benefit is worth the minimal risk.  That cannot possibly be what this Court would want to result

16  from this important case.

17        As discussed above, the crimes that Yee committed are serious and warrant a sentence that

18  conveys the Court's acknowledgement of that fact and provides just punishment to Yee individually.

19  Just as important is the deterrent purpose of sentencing in this case.  The Court has a very real

20  opportunity here to affect conduct of individuals who hold the public trust by publicly announcing and

21  showing that conduct such as Yee's is a shameful violation of the public trust.  Moreover, for those who

22  might consider making the choice that Yee did, the Court can demonstrate that the consequences are not,

23  in fact, worth the risk.

24        As the Sentencing Commission noted in the Application Notes to Section 2C1.1, "[i]n a case in

25  which the court finds that the defendant's conduct was part of a systematic or pervasive corruption of a

26  governmental function, process, or office that may cause loss of public confidence in government, an

27  upward departure may be warranted."  U.S.S.G. §2C1.1, App.N.7.  That is the case here, where Yee

28  cavalierly abused the trust of the citizens of California by utilizing the powers of his elected office to

1  ensure himself an additional eight years in public office.  Worse, Yee's goal was higher office, where

2  the duties and responsibilities, along with the benefits, would be even greater.  It is appalling to consider

3  that as Secretary of State, Yee could have been responsible for weighty matters such as elections.  When

4  all of the circumstances of this case, including Yee's shocking willingness to participate in shipping

5  arms in order to get money for his campaign, are considered together, they fit the Sentencing

6  Commission's concerns.  Pulling back the curtain on this public official and seeing his true motives for

7  his action and his readiness to abuse the public trust has undoubtedly affected public confidence in

8  elected officials. A sentence of 96 months acknowledges this and is sufficient, but not greater than

9  necessary, to fulfill the purposes of sentencing under Section 3553.

10       **D.**       **Potential Defense Request for Variance**

11       Based on submissions from Yee to the Probation Office, the government anticipates that Yee

12  may ask the Court to consider a variance under U.S.S.G. § 5H1.6 and Section 3553 due to family

13  responsibilities in connection with Yee's wife's medical situation.  The government has reviewed the

14  materials provided by Yee to the Probation Office and submits that while unfortunate, Ms. Yee's

15  circumstances do not warrant a shorter sentence for Yee.

16       As a starting place, Application Note 1(a) to Section 5H1.6 expressly provides that in

17  determining whether a departure is warranted under this policy statement, the sentencing Court shall

18  consider, among other things, the seriousness of the offense.  As discussed above, the offenses

19  committed by Yee in his position of public trust are very serious and warrant a substantial sentence.

20       Section 5H1.6 goes on to discuss certain circumstances that must be present if the Court is to

21  consider a departure based on the loss of caretaking or financial support of the defendant's family.  *See*,

22  App.N. 1(B).  The wording of those requirements shows that careful consideration was given to this

23  issue, which may arise for any number of defendants.  Clearly, the Commission set high thresholds that

24  justify a variance in only the most exceptional, out-of-the-heartland cases.

25       In the instant case, as unfortunate as Ms. Yee's physical and medical situation is, it does not meet

26  the exceptional criteria set forth by the Sentencing Commission and does not justify a reduced sentence

27  for Yee.  Yee has argued to the Probation Officer that his presence in the home is necessary in order to

28  assist his wife in her current physical and mental state.  Ms. Yee's doctor has advised that she needs

1   daily assistance in order to engage in certain basic activities and maintain her health and strength.  While

2   no doubt it would ideal for her husband to continue to attend to needs such as assisting with ambulation,

3   taking her on daily walks, and monitoring forgetfulness, there is no reason why it must be Yee who

4   provides this care.  There are three grown children living locally; they may well be busy with their own

5   lives as Yee argues, but this is not the first family that may have to make adjustments for failing family

6   members.  In addition, the information in the Presentence Report reveals that there are significant

7   financial resources available for in-home care or different living arrangements.  Not the least of which is

8   that Yee owns a property in San Francisco with a market value of at least $2 million.  In other words, the

9   circumstances here are not the extreme ones contemplated under Section 5H1.6 where "[t]he defendant's

10  service of sentence within the applicable guideline range will cause a substantial, direct, and specific

11  loss of essential caretaking, or essential financial support, to the defendant's family." App.N.1(B)(i).

12  Further, Yee cannot show that "[t]he loss of caretaking or financial support is one for which no effective

13  remedial or ameliorative programs reasonably are available, making the defendant's caretaking or

14  financial support irreplaceable to the defendant's family."  *Id*. at (B)(iii).

15      In addition, the loss of caretaking or financial support proffered here does not "substantially"

16  exceed "the harm ordinarily incident to incarceration for a similarly situated defendant."  *Id*. at (B)(ii)

17  As the Sentencing Commission recognizes, hardship and suffering of the sort faced here is "of a sort

18  ordinarily incident to incarceration."  *Id*.  That is especially the case here, where Yee was aware of the

19  risks.  His wife was first diagnosed with lymphoma and started chemotherapy in July 2012.  At that

20  time, Yee was pressing UCE 4773 for campaign funds and was about to agree to a *quid pro quo*

21  exchange of the Well Tech letter for $10,000.  Yee was well aware of the risks to his family when he

22  engaged in his crimes.

23      In sum, while it is regrettable that the family will have to find alternative care for Ms. Yee, the

24  circumstances here do not justify a reduced sentence for Yee.

25  ///

26  ///

27  ///

28  ///

1

## <u>CONCLUSION</u>

2     For all the reasons above, the government respectfully recommends that the Court impose the

3 following sentence on Count Two of the Second Superseding Indictment:  96 months in the custody of

4 the Attorney General, a three-year term of supervised release, a fine of $25,000, and a $100 special

5 assessment.

6 DATED: February 17, 2016                      Respectfully submitted,

7                                               BRIAN J. STRETCH
                                                Acting United States Attorney
8
                                                        /s/
9                                               SUSAN E. BADGER
                                                WILLIAM FRENTZEN
10                                              S. WAQAR HASIB
                                                Assistant United States Attorneys

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28