Pages 1 - 38

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CHARLES R. BREYER, JUDGE

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
  VS.                          )      **No. CR 14-0196 CRB-2**
                               )
LELAND YEE,                    )
                               )
            Defendant.         )
_____)      San Francisco, California
                                      Wednesday, February 24, 2016

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:          Brian J. Stretch
                        United States Attorney
                        450 Golden Gate Avenue, 11th Floor
                        San Francisco, California  94102
                   BY:  **William Frentzen**
                        **Susan E. Badger**
                        **S. Waqar Hasib**
                        **Assistant United States Attorney**

For Defendant:          Murphy, Pearson, Bradley & Feeney
                        88 Kearny Street, 10th Floor
                        San Francisco, California  94108-5530
                   BY:  **James Lassart, Esquire**
                        **Nicholas C. Larson, Esquire**

Also Present:           Chris Carrubba, U.S. Probation


Reported By:  Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
              Official Reporter

1    **Wednesday - February 24, 2016**                    **10:00 a.m.**

2                       **P R O C E E D I N G S**

3                          **---oOo---**

4        **THE CLERK:**  Calling case CR 14-0196, the United States

5    of America versus Leland Yee.

6        Appearances, Counsel.

7        **MS. BADGER:**  Good morning, Your Honor.  Susan Badger,

8    William Frentzen, and Waqar Hasib on behalf of the

9    United States.

10       **MR. LASSART:**  Good morning, Your Honor.  James Lassart

11   and Nick Larson appearing on behalf of Leland Yee.

12       **THE COURT:**  Good morning.

13   And Mr. Yee is --

14       **MR. LASSART:**  -- right there.

15       **THE COURT:**  Okay.

16       **MS. CARRUBBA:**  Good morning, Your Honor.  Chris

17   Carrubba with Probation.

18       **THE COURT:**  Good morning.

19   So I want to start, first, with the sentencing of Mr. Yee,

20   and then move to Mr. Keith Jackson, and then proceed

21   accordingly.

22       And, obviously -- well, I don't know how obvious it is.

23       The Court has received the presentence report as well as

24   numerous filings in connection with the sentencing procedure.

25       And you had an opportunity, Mr. Lassart, to share these

1    documents with your client; is that right?

2              **MR. LASSART:**  I have, Your Honor.

3              **THE COURT:**  All right.  And I have received from you,

4    as to the presentence report, several objections.  And I want

5    to address those objections based upon what your arguments are

6    as well as the filings in this case.

7         You have raised, I would say, two principal objections to

8    the presentence report.

9         Well, maybe I should indicate for the record what the

10   presentence report has found.  The presentence report has found

11   a total adjusted offense level of 27 and a criminal history

12   category of I.  A guideline provision, then, would be 70 to 87

13   months under the findings of the presentence report.

14        Obviously -- and people may not know this.  It is the task

15   of the Court in a sentencing, first, to address what the

16   appropriate guideline range is.  After that is addressed, the

17   Court then turns to what are called the 3553(a) factors, the

18   Sentencing Guideline being one of them.  But there are several

19   other factors -- I think six in number, maybe seven -- that the

20   Court must consider in imposing a sentence.

21        So the first task, obviously, is to address the total

22   offense level of 70 to 87 months.

23        The first objection is an objection that goes to

24   paragraphs 32 through 37 of the presentence report.  And it

25   focuses on the question of how much money was offered or

1    received by Mr. Yee in connection with the criminal offense to

2    which he pled guilty.  The presentence report indicates that it

3    was $104,600; thereby warranting an enhancement of 8 levels.

4         And, by the way, if I've got that wrong, if I have any of

5    this wrong -- other than ultimately -- you should jump in.  But

6    it's my understanding the presentence report indicates an

7    enhancement of 8 points for that level, which is found in

8    paragraph 61.

9              MR. LASSART:  We agree with that, Your Honor.

10             THE COURT:  It is your view, the defendant's view,

11   that that hasn't been sustained by the evidence and that the

12   appropriate level would be less than that.  But I believe --

13   less than 95,000.

14        And after reviewing the evidence, I am of the opinion that

15   it is not disputed, it is not disputed that more than $40,000

16   was received in connection with this entire operation to which

17   the defendant pled guilty.

18        Is there a dispute as to that?

19             MR. LASSART:  No.  I think it's 44, actually.

20             THE COURT:  I think it's 44 too.  In other words --

21   and the key as to that would be if it's more than $40,000,

22   there would be an enhancement of 6.  Is that right?

23             MS. CARRUBBA:  Yes.

24             THE COURT:  Rather than 8?

25             MS. BADGER:  Yes.

1          **THE COURT:**  And the Court will so find as follows,

2   since not disputed, that, more than $40,000 is appropriate.

3   Even if I eliminated the $60,000, which is contested, a 6-level

4   enhancement is warranted.  Therefore, pursuant to Federal Rules

5   of Criminal Procedure 32(i)(3)(B), the Court does not rule on

6   this dispute because the Court will not consider the $60,000 as

7   a contributing factor to either the guideline or the sentence.

8          So that's my response to objection number 1.

9          Objection number 2 goes to the number of weapons that were

10   part of the offense to which the defendant pled guilty.

11          And the issue basically is, as found in paragraph 68, the

12   presentence report indicates that there should be a 10-level

13   enhancement for the weapons conspiracy because 200 or more

14   weapons was involved.

15          The defense takes issue with that and states that there

16   was never a mention in the evidence as to the number -- as to

17   that particular number.  There was evidence, however, of a

18   lesser number.  And the Court, having reviewed the evidence,

19   finds as follows:

20          The Court sustains the objection on the basis that the

21   number, 200 weapons, was not mentioned by the defendant, and

22   then becomes somewhat speculative as to whether or not 200 or

23   more weapons was used.

24          The only number the defendant referenced on -- I think

25   it's March 5th, 2014, was the availability of 100 weapons.

1    According to the evidence that was in the -- over here, the

2    wiretap or the body tap, I don't know which it was, the

3    defendant told the undercover officer that there are

4    approximately 100 rifles currently available.

5        The Court finds that this statement, coupled with the

6    defendant's repeated efforts in promoting an illegal arms deal,

7    plus the added offer of payment by the undercover officer of up

8    to two-and-a-half million dollars, accompanied by a list of

9    desired weapons, establishes by clear and convincing evidence

10   that the scope of this offense was at least 100 weapons, and

11   justifies the enhancement of 6 points as distinct from the

12   higher number of points.

13       None of these facts, in the Court's view, were seriously

14   contested; and, therefore, I would adjust the offense level

15   downward.

16       So the Court's findings in that regard would be as

17   follows:

18       As to paragraph 61 of the combined group, it is plus 6.

19   Paragraph 66 would give an adjusted offense level of 26.

20       As to group number 2, paragraph 68 would be changed to

21   plus 8.  And paragraph 72 would be 26.

22       And as group number 3, it would remain the same as to 16.

23       And when you add those particular counts, you would get a

24   level of -- paragraph 80 would be 26, paragraph 82 would be 28,

25   and making the adjustment of acceptance of responsibility down

1    to 25.

2         Therefore, the Court would find that for purposes of

3    sentencing the adjusted offense level is 25; the criminal

4    history category is I; and the sentencing range is 57 to 71

5    months.

6         Now, I note that this is all over the objection of the

7    government.  The government believes that the evidence is to

8    the contrary than would justify what was in the presentence

9    report.  However, it's up to the Court to weigh the

10   government's objection, weigh the defense objections.  And the

11   Court then, after weighing it, this is what the Court finds.

12        So are there any -- oh, there's a third objection, which

13   is that the presentence report did not include certain bases

14   for either variances -- oh, "variances," I think, would be the

15   right word, or "departures."  And the Court notes that with

16   respect to that objection that the Court will consider all of

17   that in connection with the sentencing.

18        So my question to the parties -- really basically to you,

19   Mr. Lassart, is, while I've addressed the objections in a

20   particular way, do you have any further comments on the

21   Sentencing Guideline range?

22        Is it clear what it is?  It is 57 to 71 months.  Now,

23   that's different from what you've presented to me.  You

24   presented to me, I think, 53 to --

25        **MR. LASSART:**  51 to 63.

1          **THE COURT:**   51 to 63.   So it's a different range.

2    Though, of course, it does include -- it's an adjacent range,

3    so it doesn't include some of the same figures.

4          Go ahead.

5          **MR. LASSART:**   The only enhancement that I'd like to

6    address with the Court is the 200 weapons.   And the reason for

7    that is though that there is a discussion of 100, that I want

8    to call the Court's attention to the authorities that we have

9    provided with -- and I'm speaking specifically to -- and I have

10   to look at this to pronounce it.   It's *U.S. vs. Nadirashvili*,

11   and also *Spears* [sic].

12         Those two cases out of the Second Circuit speak in terms

13   of what is necessary to support an enhancement.   And in those

14   cases, the kinds of evidentiary support to support an

15   enhancement took more than the words of the conversation, the

16   way I interpret those cases.

17         In this case, there is no corroboration outside of the

18   discussion in the March time frame in which we're not talking

19   automatic weapons.   There's a hundred rifles.   The Court has

20   that correct.   That's recorded.   But there is no showing in the

21   full investigation of the government that there is any history

22   of trafficking or firearms in Leland Yee's history.

23         The Court is aware that the government has recorded, up

24   until July of 2014, 6600 conversations of then Senator Yee.   Of

25   those conversations, there are zero references to firearms,

1  weapons, trafficking, anything of that nature.  Nothing that

2  you would normally expect if you were dealing with a true

3  trafficker.

4      The government, post this investigation, tried to find

5  evidence of trafficking.  We have been given no evidence that

6  there was any trafficking or evidence of his possession of

7  weapons.

8      In addition, they searched his premises and he did not

9  have any firearms there.  There was a single note found there

10 with a list of weapons, ten styles of weapons, that was handed

11 to him by the undercover agent during the course of a

12 conversation.

13     There is no indication that there is any -- there is no

14 evidence, that we've ever seen, that Leland Yee ever found or

15 went out and purchased weapons.  There is nothing that shows

16 more than conversation.

17     And because of the fact that this standard is clear and

18 convincing, I think the evidence shows -- or the lack of

19 evidence shows that there is any form of proof by clear and

20 convincing evidence.  That is what I have been able to observe

21 from the evidence before the Court.  That is why I believe,

22 because the differential is now between 8 and zero, that that

23 is a significant enhancement.

24         **THE COURT:**  And the government's response?

25         **MS. BADGER:**  Well, Your Honor, the government is not

maintaining that Senator Yee had a history of weapons
trafficking.  But if there's one thing that the evidence in
this case shows is that Senator Yee was opportunistic.  And he
was also desperate for money.

    And when it was -- it was Keith Jackson who first
presented the idea to undercover Agent David Jordan that Leland
Yee had access to weapons as another means of gaining campaign
contributions and money from undercover Agent Jordan.

    At that point in time, the wiretaps were not going.  But
there were a number of conversations that Agent Jordan had with
both Keith Jackson and with Senator Yee.  It wasn't just one
conversation with Senator Yee.  And as we recounted in our
sentencing memo, Senator Yee was quite eager to convince Agent
Jordan that this was a real opportunity.

    We have photographs showing Senator Yee in the Philippines
with individuals with guns.  I have those copies for the Court,
if the Court would like to see them.  That was something that
Senator Yee discussed with Agent Jordan, that he had been in
the Philippines; that Dr. Lim had connections there.

    So he was quite convincing that this was a real
opportunity.  And the evidence suggests that it was.  More than
one individual was interviewed who said that Dr. Lim had
relatives in the Philippines; people had connections.

    And Senator Yee -- the discussions were things like
containers of weapons.  It was out of Senator Yee's mouth that

1  the phrase we have -- there's a hundred rifles available.  That

2  was --

3         **THE COURT:**  I'm trying to figure out, why isn't that

4  enough?  In other words, the defendant, not the agent, it's the

5  defendant who says, I have a hundred weapons available.  There

6  are a hundred weapons available.

7       The agent says, We can pay you somewhere between a quarter

8  of a million dollars and two-and-a-half million dollars.

9       Now, the deal wasn't consummated.  I understand that.  But

10  it doesn't have to be consummated under the law, at least in

11  the Court's view for this enhancement.

12       By the way, I may have misspoken.  I hope I didn't.  But

13  the enhancement is 8 points.  If I said 6, I misspoke.

14         **MS. BADGER:**  You said 6 at one point.  But when you

15  added everything up you said 8.

16         **MR. LASSART:**  I said zero to 8.  I understand it was

17  8.

18         **THE COURT:**  I appreciate that.  It's 8 under the

19  guideline.

20       I guess what I'm saying, Mr. Lassart, is here you have

21  several factors that aren't in dispute.  One is Mr. Yee says, I

22  have a hundred weapons -- a hundred rifles available.  Two, the

23  agent says, We can pay between a quarter million and

24  two-and-a-half million.  Three, they give him a list of the

25  kinds of weapons that he wants.  Four, there are meetings that

take place.  Those four factors -- meetings with arms agents.

Those four factors seem to suggest that an enhancement is

appropriate.

     I'm more concerned about the number because it's the

enhancements.  He pled guilty to the weapons.  He admitted that

he was involved in a scheme to import weapons.  The issue here

is, there was no admission, when he pled guilty, as to the

number of weapons.  And that's really what the contest is

about.  It does have a bearing on the Sentencing Guideline.

But the question is, is that enough evidence?  The Court thinks

it is.  You disagree.

          **MR. LASSART:**  Yes, Your Honor.

          **THE COURT:**  Yeah.

          **MR. LASSART:**  May I just address a couple of points?

          **THE COURT:**  Of course.

          **MR. LASSART:**  The discussion about we have pictures of

Leland Yee with armed guards, they are well aware that that's

long prior to any discussion.  And those are people who are

guarding them when he was there in the Philippines trying to

set up a facility or talking in terms of getting a dialysis

facility there.

     Now, everybody they have interviewed in the Philippines

and they can find -- and they've interviewed the alleged

Russian arms dealer who's an art dealer, monuments, then

Dr. Lim, who has family in the Philippines, who said his nephew

1   was going to be involved.  When they talked to him, he said, My

2   nephew has nothing to do with firearms.

3        The question is in this, the truth of the matter is, could

4   he ever deliver?  That's really what these cases say.  And the

5   government has tremendous resources.  And I can pretty much

6   guarantee to the Court that if they had some evidence that he

7   could ever deliver, they would have it before you.

8        I think you need more than talk.  Because there has been

9   admission to the discussions.  That's the conspiracy.  But the

10  number has never been real.  And it is -- the question is, who

11  in the sting operation was stinging whom at the time?  That's

12  really what the question was.  And I don't think that it's

13  proof that he was able to traffic in a hundred firearms.

14       They mentioned the container.  The container came out of

15  the mouth of Keith Jackson when he's speaking without Leland

16  Yee present.  And he says -- this is during the course of

17  another conversation before Leland Yee ever spoke to these

18  agents about any firearms.  That there's a, you know, container

19  load of AK47s that this Russian arms dealer has.  And the

20  Russian arms dealer, of course, is the one who carves

21  monuments.

22       So I believe the question really is, is it real?  And have

23  they proved that he's able to deliver it, to give them a

24  hundred firearms?  That's the problem.

25            **MS. BADGER:**  I would like to point out, Your Honor,

that Senator Yee pled guilty to conspiracy, conspiracy to knowingly import and bring into the United States any firearm and ammunition.

That contemplates not only an agreement but an agreement to accomplish a crime.  And Senator Yee pled guilty to that. So to step back now and say there was nothing real here, it was all talk, is contrary to his guilty plea.  I think that's worth pointing out.

Another statement by Senator Yee, when he was dealing with Agent Jordan, at one point he said to Agent Jordan, "I have spoken to Dr. Lim.  I told him you're not going to send a ship to the Philippines for just 50 rifles."

So Senator Yee understood perfectly well the goal here, and was representing he could accomplish it.  We dispute -- we say that he did have the wherewithal to accomplish it.  And he pled guilty to that.

So all of those things taken into consideration, Your Honor, I think the Court is correct in finding that there is sufficient evidence to support the enhancement.

**THE COURT:**  Do you have one other thing to add?  Yes.

**MR. LASSART:**  Well, Your Honor, you know, the -- this Court knows the overt acts of any agreement can be accomplished by a co-conspirator, not by Senator Yee.

And in this instance, like I've said in my papers, we have a very skilled undercover agent who understands the business of

1   conspiracy and the business of being an undercover agent.  And
2   all of the leading in this, where enhancement is discussed, is
3   created at the instance of the undercover agent doing his job
4   and doing it very well.
5       But for all their capacity, they can't prove that Senator
6   Yee, who has admitted the agreement, was able to deliver a
7   hundred weapons of anything.
8       **THE COURT:**  Well, I don't know.  I mean, to the extent
9   you maintain that there is inadequate evidence that he actually
10  could deliver the hundred or more weapons, I don't have that
11  evidence before me.  I have the evidence, as I've indicated,
12  the evidence of the statements.  You start from the point is
13  that he enters into a conspiracy to do it.
14      Now, if he enters into a conspiracy to do it and couldn't
15  do it at all, I'm just trying to figure out legally why he
16  would enter into a guilty plea saying yes, I conspired to
17  deliver these weapons.  Maybe it's, I conspired but I couldn't
18  do it.  I didn't hear that.  I didn't hear that at the time.
19  And I don't find it credible now.
20      Secondly, in terms of -- and I think I'm going to hear
21  more of this today about where is the crime created?  Who's
22  suggesting what and so forth?  I want to tell you, it's Senator
23  Yee who said the hundred weapons.  He's the one who said it.
24  He participated or arranged these meetings.
25      And I don't think, to the extent we're talking about Keith

```
 1   Jackson, that you can simply take a person who is your emissary
 2   and say, well, that's him; you know, I had nothing to do with
 3   it.
 4        The conspiracy was that he and Keith Jackson participated
 5   in this.  He's responsible legally, I think morally as well,
 6   for the consequences of the conspiracy, provided that it's
 7   foreseeable.  Here it was entirely foreseeable.  The details
 8   weren't foreseeable.  Whether or not and how those weapons
 9   would be physically shipped or obtained, I don't have an answer
10   to that.  You're quite right, that's not in the record.  It
11   didn't proceed to that point.  It didn't proceed to that point.
12   But the crime was completed, you know, well before that point.
13   And he pled guilty to it.
14        So the Court appreciates your arguments and finds that --
15   by clear and convincing evidence that the enhancement is
16   warranted.  And that would be an 8-level enhancement.
17        So is there anything further before we proceed to
18   sentencing?
19            MR. LASSART:  Nothing further on those subjects, Your
20   Honor.
21            THE COURT:  Okay.  So I'd like to hear, first, from
22   the government.  And then I'll hear from you, Mr. Lassart.  Of
23   course, I'll hear from Mr. Yee.
24            MS. BADGER:  Your Honor, thank you.
25        As the Court knows, the government is recommending a
```

1    sentence of 96 months or 8 years.  We submit that that's

2    warranted for a number of reasons.

3        The Court has looked at the guidelines.  As the Court is

4    well aware, and as the Court stated at the outset, that is one

5    of the factors that the Court is to consider.  But there are

6    other factors under Section 3553(a), one of which is a sentence

7    that reflects the nature and seriousness of the offense.

8        And, in this case, we submit that the offense was

9    unquestionably serious.  It goes to the most fundamental abuse

10   of the public trust and what public corruption is all about.

11       The public elects its officials, including legislators --

12   and Senator Yee is no exception -- with the understanding that

13   these public officials are going to do their jobs objectively

14   and fairly, without any consideration for personal benefit,

15   especially financial benefit.

16       The expectation is that our elected officials are going to

17   act solely in the best interests of the citizens, the people

18   who elect them.  And that's the bargain that citizens make in

19   electing officials.  And it's based on a considerable amount of

20   trust and faith, which is often tested, I think, in this

21   country these days.  There's a lot of citizens who are

22   sceptical about their elected officials and whether they are,

23   in fact, acting objectively and fairly and in their

24   constituents' best interests.

25       But, as I say, the system is based on faith and trust.

And we submit, Your Honor, that Senator Yee abused that trust and faith in the worst possible way.  It wasn't actually for personal financial wealth.  It wasn't to buy a house or to go on fancy trips.  It was to retain power as a public official. He was about to be termed out.  Or at the end of 2014, he was going to be termed out as a senator.  He often discussed on the wires that he wasn't ready to retire.  He wanted to have a job for eight more years.  He kept talking about "eight more years."

And, in fact, the public office he was seeking to maintain was a public office with more power.  Not state senator, but now he had his eyes on a Secretary of State position, which is a statewide position, an important office, an office that oversees elections.  And in order to achieve that goal, Senator Yee readily latched on to and aggressively pursued any possible money.

The undercover agents all made clear that there was no free money.  The agent 4773, Mike King, said that from the very beginning, one of the very first meetings with both -- separately, but with both Senator Yee and with Keith Jackson.

And it was made clear by all three undercover agents that they expected official acts in exchange for any money given to Senator Yee.  And only once did Senator Yee hesitate and say no.  And that was a time when Agent Jordan asked for a favor for Raymond Chow.  And the only reason Senator Yee said no was

because getting connected to Raymond Chow was too dangerous. It didn't have anything to do with the fact that it would actually be illegal to exchange a favor for a campaign donation.  Otherwise, there was never any hesitation.

Senator Yee repeatedly mentioned to the undercover agents that he knew this was illegal.  *Quid pro quo* exchange, official act for money is illegal.  He fully understood what he was doing was illegal.  He said on more than one occasion he could go to jail.

And he made the choice.  He engaged in the risk/benefit analysis, and he voluntarily engaged in these bribes.  He pursued the undercover agents.  He pursued the money.  No one twisted his arm.

In the course of this serious conduct, there are a number of aggravating facts.  One is there were multiple bribes. There was $10,000 paid for acts performed at the request of Mike King, the Well Tech letter and the phone call.

There was $6,800 paid by Special Agent Jordan for the Chee Kung Tong declaration certificate.

And there was $11,000 paid by undercover agent 4180, Mike Sweets, for the introduction, the meeting with state senator 1. And there was $10,000 paid for the introduction to state senator 2.

Second aggravating factor -- this was over a period of time.  The first ask was back in September 2012.  This was a

1  year after Keith Jackson and Senator Yee had been cultivating

2  Mike King, UCD 4737.  And the last payment was in September

3  2013.

4       So over the course of a year, Senator Yee had time to

5  reflect.  He had time to choose.  And he did not walk away.  In

6  fact, there were numerous conversations intercepted over the

7  wiretaps where he complained quite bitterly about the fact that

8  he had performed and where was the money.

9       Third aggravating factor is that he came up, Senator Yee

10 came up with these extortion schemes.  Had nothing to do with

11 the FBI.  These are the schemes involving the California State

12 Athletic Commission issue and the workers' comp for

13 professional athletes.

14      And this is very serious public abuse because it goes to

15 one of Senator Yee's -- or maybe the most important duty, his

16 vote on legislation.  But he was quite mercenary about it.

17      He said, at one point, in regards to the Athletic

18 Commission vote, "All I'm interested is getting something out

19 of this guy."

20      And as to the workers' comp, Keith Jackson put it quite

21 succinctly.  He said, "Leland, go with the owners.  The players

22 don't write checks."  And Senator Yee said, "Yeah, I don't

23 care."

24      There was also, as the Court knows, crimes beyond the

25 bribery.  There was money laundering involving -- excuse me --

in two instances involving the bribery funds.  And, as we discussed at some length, there's a weapons trafficking conspiracy.

So opportunities presented themselves in the form of these undercover agents.  And especially in terms of weapons trafficking, that was something that Keith Jackson and Leland Yee brought to the undercover agent.  And, again, Senator Yee was mercenary about it.  He said, at one point, even though he was supposedly supporting gun control legislation, he said, "I'm agnostic.  People need what they need."

And finally in aggravation, Senator Yee lied to the agents when they came to his house.  They did not arrest him.  At that point he was not in custody.  He was not compelled.  And he lied about any number of things.

So the government would submit, Your Honor, without a doubt this is a serious offense.  And the sentence should reflect that.  Just as important is the purpose of deterrence and respect for the law, that the sentence reflect that.

This is Senator Yee's choice to make a career of being a public official, to hold public office, to be a public figure. He knew exactly what he was doing.  His fall has been public and no doubt humiliating.  And it's regrettable that it has affected his family.  And there's some suggestion by the defense that this is punishment enough.

The government would submit that it is not.  The point is

1  that this matter has been very public.  Citizens are looking to

2  see how the Court regards this offense; how it treats this

3  offense.  Fellow legislators, no doubt, are looking to see what

4  the sentence is going to be.  They are watching.  They're

5  aware.  And it's not just what the Court says about this

6  offense, but it's going to be what the Court does about this

7  offense.  That, frankly, is the bottom line.

8      Whatever the Court does will send a very loud and clear

9  message about how such illegal conduct should be treated.  And

10 we would submit to you, Your Honor, that like other public

11 officials, other elected people who are looking on, they are

12 going to do the same risk/benefit analysis as Senator Yee did.

13 He decided it was worth the risk.

14      We submit that it's important that the Court convey that

15 it is not worth the risk, and there will be severe consequences

16 if an elected official engages in this kind of conduct.

17      We recognize that an 8-year sentence is substantial.  We

18 submit that it meets the criteria of Section 3553, which is

19 sufficient but not more than necessary to fulfill the 3553(a)

20 purposes.

21      We recognize this would be an upward departures under the

22 guidelines.  We mention this in our briefing, but there is an

23 application note to Section 2C1.1, the public corruption

24 guideline provision that states that, "An upward departure may

25 be warranted if the Court finds that the defendant's conduct is

1  part of a pervasive corruption that may cause loss in public

2  confidence in the government."  And we submit that the facts

3  fit that here.  And, as I mentioned, the guidelines are only

4  one factor.  There are a number of aggravating factors here.

5      On that, we would submit it, Your Honor.  Thank you.

6          **THE COURT:**  Mr. Lassart?

7          **MR. LASSART:**  Your Honor, I believe, in looking at

8  3553, that the Court has before it both the letters that

9  have -- that have been submitted as well as the videotape of

10  family members and those individuals that Senator Yee has

11  helped during the course of his 40-some-odd years in public

12  service.

13      He has championed any number of causes.  And we have

14  submitted to the Court a list of over a hundred bills that have

15  passed into chapter and that deal with healthcare, children,

16  social services, those kinds of removal from the budget of

17  funds that would help healthcare and education.  He supported

18  that throughout his career.

19      In this instance -- and it is not my intention to minimize

20  what it is that Senator Yee has pled to with regard to the

21  activities for which he took the $44,000.  However it, has to

22  be looked at from the standpoint of, one, he took no money from

23  the public, number one.  They did not take public funds from

24  anyone.

25      Number two, it is quite obvious from the history and

background, Senator Yee has not enhanced his life in a

luxurious lifestyle while he was a public official.  He doesn't

have these troves of money you'll hear about on those

individuals who have in the past been involved in public

corruption.

Now, what I can tell the Court is that Senator Yee's

dealing with certain of these issues -- first of all, let me

talk about the, quote, extortion scheme.  There was no

extortion scheme that -- as characterized.  And it changed as a

result of a conversation that was raised by Mr. Jackson about a

boxing commission, and, also, by the way, the NFL issue.  Those

were issues where, in fact, Senator Yee was voting for that

legislation at any rate.  Without a doubt, never changed his

vote as a result of receiving any money.

The other is that there is a proclamation issue in which

there was a donation made to his campaign.  The proclamation

wasn't for Raymond Chow, as it had been originally scoped.  It

was for the particular organization.  And that organization he

had given a proclamation to before.

There was -- also, funds were exchanged for a meeting with

senators.  Meetings which he did not participate in and

meetings which did he not encourage a particular direction one

way or another.

There was a -- one of the issues was a letter.  The letter

was written so that an agency would look into something, but he

didn't say you should follow this.  He wrote a letter.  If you look -- and actually made a phone call.

I think you have to look at Senator Yee's entire life.  And to, as one of the individuals in the video said, to weigh both the negative and the positive in his life, because the purpose of sentencing is to affect his life and to affect others as seeing what happens to him.

And I would ask the Court to do that.  I would ask the Court to look carefully at his service.  I would ask the Court to look carefully at the manner in which he has conducted himself over his number of years.

I ask the Court to look at the entirety of this because this government investigation has examined his life under a microscope.  And they found these -- these things.  And that's it.  He doesn't have a history of this.

And it is interesting to note that the government is seeking what's known as an upward departure.  In other words, a sentence far above the top of the guideline range.  It's now from -- it's 96 months or -- 96 months, above the 71 top of the guideline range.  And at the same time, while they're doing that in this same case, they have made an agreement with someone who, if you look at it, the range of criminal activity that, say, Mr. Jackson is involved in, they've done a downward departure.  It's a 33 guideline range, and they're looking at it as a 30 guideline range because of a deal they made in a

plea agreement.  Now, that is inconsistent.  And that is disparity.

      With regard to this, Senator Yee, I'm aware the Court is going to impose a sentence.  I think a sentence has to be imposed as the sentence which is necessary, not excessive.

      Senator Yee should not be incarcerated for eight years. His life doesn't dictate that.  Has he been punished enough? The government says no.  We have a differing opinion.  But the Court has to deal with that.

      Has he been punished because of this?  Yes.  Has he been humiliated?  Yes.  Has his family been humiliated?  Yes.  Is he ashamed of himself?  Yes.  Does his wife, who is very ill, need his assistance?  That's also a yes.

      Those are all the factors before the Court orally.  And you have our volumes of paper.  I know the Court looked at everything.  And I don't -- repeating that is not going to make it any clearer to the Court.

      Basically, what I would ask is if the Court needs clarification on anything, I would request the Court tell me. And I would address that rather than just going on and repeating what I think we supplied to this Court that shows that Senator Yee has taken responsibility; has led a good life; has made mistakes; has admitted his mistakes.  And he shouldn't be, sort of, overpunished because he happens to be a public official.  Yes, he's a public official, and public trust is

violated.  But it should not be an overarching crushing of this

man and his family.

          **THE COURT:**  Thank you.

    Senator Yee, do you want to address the Court?

          **THE DEFENDANT:**  Thank you very much, Your Honor, for

the opportunity to hear some comments.

    As I wrote a letter to you indicating that I have taken

full responsibility for my actions and the crimes that I've

committed.  I want to appear before you to say that verbally.

I have accepted/understand the crimes that I've committed.

    Given that, with all of the actions that I've taken,

nothing will ever take away those crimes and those actions.

Nothing that I will ever do will take away the pain that I have

caused to my family, friends, supporters, constituents, the

institution that I represent, and society in general.

    What I will say to you is that this period of time that

I've had, I had opportunities to reflect on what I did; why I

did it; how did I do it; and what I ought to have done to not

have done that; and to do -- not to do it in the future.

    I have started that process by meeting with individuals,

talking to organizations individually and collectively, and to

explain to them what I did and what I should not have done.

And, hopefully, through that process that there is a healing

between those individuals, organizations and myself, and a

clearer understanding.

1    I think -- as my attorney had mentioned, I hope that in

2 your sentencing of me that you look at the entire life and not

3 just these crimes that I have committed.

4    In the 67 years of my life, I have devoted much of it to

5 the work of the community and people here in San Francisco and

6 the State of California.

7    And in looking broadly and expansively, hopefully that

8 might provide a better perspective of who I am and what I'm

9 about.

10    I say all that because I am asking for leniency.  I ask

11 for leniency for a couple of reasons.  Number one, I need to

12 continue to reach out to individuals that I have hurt,

13 organizations that I have shamed.  And to help them and for me

14 to understand better how I should have behaved and how others

15 should have behaved so that this does not befall any other

16 individual whatsoever.

17    I think the other thing that I want to do is that

18 throughout my life I've always looked at it as an opportunity

19 to do what I can to be of help.  Since my days in Berkeley, my

20 days in the Oakland Unified School District, my time on the

21 San Francisco Board of Education, an issue that has harmed our

22 society for a long, long time and even now and unfortunately I

23 think that it will continue, how is it that young individuals

24 continue to not do well in our schools?  I think that's

25 something that I want to continue to do in my retirement.

1        I think the other point that I would raise is that my wife

2   has given me much of my life.  And much of my life has been

3   away from her.  And now that I am retired and now with the

4   situation that I find myself in, you know, I'm not going to be

5   employed anymore.  But rather what I have done and what I want

6   to continue is to give Maxine a little bit more of help than I

7   have given her in the past.

8        As you know, she has progressively become more and more

9   disabled.  And I am the only able-bodied individual to help her

10  care for herself, care for the family.

11       And so I just want to end by thanking you, Your Honor, and

12  your staff, and the government for their consideration, to my

13  attorney, his staff, to all those individuals who have been so

14  helpful and who stood by me all these two years that I've had

15  to endure to deal with this particular case.

16       And, finally, to my family, to my wife, to my children, to

17  my sisters, they've hung in there.  Particularly Michelle, who

18  works for Mr. Lassart.  She has had to endure on a daily basis

19  reading some of the materials, understanding what I was going

20  through, the crimes I have committed.  I think that will always

21  weigh on me.  And that will always haunt me for the rest of my

22  life.

23       So thank you very, very much.

24       **THE COURT:**  Thank you.

25       Let me start by assuring you, Mr. Yee, that I have read

your submissions/letters on your behalf.  I think Mr. Lassart
is correct.  You have -- I have the responsibility of
sentencing the whole individual, looking at the person's life.

You've done a number of very good things on behalf of
people who are in need of your services.  And I think that
that's a factor that the Court has to consider and has
considered in determining sentence.

You raised the issue of leniency.  And I think that I have
to say something about that.  I don't feel I should be lenient.
That is that, the crimes that you committed have resulted in
essentially an attack on democratic institutions.

We all, judges in the judiciary, legislators in the
legislative branch, attorneys in the operation of the
Department of Justice, we all deal with the situation that we,
in our work, must be accepted by the public as having done an
honest job.

There will be great differences of opinion as to what are
appropriate policies, what are appropriate actions, what should
be done in any given situation.  Those are differences that
every democracy recognizes and addresses.

But what it doesn't address, in the sense of its
operation, is that there must be an acceptance by the public
that the system is fair; that for the judiciary, for the
legislative branch or for any branch of government to operate,
it must be that the public has trust in the integrity of the

1    institution.

2        And, Mr. Yee, you abused that trust.  You showed that you

3    did not have integrity in your actions.  And you brought into

4    question the very operation of an institution of government,

5    that, as a result of your conduct, has to be sanctioned.

6        I think under the 3553(a) factors, I think the government

7    is correct.  It's not just what I say in this sentencing

8    proceeding, but it is what is done in this sentencing

9    proceeding should be known to everyone, the public, people who

10   are involved in the public sector, and people who are involved

11   in the private sector.  The citizens of this country have to

12   have confidence that the institutions of government will

13   operate appropriately and honestly.

14       And so I look at it from the point of view of what is an

15   appropriate sentence given everything that you've done, and

16   given the fact that this is a serious, serious injury to a

17   governmental institution.

18       I don't know whether this sentence will invite legislators

19   to engage in some risk analysis.  I hope not.  I hope that when

20   they accept that position as a legislator they believe that the

21   public is entitled to honest services.  They're not there for

22   any particular vote.  They are there for their judgment.  And

23   their judgment has to be -- has to be arrived at as part of an

24   honest process of consideration by a legislator.

25       So when you look at the crimes that you have -- that you

have committed, I think there are several levels.  Certainly,
it is wrong to grant favors to constituents based upon campaign
contributions.  That's wrong.  It's not permitted by law.

But the more significant violation of trust, I think, is
indicating -- whether it's true or not -- that your vote was
for sale; that you would vote one way or another way depending
on a campaign contribution.  Because it is the vote, it is the
vote that is a key part of the legislative process.  And that,
in the Court's view, is a very serious violation of trust.

Votes are not for sale.  Positions are not for sale.  And
your conduct -- and it's on hours and hours of tape indicating
that it was for sale -- was a violation of trust.

To that is added, in the Court's view, something that was
inexplicable.  And that is your participation in the weapons
conspiracy.

Putting aside for a moment -- and there's no nice way to
say it -- basically a hypocritical position on your part in
favor of gun control, and then engaging in a process whereby
automatic weapons/not automatic weapons would be brought into
the United States is frightening and unfathomable.

The harm that can be caused today, as we know it, by
weapons is incalculable.  And how you could participate in this
conspiracy is -- I can't express it, actually.  I can't tell
you how disturbing it is.  The harm that could be caused by
these weapons is incalculable.

1    And I looked very hard at the evidence to try to figure

2  out why is a person who has publicly spoken out against such

3  things as importation of weapons or spoken in favor of gun

4  control, sanctioned and participated in this scheme.  And the

5  answer, I think, comes out frequently on the tape, is for

6  money.  You did it for money.

7    And the money -- I don't know that it necessarily would

8  have been a self-aggrandizing, a better house, a better this or

9  a better that, but it would be perpetuation of your power.

10    And you were willing to go entirely contrary to your

11  stated position and engage in this kind of transaction for

12  money.  And that, to me, is the most venal thing and most

13  dangerous thing that I've seen that you've done.

14    I looked at the number of factors.  And I believe that,

15  overall, I should fashion a sentence that is sufficient but not

16  greater than necessary in order to impose a sentence.

17    I am imposing a sentence within the guideline range.  I

18  think that that is appropriate under these circumstances.  I

19  think the government has excellent arguments why I should

20  depart upward.  But I also think that when you look at the

21  overall consideration of imposing a sentence that is sufficient

22  but not more than necessary to achieve the purposes, I believe

23  the sentence I'm about to impose does achieve that purpose.

24    I, of course, understand your family's situation.  I

25  understand the enormous impact it's had on your family and your

wife's condition.  And that obviously is something that I considered.  But I also considered the fact that almost every defendant who comes before me has committed crimes, when they've either been convicted or pled guilty, that has an enormous impact on their family, and, in many cases, destroys the family unit; in many cases causes such grief, pain and sorrow to an innocent person that you feel as a judge that there ought to be some other way to sentence people so that they are the only people who suffer the adverse consequences. I know of no other way.  I would -- I would embrace some other way.

I don't want to see your wife hurt.  I don't want to see families hurt.  It's not my idea to try to punish them.  But, you see, the problem is that when anybody is faced, as the government points out, with a choice -- Am I going to do X or am I going to do Y? -- they ought to think that if they do one thing which is illegal they will be harming their family as well as themselves, and, of course, in this particular case the public.

And so while I am mindful of what you have said, I am not taking that into consideration in imposing a sentence in this particular case.

Accordingly, pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that Leland Yee is hereby committed to the custody of the Bureau of Prisons to be

imprisoned for a term of 60 months.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of three years.  Within 72 hours of release from the custody of the Bureau of Prisons the defendant shall report in person to the probation office in the district to which the defendant is released.

While on supervised release, the defendant shall not commit another federal, state, or local crime; shall comply with the standard conditions that have been adopted by this court, except that the mandatory drug testing provision is suspended; and shall comply with the additional conditions:

Defendant shall not maintain a position of fiduciary capacity without the prior permission of the probation officer.

Defendant shall pay any fine or special assessment that is imposed by this judgment and remains unpaid at the commencement of the term of supervised release.

Defendant shall submit to a search of his person, residence, office, vehicle or any property under his control. Such a search shall be conducted by a U.S. Probation officer or any federal, state, or local law enforcement officer at any time, with or without suspicion.  Failure to submit to such a search may be grounds for revocation.  Defendant shall warn any residents that the premises may be subject to searches.

The defendant shall not have contact with any codefendant in this case.

1     The defendant shall cooperate in the collection of DNA as

2  directed by the probation officer.

3     Defendant shall not own or possess any firearms,

4  ammunition, destructive devices or other dangerous weapons.

5     Further ordered the defendant shall pay the United States

6  a special assessment of $100, which will be due immediately.

7  When incarcerated, payment of criminal monetary penalties are

8  due during imprisonment at the rate of not less than $25 per

9  quarter.  Payment shall be made to the Bureau of Prisons Inmate

10 Financial Responsibility Program.

11    Criminal monetary payments shall be made to the Clerk,

12 U.S. District Court, 450 Golden Gate Avenue, Box 36060,

13 San Francisco, California 94102.

14    Further ordered the defendant shall pay to the

15 United States a fine of $20,000, which shall be due immediately

16 in a lump-sum payment, within five days of sentencing.

17    Defendant's interest in the following property shall be

18 forfeited to the United States:  $6,066 seized from 1370 24th

19 Avenue, San Francisco, California, on March 26, 2014; and

20 $27,400 in U.S. currency seized on February 18, 2015, from the

21 bank account number which ends in 2825, held in the name of

22 Leland Yee for Secretary of State 2014, at Wells Fargo Bank

23 San Francisco, California.

24    I would also note that even if the guideline range was

25 lower, that is, was at 24, the Court would have imposed the

1    same sentence that the Court has imposed in this case.

2           **MS. BADGER:**  Couple --

3           **THE COURT:**  Yes, go ahead.

4           **MS. BADGER:**  Your Honor, when you entered your oral

5    judgment about the forfeiture order, I believe the Court said

6    $6,066 --

7           **THE COURT:**  Am I wrong?

8           **MS. BADGER:**  We've made an adjustment.  The

9    preliminary order of forfeiture said $1,066.

10          **THE COURT:**  It will be amended to say that, yes.

11          **MS. BADGER:**  Thank you.

12          **THE COURT:**  The defendant will be ordered to surrender

13   within 30 days of today's date.  I will sign the judgment and

14   commitment within a day.

15       And if there's any difficulty in -- in the designation of

16   a facility, please come back to the Court.  Otherwise, you have

17   the option of surrendering to the U.S. Marshal's Office, 450

18   Golden Gate, on the 20th floor by that -- within 30 days.

19          **MR. LASSART:**  Your Honor, we would ask the Court for a

20   recommendation of Taft in this matter.

21          **THE COURT:**  Yes.  That will be -- of course, I don't

22   control the Bureau of Prisons.  They make up their own mind.

23   I'll put that recommendation in.  All right.

24          **MR. LASSART:**  Thank you, Your Honor.

25          **THE COURT:**  That concludes that sentencing.  Let's

1   move on --

2          **MS. BADGER:**  Thank you, Your Honor.

3          (At 11:06 a.m. the proceedings were adjourned.)

4                         -   -   -   -

5

6

7

8                    **CERTIFICATE OF REPORTER**

9          I certify that the foregoing is a correct transcript

10  from the record of proceedings in the above-entitled matter.

11

12  DATE:   Wednesday, April 21, 2016

13

14

15                    *Katherine Sullivan*

16  _____

17      Katherine Powell Sullivan, CSR #5812, RMR, CRR
                     U.S. Court Reporter

18

19

20

21

22

23

24

25